**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 23-cr-177-ABJ** |
| **SHANE BRIAN LAMOND,** | |
| **Defendant.** | |

**UNITED STATES' MOTION TO ADMIT CERTAIN EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 807 AND 801(d)(2)(E)**

The United States of America respectfully moves *in limine* for an order to admit certain evidence pursuant to Federal Rules of Evidence ("FRE") 807 and 801(d)(2)(E).[1]

## I.   PROCEDURAL HISTORY

On May 18, 2023, a federal grand jury in the District of Columbia returned a four-count indictment charging Defendant Shane Lamond, a Lieutenant in charge of the Intelligence Branch of Metropolitan Police Department's ("MPD") Homeland Security Bureau, with one count of obstruction of justice in violation of D.C. Code § 22-722, and three counts of making false statements in violation of 18 U.S.C. § 1001(a)(2).  *See* ECF No. 1.

The Defendant is charged with one count of obstruction of justice in violation of D.C. Code § 22-722 for impeding an investigation conducted by the Metropolitan Police Department ("MPD") into the person responsible for stealing and burning a Black Lives Matter flag in Washington D.C. on December 12, 2020.  The MPD's investigation indicated that Enrique Tarrio

---

[1] The Government attempted to meet and confer with defense counsel to obtain the Defendant's position on this motion but was unable to schedule a mutually agreeable time.

("Tarrio"), the leader of a right-wing extremist group called the Proud Boys, was the person responsible for desecrating the flag.[2]

## II.     LEGAL STANDARDS

### A.  Federal Rule of Evidence 807

Under Rule 807, also known as the residual hearsay exception, an out-of-court statement is admissible despite the limitations on hearsay if "(1) the statement is supported by sufficient guarantees of trustworthiness; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."  Fed. R. Evid. 807(a)(1)–(2).

Although the Rule 807 hearsay exception has been characterized by the D.C. Circuit as "extremely narrow," out-of-court statements can be admitted where, as here, they are determined to be "very important and very reliable."  *United States v. Mason*, 951 F.3d 567, 574 (D.C. Cir. 2020) (quoting *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017) (*per curiam*)).

In 2019, Rule 807 was revised to streamline the analysis required to determine if proffered hearsay statements are trustworthy.  In its revision of Rule 807, the advisory committee found that the proffered "hearsay must be evidence of a material fact and that its admission [would] best serve the purposes of [the Federal Rules of Evidence]" was a "superfluous" requirement and eliminated it. Fed. R. Evid. 807, Advisory Comm. Note on 2019 Amendments.  Now, the amended rule requires courts to "to proceed directly to a determination of whether the hearsay is supported by guarantees of trustworthiness." *id*. The analysis of the proffered statements for trustworthiness is based on the "'totality of [the] circumstances . . . that surround the making of the statement and

---

[2]  Tarrio was arrested and pled guilty to one count of destruction of property in Superior Court in the District of Columbia for his role in that crime.

that render the declarant particularly worthy of belief,'" such that the speaker would be "'highly unlikely to lie.'" *Slatten*, 865 F.3d at 807 (quoting *Idaho v. Wright*, 497 U.S. 805, 819-20 (1990)). This includes "any independent evidence corroborating the statement." Fed. R. Evid. 807, Advisory Comm. Note on 2019 Amendments.

Importantly, the 2019 amendments to Rule 807 "leave some doubt. . . as to whether the hearsay exception remains 'extremely narrow'" *See United States v. Smith*, No. CR 19-324 (BAH), 2020 WL 5995100, at *5 (D.D.C. Oct. 9, 2020) (quoting *Slatten*, 865 F.3d at 807); *see also* Daniel J. Capra, *Expanding (or Just Fixing) the Residual Exception to the Hearsay Rule*, 85 Fordham L. Rev. 1577 (2017) (discussing 2019 amendments to Rule 807 and stating that one of the aims was "to allow the admission of *more* hearsay if it is reliable" (emphasis added)). Indeed, Rule 807 "'was designed to encourage the progressive growth and development of federal evidentiary law by giving courts the flexibility to deal with new evidentiary situations which may not be pigeon-holed elsewhere.'" *Slatten,* 865 F.3d at 806 (quoting *United States v. Mathis*, 559 F.2d 294, 299 (5th Cir. 1977)).

### B. Federal Rule of Evidence 801(d)(2)

Under the Federal Rules, co-conspirator statements are not hearsay – and are thus admissible as an opposing party's statement – when they were "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). As the D.C. Circuit has noted:

> "Fed.R.Evid. 801(d)(2)(E) embodies the longstanding doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are not hearsay and are admissible against the others, if made in furtherance of the common goal." *United States v. Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983), *cert. denied*, 465 U.S. 1027, 1034, 104 S.Ct. 1285, 1305, 79 L.Ed.2d 688, 704 (1984). The statements of joint venturers may fall within the scope of the Rule, and there is no requirement that a conspiracy be formally charged in the indictment.

*United States v. Perholtz*, 842 F.2d 343, 356 (D.C. Cir. 1988); *see also United States v. DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993) ("It is now well established that the applicability of the co-conspirator exception to the hearsay rule is not conditioned on the presence of a conspiracy count in the indictment.") (citation, quotation omitted).  Following the language in the rule itself, "[i]n order to admit co-conspirator statements, the trial judge must determine that a conspiracy existed, that the co-conspirator and the defendant against whom the statement is offered were members of the conspiracy, and that the statements were made in furtherance of the conspiracy." *Perholtz*, 842 F.2d at 356; *see also United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) (per curiam) (same).  Of particular import here, "'acts of concealment done in furtherance of the main criminal objectives of the conspiracy' may be considered to be in furtherance of the conspiracy within the meaning of the co-conspirator hearsay exemption." *Perholtz*, 842 F.2d at 356-57 (quoting *Grunewald v. United States*, 353 U.S. 391, 405 (1957)).

Moreover, "the D.C. Circuit has likewise emphasized the agency-law principles underlying Rule 801(d)(2)(E) to conclude that out-of-court statements are admissible so long as they advance a joint endeavor in which the defendant was involved."  *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 190 (D.D.C. 2015), *aff'd*, 902 F.3d 285 (D.C. Cir. 2018), citing *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006).  To be clear, as the D.C. Circuit stated: "our precedents hold that the doctrine is not limited to unlawful combinations." *Id*. at 201.  In *Gewin*, the Circuit upheld admission of statements made in furtherance of a *legal* conspiracy, observing that Rule 801(d)(2)(E), "based on concepts of agency and partnership law and applicable in both civil and criminal trials, embodies the longstanding doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are admissible against the others, if made in furtherance of the common goal." *Id*. at 201 (internal quotation and alteration

omitted), quoting *United States v. Weisz*, 718 F.2d 413, 433 (D.C.Cir.1983); *see also Gewin*, 471 F.3d at 202 ("the term 'conspiracy' does not limit the doctrine to unlawful combinations, and that the doctrine applies equally in civil and criminal cases").   Nor was *Gewin* an outlier; the D.C. Circuit later reiterated: "Admission . . . is not contingent upon the finding of an unlawful combination. Rather we have held that, despite its use of the word 'conspiracy,' Rule 801(d)(2)(E) allows for admission of statements by individuals acting in furtherance of a lawful joint enterprise." *United States v. Brockenborrugh*, 575 F.3d 726, 735 (D.C. Cir. 2009); *see also United States v. Darnel*, No. CR 22-096-2 (CKK), 2023 WL 5723371, at *2 (D.D.C. Sept. 5, 2023) ("The key question is whether the defendant and their co-conspirator were 'acting in concert toward [some] common goal,' lawful or unlawful," quoting *Weisz*, 718 F.2d at 433).   And other Circuits are in accord.  *See United States v. El-Mezain*, 664 F.3d 467, 503 (5th Cir. 2011), as revised (Dec. 27, 2011) ("we are not alone in our construction of Rule 801(d)(2)(E), as our sister circuits have also held that statements made in furtherance of a lawful common enterprise are admissible") (collecting cases).

### III.   RELEVANT FACTS

The evidence at trial will prove the following:

#### A.  Defendant's Responsibilities

As the Lieutenant in charge of the Intelligence Branch, the Defendant's responsibilities included supervising MPD's efforts to gather information about forthcoming rally or protest activity in the District of Columbia that may pose public safety threats to the community. Beginning in July 2019 and continuing to at least January 2021, the Defendant and Tarrio were in regular contact regarding the Proud Boys' planned activities in the District of Columbia.  They

communicated at least 500 times using cloud-based messaging services, including Google Voice, Apple iMessages, and Telegram, an encrypted messaging application.

The Defendant began using Telegram to provide information to Tarrio about law enforcement activity relating to the Proud Boys' activities in Washington, D.C., as early as July 2020. For example, on July 8, 2020, using Telegram, the Defendant notified Tarrio that a bar in Washington, D.C. frequented by Tarrio and members of Proud Boys might be subject to sanctions after an Alcohol and Beverage Control violation was reported. The Defendant informed Tarrio, "I'm working on finding out what sanctions might be imposed. As soon as I find out I will let you know."

### B.  Defendant's Communications and the Banner Burning Investigation

On November 7, 2020, vote counts revealed that President Joseph R. Biden had won the 2020 Presidential Election, and several news organizations began reporting this fact. As the evidence at trial will show, at 1:08 p.m. on November 7, 2020, the Defendant texted Tarrio, "Hey brother, sad, sad news today. You all planning anything?" Tarrio responded, "Yep." At 2:10 p.m. on November 7, 2020, using Telegram, the Defendant told Tarrio that "Need to switch to encrypted. Alerts are being sent out to LE that [Social Media Website] accounts belonging to your people are talking about mobilizing and 'taking back the country'. [sic] Getting people spun up. Just giving you a heads up." At 2:14 p.m. that same day, using Telegram, Tarrio sent the Defendant an audio message. At 2:16 p.m., using Telegram, the Defendant told Tarrio, "Got your voice messages. Just giving you a heads up. Please keep this between you and me."

On November 13, 2020, Tarrio came to Washington, D.C., to attend a rally scheduled for the next day to contest the results of the 2020 Presidential Election. Earlier on November 13, 2020, the Defendant texted Tarrio, "I'm staying in D.C. tonight. Let me know if you go out and I

may stop by."  After Tarrio later told the Defendant that he was heading to a bar in Washington, D.C., frequented by members of the Proud Boys, the Defendant responded, "Check telegram." Around the same time, on Telegram, the Defendant told Tarrio, "Just giving you a heads up there's a lot of attention at [the bar] right now.  If it doesn't calm down they are going to shut [the bar] dow[n]."  A short time later, the Defendant told Tarrio through Telegram, "Just wanted to let you know.  I heard [the District of Columbia Alcoholic Beverage Regulation Administration] already on scene."

On December 11, 2020, Tarrio and other members of the Proud Boys were in Washington, D.C., in advance of a rally planned for December 12, 2020, to protest the results of the 2020 Presidential Election.  That evening, Tarrio, using Telegram, informed the Defendant that Tarrio and members of the Proud Boys were "going to have a briefing tonight at 1030 at the national mall" and that they were marching from a hotel in Washington, D.C.  The Defendant responded, using Telegram, "Copy.  Antifa should be staying up at BLM Plaza.  Do you want me to let our uniformed officers know that or keep it to myself?  I will be around all night in case anything kicks off."  Immediately after, using Telegram, Tarrio sent the Defendant an audio message.

On December 12, 2020, Tarrio and other members of the Proud Boys attended a rally in Washington, D.C., organized to protest the results of the 2020 presidential election.  Later in the evening of December 12, 2020, Tarrio participated in the theft and burning of a banner that read "#BLACKLIVESMATTER" ("the BLM Banner"), which was property of Asbury United Methodist Church in Washington, D.C. After the theft and burning was reported to law enforcement, MPD initiated an investigation ("the BLM Banner Burning Investigation").  The BLM Banner Burning Investigation was handled by MPD's riot task force, which consisted of various MPD detectives.

On December 17, 2020, Tarrio posted a message to a social media account in which he admitted he was the "person responsible for the burning." On December 18, 2020, MPD received an anonymous tip that Tarrio had claimed responsibility for the burning.

On December 18, 2020, after the Defendant learned of the anonymous tip MPD received identifying Tarrio as the individual responsible for burning the BLM Banner, the Defendant contacted Tarrio on Telegram. To contact Tarrio, the Defendant used a chat on Telegram with the highest level of encryption available. The Defendant then asked Tarrio if he had called in the anonymous tip. Tarrio responded "I did more than that. It's on my social media." The Defendant told Tarrio "I'm curious to see what happens too. I will check with our CID [Criminal Investigations Division] people if they have you on video."

Soon after, Tarrio, using Telegram, told other members of the Proud Boys that "We got the jump on the narrative for the banner burning. This should make it next it impossible for them to use 'hate crime' enhancement. As per my contact at DC Metro… This stays in here."

Later on December 18, 2020, using the same encrypted chat function, after Tarrio asked the Defendant if he thought "they'll make a stink of it," the Defendant responded: "No, a bit of the opposite. I've been talking to CID about it. They wanted to know what I know about your group and if I think you all are racist. I told them you are made up a lot of Latinos and blacks so not a racist thing. If anything I said it's political but then I drew attention to the Trump and American flags that were taken by Antifa and set on fire. I said all those would have to be classified as hate crimes too. It's not being investigated by FBI though. Just us (MPD)."

A short time later on December 18, 2020, the Defendant, using the same encrypted chat function, told Tarrio: "I don't think they have any pictures of you though." After Tarrio sent an image file to the Defendant, he responded, "Got it. We will see if we can ID the person."

Soon after, Tarrio, using Telegram, copied the information that he had received from the Defendant and shared it with other members of the Proud Boys.  Tarrio, using Telegram, also told an individual "So I just got word… we're clear on the banner."

Tarrio then posted on Parler, a social media network, that "…I'm here to tell you that no hate crime was committed.  The only hate there is in my heart is for communism and an authoritarian government.  BLM is a Marxist movement.  It isn't about the color of someone's skin.  Against the wishes of my attorney I am here today to admit that I am the person responsible for the burning of this sign.  And I am not ashamed of what I did because I didn't do it out of hate… I did it out of love. Love for a country that has given my family SO MUCH.  The burning of this banner wasn't about race religion or political ideology it was about a racist movement that has terrorized citizens of this country.  I will not standby [sic] and what them burn another city. So let me make this simple.  I did it. Come get me if you feel like what I did was wrong.  We'll let the public decide.  Forever PROUD.  Enrique."

On December 19, 2020, the Defendant, using the same encrypted chat, function told Tarrio that "[p]olice want to talk to you about the banner" and asked Tarrio if there was a phone number Tarrio wanted the Defendant to give the police.

On December 20, 2020, at 4:51 p.m., Tarrio called the Defendant using Telegram.  The call lasted approximately 7 minutes.

On December 22, 2020, approximately two minutes after Tarrio sent the Defendant a screenshot of a message he received from an MPD detective assigned to the BLM Banner Burning Investigation through Telegram, the Defendant changed the settings of his encrypted chat with Tarrio on Telegram so that future messages would delete 5 seconds after the recipient opened them.

On December 25, 2020, on the same encrypted chat, the Defendant informed Tarrio, "Just a heads up, CID had me ID you from a photo you posted on [social media website] kneeling down next to the BLM banner so they may be submitting an arrest warrant to US Attorney's Office."

On December 30, 2020, at 6:20 p.m., the Defendant called Tarrio using Telegram.  The call lasted approximately 14 minutes. After the call with the Defendant, at 6:38 p.m., Tarrio initiated an "Emergency Voice Chat" with the group "Ministry of Self Defense," at text group containing members of the Proud Boys.   On that same day, at 6:55 p.m., Tarrio, using Telegram, sent a message to Person 2, stating, "My contact just called me… DA hasn't signed it yet…"  Soon after, at 7:13 p.m., Tarrio, using Telegram, sent several messages to the "Ministry of Self Defense" group chat discussing the status of potential charges against him.

On December 30, 2020, MPD and the U.S. Attorney's Office for the District of Columbia applied to the D.C. Superior Court for a warrant to arrest to Tarrio for destruction of property for his participation in the destruction of the BLM Banner.  The same day, a judge of the D.C. Superior Court signed the arrest warrant, and the warrant was issued.

On January 1, 2021, at approximately 1:06 p.m., the Defendant sent several messages to Person 3, an official with the Capitol Police Department, stating, "TIGHT HOLD on this but I may lose him as a source soon.  Our CID got a warrant for him burning them BLM banner.  They are going to pick him up next week when he is in town so he may not speak to me anymore… They were contemplating making this one a hate crime. I said if that's the case they would have to make all of the us taken and burned by Antifa hate crimes. They backed off then… in the end it's just a misdemeanor charge so it won't go far but it was very political."

That same day, beginning at approximately 1:33 pm, Tarrio, using Telegram, sent several messages to Person 4, stating, "DC metro submitted an arrest warrant to the Attorneys office . . .

Destruction of property.  No hate crime enhancement . . . But he says that he's doesn't think they're going to sign off on it . . . Because they're afraid I'll take it to trial and their argument is weak."

On January 4, 2021, Tarrio flew from Miami, Florida to Arlington, Virginia.  At approximately 1:02 p.m., while Tarrio was inflight, the Defendant changed the settings of his encrypted chat with Tarrio on Telegram so that future messages would delete 10 seconds after the recipient opened them.  Using Telegram, the Defendant then sent a message to Tarrio while Tarrio was inflight.  At 1:30 p.m., using Telegram, Tarrio sent several messages to an Individual 1 indicating that he had just become aware that an arrest warrant for him had been signed.  At approximately 1:31 p.m., Tarrio messaged the group chat "Ministry of Self Defense" and stated, "The warrant was just signed."  That afternoon, soon after entering the District of Columbia, Tarrio was arrested pursuant to the December 30, 2020, warrant.  Tarrio spent the night in jail and released from custody on January 5, 2021.  As discussed in more detail below, Nicholas Quested ("Quested"), an award-winning filmmaker who had developed a relationship with Tarrio and other members of the Proud Boys for a project he was developing, picked Tarrio up from jail and rode with him to a parking garage.  In that parking garage, Quested and a film crew filmed Tarrio meeting with known associates and members of the Oath Keepers, another right-wing extremist group.

Prior to and after Tarrio's arrest, the Defendant did not tell MPD personnel handling the BLM Banner Burning Investigation that he had given Tarrio information about the status of the investigation or that Tarrio had made admissions to the Defendant about Tarrio's involvement in the destruction of the BLM Banner.  The Defendant also did not provide his communications with Tarrio about the BLM Banner Burning Investigation or Tarrio's involvement in the destruction of the BLM Banner to anyone at MPD.

### C.  Defendant's Statements to Law Enforcement

On June 2, 2021, when federal law enforcement officers interviewed the Defendant about his contacts with Tarrio, the Defendant knowingly and willfully made several false and misleading statements to them, as described below.  For instance, when asked whether, in his conversations with Tarrio, it was common for Tarrio "to fish" for information, the Defendant responded, "No, not really. He never really asked me questions about, like, you know, what we were doing or anything. It was more, you know, one-sided with just him telling me, you know, what their plans were."  In fact, as the Defendant knew, since at least July 2020, the Defendant regularly provided sensitive law enforcement information to Tarrio.

When asked how he would typically communicate with Tarrio, the Defendant misleadingly stated, "[e]ither by phone, or I'm trying to think.  Never by email.  I can't remember.  I think sometimes it was by text, too.  I don't remember."  When then asked specifically whether the Defendant and Tarrio used Telegram or another encrypted messaging service, the Defendant misleadingly stated, "I think Telegram, maybe?"  In fact, as the Defendant knew, by November 2020, the Defendant and Tarrio communicated almost exclusively by Telegram.

When asked what the Defendant's conversations were like with Tarrio between the date of the BLM Banner Burning and Tarrio's arrest on January 4, 2021, the Defendant responded, "I was trying to find out, without tipping him off to the MPD investigation."  In fact, as the Defendant knew, between the date of the BLM Banner Burning and January 4, 2021, the Defendant provided regular updates and information to Tarrio about the BLM Banner Burning Investigation.

Later in the interview, the Defendant falsely stated that after Tarrio publicly claimed responsibility for the BLM Banner Burning, the Defendant and Tarrio "ha[d] another conversation afterwards, but we didn't talk about the banner, or whether or not he did it."  In fact, as the

Defendant knew, Tarrio had indicated to the Defendant that Tarrio participated in the BLM Banner Burning.

When asked whether MPD's arrest plan for Tarrio in the BLM Banner Burning Investigation was to carry it out without notifying Tarrio in advance or to get Tarrio to turn himself in, the Defendant stated that he believed the plan was to carry out the arrest plan without notifying Tarrio and that "I know that I didn't, you know inform him that he had an arrest warrant."  In fact, as the Defendant knew, he had informed Tarrio that MPD had an arrest warrant for Tarrio before MPD arrested him.

As a result of these false statements, the Defendant is charged with three counts of making false statements in violation of 18 U.S.C. § 1001(a)(2) for lies and misleading statements he made in a June 2, 2021, interview with federal law enforcement officers about his communications with Tarrio in the lead up to and after the January 6, 2021, attack on the U.S. Capitol, including communications he had with Tarrio about the BLM Banner Burning Investigation and Tarrio's impending arrest for stealing and burning the banner.

## IV.    EVIDENCE THAT SHOULD BE ADMITTED AT TRIAL

Pursuant to FRE 807 and 801(d)(2), the Government intends to offer as evidence two sets of statements made by Enrique Tarrio because both statements are (1) supported by sufficient guarantees of trustworthiness; (2) are more probative on the points for which they would be offered than any other evidence the Government has been able to obtain; and (3) are co-conspirator statements.  As described below, those statements include:

- Video recorded statements by Tarrio in which he claims that he learned there was a warrant for his arrest while he was traveling to Washington, D.C.; and

- Statements made by Tarrio to Jeremy Bertino ("Bertino"), a cooperator for the Government, who the Government anticipates will testify Tarrio referred to the Defendant

as his "federal agent," as "my fed" or "my guy," that Tarrio told him the Defendant was a source of information, and "Shane" was the person who told him about the arrest warrant.[3]

### 1. January 5, 2023, Video Recorded Statements of Tarrio Should Be Admitted Pursuant to Rule 807

The Government seeks to admit a film clip through documentary filmmaker and Government witness Nicholas Quested.  *See* Ex. H (documentary film clip).  The Government anticipates that Quested will testify that he is an award-winning filmmaker, who in 2020 became interested in political divisions taking place in America and attended protests and rallies as part of a project.  *See* Ex. G (Portions of Quested Trial Transcript) at 4476-78.  His work brought him into contact with members of the Proud Boys, including Tarrio, who Quested texted to introduce himself and subsequently met in person on December 11, 2020, at a bar in Washington D.C.  *Id.* at 4479.  The Government anticipates Quested would testify that he developed a rapport with Tarrio and other Proud Boy members during that initial meeting.  *Id.* at 4480-82.  The next day, December 12, 2020, Quested and a film crew again met with Tarrio and other Proud Boy members around 11:00 a.m., and then followed them around to film and take pictures at various events, including at Black Lives Matter Plaza where Quested witnessed Tarrio burn the Black Lives Matter banner.  *Id.* at 4492, 4418.  After that event, Quested and Tarrio remained in contact and Quested arranged an interview with Tarrio in Washington, D.C. on January 5, 2021.  *Id*. at 4510.  The

---

[3] While the Government seeks to admit the proffered statements for the truth of the matter against the Defendant, they were made to Tarrio's known associates in informal settings. As such, these statements are not testimonial and are not subject to the requirements of the Confrontation Clause of the Sixth Amendment. *See United States v. Wilson*, 605 F.3d 985, 1017 (D.C. Cir. 2010) ("The Confrontation Clause prohibits 'admission of *testimonial statements* of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'") (quoting *Davis v. Washington*, 547 U.S. 813, 821 (2006)) (emphasis added); *see also United States v. Moore*, 651 F.3d 30, 69-70 (D.C. Cir. 2011) (explaining testimonial statements are "ex-parte in-court testimony or its functional equivalent," and providing list of examples, such as "affidavits, depositions, prior testimony, or confessions.") (citation omitted).

Government anticipates Quested will testify that he almost did not come for that interview because he learned that Tarrio had been arrested for stealing and burning the Black Lives Matter banner, but ultimately, he was part of the group that picked Tarrio up from jail after his release from custody on January 5, 2021. *Id.* at 4510-12.

As relevant here, the Government also anticipates Quested would testify that he and a film crew were with Tarrio for hours after picking him up from the jail, and captured Tarrio's actions and conversations on video, including in a parking garage where Tarrio met with known associates and members of the Oath Keepers. *Id.* at 4510, 4522-4527. The Government seeks to admit a clip of this video, in which a member of the group in the garage says, "you knew it was happening." Tarrio responds, "I knew as soon as I got to the airport" and then hugs a member of the group and says, "he texted me in the air." *See* Ex. H. When the associate responds, "For real? From the air?" Tarrio confirms, "from the air was when I knew they signed the warrant." *Id.*

The Government seeks to admit Tarrio's out-of-court recorded statements, pursuant to Rule 807, because they are very reliable and very important. *First*, the statements made in this clip are very reliable, satisfying the first part of Rule 807's two-part test. Notably, the Government anticipates Quested would testify that the video truly and accurately depicts Tarrio's actions and statements—in other words, Tarrio's statements about when he learned of the arrest warrant were not altered in anyway. Additionally, Tarrio makes the statements to known associates, who were all in Washington D.C. at the time for the same goal. Tarrio had no incentive to lie to his associates, which is only underscored by the fact that the statements are against his penal interest. *See* Fed. R. Evid. 804. Advisory Comm. Notes (indicating that the "circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true"). In this context, Tarrio

admits to having learned of the warrant for his arrest before he was arrested.  While this is not a confession to a crime, when reviewed in the context of the instant offense, it would likely help police find evidence of criminal wrongdoing—such as, evidence of a conspiracy and efforts to obstruct justice in concert with the Defendant.  As such, Tarrio's statements are self-inculpatory and are that much more reliable.  *See Williamson v. United States*, 512 U.S. 594, 603 (1994) ("Even statements that are on their face neutral may actually be against the declarant's interest. 'I hid the gun in Joe's apartment' may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory.").  Likewise, as the existence of the hearsay exception for co-conspirator statements implicitly recognizes, statements during and in furtherance of a conspiracy are similarly more reliable.

Furthermore, Tarrio had no incentive to lie within the context of the documentary.  Shortly after making the statements, Tarrio is captured on the same video in conversation with his associates.  He then acknowledges the filmmaker and asks the filmmaker to give him "a chance," ostensibly for privacy as the filmmaker walks away from the group as Tarrio and the others discuss something secretly.  Thus, the reliability of Tarrio's statement in this clip is corroborated by the nature of the recording, which was made for a documentary film with Tarrio's knowledge that he was being recorded. *See Slatten*, 865 F.3d at 807 (explaining when a declarant is "particularly likely to be telling the truth when the statement was made," that the statement is trustworthy) (citation omitted).

Tarrio's statements on the video clip are further corroborated by digital evidence and business records.  Records obtained from American Airlines indicate that on January 4, 2020,  at 11:55 a.m., Tarrio boarded flight 925 from Miami to Ronald Regan National Airport in Arlington, Virginia, and that flight 925 was scheduled to depart at 12:29 p.m.  At 1:02 p.m. on January 4,

2021, Lamond set messages with Tarrio in Telegram, an encrypted messaging application, to self-destruct 10 seconds after the recipient opened them, suggesting Lamond sent Tarrio additional messages at that time that he wanted to ensure nobody else would see.  At 1:31 p.m., Tarrio texted a Proud Boys messaging group called "Ministry of Self Defense" on Telegram that "[t]he warrant was just signed."  This evidence indicates that Lamond informed Tarrio sometime between 1:02 p.m. and 1:30 p.m., while Tarrio was flying from Miami to the greater Washington, D.C. area, that the warrant had been signed by sending a self-destruct message through Telegram. This corroborates Tarrio's statements on the video that he learned of the arrest warrant "from the air." On January 4, 2021, Tarrio was, in fact, arrested pursuant to an arrest warrant shortly after he landed.  This sort of corroboration with factual records is exactly the corroboration contemplated by Rule 807 to indicate a statement's veracity.  *Compare Smith*, 2020 WL 5995100, at *12 (D.D.C., Oct. 9, 2020) (admitting hearsay statements corroborated through images pursuant to Rule 807) *with United States v. Benton*, 656 F. Supp. 3d 1, 10 (D.D.C. 2023) (ruling co-conspirator's hearsay statements to FBI were unreliable because the statements were contradicted by documentary evidence and co-conspirator had incentive to lie to FBI and were inadmissible pursuant to Rule 807); *see also United States v. Shaw*, 824 F.2d 601, 609 n. 9 (8th Cir. 1987) (Noting that "as the trustworthiness of a statement increases, the justification for excluding it as hearsay decreases").

Second, Tarrio's proffered statements are very important because they are probative evidence of an element of the offense and satisfy the second part of Rule 807's two-part test.  *See* Fed. R. Evid. 807 (requiring proffered statements be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"); *see also Slatten*, 855 F.3d at 810 (noting because proffered statements were offered to bolster defense

case, they were evidence of material fact).  As detailed above, the Defendant is charged with four counts, all related to allegations that he leaked sensitive law enforcement information to Tarrio and then lied about it.  Specifically, in Court Four, Tarrio is charged with making a false statement for telling federal law enforcement agents he did not inform Tarrio that there was a warrant for his arrest. ECF No. 1 at ¶ 80. The timing of when Tarrio found out about the warrant is therefore highly probative of who informed him of this sensitive law enforcement information, especially when considering Tarrio's proffered statements captured on the video with the timing of the Defendant using the self-destruct feature in Telegram.  As the Defendant set his encrypted messages to Tarrio to self-destruct, this evidence is not otherwise available and the statements on the video clip are evidence that "will be more probative than any other evidence the government could procure on these points." *See Smith*, 2020 WL 5995100, at *12 (finding that Rule 807's requirement that that the proffered hearsay be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts" was met because witness was unable to remember details of the charged crime).

Tarrio's statements on the documentary video clip, "I knew as soon as I got to the airport," "he texted me in the air," and "from the air was when I knew they signed the warrant," are sufficiently reliable.  Not only because they are statements made against interest in the context of the documentary film to known associates, but also because the statements are corroborated by digital and documentary evidence.  These statements are also very important because they are probative of when Tarrio learned of the warrant for his arrest and from whom—evidence that goes directly to Count Four. *See* ECF No. 1 at ¶ 80 (alleging the Defendant lied to federal investigators when he falsely stated that he "didn't, you know, inform him that he had an arrest warrant" for Tarrio's participation in the December 12, 2020, destruction of the BLM banner). As such, Tarrio's

proffered statements on the documentary film clip satisfy Rule 807's two-part test and should be admitted pursuant to Rule 807.

Indeed, where the elements of Rule 807 are so amply met, the D.C. Circuit has even *reversed* a District Court's refusal to admit such evidence as an abuse of discretion. *Slatten*, 865 F.3d at 807. There, pointing to numerous factors supporting the trustworthiness and reliability of the statements, it was error to have excluded them. *Slatten*, 865 F.3d at 808-810.

Other circuits have similarly found the Rule 807 residual hearsay exception warrants the admission of otherwise-reliable statements that bear such indicia of reliability. In *United States v. Harrison*, 296 F.3d 994, 995 (10th Cir. 2002), the Tenth Circuit found no abuse of discretion in admitting statements by an alleged child abuse victim to law enforcement admissible under the residual hearsay exception when the declarant later recanted, highlighting its indicia of reliability. *Id*. at 995. In *United States v. Dunford*, the Fourth Circuit found no abuse of discretion in admission, under the residual hearsay exception, the out-of-court statements of child abuse victims who later recanted, emphasizing the "clear indicia of the trustworthiness of their statements." 148 F.3d 385, 393 (4th Cir. 1998). And in *United States v. Peneaux*, the Eighth Circuit affirmed (on plain error review) the admission of a child sex abuse victim's prior statements under Rule 807 despite her later denial of any abuse. 432 F.3d 882, 892-93 (8th Cir. 2005). Here, more so than the child abuse contexts where Circuits have found Rule 807 applicable, there is greater indicia of reliability: a co-conspirator bragging to known associates, while willingly being filmed, about receiving information he should not have had.

### 2. Tarrio's Statements to Bertino Should be Admitted Pursuant to Rule 807 and Rule 801(d)(2)(E)

The Government also seeks to admit testimony from Bertino, who the Government anticipates would testify about statements that Tarrio made to him about his relationship with

"Shane."  As background, on October 6, 2020, Bertino pled guilty to a two-count Information, which charged him with Seditious Conspiracy, in violation of 18 U.S.C. § 2384, and Unlawful Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922 (g)(l) for his role in the events that took place at the Capitol Building in Washington D.C. on January 6, 2021. *See* Ex. A (Information).  Bertino admitted to being a regional leader of the Proud Boys, who followed the commands of Tarrio and other Proud Boy leaders. *See* Ex. B at ¶ 8 (Statement of Offense). Bertino also admitted to being present on December 12, 2020, when members of the Proud Boys stole the Black Lives Matter banner from the church and burned it. *Id*. at ¶ 4.  Bertino further admitted that he was part of a group Tarrio advised in the early afternoon of January 4, 2021, that a warrant for his arrest had been signed. *Id.* at ¶ 16.  As part of his plea, Bertino agreed to cooperate with the United States Attorney's office for the District of Columbia. Bertino agreed to cooperate "fully, truthfully, completely and forthrightly[.]" *See* Ex. C at 7 (Plea Agreement).

As part of Bertino's cooperation, he met with the case agents for the present offense to discuss Tarrio's relationship with the Defendant.  Based on information learned during that interview and a prior interview, the Government anticipates that Bertino would testify that he had a close relationship with Tarrio between January 2020 and January 2021. *See* Ex. D at 2 (03/18/2022 Interview Report); *see also* Ex. F at 41 (Bertino Interview Transcript).   The Government further anticipates Bertino will testify that, on or around November 3, 2020, he met Tarrio and other Proud Boy associates at a bar in Washington, D.C. *See* Ex. E at 1 (09/25/2023 Interview Report); *see also* Ex. F at 65.  While at the bar, Tarrio told him that his federal agent was coming to meet them, and that Bertino observed when this federal agent came into the bar, Tarrio walked over to him and shook his hand.  *See* Ex. E at 1; *see also* Ex. F at 61-67.  Tarrio then brought him over and introduced him to Bertino as "Shane," telling Bertino "that's my fed"

or "that's my guy." *See* Ex. E at 1.  The Government anticipates that Bertino would testify about his observations of "Shane," and would describe him as legitimate because of his demeanor and friendliness, as well as the way Tarrio seemed to hold him in high regard as a source. *Id.*  Even before Bertino met "Shane," Tarrio told Bertino that "his fed in D.C." or "his guy in D.C." would tell him certain things. *Id.* at 2.  After meeting "Shane," Tarrio would mention "Shane" by name as the source of information. *Id.*

The Government further anticipates that Bertino would testify that after Tarrio found out there was a warrant for his arrest in D.C., Tarrio had an audio call with Bertino and other Proud Boys, who were part of the "Ministry of Self Defense" Telegram group. *Id.*  While on that call, Tarrio told the group that his "contact in D.C. told me they got the warrant." *Id.*  According to Bertino, after the audio call, he called Tarrio and asked who had told him about the warrant and if it was the same person that he had met on election night. *Id.*  The Government anticipates that Bertino would testify that Tarrio responded, "Yeah—Shane." *Id.*

### a. Tarrio's Statements to Bertino about the Defendant Are Reliable and Probative, and Should be Admitted Pursuant to Rule 807.

Tarrio's statements to Bertino that "Shane", the Defendant, was "my fed" or "my guy" are also very reliable and probative and should be admitted pursuant to Rule 807.

With respect to the "reliability" prong of Rule 807's two-part test, Bertino's anticipated testimony is sufficiently trustworthy.  As an initial matter, Bertino has two big incentives to tell the truth.  *First*, Bertino was almost completely immunized when he interviewed with the Government.  All Bertino had to do was tell the truth.  In fact, if Bertino failed to cooperate "fully, truthfully, completely and forthrightly," it would constitute a breach of his plea agreement, and the Government would no longer have to abide by the terms of that agreement.  This would mean Bertino would no longer receive the benefit of a motion pursuant to Section 5K1.1 of the

sentencing guidelines and that the Government could bring additional charges against Bertino for his role in the January 6, 2021, attack on the Capitol, using any information Bertino provided against him.

*Second*, Bertino had a clear incentive to tell the truth because if he made a materially false statement to investigators, he faced criminal liability under 18 U.S.C. § 1001—a fact made clear in Bertino's plea agreement and relayed to him in discussions with the Government. *See* Ex. C at 11-12; *see also* Ex. F at 4-5. These incentives to speak truthfully indicate Bertino's statements are reliable and that he is telling the truth about his observations and the statements Tarrio made to him about the Defendant. *See Slatten*, 865 F.3d at 808-09 (finding that a co-defendant's declarations were reliable in part because he was immunized when he made his statements and faced criminal liability under 18 U.S.C. § 1001 if he made a materially false statement); *see also SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1225 (D.C. Cir. 1989) (relying, in part, on fact that out-of-court declarations were "subject to criminal prosecution under 18 U.S.C. § 1001" to affirm reliability and finding no error in admitting such declarations pursuant to residual hearsay exception). Importantly, the digital evidence corroborates Bertino's proffered testimony. As noted above, while in the air, Tarrio used Telegram to text the "Ministry of Self Defense" group—the group Bertino was part of— that, "[t]he warrant was just signed."

Moreover, as for the underlying statements, Tarrio's statements to Bertino are also reliable. Tarrio's statements to Bertino "that's my fed" or "that's my guy" were made while Tarrio was introducing Bertino to the Defendant, indicating that Tarrio was telling the truth about the nature of their relationship as the Defendant was standing right next to him. In the context of their Proud Boys membership, *see* Ex. D at 1, their close relationship, *see id.* at 2, and their similar ideologies, *see id.* at 1, Tarrio had no reason to lie to Bertino about his relationship with the Defendant or the

information the Defendant was providing him.  These statements are further reliable because they constitute statements against interest, *see supra* at 15-16, and are corroborated by the digital and documentary evidence, *see supra* at 16-17. They are also consistent with what Tarrio said in the Quested documentary footage. *See* Ex. G; *see also Slatten*, 865 F.3d at 808 ("Consistency supports the reliability of his multiple statements and, consequently, his veracity.")

As for the second part of Rule 807's two-part test, Bertino's anticipated testimony, and the underlying statements, are also very probative.  At the core of the allegations against the Defendant is the criminal association between the Defendant and Tarrio, which led the Defendant to obstruct justice by leaking sensitive law enforcement information to Tarrio and then to lie about it.  Bertino is a direct witness to this criminal association.  The Defendant has claimed that he did not provide Tarrio with information he learned as a Lieutenant with the MPD.  Bertino's proffered statements, and Tarrio's own statements, directly rebut the Defendant's claims, making them highly probative. *See Mason*, 951 F.3d at 574 (recognizing that statements impeaching a witness may be "very important.")

Tarrio's statements to Bertino, including "that's my fed" or "that's my guy," "Shane" was the source of information, and that "Shane" was the one who told him about the warrant, are very reliable, as is Bertino's anticipated testimony about those statements.  Because of the terms of his cooperation agreement and the additional criminal charges he would face if he did not, Bertino has every incentive to tell the truth. Tarrio also had no reason to lie to Bertino, his associate with a like-minded agenda. The veracity of Tarrio's statements to Bertino are only further underscored by the fact that the Defendant was standing right next to Tarrio when he made the initial introduction, referring to the Defendant as "my fed" or "my guy." These statements are also very important, as they directly contradict Lamond's claims that his relationship "was more, you know,

one-sided with just him telling me, you know what the plans were," which is the basis for Count Two, *see* ECF No. 1 at 15, and that he "didn't, you know, inform him that he had an arrest warrant," which is the basis for Count Four, *see id.* at 16.  For these reasons, Bertino's anticipated testimony about statements Tarrio made referencing the Defendant satisfy Rule 807's two-part test and this Court should allow the testimony pursuant to Rule 807.

> **b. Tarrio's Statements to Bertino Are Also Co-Conspirator Statements Made in Furtherance of a Conspiracy and Should Be Admitted Pursuant to Rule 801(d)(2)(E)**

Defendant, Tarrio, and others were all co-conspirators to obstruct the MPD Banner Burning Investigation and joint venturers to advance the Proud Boys' agenda in D.C.[4]  Thus, statements made by Tarrio to Bertino to advance that conspiracy are admissible under Rule 801(d)(2)(E).

*First*, though uncharged, the evidence establishes a conspiracy between the Defendant, Tarrio, and other Proud Boys to obstruct MPD's BLM Banner Burning Investigation.  As summarized above and alleged in the indictment, leading up to and including Lamond's tip to Tarrio on January 4th, 2021, the Defendant was providing Tarrio with confidential information about the status of the investigation – including discussions about the warrant and ultimately that it was signed.  Following Tarrio's release after his initial arrest through at least mid-2021, the Defendant continued to act in furtherance of the conspiracy to obstruct the investigation by not revealing to MPD that he had communicated extensively with Tarrio and provided him

---

[4] Tarrio's statements on the documentary video clip, "I knew as soon as I got to the airport," "he texted me in the air," and "from the air was when I knew they signed the warrant" are also arguably admissible coconspirator statements. These statements were also made in furtherance of a joint enterprise to advance the Proud Boys' agenda in D.C. because they indicate to other Proud Boys that they are being helped by at least one operative within law enforcement, who was supportive of the Proud Boys' agenda and was willing to provide confidential information to protect them, thus encouraging Proud Boys to continue their activities in D.C. In sum, admitting the proffered statements from the documentary film clip as co-conspirator statements is well-warranted under Rule 801(d)(2).

confidential information about the status of the investigation, ECF No. 1 at ¶¶ 51-52, and then by lying to investigators in his June 2, 2021, interview about those extensive communications with Tarrio, *id.* at ¶¶ 65-72. Although Tarrio was arrested on January 4, 2021, for his role in the BLM banner burning, he did not plead guilty until July 19, 2021. The Defendant's continued concealment of his communications with Tarrio and his lies to investigators on June 2, 2021, are blatant attempts to protect himself, his co-conspirator Tarrio, and others from being implicated in the BLM Burning Investigation, further indicating the existence of an ongoing conspiracy. *See Perholtz*, 842 F.2d at 356-57 (noting precedent that acts of concealment can indicate the coverup of a criminal enterprise or can be done 'in furtherance of the *main* criminal objectives of the conspiracy'") (*quoting Grunewald*, 353 U.S. at 405) (emphasis in original).

Moreover, for the statements to be admissible as co-conspirator non-hearsay under *Gewin*, 471 F.3d at 201-202, Tarrio and the Defendant need not even have been engaged in an illegal conspiracy to obstruct, so long as they were engaged in a joint enterprise. Here, the Defendant, Tarrio, and other Proud Boy members were clearly working together to advance the Proud Boys' agenda in D.C. *See, e.g.*, ECF No. 1 at ¶ 14 (the Defendant giving Tarrio "a heads up" that Proud Boys activity was "Getting people spun up"); ¶ 16 (the Defendant telling Tarrio he was giving him "a heads up" and asking him to "Please keep this between you and me"); ¶ 18  (the Defendant telling Tarrio the day before a planned rally to contest the 2020 Presidential Election, "I'm staying in D.C. tonight. Let me know if you go out and I may stop by");  ¶ 20 (the Defendant warning Tarrio that police may shut down a popular Proud Boys' meeting place down); ¶ 21 (Tarrio telling the Defendant the Proud Boys' plans in advance of the December 12, 2020, rally and the Defendant responding, "Copy. Antifa should be staying up at BLM Plaza. Do you want me to let our uniformed officers know that or keep it to myself? I will be around all night in case anything kicks

off"). As such, the proffered statements made by Tarrio, a member of the conspiracy to impede MPD's Banner Burner Investigation and a member of the joint enterprise to advance the Proud Boys' agenda in D.C., are being offered against the Defendant, Tarrio's co-conspirator and joint venturer.

Tarrio's statements to Bertino emphasize the extent to which (and the period over which) Tarrio used the value of having a co-conspirator and joint venturer in law enforcement to his advantage ("that's my fed" or "that's my guy") – and how he emphasized that relationship when he faced criminal jeopardy or needed to encourage his associates to maintain discretion to avoid criminal prosecution and to continue advancing their agenda.  As such, the proffered statements were made in furtherance of that conspiracy and joint venture and should be admitted pursuant to Rule 801(d)(2)(E).

### V. CONCLUSION

For the foregoing reasons, the Court should grant the Government's motion.

> Respectfully submitted,
>
> MATTHEW M. GRAVES
> UNITED STATES ATTORNEY
> D.C. Bar Number 481052
>
> */s/ Rebecca G. Ross*
> Rebecca G. Ross
> N.Y. Bar Number 5590666
> Joshua S. Rothstein
> N.Y. Bar Number 4453759
> Assistant United States Attorneys
> 601 D Street, N.W.
> Washington, D.C. 2053
> Office: 202-252-7164 (JSR), 202-252-6937 (RGR)
> Rebecca.Ross2@usdoj.gov
> Joshua.Rothstein@usdoj.gov

**CERTIFICATE OF SERVICE**

Rebecca G. Ross, attorney for the United States, hereby certifies that a true and correct copy of the motion has been electronically filed and accordingly served upon attorney for the defendant.

*/s/ Rebecca G. Ross*
Rebecca G. Ross