# EXHIBIT 1



U.S. Department of Justice

Matthew M. Graves
United States Attorney

*District of Columbia*

---

*Patrick Henry Building*
*601 D Street, N.W.*
*Washington, D.C. 20530*

January 2, 2024

Mark E. Schamel
Ana L. Jara
Counsel for Shane Lamond
mescahmel@venable.com
aljara@venable.com

      Re:   ***United States v. Shane Lamond*** (Case No. 23-cr-177)

Dear Counsel:

The government hereby provides notice of intent to offer the testimony of Jennifer Kathryn Cain, Senior Digital Forensic Examiner for the Federal Bureau of Investigation ("FBI"). The government does not assert that the testimony of Examiner Cain constitutes expert witness testimony pursuant to Federal Rules of Evidence 702, 703, and 705. Out of an abundance of caution, however, and to the extent Examiner Cain's testimony may be construed by the Court as requiring expert testimony under those Rules, the government hereby gives notice of expert witness testimony pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G).[1]

Attached to this letter are descriptions of the qualifications and anticipated testimony of Examiner Cain. Specifically, Attachment A is a description of Examiner Cain's anticipated testimony. As noted, Examiner Cain's anticipated testimony will be about digital evidence collected from a cell phone belonging to Mr. Lamond and a cellphone belonging to Enrique

---

[1] If a law enforcement witness testifies to what files he or she found on a digital device or account, his or her testimony is not expert testimony. *See United States v. Berry*, 318 Fed. Appx. 569, 570 (9th Cir. 2009) (agent's testimony was not expert testimony because the agent "simply testified to what he found on the [defendant's] hard drive…, without expressing an opinion that required specialized knowledge or offering insight beyond common understanding") (citing Fed. R. Evid. 702). Thus, much of the anticipated testimony we lay out in Attachment A falls into this category, and does not require expert notice.

1

Tarrio. The evidence related to these devices has been provided to you through discovery, including discovery productions made on May 24, 2023, June 15, 2023, and June 23, 2023.

Attachment B is Examiner Cain's curriculum vitae. For your convenience, in Attachment C, the government is providing transcripts from Examiner Cain's prior expert testimony. The government reserves the right to: (1) supplement this notice with additional expert testimony; (2) provide you with any future expert reports prepared; and (3) provide you with any supplemental information.

Accordingly, this letter, and the incorporated attachments, constitute the government's expert notice disclosure, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), of witnesses who may be called as experts during trial in this matter to testify regarding the topics listed in the attached.

Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government requests immediate reciprocal disclosure from the defense of any evidence that defendant intends to introduce at trial under Rules 702, 703, and/or 705 of the Federal Rules of Evidence

Sincerely,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

*/s/ Rebecca G. Ross*
Rebecca G. Ross
Joshua S. Rothstein
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 2053
Office: 202-252-7164 (JSR), 202-252-6937 (RR)
Rebecca.Ross2@usdoj.gov
Joshua.Rothstein@usdoj.gov

# ATTACHMENT A

<u>ATTACHMENT A</u>

**I.    FBI Senior Digital Forensic Examiner Jennifer Kathryn Cain**

Examiner Cain has been with the Federal Bureau of Investigation ("FBI") for over ten years and has served as a digital forensic examiner for approximately six years, earning the "senior examiner" certification in 2021.  Her expert qualifications are further detailed in her curriculum vitae, which is attached as Attachment B.

The government seized a significant amount of evidence in the form of photographs, videos, and messages extracted from the digital devices of the defendants and co-conspirator, Enrique Tarrio ("Tarrio"). That electronic evidence seized from digital devices will be admissible through lay/fact witness testimony by FBI special agents or Examiner Cain who extracted, located, and/or reviewed this evidence. [1]

The government may qualify Examiner Cain as an expert in the field of digital forensic analysis and have Examiner Cain offer some background testimony about how data is extracted, processed, and analyzed from digital devices, and then to offer testimony about conclusions she drew about a limited subset of the electronic evidence in this case.

Specifically, Examiner Cain's testimony will be about digital evidence collected from the following two devices:

| Device     Belonging to: | Description |
|---|---|
| Shane Lamond (Referred herein as "Lamond's Device") | One (1) iPhone XR [iPhone11,8 N841AP] running iOS 14.6 with S/N: DX3CJ7BMKXKN;      IMEI:     356450107630375;      MSISDN: 12024370434; and UUID: 00008020-000948AC3C0B002E. |
| Enrique Tarrio (Referred herein as "Tarrios's Device") | One (1) iPhone 11 Pro Max (iPhone 23,5 D431Ap) running iOS 14.2 with  S/N:  F2MZKPPGN70G;  IMEI:  353891104722470;  MSIDN: 1786916789, and UUID: 00008020-000948AC3C0B002E |

---

[1] Law enforcement witness is not expert testimony if it is simply about what files he or she found on a digital device or account.  See United States v. Berry, 318 Fed. Appx. 569, 570 (9th Cir. 2009) (agent's testimony was not expert testimony because the agent "simply testified to what he found on the [defendant's] hard drive…, without expressing an opinion that required specialized knowledge or offering insight beyond common understanding") (citing Fed. R. Evid. 702).  Please let us know immediately if you disagree with this position so that we can raise this issue with the Court well in advance of trial.

1

## II.    General Topics

a.  Examiner Cain will provide a basic overview of how data is extracted from cellular telephones and similar digital devices and then processed and examined, including certain specific steps that need to be taken to extract data from certain messaging platforms, including Telegram, from certain devices.

b.  Examiner Cain will provide testimony about what the Telegram application is and how it works.  Examiner Cain will testify that Telegram is an end-to-end encrypted communications application, available for use on mobile devices and computers. Examiner Cain will explain that end-to-end encryption is a method of secure communication that prevents third parties from accessing data while it is transferred from one end system or device to another.  In end-to-end encryption, the data is encrypted on the sender's system or device, and only the intended recipient can decrypt it.  As it travels to its destination, the message cannot be read or tampered with by an internet service provider ("ISP"), application service provider, hacker, or any other entity or service.  Examiner Cain will explain that this technology makes it harder for providers to share user information from their services with law enforcement authorities.

c.  Examiner Cain will testify about how group chats are set up and administered on the Telegram application and will walk the jury through what group chats look like and how to read them.  Examiner Cain will explain that, if one joins a Telegram group chat after it was created, one will not see the prior chats and will only be able to see the chats from the point that person joined, going forward. Examiner Cain will explain how chats can be deleted on Telegram group chats and by whom.  She will testify that the version of the Telegram app may affect how chats can be deleted on Telegram group chats and by whom.

d.  Examiner Cain will also testify what the WhatsApp application is and how it works.

e.  Examiner Cain will provide testimony about Google Voice and explain that Google Voice is a free telephone application that provides calling, text messaging, and voicemail. Examiner Cain will testify that Users must provide a valid phone number during registration. Once setup is complete, users are assigned a dedicated Google Voice number, which they can select from a variety of area codes.

f.  Examiner Cain will explain that, by convention, many cellular telephone service providers, cellular telephone manufacturers, and social media and e-mail providers save their records and data using a twenty-four hour clock similar to "military" time and based on the 0° longitude meridian, also known as the "Greenwich meridian."  Universal Coordinated Time ("UTC" or "UTC+0") refers to the time on that zero or Greenwich meridian.  To convert UTC+0 time into local time here in the United States, one needs to subtract a certain number of hours

2

from UTC depending on how many time zones away one is from Greenwich, England. Examiner Cain will explain that for the period of November 2020 through January 2021, Eastern Standard Time was five hours behind UTC+0 and referred to as UTC-5; Central Standard Time was six hours behind and referred to as UTC-6; Mountain Standard Time was seven hours behind and referred to as UTC-7; and Pacific Standard Time was eight hours behind and referred to as UTC-8.

g. Examiner Cain will offer some background testimony on how, generally, a forensic examiner can determine if and when data was deleted from a device or account.

**III.  Forensic Imaging/Data Extraction for the Relevant Devices and Online Accounts:**

a. Examiner Cain will testify about, among other things, the forensic images and/or data extractions that he (or other law enforcement personnel) created of the electronic devices described above; methods used to confirm that the images were reliable copies of the original devices (for example by comparing hash values, where appropriate); the extractions of data from and searches of those images; and the tools and techniques used. For example, we anticipate she will testify that she and her colleagues used, among other tools, Cellebrite and Magnet. She will also testify about the difference between a logical versus a physical copy and the ability to recover and identify deleted files.

b. Examiner Cain will also explain the extraction reports that were generated for the cellphone extractions.

**IV.  Analysis and Verification of Data From the Relevant Devices**

a. Examiner Cain will also testify about how she analyzed or reviewed the data extractions that she (or others law enforcement personnel) created, and identified specific files that had been recovered from the various devices. This will include specific files he observed on these devices such as e-mail messages, e-mail and e-mail headers, text messages (to include iMessages, WhatsApp, and Telegram messages), voice messages, photographs, videos, and phone logs. She will also testify about the tools and techniques she used. For example, we anticipate that, for the cell phone extractions and analyses, she will testify that his colleagues and he used, among other tools, Cellebrite and Magnet hardware/software. These files have been produced to you in discovery, and copies of the data extractions and forensic images have also been produced to you in discovery.

**V.  Lamond's Device**

a. Examiner Cain will testify that Lamond's device contains Telegram user account: 'BikNBil' (869476955). This account contains two Telegram contacts with the display name 'Enrique Tarrio': username 'bannern****' with phone number

17869616789 and Telegram ID 1150826464; and username 'NobleLead' with phone number 13057668213 and Telegram ID 581632416.

b. Examiner Cain will testify that 'BikNBil' is a member of the group chat 'Christian Nationalists' (formerly 'PROUD GOYS'), iOS group ID(s) 9928549958 and 1338615366. This chat contains thirty-three (32) messages from 'Enrique Tarrio' (581632416) and one (1) message from 'Enrique Tarrio' (1150826464), all posted on 11/09/2020. There are two secret chats between BikNBil' and 'Enrique Tarrio' (581632416). The first chat begins on 12/18/2020 and contains remnants of deleted chat ID 14483375238. The contents of the nineteen (19) recovered messages are identical to the messages found in the secret chat on Tarrio's device. The attachment secret-file-5156987684941463853-1 is an audio file from Tarrio in this chat, however the corresponding message record could not be recovered. Examiner Cain will testify as to reasons why certain records could not be recovered.

c. Examiner Cain will testify that the second secret chat, ID 14667027830, contains messages from 01/07/2021 to 01/27/2021. The final messageID for 'Enrique Tarrio' is 28 and the final messageID for 'BikNBil'' is 36, indicating that the secret chat contains a minimum of sixty-four (64) messages. Of these messages, only fifty-eight (58) messages were fully recovered. The attachment secret-file-4902515399548993725-1 is an audio file from Tarrio in this chat, however the corresponding message record could not be recovered. Examiner Cain will testify as to reasons why certain records could not be recovered.

d. Examiner Cain will testify there is one incoming Telegram call on 01/09/2021 lasting approximately twenty five (25) minutes. Examiner Cain will testify as to why the call was likely initiated through the secret chat and why it was - by design - assigned a message ID in the private cloud chat.

## VI.   Tarrio's Device

a. Examiner Cain will testify that Tarrio's device contains two Telegram user account(s): 'DeathFromAbove' (1150826464) and 'NOBLE LEAD' (581632416). Both accounts contain Telegram contact 'Shane FBI Police' with phone number 2024370434 and Telegram ID 869476955.

b. Examiner Cain will testify that the 'DeathFromAbove' account shows that 'Shane FBI Police' joined group 'Christian Nationalists' (formerly 'PROUD GOVS'), iOS group ID 9928549958, on 11/9/2020 21:44:02 (EST/EDT).

c. Examiner Cain will testify the 'NOBLE LEAD' account contains two chat threads with 'Shane FBI Police'. The first chat is a private cloud chat containing seventy-nine (79) messages, ranging from 07/03/2020 through 12/17/2020. The second chat thread is a secret chat (E2E encryption) beginning 12/18/2020 and ending 01/04/2021. The final messageID for 'NOBLE LEAD' is 52 and the final

4

messageID for 'Shane FBI Police' is 93, indicating that the secret chat contains a minimum of one hundred and forty-five (145) messages. Of these messages, only forty-four (44) messages were fully recovered. Examiner Cain will testify as to reasons why certain records could not be recovered.

d.  Examiner Cain will further testify that there are two Telegram calls on 12/20/2020 and 12/30/2020 lasting approximately seven (7) minutes and fourteen (14) minutes, respectively. Examiner Cain will testify as to why the call was likely initiated through the secret chat and why it was - by design - assigned a message ID in the private cloud chat.

e.  Examiner Cain will provide testimony that Tarrio's Device contains Google Voice phone number 3057668213 and shows activity from January 2020 to January 2021. All calls are configured to forward to 7869616789, which matches the phone number for Tarrio's Device. Forensic Examiner Cain will testify that between 02/10/2020 and 07/04/2020, there are fifty-six [56] messages and five [5] calls between 3057668213 and 2024370434.

**VII.  A list of cases in which, during the previous four years, the witness has testified as an expert at trial or by deposition:**

a.  *United States v. Ethan Nordean, et al.*
b.  *United States v. Christopher Worrell*
c.  *United States v. Elmer Stewart Rhodes III, et al.*

Transcripts of Examiner Cain's testimony have been provided for your convenience in Attachment C.

**VIII.  Bases and Reasons in Support of Testimony**

a.  The bases and reasons for Examiner Cain's anticipated testimony is her training and experience, education, and review of the facts and evidence provided in discovery in this case, including, but not limited to:
    i.  Law enforcement reports produced in this case;
    ii.  Cellebrite and similar forensic reports produced in this case;
    iii.  Data extractions of electronic devices.

**I had read and approve of the above statement:**

**Jennifer Kathryn Cain**
**Federal Bureau of Investigation, Senior Digital Forensic Examiner**

# ATTACHMENT B



# JENNIFER KATHRYN CAIN

SENIOR DIGITAL FORENSIC EXAMINER, FEDERAL BUREAU OF INVESTIGATION

1501 DOWELL SPRINGS BLVD. KNOXVILLE, TN 37909 | 813.███.████ | ███████@FBI.GOV

## EDUCATION

**UNIVERSITY OF SOUTH FLORIDA**

Tampa. FL | 2017
MS in Cybersecurity
Concentration in Digital Forensics

**UNIVERSITY OF NORTH CAROLINA**

Chapel Hill, NC | 2003
BS in Business Administration
Kenan-Flagler Business School

## CERTIFICATIONS

GIAC Adv Smartphone Forensics (2023)
FBI Senior Forensic Examiner (2022)
GIAC Battlefield Forensics (2020)
FBI Forensic Examiner (2019)
CompTIA A+ (2019)
GIAC Forensic Examiner (2018)
AccessData Forensic Examiner (2018)
FBI Digital Extraction Technician (2017)
FBI CART Technician (2017)

## VENDOR TRAINING

SANS Advanced Smartphone Forensics
Magnet Forensics: Advanced iOS Exams
Magnet Forensics: MacOS Exams
Magnet Advanced Computer Forensics
Magnet Axiom Forensic Fundamentals
Magnet Axiom Examinations
SANS Battlefield Forensics & Acquisition
SANS Mac & iOS Forensic Analysis & IR
SANS Windows Forensics Analysis
BlackBag Essential Forensic Techniques
AccessData Intermediate OS Artifacts
AccessData Web Artifacts
AccessData Windows Forensics & Tools

## FBI TRAINING

CART Senior Moot Court
Analog Forensics
Enhancing Your Forensic Skills
CART Moot Court
Digital Forensic Examiner Capstone
Cyber BootCamp
Mobile Forensics
Linux Command Line Interface
File Systems Basics

## FBI INSTRUCTOR

Incident Response, Acquisition, & Analysis
Digital Forensic Field Operations

## PROFESSIONAL EXPERIENCE

**SENIOR DIGITAL FORENSIC EXAMINER** | FEDERAL BUREAU OF INVESTIGATION

Knoxville, TN | July 2017 – Present

Conduct forensic examinations of digital evidence for the Computer Analysis Response Team (CART). Participate in search and seizure operations, identifying, diagnosing, and correcting problem conditions to aid in the retrieval of data in complex situations. Perform technical analysis on digital evidence and prepare authoritative oral and written reports to investigative team. Complete routine application testing and validation on vendor software.

**STAFF OPERATIONS SPECIALIST** | FEDERAL BUREAU OF INVESTIGATION

Tampa, FL | Feb 2013 – July 2017

Performed tactical analysis for the Field Intelligence Group, specializing in violent crime and organized criminal activity threats. Conducted operational research and performed data exploitation and analysis to support analytic and investigative strategies. Collected, analyzed, and integrated raw data into comprehensive intelligence packages. Awarded 2017 Intelligence Professional of the Year.

**SYSTEMS ANALYST** | JOHNS HOPKINS MEDICINE ALL CHILDREN'S HOSPITAL

St. Petersburg, FL | Nov 2010 – Feb 2013

Served as a database administrator. Conducted system analysis projects including requirements definition, design, development, and implementation per the system life cycle methodologies and standards. Created and executed system test plans by defining test conditions, scenarios, and expected results. Participated in installation of software updates to ensure completion of expected results.

**SYSTEMS ADMINISTRATOR / BUSINESS ANALYST** | PMSI

Tampa, FL | Jun 2009 – Nov 2010

Maintained, troubleshot and provided technical support for database applications. Performed User Acceptance Testing (UAT) and Quality Assurance (QA), and refined processes inside the system to automate process and functions. Designed database for the Centers for Medicare & Medicaid Services (CMS). Developed dashboards and reporting within the business intelligence portal.

**OPERATIONS MANAGER** | FOCUS INC

Tampa, FL | Feb 2007 – Jun 2009

Managed all product development activities for direct response marketing. Designed and managed database to track media planning and buying activities; and created automated reporting functions to show past purchase trends, detail historical performance behavior and predict future results.

**JD POWER SYSTEMS ANALYST** | LENNAR HOMES

Tampa, FL | Oct 2005 – Sep 2007

Designed and managed database to track all construction management activities including operational workflow, completion timelines, purchasing, and scheduling.

## TRIAL EXPERIENCE

Expert Witness | District of Columbia
    United States v. Christopher Worrell | Apr 2023
    United States v. Ethan Nordean et al. | Feb 2023
    United States v. Elmer Stewart Rhodes, III et al | Nov 2022

# ATTACHMENT C

```
 1                          - - -

 2    KATHRYN CAIN, WITNESS FOR THE DEFENDANT, SWORN

 3                      DIRECT EXAMINATION

 4                          - - -

 5    BY MR. CRISP:

 6        Q    Good morning, ma'am.

 7        A    Good morning.

 8        Q    If you could please state your full name and city

 9    and state of residence?

10        A    Jennifer Kathryn Cain and Knoxville, Tennessee.

11        Q    And by whom are you employed?

12        A    The Federal Bureau of Investigation.

13        Q    And what do you do for them?

14        A    I am a senior digital forensic examiner.

15        Q    Is there a nickname for that?

16        A    We go by FE for forensic examiner.  And we work on

17    the Computer Analysis Response team, which is commonly

18    referred to as CART.

19        Q    And, ma'am, I'm going to anticipate, if you can

20    adjust the mic a little bit or slide up a little bit, I'm

21    having a little hard time hearing you.  I don't know if the

22    rest of them are.  And I apologize.

23             So, thank you.

24             What do you do?  I understand the title, but what

25    exactly do you do so we understand specifically how you
```

1    operate?

2         A    Sure.

3              I handle all aspects of digital evidence,

4    including the identification and collection of it, the

5    acquisition and extraction of digital evidence, processing

6    those extractions into meaningful formats, and then

7    analyzing the data and preparing reports.

8         Q    And what type of training, education did you

9    receive in order to obtain the position you hold?

10        A    To become a forensic examiner, it takes roughly

11   two years and about 400 hours of formal training.

12             We go through all type of technical and computer

13   examination and mobile forensic work to include file systems

14   and learning how to extract and process data.

15             From there, we roughly complete about 100 hours of

16   advanced formal training each year after that.

17        Q    And do you have a bachelor's degree?

18        A    I do.

19        Q    In what?

20        A    Business administration.

21        Q    Any advanced degrees?

22        A    I have a master's in cybersecurity with a

23   concentration in digital forensics.

24        Q    Have you testified in court before?

25        A    I have not.

1      Q    All right.

2           And you would label your area of expertise in

3    digital forensic extractions?

4      A    In digital forensic extractions and processing and

5    analysis.

6           MR. CRISP:  Okay.

7           Your Honor, I don't believe the government has an

8    objection, but I will move to admit her as an expert in this

9    area.

10          MS. RAKOCZY:  No objection to qualifying her in

11   the area of forensic cell phone examination and digital

12   evidence examination.

13          THE COURT:  Okay.

14          So Ms. Cain will be so qualified as an expert in

15   those areas.

16   BY MR. CRISP:

17     Q    So, ma'am, I want to direct your attention to this

18   case.

19          You conducted certain extractions from phones in

20   this case?

21     A    Some extractions and some I processed.

22     Q    Okay.

23          And, again, so the jury understands, the

24   distinction between an extraction and a processing, what

25   comes first?

1       A      First we extract the phone, which means to make a

2    copy of the data that is contained on that device.

3              The second component is processing that data into

4    a meaningful and useable format for our investigative teams

5    to review.

6       Q      What are the various programs that you would use

7    to do that?

8       A      For extracting, the most popular programs and the

9    ones used in the case today were Grayshift's GrayKey and

10   Cellebrite.

11      Q      Is there also another one that was used in a few

12   of them such as Axiom?

13      A      That was used to process the devices.  The second

14   component to turn those extractions into meaningful data,

15   yes.

16      Q      So the extraction, if I can make an analogy, and

17   if I am inaccurate please correct me, is pulling the data

18   out of the phone in a way that you can view it in a readable

19   format?

20      A      That is correct.

21      Q      Okay.

22             And then the processing of it would be putting it

23   in a format that is actually readable to someone such as me?

24      A      Yes, you could, similar to drawing blood --

25   someone's blood and then using that blood sample to read the

 1    certain indicators inside of it.

 2         Q    The first extraction program that you referenced

 3    GrayKey, is that used more specifically for a different --

 4    for certain types of operating systems?

 5         A    Typically, we use it for iPhone extractions.

 6         Q    And why is that?

 7         A    It does an excellent job of obtaining an image of

 8    that device.

 9         Q    And is it also usable for android devices?

10         A    It is in certain cases, yes.

11         Q    Okay.

12              And I believe you said you have done digital

13    extractions.  Does that also include computer hard drives?

14         A    It does.

15         Q    All right.  And there's a difference in extracting

16    information from a computer hard drive from a cell phone;

17    is that fair to say?

18         A    That is fair.

19         Q    And what are those differences?

20         A    Well, when you look at a computer, we can actually

21    remove the hard drive from those and keep everything powered

22    off and make an actual bit-for-bit copy of that hard drive.

23              When we interact with mobile devices, the device

24    has to be on and connected to one of our machines so that

25    the data -- so that the tool used to extract the device is

```
 1   actually interacting with that phone in order to get the
 2   extraction of the phone.
 3        Q    So specifically as to some of the phones you've
 4   looking at, did you -- and I'll list a number of defendants
 5   here, individuals here, I should say, in this case.  Did you
 6   look at Mr. Harrelson's phone, Ms. Watkins' phone,
 7   Mr. Caldwell's, Mr. Rhodes', Mr. Greene's, Ms. SoRelle's?
 8        A    Yes, all of those.
 9        Q    Okay.
10             And for clarity's sake, you either processed and
11   extracted or -- I'm sorry, extracted and then processed --
12   or simply processed someone else's extraction?
13        A    Yes, that is correct.
14        Q    Okay.
15             Is it normal to rely in your line of work upon the
16   extraction of another individual and then process that?
17        A    Yes, it is.
18        Q    Okay.
19             And you all use the same standards and systems?
20        A    Yes, we do, we have the same standard operating
21   procedure.
22        Q    Now, I want to talk would you -- and if we can
23   pull up what's been admitted into evidence as Government
24   Exhibit 6740.
25             Ma'am, do you need some water while testifying?
```

1      A      I'm good.  Thank you.

2      Q      Okay.

3             While we're waiting for that, I'll jump around

4   here a little bit.

5             During the course of your work on this case,

6   did you compile what's called an amalgamated report?

7      A      I did.

8      Q      Okay.

9             And an amalgamated report is what?

10     A      I took -- for a specific requested chat, I took

11  that chat and found it across several different devices and

12  put that in one report so that it was all easily accessible

13  in one location.

14     Q      All right.  Ma'am, what are we looking at here on

15  what's been marked as Government Exhibit 6740.

16            MR. CRISP:  And if we can -- do you know if this

17  has been entered so we don't have issues with publishing it?

18            MS. RAKOCZY:  I don't have an objection to

19  publishing, Your Honor, but could we just briefly chat on

20  the phone.

21            (Bench conference)

22            MS. RAKOCZY:  Your Honor, my apologies.  I am not

23  certain that this witness has an ability to opine about call

24  detail records, which the exhibit that we're looking at

25  right now is about, so I'm just -- I'm not sure that a

1   proper foundation has been laid for her to opine about call

2   detail records which come from cell phone companies and are

3   normally interpreted by an expert from the FBI CAST

4   department or their cell site cell phone record experts.

5           MR. CRISP:  Judge, I'll lay the foundation.

6   I discussed this with her, so I can certainly lay a

7   foundation as to how and why she's able to do that.

8           THE COURT:  Okay.

9           (Open court)

10  BY MR. CRISP:

11      Q    So, ma'am, I want to talk about something called

12  CDRs.  Are you familiar with them?

13      A    Yes, I am.

14      Q    Okay.  And what does CDR stand for?

15      A    Call detail record.

16      Q    And what is it?

17      A    They are essentially exactly what they sound like,

18  call detail records provided by any given cell phone

19  provider.

20      Q    Okay.

21           And during the course of your work when you'd

22  conduct an extraction and then process it, are you -- what

23  do you pull from there?  And if I may lead a little bit just

24  to try and speed this along.

25           Do you pull things like voice detail records, text

1    records, things -- or text messages, things like that?

2        A    We do pull call logs and text messages from the

3    extractions, yes.

4        Q    All right.

5            So when you get call logs and you -- let's say,

6    for example, you were to compare a call log from an

7    individual A's phone versus individual B's phone and one

8    shows a communication between one phone and the other, that

9    doesn't -- it doesn't show up on the second phone.  Do you

10   use things like CDRs to reconcile those differences?

11       A    Potentially as requested by the investigative

12   team.

13       Q    Okay.

14           So are CDRs things upon which you have relied on

15   at times in the course of your work in conducting your

16   extractions and processing?

17       A    I have seen them.

18       Q    And are you familiar with them and have you looked

19   at CDRs in this particular case?

20       A    I have looked at some of them.

21       Q    Okay.

22           And have you looked at the CDRs for both Ms. --

23   I'm sorry, Ms. Watkins and Mr. Caldwell?

24       A    I have.

25           MR. CRISP:  Okay.

1           And, Your Honor, at that point I believe that

2     based on that, I've laid a sufficient foundation and would

3     submit that she can speak to this document.

4           MS. RAKOCZY:  No objection to talking about this

5     document, but I'm not -- I may have an objection when we go

6     further.

7           THE COURT:  Okay.  See where it goes.

8           MR. CRISP:  Thank you, Your Honor.

9     BY MR. CRISP:

10      Q    So, ma'am, do you see what's on the screen marked

11    as 6740?

12      A    I do.

13      Q    Okay.

14           And what are we looking at, to your understanding?

15      A    It looks like a summary of call detail records.

16      Q    Is this something that you have seen before?

17      A    I have.

18      Q    All right.  Fair to say you and I have gone over

19    this?

20      A    We did.

21      Q    All right.

22           And I want to direct your attention to the

23    discussions on the bottom block which lists Caldwell,

24    Watkins, Donovan Crowl, Paul Stamey, specifically if we

25    can -- starting at the second column -- I'm sorry, second

1    row, sorry, I'm not terribly accurate here.

2              At 1/6 at 5:04, there's a call between Caldwell

3    and Watkins.  Do you see that?

4        A    I do.

5        Q    All right.  And then I'll have you go down to the

6    row here at 2:08, I want to focus on those series of phone

7    calls.

8              Now, did you find evidence of those phone records

9    in the extraction from Ms. Watkins' phones?

10       A    I did.

11       Q    Okay.  Which ones?

12       A    The call at 5:04, the call at 5:43, 6:49, and

13   2:08.

14       Q    Okay.

15             So I'm clear, you did not find any evidence of a

16   call at 10:04, 10:44, and 10:54 correct?

17       A    Correct.  In Eastern Standard Time.

18       Q    Right.

19             And just so we're clear, when you conduct an

20   extraction, you always perform that extraction in UTC?

21       A    I do, yes.

22       Q    Why?

23       A    It is a -- it is the universal standard and almost

24   are data is stored in UTC, so it's simply easier to keep

25   that standard, especially when you're comparing multiple

```
 1    devices going across multiple time zones.

 2         Q    Okay.

 3              Now, in Mr. Caldwell's CDR -- did you review his

 4    CDR?

 5         A    I did.

 6         Q    Did you find evidence of the calls listed at

 7    10:04, 10:44, and 10:54 in his CDR?

 8              MS. RAKOCZY:  Objection.

 9              THE COURT:  Basis?

10              MS. RAKOCZY:  Foundation.

11              (Bench conference)

12              MS. RAKOCZY:  Your Honor, my only concern with

13    this is that I know that she says she sometimes looks at

14    CDRs but she is not an expert in CDRs.  She does not have

15    the familiarity with how the different cell phone providers

16    keep their records, et cetera.

17              So I think it's a little bit unfair to show this

18    witness some records without having her be an expert or

19    having her had done the actual work that a CAST analyst

20    would do, to ask her what call detail records show to try to

21    seek her -- you know, put the imprimatur of an expert

22    witness on examining call detail records when she's not been

23    qualified as an expert as such.

24              MR. CRISP:  It sounds like weight versus

25    admissibility to me, Judge.  I think I could ask her that.
```

```
 1    She's looked at it.  She can speak quite intelligently to a
 2    lot of these CDRs and has with me.  I think the government
 3    can explore that on cross-examination.
 4              THE COURT:  If it's something she uses in her work
 5    and has used in her work, I don't know whether -- did she
 6    compile this report or no?
 7              MS. RAKOCZY:  No, Your Honor.
 8              THE COURT:  Okay.
 9              In any event, she's testified she's looked at them
10    as part of her work, and so I think she can testify.
11    Ms. Rakoczy, if on cross-examination you want to make clear
12    she's not an expert and doesn't have specific knowledge,
13    that's fine, and obviously, Mr. Crisp, you can do that in
14    direct examination if you want to as well.
15              MR. CRISP:  Thank you, Judge.
16              (Open court)
17              THE COURT:  The objection will be overruled.
18    BY MR. CRISP:
19         Q    So, ma'am, I believe I asked you did you find
20    evidence of those calls in Mr. Caldwell's CDR?
21         A    I can't recall in his CDR.  I know I found records
22    of them in his phone extraction.
23         Q    Okay.
24              In his phone extraction or her phone extraction?
25         A    Both.
```

```
 1        Q    Okay.

 2             So when you say -- you're talking about the 10:04

 3   or the 5:04?

 4        A    Well, since this has been standardized to Eastern

 5   Standard Time, in Eastern Standard Time records of 10:04 --

 6   sorry, 5:04 Eastern Standard Time.

 7        Q    All right.

 8             And would seeing Mr. Watkins -- I'm sorry,

 9   Mr. Caldwell's CDR help refresh your memory as to that, or

10   are you clear that there were no records in Eastern Standard

11   Time of a 10:04 call from Caldwell to Watkins?

12        A    I believe his CDR matched exactly what was in his

13   phone extraction.

14        Q    Okay.

15             And that was what, the four calls we referred?

16        A    The four calls we've referenced.

17        Q    Okay.

18        A    None in the 10:00 a.m. Eastern Standard Time.

19        Q    All right.

20             And then I want to talk a little bit about --

21             Again, his CDR only had four calls between the two

22   of them, is that fair to say?

23        A    It included at least those four calls, yes.

24        Q    On the date, time in question, so between the

25   hours of 5:00 a.m. and 2:08 p.m., Eastern Standard Time,
```

```
 1    fair to say there were only four calls that you saw records
 2    of in the extraction?
 3         A    Yes, there was actually one more that is not
 4    listed on this exhibit.
 5         Q    Okay.
 6              And what was that?
 7         A    I believe it was also in the 5:00 a.m. time frame,
 8    either slightly before or slightly after 5:43 a.m.
 9         Q    Okay.
10              So nothing in the 10:00 time frame, correct?
11         A    Correct.
12         Q    All right.
13              And when you conducted an extraction of
14    Ms. Watkins' phone, did you see evidence of calls in the
15    10:00 time frame Eastern Standard Time?
16         A    No, I did not.
17         Q    All right.
18              When you looked at her CDR, did you see evidence
19    of something in her CDR that would have implied a 10:00
20    call?
21         A    There were line items for a 10:00 call.
22         Q    Okay.  Now, to be clear, while you rely on these
23    CDRs, it's not something that you would put yourself out as
24    an expert, correct?
25         A    That is correct, I am not an expert in CDRs.
```

1        Q    You use them to reconcile differences, however,

2  correct?

3        A    Yes, to validate the data in my extractions.

4        Q    Now, when I brought this to your attention, was

5  this the first time you had seen this discrepancy as to the

6  respective CDRs and extractions?

7        A    Yes.

8        Q    Did you take time to review the CDRs and attempt

9  to reconcile for your expertise why that would have

10 occurred?

11       A    I did.

12       Q    Was there a phone number listed as -- on the 10:00

13 ones?

14            And if we can pull up Watkins 52 for the witness

15 only, please.

16            Are you able to see that, ma'am?

17       A    Yes, sir.

18       Q    Can you go to 3 of 13, please.

19            And back to page -- yeah, there you go.  13.

20            In looking at this document, ma'am, what anomalies

21 did you note as to why there may have been confusion as to

22 whether or not there were calls in the 10:00 Eastern Time

23 frame?

24            THE COURT:  Mr. Fischer, I'm sorry -- I'm sorry,

25 Mr. Crisp, could you just orient the jurors as to what this

```
 1    is.
 2              MR. CRISP:  Sure.  I'm sorry.
 3    BY MR. CRISP:
 4         Q    Ma'am, what are we looking at?
 5         A    These are the call detail records for Ms. Watkins'
 6    phone.
 7         Q    Okay.
 8              And as it pertains to the issue of the anomaly as
 9    to the 10:00 phone calls, what did you discover?
10         A    There are three calls in the 10:00 a.m. range that
11    have a different number in the dialed digits column.
12         Q    Now, in your experience, what does that mean?
13         A    It could be that the call was routed through some
14    kind of provider number.
15         Q    Okay.  And why would that happen?
16         A    I honestly -- I don't know why calls are routed.
17         Q    All right.  You talked about historically, certain
18    providers and cell phone providers had done this in the
19    past, is that accurate?
20         A    I have -- yes, I have seen that in the past.
21         Q    Okay.  And why have they done that -- why was it
22    done in the past?
23         A    The way cell phone technology used to work is that
24    it would send a call through your home tower before it would
25    hit the local tower near where you were.
```

1         It's been several years since I've looked at that.

2    I'm not well-versed in it nowadays.

3         Q    All right.  So the phone number that you think may

4    be a routing number, what is that number?

5         A    (937) 727-9469.

6         Q    Did you see evidence of that number in any of the

7    extraction that you conducted in Ms. Watkins' phone?

8         A    I did not.

9         Q    Did you see any evidence of that number in

10   Mr. Caldwell's CDR?

11        A    I did not.

12        Q    His phone extraction?

13        A    I did not.

14             THE COURT:  Sorry -- Mr. Crisp, I'm sorry, what

15   was that number again?

16             MR. CRISP:  It is (937)727-9469.

17             THE COURT:  All right.  Thank you.

18             MR. CRISP:  And to be clear -- Your Honor, at the

19   point I'm going to move to admit Watkins 52.

20             MS. RAKOCZY:  No objection.

21             THE COURT:  All right.  Watkins 52 will be

22   admitted.

23                                (Defendant Watkins Exhibit 52
                                      received into evidence.)
24

25             MR. CRISP:  If we can publish that to the jury.

```
 1    Thank you.
 2    BY MR. CRISP:
 3         Q    So can an individual go in and delete a phone call
 4    from their phone?
 5         A    Yes, they can.
 6         Q    And if you delete a phone call from a phone, would
 7    it show up on an extraction?
 8         A    Potentially.
 9         Q    If I delete a phone call from my phone and you get
10    a CDR of my phone, would that deleted phone call show up on
11    the CDR?
12         A    Yes.
13         Q    Am I able, as a user, to go and delete records
14    from the cell phone provider?
15         A    No, you're not.
16         Q    So regardless of what I do with my phone, a phone
17    call is still going to show up on a CDR if it was made, is
18    that fair to say?
19         A    That's fair.
20         Q    Okay.
21              And to be clear, all but one of these calls, as I
22    see it, was made from Mr. Caldwell's phone to Ms. Watkins'
23    phone?
24         A    That is correct.
25         Q    Okay.
```

```
 1              And based on your expertise and knowledge and the
 2    extraction you conducted as far as both of these phones, is
 3    it fair to say you would indicate to a reasonable degree of
 4    forensic certainty that there were no phone calls made in
 5    the 10:00 time frame between these two phones?
 6       A    In comparing to the extractions, I would say that,
 7    yes.
 8       Q    Okay.
 9            Any question about that?
10       A    No.
11       Q    Okay.
12            All right.  I want to also, before we move on from
13    that, I want to talk about the final call that was made at
14    2:00, around about 2:08, 2:07.  What can you tell me about
15    that call?
16       A    It was noted in the extraction as being a missed
17    call.
18       Q    As a what, ma'am?
19       A    As being a missed call.
20       Q    Okay.
21            And how was an extraction able to say whether it's
22    missed or not?
23       A    If it actually has device connectivity and the
24    user answers the call.
25       Q    Okay.
```

1           So a missed call is, without being too redundant

2    or obvious, is one that you call me, it rings, it rings, it

3    rings, I never pick it up?

4         A    That is correct.

5         Q    And I want to pull up Watkins 13, please.

6              Just for the witness.

7              THE COURT:  Mr. Crisp, how long do you anticipate

8    direct examination will be?

9              MR. CRISP:  I'm sorry, Judge.

10             THE COURT:  How much longer for your direct?

11             MR. CRISP:  If you want take a break now, we can.

12             THE COURT:  That's what I'm trying to figure out.

13             MR. CRISP:  Another 15, 20 minutes.

14             THE COURT:  Why don't we take a quick break.

15   I know our court reporter has been working since 8.

16             MR. CRISP:  Roger that.

17             THE COURT:  Let's take our morning break.  It's

18   10:30.  We will resume at 10:45.  Thank you very much.

19             COURTROOM DEPUTY:  All rise.

20             (Jury exited the courtroom.)

21             THE COURT:  Ms. Cain, you can step down.  I'll ask

22   you not to discuss your testimony with anyone during the

23   break.  Thank you.

24             MR. FISCHER:  Your Honor, could I, for the

25   record --

```
 1                THE COURT:  Ms. Cain, you can be excused.
 2                Be seated, everyone.
 3                MR. FISCHER:  For the record, now that
 4    Mr. Caldwell, we have rested, can I make a Rule 29 motion
 5    and for all the previous reasons or --
 6                THE COURT:  Sure.
 7                MR. FISCHER:  That are on the record and it's
 8    preserved, I just want to be clear.
 9                THE COURT:  Okay.
10                MR. FISCHER:  Thank you, Your Honor.
11                THE COURT:  Thank you, Mr. Fischer.
12                All right.  Thanks, everybody.  See you in 15
13    minutes.
14                (Recess from 10:31 a.m. to 10:46 a.m.)
15                THE COURT:  Please be seated, everyone.
16    Thank you, all.
17                Ms. Cain, come on back up.  Thank you.
18                (Pause)
19                COURTROOM DEPUTY:  Jury panel.
20                (Jury entered the courtroom.)
21                THE COURT:  All right.  Please have a seat,
22    everyone.
23                Okay.  Welcome back, everybody.
24                Mr. Crisp.
25                MR. CRISP:  Thank you, Your Honor.
```

```
1    BY MR. CRISP:

2        Q    Ma'am, are you able to see what is on the screen?

3        A    I am.

4             MR. CRISP:  And, Your Honor, for the record, this

5    has been marked as Watkins 13.  And I move for its admission

6    at this time, please.

7             MS. RAKOCZY:  No objection.

8             THE COURT:  Watkins 13 will be admitted.

9                              (Defendant Watkins Exhibit 13
                                        received into evidence.)
10

11   BY MR. CRISP:

12       Q    So, ma'am, is this a compilation of the call logs

13   we discussed?

14       A    It is, from the extraction.

15       Q    Okay.

16            And I believe earlier you said that there are

17   approximately five calls that you think occurred between

18   those two individuals?

19       A    Correct.

20       Q    And does this accurately reflect the five calls

21   that occurred?

22       A    It does.

23       Q    Okay.

24            So if I can shift a little bit, just for the

25   witness, please, if we can have Watkins 5.
```

```
 1              And, Your Honor, I do not intend to admit this
 2   report.  This is just for edification.
 3              Now, the amalgamated report that we discussed,
 4   what did you do and how did you compile that?
 5        A    I'm sorry, are we speaking about the Signal
 6   report?
 7        Q    Yes, ma'am.
 8        A    Okay.
 9              I was requested for one specific chat, to look on
10   all of the devices that I examined and find where that chat
11   appeared across the devices.
12              And then on every device it appeared on, I
13   combined that into one report so that the entire chat was in
14   one location.
15        Q    All right.
16              And so my understanding is that there were
17   approximately four phones with which you did this, right?
18        A    I did.
19        Q    And it would have been in Kellye SoRelle's
20   Stewart Rhodes', Michael Greene's, and Mr. Harrelson's,
21   who's first name is escaping me right now, I apologize,
22   but --
23        A    That is correct.
24        Q    And there were no records as it relates to
25   Mr. Harrelson's phone.
```

```
1        A    No.  The group chat was on his device but there
2   was not content.
3        Q    Okay.
4             I apologize.
5             So there were no input from him on the chat?
6        A    Yes, his membership -- listed his membership on
7   that chat in his phone.
8        Q    And is that why, as far as this amalgamated
9   report, you really only see three participants.
10       A    That is correct.
11       Q    And what I would like to do now is show you
12  Watkins 8, please.
13            Now on the screen is Watkins 8.
14            MR. CRISP:  And, Your Honor, for --
15            THE COURT:  Mr. Crisp, I'm sorry to interrupt.
16            I don't think I heard her identify which Signal
17  chat she did this for.  Did she --
18            MR. CRISP:  Which chat group?
19            THE COURT:  Yes.
20            MR. CRISP:  Fair enough, Your Honor.  Thank you.
21            THE COURT:  Could you just --
22  BY MR. CRISP:
23       Q    Ma'am, let's clarify that.  Which group did you do
24  this amalgamated report for?
25       A    I believe it was called "D.C. Op Jan. 6, 21."
```

1     Q     Thank you.

2           Now, in looking at what's on --

3           MR. CRISP:  Your Honor, I'm going to move for the

4    admission of Watkins 8, 9, and 11.  This is 8, so if I can

5    do that upfront.

6           MS. RAKOCZY:  No objection.

7           THE COURT:  All right.  8, 9, and 11 will be

8    admitted.

9                          (Defendant Watkins Exhibits 8, 9 and 11
                                  received into evidence.)
10

11   BY MR. CRISP:

12    Q     Do you recognize Watkins 8?

13    A     I do.

14    Q     And is this essentially an extraction from what we

15   looked at earlier of Watkins 5?

16    A     Yes, it is.

17    Q     Okay.

18          So essentially we've cut and pasted sections of

19   that entire report for efficiency purposes?

20    A     That is correct.

21    Q     All right.  If this is not published to the jury,

22   if we could please do so.

23          I want to go over what the columns are marked as.

24          So "source" column means what?

25    A     That is the device owner of the phone that this

```
 1    line item was taken from.
 2         Q    Okay.
 3              So the first one says "source," and there you have
 4    "Greene."  Is this Mr. Greene's phone?
 5         A    That's correct.
 6         Q    And the second one, so that would have been
 7    Rhodes' phone and SoRelle's phone, right?
 8         A    Yes, sir.
 9         Q    Let's jump over to "remote party name."  What does
10    that connote?
11         A    That corresponds with the remote party column and
12    that is the sender of any particular message on here.
13         Q    All right.
14              Let's talk about some distinctions between and the
15    application Signal.  You're familiar with that?
16         A    I am.
17         Q    And how are you familiar with that?
18         A    I routinely see it as on all of my -- on many of
19    my cell phone extractions that I do.
20         Q    When it's on an Apple phone versus an Android
21    phone, are there differences in how you're able to -- how
22    you extract that information, how you compile that
23    information and so on?
24         A    There are differences.
25         Q    Can you tell the jury what those are, please, and
```

1   why.

2        A      The main difference is the database that actually

3   houses the information corresponding to these Signal

4   messages in an iPhone, the generic date field is the date

5   the message was sent.

6             In an Android database for Signal, the generic

7   date field is the date the message was received.

8        Q      So did Mr. Rhodes and Ms. SoRelle have an iPhone?

9        A      They did.

10       Q      Did Mr. Greene have an Android or iPhone?

11       A      He had an Android.

12       Q      So as to the point you discussed earlier, if you

13  have a person from an Android phone sending to an Apple

14  phone and you do an extraction, and in the Signal app, let's

15  assume it's all through Signal, at 1:00, when would the

16  Android sender show the sent time?

17       A      1:00.

18       Q      When would the Apple recipient show the receipt

19  time?

20       A      1:00.

21       Q      Now, do we know, based on how this is done,

22  whether or not the Android phone -- I'm sorry, the Apple

23  phone actually received it at 1:00?

24       A      No, we don't.  This is just the sent time of the

25  message.

1     Q   Let's turn it around.

2         Apple sender at 1:00, Android recipient.

3         The sent time for Apple sender would be 1:00,

4 right?

5     A   That is correct.

6     Q   What time would the Android recipient show in

7 receipt time?

8     A   The actual time that that message was received.

9     Q   Okay.

10        So Android -- and as to how this is -- these

11 extractions are done through Signal with Androids, you can

12 show with greater specificity, shall we say, in using an

13 Android phone in terms of send and receive times?

14    A   Assuming that you have the sent time from another

15 location, yes, from another source.

16     Q   All right.

17        So if the Android recipient didn't receive it

18 until 1:10, that would actually show up on this kind of

19 extraction as 1:10?

20    A   That is correct.

21     Q   Okay.

22        And in this particular case, do you see any

23 discrepancies between send receipt times between the

24 receivers and senders?

25    A   I do not.

1      Q      Okay.

2             And as to Mr. Greene, we indicated he is an

3      Android user so it's fair to say that when Mr. Rhodes sent

4      the message, "Correction.  That's C Street," so on at 11:35,

5      and this is all in Eastern Standard Time?

6      A      This is, yes.

7      Q      Did you convert that from UTC to Eastern Standard?

8      A      My report was in UTC, but I confirmed that what

9      you have shown me here was correctly converted into Eastern

10     Standard Time.

11     Q      So simultaneous send/receipts fair to say?

12     A      Yes.

13     Q      We can have -- I'm sorry.

14            One moment, Judge.

15            Watkins 9, please.

16            Now, have you seen this exhibit as well?

17     A      I have.

18     Q      And same thing here, these are copies of or cut

19     and pastes from your report?

20     A      Yes, with the timestamp converted to Eastern

21     Standard Time.

22     Q      Roger.

23            Okay.

24            Now, let's go with the first one with Greene, it's

25     from Rhodes, so it's Stewart -- I'm sorry, it is

```
 1   Michael Greene's phone with the sender being Stewart Rhodes
 2   in the first row, yes?
 3        A    Yes.
 4        Q    And here you have "Pence is doing nothing as I
 5   predicted."
 6             The receipt time for Mr. Greene is reported as
 7   1:36, is that accurate?
 8        A    Yes, it is.
 9        Q    Do we know when Mr. Rhodes sent that?
10        A    If you look further down on Rhodes' -- where
11   Rhodes is the sourced device, that same message is on the
12   first line and it's 1:25:41 p.m.
13        Q    And Ms. SoRelle has the receipt date as 1:25 as
14   well, right?
15        A    Her time stamp date, that is the date that --
16   because she has an iPhone that is also the date the message
17   was sent.
18        Q    We don't know if she actually received it at 1:25?
19        A    Not on this report, no.
20        Q    Is there a way of actually making a determination
21   as to when she would have received it?
22        A    At this time, none of the tools available to us
23   parse any other date other than these generic time stamps.
24   It is possible that we could have created a custom-coded
25   solution to potentially pull those dates out if they were
```

1    available in the database.  I do not know if they are.

2        Q    Okay.

3            Now, can you tell me why there would have been an

4    approximately 11 minutes and few odd seconds delay between

5    the send/receipt between Mr. Rhodes and Mr. Greene?

6        A    There are a couple of different potential reasons.

7    The first reason being if the phone was powered off or in

8    airplane mode and it wasn't connected to any network, then

9    the application obviously couldn't receive any messages at

10   that time.

11           The second explanation is if his phone was powered

12   on but say perhaps he had turned off the ability for the app

13   to refresh in the background so, which means that if the app

14   is not actively open, it isn't actively reaching up to the

15   server and pulling down those messages.

16           And then in that case, you would need to actually

17   open the Signal app in order for it to sync and bring down

18   those messages.

19           The third is that potentially the notifications

20   were turned off on the device and that device refresh was

21   off, and so those two kind of align in that the messages

22   would not be received until the user opened the Signal app

23   on their device.

24       Q    Is network delay also a possible reason?

25       A    It is, yes.

1      Q    As we sit here right now, there's at least four

2   reasons why there would have been a delay in the receipt

3   from -- to Mr. Greene?

4      A    That is correct.

5      Q    In all of those instances, however, just so I'm

6   clear, what we can definitively say from this is that you

7   can say Mr. Greene would not have seen that message in the

8   first row until 1:36 Eastern?

9      A    That is correct.

10      Q    Now, these discrepancies that are listed later in

11   the rest of the remaining phone conversations are also

12   consistent with your report?

13      A    They are.

14      Q    Okay.

15           Now, let's go down to the third one that's from

16   Whiplash, it says, at 2:14, "They have taken ground at the

17   Capitol."  That is his send date because he's sending the

18   message, correct?

19      A    That is correct.

20      Q    And Mr. Rhodes has that time receipt as what time?

21      A    Well, he has his generic time stamp, which on the

22   iPhone is time sent as the same time, which is 2:14:43 p.m.

23      Q    And that is because that's going to reflect, as we

24   said earlier, sent date, not necessarily receipt date?

25      A    Correct.

1    Q    All right.

2         If we can go to Watkins 11.

3         Now, Watkins 11, as you'll see here in a moment,

4    ma'am, is the report that we discussed earlier that deals

5    with a large chunk of messages that have a two plus hour

6    delay.

7         And we'll probably have to blow that up a little

8    bit so if we can do that.

9         So what we're looking at here are the first party

10   here, the sending party -- or the source phone is going to

11   be Mr. Rhodes on the first block, is that fair?

12   A    That's correct.

13   Q    And then if we can scroll down to the bottom

14   block, please, and this is going to be Mr. Greene.

15        So if we can scroll back up to Mr. Rhodes'

16   messages, here you have messages that he is showing having

17   been sent in the 2:41 through 3:31 time frame.  Is that

18   correct?

19   A    That is correct.

20   Q    If we can scroll down to Mr. Greene's phone,

21   please.

22        And these are the same messages but these are

23   showing a receipt date of approximately anywhere from two

24   plus hours upwards of three hours' difference?

25   A    That is correct.

1      Q     Correct?  Okay.

2            Now, in your review of Mr. Greene's phone, if we

3      could scroll back up to Mr. Rhodes' time frame, you

4      recall -- do you recall seeing messages that Mr. Greene was

5      either sending or receiving from other parties in the 2:40,

6      2:41, 2:45 time frame?

7      A     I do.

8      Q     And he was, to your recollection, receiving

9      messages from others intermittently in that same time

10     window.

11     A     He was.

12     Q     So what does that tell you?

13     A     The most likely explanation is that the Signal app

14     was open during that time.

15           THE COURT:  I'm sorry, was what?  I didn't hear

16     her.

17           THE WITNESS:  Was open during that time.

18     BY MR. CRISP:

19     Q     And he was using it, right?

20     A     And he was using it.

21     Q     So the likely explanation as to why he's not

22     receiving these messages from Mr. Rhodes would either be a

23     send delay from Mr. Rhodes or just a network busy issue

24     overall?

25     A     That is correct.

```
 1         Q      Okay.

 2                MR. CRISP:  The Court's indulgence one moment,

 3   Your Honor.

 4   BY MR. CRISP:

 5         Q      Ma'am, I'm sorry, I was reminded I forgot to ask

 6   something on Watkins 9.

 7                If we can pull that up real quickly.

 8                All right, ma'am, I want to direct your attention

 9   to -- if we can go to Mr. Rhodes as a source phone and it's

10   going to be the one -- third row, this is where Mr. Rhodes

11   is asking Whip, "What's your location, I'm trying to get to

12   you," and that was from him, right?

13         A      That was from Mr. Rhodes, yes.

14         Q      And it was sent then to, do we know who?

15         A      The entire group of the "D.C. Op Jan. 6, 21."

16         Q      When can we tell when Mr. Greene received that

17   message?

18         A      According to his device, Mr. Greene received that

19   message at it 2:24:21 p.m.

20         Q      All right.  So we're talking a difference of about

21   18 minutes or so, yes, before Mr. Greene actually saw that

22   message?

23         A      Yes.

24         Q      All right.

25                MR. CRISP:  Ma'am, I don't have any additional
```

9279

1    questions.

2          Thank you, Judge.

3          THE COURT:  Thank you, Mr. Crisp.

4          MR. CRISP:  I believe government counsel does.

5          THE COURT:  All right.

6          MS. HALLER:  With the Court's indulgence, we would

7    just have a few questions on direct.  Just one moment.

8          THE COURT:  Any objection?

9          MS. RAKOCZY:  In light of expediency, Your Honor,

10   no.

11         THE COURT:  Ms. Haller, do you have questions?

12         MS. HALLER:  Yes, Your Honor.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           - - -

 2                      DIRECT EXAMINATION

 3   BY MS. HALLER:

 4        Q     Good morning.

 5        A     Good morning.

 6        Q     I'm Juli Haller, and I represent Kelly Meggs in

 7   this case, and I'm sorry I've lost my voice a little bit so

 8   just bear with me.

 9              (Pause)

10              Forgive me.

11              If we can just go over some of the chats.  You

12   said that you helped doing the analyzing data based off of

13   the cell phones.

14              As for the chats, did you review the

15   "Old Leadership" chat as one of the chats in this case?

16        A     I did extract data containing that for the

17   "Old Leadership" chat.  I'm not too familiar with the

18   content inside that chat.

19        Q     Okay.

20              But when you extracted data, do you recall whether

21   or not you checked for when various defendants sent their

22   last message?

23        A     I did prepare a report that said certain key

24   individuals and certain group chats, when they did have the

25   first and last message, yes.
```

```
 1       Q     Okay.

 2             I'm going to show what I think that report might

 3   be.

 4       A     Okay.

 5       Q     And you tell me --

 6             Just for the witness if that's --

 7             So this did have a Government's Exhibit number,

 8   but we're going to call it KM79 at this time.

 9             And just to show it to the witness.

10             Ms. Cain, would you be able to identify this

11   document where it's about defendants' entry to and exit from

12   key Signal chats?

13       A     Yes, this is my report.

14             MS. HALLER:  At the time, we would like to move in

15   Exhibit 1 -- or KM79, please.  And publish it to the jury.

16             MS. RAKOCZY:  No objection, Your Honor.

17             THE COURT:  KM79 will be admitted.

18                                    (Defendant Exhibit KM79
                                       received into evidence.)
19

20   BY MS. HALLER:

21       Q     Going down to the pink section where it says

22   Kelly Meggs, would it be correct to say that the last

23   message from Kelly Meggs in what's called the "Old

24   leadership" chat is 12/18/2020?

25       A     That is correct.
```

9282

1     Q     Okay.

2           And as for his other chats, looking at the

3     "D.C. Op Jan. 6", what time or what's the date of his last

4     known message?

5     A     January 8th, 2021.

6     Q     And -- thank you.

7           Looking at the "OK FL D.C. Op Jan. 6" chat, what

8     does it say for the date or what did you determine to be the

9     date of his last known message?

10    A     His last known message was January 7th, 2021.

11    Q     And looking at the -- sorry, I can't see what

12    the -- the OK FL hang out, what did you determine to be the

13    last date of his message?

14    A     January 7th, 2021.

15    Q     Thank you.

16          And the last one "Vetted OK FL hangout" chat, what

17    did you determine to be his last message?

18    A     January 20th, 2021.

19    Q     Okay.  Thank you.

20          And then the only --

21          Okay.  So now looking at what we would, just for

22    the witness, show -- what we would mark as KM80.  And if we

23    can just show the witness -- thank you.

24          Looking at this excerpt from a cell phone -- can

25    we make it a little bigger -- I'm not sure --

```
 1              Would you be familiar with what these individuals
 2    called themselves, their monikers?
 3         A    I know that Mr. Meggs is OK Gator 1.
 4         Q    Okay.
 5              And I'm showing you an excerpt from -- would you
 6    be able to identify from the visual whether it's an iPhone
 7    or Android?
 8         A    Not from this visual, no.
 9         Q    Okay.
10              Did you review Isaac's phone as a way to extract a
11    chat which was the "OK FL D.C. Op Jan. 6" chat?
12         A    I did not review Mr. Isaacs' phone.
13         Q    Oh, okay.  So you didn't extract?
14         A    I did not.
15         Q    Okay.  And then you will not -- you wouldn't be
16    familiar with Isaac' phone at all?
17         A    That is correct.
18         Q    Okay.
19              MS. HALLER:  Then that is all I have.  Thank you
20    for your time.
21              THE COURT:  All right, Ms. Rakoczy.
22              MS. HALLER:  Thank you, Your Honor.
23              THE COURT:  Thank you, Ms. Haller.
24                            -  -  -
25                       CROSS-EXAMINATION
```

BY MS. RAKOCZY:

Q    Good morning, Examiner Cain.  How are you?

A    Great.  Thank you.

Q    I just have a few questions for you this morning.

I'd like ask you a couple of questions about what Mr. Crisp asked you about with respect to call detail records that you looked at.

Could you just explain the difference between call record data that you see on a phone versus call record data that you get from cell phone providers?

A    Sure.

When we look at a phone extraction, all of the messages that are -- that come to that phone, either sent or received or missed and that you can visibly see on the interface of that device, that would be something that would be available in a phone extraction.

Call detail records come from a phone provider and they detail any call that actually goes through one of the cell towers on their system.

So, for instance, if I say I called someone and they look at their phone and they do not see that call, maybe they're in airplane mode, maybe for some other reason, and they can't see that on their actual phone, then that call would be not be reflected on the extraction but it could be on the provider's records.

```
1        Q    Okay.
2             Now, when you're looking at the data on someone's
3    actual phone or device, is it possible for the user of the
4    device to delete the record of a phone call from their
5    phone?
6        A    It is.
7        Q    Is it possible for them to delete it from the
8    records that the phone companies keep?
9        A    To my knowledge, it is not.
10       Q    Okay.
11            Let's talk about Signal, the Signal app.  Can you
12   make calls through the Signal app?
13       A    You can.
14       Q    And could that data -- would that data be stored
15   by a person's phone?
16       A    It would.
17       Q    Could the user of the phone delete a record of a
18   Signal call that had been made on their phone?
19       A    They could, yes.
20       Q    Now, would the cell phone companies keep a record
21   of a call made through the Signal app?
22       A    No, they would not.
23       Q    So is it fair to say if you and I had a Signal
24   call and I deleted the record of that from my phone, there
25   wouldn't also be a record of that that the cell phone
```

1    providers would have, correct?

2        A    There would not be a record.

3        Q    There would be no record of that call, correct?

4        A    Correct.

5        Q    How about with are there other apps on people's

6    cell phones that people can use to make calls?

7        A    There are.

8        Q    And can people go into their phones then and

9    delete the record of those communications?

10       A    Yes, you can.

11       Q    And would the cell phone providers have any record

12   of those communications through apps?

13       A    No, they would not.

14       Q    If we could talk a little bit now about the

15   questions you were asked about the analysis you performed of

16   this "D.C. Op Jan. 6" Signal chat, you were talking a little

17   bit about the difference between the way that Android phones

18   store the timestamp on messages versus iPhone messages.

19            Can you remind us again just what it means when

20   you say that an Android phone has received a message?

21       A    Sure.

22            It is the time that the message actually leaves

23   the Signal server and hits that device.

24            It could be, like we said earlier, dependent on

25   several factors as to when it hits the device, but it's when

1    that device receives it and is notified that there is a

2    message.

3         Q    Okay.

4              And you testified on direct examination that there

5    were some differences between the time that certain messages

6    were sent by, say, Stewart Rhodes' phone and when they were

7    marked as having been fully received by the Michael Greene

8    phone.  Do you remember that?

9         A    That is correct.

10        Q    Could we bring up the screen Watkins Exhibit 8,

11   please.

12             Do you see Exhibit Watkins 8 on the screen now?

13        A    I do.

14        Q    Now, these were two messages that were originally

15   sent by the Stewart Rhodes phone; is that correct?

16        A    That is correct.

17        Q    Okay.

18             And is it fair to say that these two messages that

19   Mr. Rhodes sent were both received by Mr. Greene's phone at

20   the same time they were sent?

21        A    Yes, it is, that is correct.

22        Q    Okay.

23             So no delay at all on these two messages?

24        A    Correct.

25        Q    That's including a message that Mr. Rhodes sent at

1    2:43 p.m. saying, "Come to the south side.  Just left of

2    dome"?

3         A    That is correct.

4         Q    Okay.

5              If we could take that down, please.  Thank you.

6              Could we bring up Watkins Exhibit 9.

7              Now, these are a few messages that were sent by

8    both Mr. Rhodes and Mr. Greene's phone in the period of

9    roughly 1:25 to 2:15 p.m. or 2:24 p.m.; is that right?

10        A    That is correct.

11        Q    Okay.

12             So the first message I think that we're talking

13   about is "Pence is doing nothing as I predicted"; is that

14   right?

15        A    Yes, it is.

16        Q    And that was a message that Mr. Rhodes' phone

17   sent?

18        A    Yes, it is.

19        Q    And Mr. Rhodes' phone suggests that he sent that

20   message at 1:25 p.m., is that right?

21        A    That is correct.

22        Q    And this exhibit is in Eastern Time, right?

23        A    It is.

24        Q    And you triple-checked that and made sure that it

25   really was 1:25 p.m. Eastern Time?

```
 1        A     I did.

 2        Q     Okay.

 3              And that message was received by Mr. Greene's

 4   phone at 1:36 p.m., correct?

 5        A     That is correct.

 6        Q     And so just a nine-minute delay; is that right?

 7        A     Yes, ma'am.

 8        Q     And the fact that we have that timestamp of

 9   1:36 p.m., that means that the phone got it at that point,

10   right?

11        A     Yes, ma'am.

12        Q     Okay.

13              And then the next message we're talking about was

14   sent by Mr. Rhodes' phone at 1:38 p.m.; is that right?

15        A     That is correct.

16        Q     And that was the message "All I see Trump doing is

17   complaining.  I see no intent by him to do anything.  So the

18   patriots are taking it into their own hands.  They've had

19   enough"?

20        A     Correct.

21        Q     Okay.

22              And that was also sent at 1:38 p.m. Eastern,

23   right?

24        A     Yes, ma'am.

25        Q     Okay.
```

1          And that was received by Mr. Greene's phone,

2   according to the records at the top, just four minutes

3   later, right?

4       A    That is correct.

5       Q    Okay.

6          And then Mr. Greene's phone is the next one,

7   I think, to send messages, at about 2:14 and 2:15 p.m.;

8   is that right?

9       A    That's correct.

10      Q    And you told us on direct that the fact that we're

11  seeing these red received times on Mr. Greene's phone

12  relatively close in time to when they were sent, Mr. Rhodes'

13  messages, that means that it appears as though Mr. Greene

14  has the app open and is using it, right?

15      A    That's correct.

16      Q    And so then at 2:14 and 2:15 p.m., Mr. Greene's

17  phone says, "They've taken -- they have taken ground at the

18  Capitol.  We need to regroup any members who are not on

19  mission," correct?

20      A    Yes, ma'am.

21      Q    And we can't really tell exactly when Mr. Rhodes

22  and Ms. SoRelle's phone received that because they're

23  Androids, right?

24      A    IPhones, yes.

25      Q    Or iPhones, sorry.  Thank you for correcting me.

1           The last message in this is then the message that

2    Mr. Rhodes sends at 2:15 p.m.; is that right?

3           A    Yes, ma'am.

4           Q    And that's when he says, "I'm on the Supreme Court

5    side of the Capitol.  Whip or Landon, where are you," right?

6           A    Yes.

7           Q    And Mr. Greene's phone, it looks like he gets that

8    no later than nine minutes later, is that fair?

9           A    That's correct.  That is correct.

10          MS. RAKOCZY:  Ms. Rohde, we can take that one

11   down.

12          Can we bring up Watkins 11, please.

13   BY MS. RAKOCZY:

14          Q    Now, these are a series of messages that were sent

15   by Mr. Rhodes entirely, right, are these messages sent by

16   Mr. Rhodes' phone?

17          A    Yes.

18          Q    Okay.

19          And these were sent, it looks like between 2:41

20   p.m. Eastern time and 3:30 p.m. Eastern Time, fair to say?

21          A    Yes, ma'am.

22          Q    And you checked these as well and these are all

23   the correct Eastern Time timestamp that Mr. Rhodes' phone

24   sent these messages?

25          A    Yes, ma'am.

1      Q    Okay.

2          Now, we see that Mr. Greene's phone doesn't show a

3 received time for these messages until like the 5:30, 5:45

4 p.m. time frame; is that correct?

5      A    That's correct.

6      Q    But we do not have those corresponding messages

7 that Mr. Greene is sending in this time period, right?

8      A    Not on this report, no.

9      Q    Okay.  So you can't say one way or the other --

10 well, let me ask you this.

11          Isn't it true that it could be the case that

12 Mr. Greene had his app closed and that's why he's not

13 getting these messages?

14      A    It could be, yes.

15      Q    Okay.

16          So we don't know that there was some kind of a

17 delay causing these messages to be -- to show a 5:00 p.m.

18 receipt date, right?

19      A    Correct, we do not know the reason for the delay.

20      Q    Okay.  So we can't really tell anything about why

21 Mr. Greene's phone is getting these messages later, correct?

22      A    Correct.

23      Q    Okay.

24          Thank you, Ms. Rohde.  If we could take that down.

25          We then were -- you then were in the looking at,

```
 1   when Ms. Haller was asking you questions about an exhibit
 2   that you made that I think was Watkins or Mr. Meggs' 79.
 3   Do you remember that?
 4        A    Is that the Signal membership chart?
 5        Q    When people came and left chats?
 6        A    Yes, ma'am.
 7        Q    Okay.
 8             Could I have the Court's indulgence one minute.
 9             MS. RAKOCZY:  If we could bring up on the screen
10   and publish, I believe we're now looking at the exhibit that
11   Ms. Haller was just showing.  I think it's KM79.
12   BY MS. RAKOCZY:
13        Q    Do you see this chart, Ms. Cain?
14        A    Yes, ma'am.
15        Q    Okay.
16             And this is something you prepared; is that right?
17        A    It is.
18        Q    Okay.
19             If we could just zoom in on the peach or pink
20   colored series of rows that say "Kelly Meggs."
21             Okay.  So these are some chats that defendant
22   Kelly Meggs was a participant in; is that right?
23        A    That is correct.
24        Q    And it's the "Old Leadership" chat,
25   "D.C. Op Jan. 6, 21,"  "OK FL "D.C. Op Jan. 6,"  "OK FL
```

```
 1    Hangout," and "Vetted OK Hangout:; is that right?

 2        A    That's correct.

 3        Q    Okay.

 4             Now, you have at first the first row is -- says

 5    "joined chat," is that right?

 6        A    That is correct.

 7        Q    What does that mean?

 8        A    When you become a member of a Signal group, Signal

 9    stores a membership list of that group on their server.

10             When your device connects to that group, it sends

11    down a realtime version of that membership list.

12             So if I create a group at 1:00 and there are five

13    members on it and then another member joins at 2:00, there

14    would be a refresh of that membership group, both at 1:00

15    and 2:00.  So it is continually refreshing its membership

16    list when you open that app.

17        Q    And then I see you also noted when you saw or when

18    the first known message was sent by Mr. Meggs in each of

19    these chats, is that right?

20        A    That's correct.

21        Q    And so sometimes I see, like in the third column

22    for the "OK FL D.C. Op Jan. 6" chat, I noticed that you put

23    an "unknown" for the join-chat date.  Why did you put that

24    there, if you remember?

25        A    I was not able, across any of the devices, to find
```

1    an incoming membership list that noted when he entered that

2    chat, which just shows that it was -- he likely entered it

3    before any of my extractions also joined that chat.

4         Q    Okay.

5              But you did note that the first message that you

6    saw Mr. Meggs' phone sending to this chat was on January 2nd

7    of 2021; is that correct?

8         A    That's correct.

9         Q    Okay.

10             So now can you explain to us the last two rows,

11   the last known message versus the last known membership?

12        A    Yes.

13             The last known message is exactly what it sounds

14   like, the last message that Mr. Meggs sent in participation

15   with that group.  It's the last message that he posted in

16   that group chat.

17             The last known membership is based on those

18   membership lists.

19             So, for instance, that same chat that you were

20   talking about, OK Florida D.C. Op January 6th, in that third

21   column, it says down there that Mr. Meggs is still a member

22   at the time of the Stone extraction.

23             So Mr. Stone's device was extracted in December of

24   2021.  He still had that Signal group present on his device

25   and was still receiving regular membership updates to that

```
 1   group list at that time.
 2            Mr. Meggs was still showing up in his member list
 3   as a member of that group at that time.
 4       Q    If you don't have someone's phone, can it be
 5   challenging to say with certainty when for sure they left a
 6   Signal group chat?
 7       A    It can be, yes.
 8       Q    And if you have someone's device but they've
 9   deleted Signal content or some Signal content from their
10   phone, can that make it challenging to know when they left
11   or whether they left a Signal group chat?
12       A    It can make it challenging, yes.
13       Q    Did you look at the data from Kelly Meggs'
14   cell phone?
15       A    I did.
16            MS. HALLER:  Objection, Your Honor; outside the
17   scope.
18            THE COURT:  It's overruled.
19   BY MS. RAKOCZY:
20       Q    I'm sorry, what did you say about whether you
21   looked at his phone?
22       A    I did look at Mr. Meggs' data.
23       Q    Okay.
24            And did you notice whether there was any Signal
25   data on that phone?
```

1    A    The Signal application was installed on his

2  device, and there were messages; however, they were very

3  limited, there was not many of them at all, and they were

4  much later in the course of 2021.

5    Q    And do you recall that you found that the Signal

6  data, in fact, had sort of -- did not exist prior to some

7  date in January of 2021?

8    A    That is correct, there was not data from January

9  2021.

10        MS. RAKOCZY:  Thank you, Your Honor.  I have no

11  further questions.

12        THE COURT:  Okay.  Mr. Crisp, any redirect?

13        MR. CRISP:  I do, Your Honor.  If I may have the

14  Court's indulgence real quick, please.

15                      - - -

16              REDIRECT EXAMINATION

17  BY MR. CRISP:

18    Q    Ma'am, I'm going to throw a little bit of

19  curveball here because I didn't expect to have to go down

20  this road here, but I am going to show you what's been

21  marked as --

22        Sorry, I'm getting different marching orders at

23  the moment.

24        Let's start with 6740, please.

25        And then have Watkins 13 in conjunction with that,

```
 1   please.
 2           So, ma'am, what I want to make sure about is, you
 3   see the two exhibits?
 4       A   I do.
 5       Q   All right.  On your left, this is published --
 6   these are already admitted so they should be published -- on
 7   the left is going to be what is Government 6740, on the
 8   right is going to be Watkins 13.  Is that correct?
 9       A   That's correct.
10       Q   Okay.
11           Now, what I want to make sure we're clear about
12   here is when you're looking at the CDRs, okay, you had
13   testified earlier both on direct and on cross, that an
14   individual cannot delete phone calls from a CDR?
15       A   That is correct.
16       Q   All right.
17           And when you looked at Mr. Caldwell's CDR, did you
18   see any call to that 937 number that you kind of referred to
19   as a ghost number?
20       A   I did not.
21       Q   And Mr. Caldwell had Signal on his phone, right?
22       A   I do not recall if he had Signal on his device.
23       Q   Did you look at his extraction?
24       A   I did.
25       Q   All right.  So you have no reason to believe that
```

1    when we talked about whether or not you had ever seen that

2    phone number, that you had ever seen that on Mr. Caldwell's

3    phone?

4         A    I had never seen that phone number on his phone.

5         Q    Okay.

6              Did you ever see that phone number that you

7    referenced as a ghost number -- and when I saw ghost, that's

8    essentially a routing number, right?

9         A    Well, it was a number that it was not identifiable

10   to me, I don't know the source of that number.

11        Q    To your understanding based on the CDR and based

12   on the extractions, do you have any reason to believe that

13   it was actually a legit number that was ever dialed?

14        A    It would not appear so, no.

15        Q    Okay.

16             So the likelihood that it was a number that was

17   either in a Signal app based on your review of all the

18   records in this case is extremely row?

19        A    It is.  Signal records do not appear on call

20   detail records.

21        Q    But Signal, if you have it on your phone, is still

22   visible, right?

23        A    It is still visible.

24        Q    And if you have it on your phone and it hasn't

25   been removed, you're still going to see the numbers that

1    have been called?

2         A    That is correct.

3         Q    Okay.

4              And I want to just, there's one final thing as to

5    Government's 6740, at the phone call that took place at

6    approximately 2:08:25.  I'd like to compare that to Watkins

7    13.

8              The actual length of that call was approximately

9    what, do you know?

10        A    According to the extraction, it was a missed call

11   so the length was zero.

12        Q    Okay.

13             So it wouldn't have been a 26-second phone call,

14   would it?

15        A    No, it would not have.

16        Q    Okay.  Thank you.

17             So, ma'am, we're going to have to go through this

18   somewhat methodically, but I'm going to show you what's been

19   marked as Watkins 10 alpha through 10 Charlie, so 10A, B, C.

20             Let's start with 10 alpha, please.

21             Now, again these are extractions or these are

22   copies of the extractions in similar format as the earlier

23   exhibits?

24        A    Yes.

25        Q    All right.

1          And do you remember discussing with me yesterday

2     the issue of how we could determine whether or not an

3     individual was able to receive messages during a time period

4     if you can cross-reference it from send receipts from other

5     parties?

6          A     I believe so.

7          Q     Okay.

8          And if my question is unclear, I'm kind of winging

9     it here, so I apologize, if you don't understand, I'll try

10    and rephrase it.

11         So, for example, there's a question about whether

12    or not Mr. Greene had his phone open or on or the app open

13    in that two to three-hour window that a glut of messages was

14    received at the 1730 or 5:30 p.m. time frame, right?

15         A     Yes.

16         Q     If the individual is receiving messages from other

17    parties at 2:41, 2:42, 2:43, what would that tell you?

18         A     It would indicate that the app was most likely

19    open.

20         Q     Okay.

21         If we can go down to, I believe it is 10 Charlie.

22         Yeah, I think we're just going to have to stick

23    with one at a time, please.

24         But I don't believe the government objects to its

25    admission?

1           MS. RAKOCZY:  No objection.

2           THE COURT:  10 -- Watkins 10A, B and C will be

3    admitted.

4                     (Defendant Watkins Exhibit 10A, B and C

5                                      received into evidence.)

6    BY MR. CRISP:

7       Q    Again, we are looking at essentially the same

8    format, extraction from the amalgamated report you

9    conducted?

10      A    Yes.

11      Q    Okay.

12           Do you remember me going over some of these

13   messages from third parties to Mr. Greene's phone?

14      A    Yes.

15      Q    Do you remember seeing these messages from -- and

16   again, so third column is listed as remote party?

17      A    That is correct.

18      Q    Which means what?

19      A    That is the person sending the message.

20      Q    Okay.

21           And first column is, we know this is Mr. Greene's

22   phone because that's the source phone, right?

23      A    That's correct.

24      Q    All right.

25           And what are you able to tell me from this report?

1    A    That his device was receiving messages between the
2  first and last timestamp, 2:58 and 3:12 p.m.
3    Q    Okay.
4         So can we say whether or not his phone was on?
5    A    His phone was on.
6    Q    Can we say whether or not he had the
7  notifications -- well, whether the app was open?
8    A    Um --
9    Q    During this time period?
10   A    It is likely that he had the app open, however, he
11  could have had the app closed and had the background refresh
12  happening even if the app was closed down.
13   Q    In that event, would the messages that came in at
14  17:30 would also have hit in this time period, too, correct?
15   A    One would think so.
16   Q    And barring a network delay?
17   A    Correct.
18   Q    Okay.
19        But if he's receiving messages from some other
20  parties and it's refreshing in this 2:58, 3:12, 3:12 window,
21  the messages that had been sent at 2:41 from the earlier
22  chat we looked at would have hit in this window as well?
23   A    They could have.  They did not.
24   Q    And the likely explanation is a network delay?
25   A    Yes.

1        Q     Okay.

2              MR. CRISP:  Your Honor, we're going to pull up

3    Watkins 9, please.

4    BY MR. CRISP:

5        Q     All right.

6              And, again, just for expediency purposes, first

7    block is Mr. Greene's phone, right?

8        A     Yes, sir.

9        Q     All right.

10             And he is sending messages, there's two messages

11   he sent at both the 2:14 at 2:15 time frame, right?

12       A     Yes, there are, yes.

13       Q     All right.

14             And from that, you're able to determine that he

15   was actually utilizing the app or somebody or some entity

16   was utilizing the app from his phone?

17       A     Yes.

18       Q     Okay.

19             So if he's sending a message at 2:15, he should

20   have received the message from Mr. Rhodes that was sent at

21   2:06, right, at 2:15, if it were anything other than a

22   network delay?

23       A     That's a reasonable conclusion, yes.

24             MR. CRISP:  Thank you, ma'am.  No further

25   questions.

Direct Examination - Cain (By Ms. Hughes)

1    might go longer than the government expects.  I expect,

2    particularly with that witness, to go quite a while.

3              THE COURT:  Okay.

4              (Jury entered the courtroom.)

5              THE COURT:  Thank you.  Be seated.  Thank you for

6    your patience.

7         Ms. Hughes.

8              MS. HUGHES:  The government calls digital forensic

9    examiner, Katherine Cain.

10             THE CLERK:  Please raise your right hand.

11                       KATHERINE CAIN,

12   called as a witness, being first duly sworn, was examined and

13   testified as follows:

14             THE WITNESS:  I do.

15             THE CLERK:  Have a seat.

16             THE COURT:  All right.  Welcome.  Remove your mask

17   if you're comfortable doing so.

18        Ms. Hughes, ready when you are.

19                     DIRECT EXAMINATION

20   BY MS. HUGHES:

21   Q.  Good afternoon.  Could you please introduce yourself to

22   the ladies and gentlemen of the jury by stating and spelling

23   your full name?

24   A.  Jennifer Katherine Cain, C-A-I-N.

25   Q.  Where do you work?

Direct Examination - Cain (By Ms. Hughes)

1   **A.**   For the Federal Bureau of Investigation.

2   **Q.**   What is your title?

3   **A.**   I am a senior digital forensic examiner.

4   **Q.**   In which section?

5   **A.**   I am a part of the CART team, which stands for Computer

6   Analysis Response Team.

7   **Q.**   How long have you been with the FBI?

8   **A.**   Next month will be ten years.

9   **Q.**   What are your duties as a CART examiner?

10  **A.**   We handle all types of digital evidence, which is any kind

11  of electronic storage media, to include laptops, computers,

12  mobile devices, tablets, and anything that can store data for

13  any of those systems.

14  **Q.**   What is your educational background?

15  **A.**   I have a degree from the University of North Carolina,

16  Chapel Hill in business and a master's in cybersecurity with a

17  concentration in digital forensics from the University of

18  South Florida.

19  **Q.**   What kinds of trainings are you required to do to become a

20  CART examiner with the Federal Bureau of Investigation?

21  **A.**   Sure.  Our original process is a two-year process in about

22  400 hours of classroom and hands-on instruction, and then

23  after we are certified, we have about a hundred hours of

24  additional training we have to complete each year.

25  **Q.**   Do you conduct any trainings, Examiner Cain?

Direct Examination - Cain (By Ms. Hughes)

1    **A.**  I do.

2    **Q.**  What trainings?

3    **A.**  I teach our new examiners in training.  I teach incident

4    response and digital -- digital forensic fundamentals,

5    sorry.

6    **Q.**  Have you been qualified as an expert in federal court?

7    **A.**  I have.

8    **Q.**  In which jurisdiction?

9    **A.**  The District of Columbia.

10   **Q.**  And have you been called by an expert by the defense?

11   **A.**  I have.

12   **Q.**  In connection with this matter, were you asked to examine

13   several mobile devices, seized from multiple defendants and

14   subjects?

15   **A.**  I was.

16   **Q.**  And as part of your analysis, were you asked to determine

17   if the Signal application was presently located on any given

18   device?

19   **A.**  I was.

20   **Q.**  Did you examine an iPhone associated with Joseph Hackett?

21   And this is government's -- for identification, this is

22   Government's Exhibit 66.

23   **A.**  I did.

24   **Q.**  Did you examine a Motorola cell phone associated with

25   David Moerschel?  And again, this an identification number of

Direct Examination - Cain (By Ms. Hughes)

1   Exhibit 130.

2   **A.**  I did.

3   **Q.**  And did you examine a Motorola Moto cell phone associated

4   with Edward Vallejo?  And this is government's identification

5   Exhibit Number 210.

6   **A.**  I did.

7   **Q.**  For each of these three devices, did you look to see if

8   Signal was still on the phone?

9   **A.**  I did.

10  **Q.**  What was your conclusion?

11  **A.**  Signal was not present on any of the devices.

12  **Q.**  Now, did you also examine a device associated with an

13  individual named Roberto Minuta?

14  **A.**  I did.

15  **Q.**  From looking at that phone, when could you tell the phone

16  was set up?

17  **A.**  The phone artifacts suggest on or around February 20th of

18  2021.

19  **Q.**  And for January 6, 2021, what does that mean for the

20  Signal messages that would have been sent in January of

21  2021?

22  **A.**  It would not be possible for them to be present on that

23  phone.

24  **Q.**  And so for any messages that were sent in the January 2021

25  time frame, they would not be on the phone that you examined

Direct Examination - Cain (By Ms. Hughes)

1    in connection with Mr. Minuta?

2    **A.**   That is correct.

3    **Q.**   Okay.  So we're going to focus on the three phones then,

4    the cell phones from Mr. Moerschel, Mr. Hackett, and

5    Mr. Vallejo.

6         Before we talk about each of these phones in depth, what,

7    in general, do you do when you extract the data from a

8    phone?

9    **A.**   So we have a variety of commercial tools available to us.

10   So the first thing we look at the device is, we manually

11   review it and determine the best tool.  We then extract the

12   information off of that device, so that we can look at a copy

13   of the phone itself without having to constantly look at the

14   phone.  And then we process that information into a meaningful

15   way and provide reports.

16   **Q.**   What is Signal?

17   **A.**   Signal is an encrypted chat application.  You can download

18   it for your mobile device, iPhone and Android, and your

19   desktop computer, and it -- you are able to microphone calls,

20   video calls, and send messages, both privately and in a group

21   scenario.

22   **Q.**   What does a Signal extraction look like and the data you

23   would review from a phone?

24   **A.**   It's a database.  They store all their information in the

25   database.

Direct Examination - Cain (By Ms. Hughes)

1    **Q.**  And if Signal on a device has been deleted, what does that

2    mean in terms of the data that would be stored in your

3    Signal -- in your Signal profile?

4    **A.**  When you remove the Signal application from your phone,

5    the database is also removed entirely from that phone.

6    **Q.**  So there's no data that's stored say in the cloud?

7    **A.**  That is correct.

8    **Q.**  Let's turn first to your examination of the iPhone

9    associated with Mr. Hackett.  First of all, what was the

10   iPhone that was associated with Mr. Hackett?

11   **A.**  It was an iPhone 6S Plus.

12   **Q.**  And was Signal on that phone, that iPhone 6S Plus?

13   **A.**  No, it was not.

14   **Q.**  Were you asked to review iCloud search warrant returns in

15   connection with this phone?

16   **A.**  I was.

17          MS. HUGHES:  If we could please bring up just for

18   the witness, Government's Exhibit 9705.  And if we could just

19   zoom in on the top, please.

20   **Q.**  (BY MS. HUGHES)  Is this a fair and accurate version of

21   some of the cells and rows that were in that search warrant

22   return?

23   **A.**  It is.

24          MS. HUGHES:  Government seeks to admit and publish

25   Government's Exhibit 9705.

Direct Examination - Cain (By Ms. Hughes)

1      MS. HALIM:  No objection.

2      THE COURT:  9705 will be admitted.

3  **Q.** (BY MS. HUGHES)  Okay.  So first, what are we looking at

4  here, what is this chart?

5  **A.** This is -- it comes straight from Apple.  It is related to

6  Mr. Hackett's Apple identifier, and this particular

7  spreadsheet are update and redownload data details for two

8  different applications.

9      MS. HUGHES:  Okay.  And if we could just zoom in on

10  the top here, Ms. Badalament, thank you.

11  **Q.** (BY MS. HUGHES)  Okay.  So you said update and download

12  details.  Is that what it says here:  Report description,

13  update and redownload details related to DSID?

14  **A.** Yes.

15  **Q.** What is a DSID?

16  **A.** That is the identifier that Apple internally assigns to

17  someone when they sign up for an iCloud account.

18      MS. HUGHES:  Okay.  If we could zoom out, please.

19  **Q.** (BY MS. HUGHES)  Now, the left-hand column --

20      MS. HUGHES:  If we could just zoom in on this column

21  to begin with.

22  **Q.** (BY MS. HUGHES)  What is this global unique ID?

23  **A.** That is an identifier for Mr. Hackett's iPhone.

24  **Q.** The physical iPhone?

25  **A.** The physical iPhone.

Direct Examination - Cain (By Ms. Hughes)

1   **Q.**  Does this global unique ID correspond with the physical

2   iPhone?  And that would be, for identification purposes,

3   Government's Exhibit 66, the physical phone that you examined,

4   does that relate to the phone?

5   **A.**  It does.

6        MS. HUGHES:  If we could please zoom out.  And, Ms.

7   Badalament, if we could now focus on this section, and just

8   for Signal, please.  So -- sorry.  Thank you so much.

9   **Q.**  (BY MS. HUGHES)  Okay.  So these entries, are there dates

10  and times that are associated with specific update and

11  download entries?

12  **A.**  There are.

13  **Q.**  And what is the general date range of these update and

14  download entries?

15  **A.**  Around, it looks, August 2020 through January 2021.

16  **Q.**  And what does it say in terms of the content, what is the

17  application that is being updated, what does this column

18  correspond to here?

19  **A.**  Signal private messenger.

20        MS. HUGHES:  If we could please zoom out, thank you,

21  Ms. Badalament.

22  **Q.**  (BY MS. HUGHES)  Are there, in fact, two phone numbers

23  that are connected with Mr. Hackett?

24  **A.**  There are.

25  **Q.**  Why are there two numbers associated with Mr. Hackett?

Direct Examination - Cain (By Ms. Hughes)

1    **A.**  When we looked at his Signal username, he actually has two

2    accounts registered with Signal.

3    **Q.**  And what do you attribute to there being these two phone

4    numbers?  Are there two phones?

5    **A.**  No.  One of the phone numbers is for the actual iPhone

6    that we have, and the other phone number is a Text Me phone

7    number.

8    **Q.**  What is Text Me?

9    **A.**  It's a third-party application that you can download to

10   your Android or iPhone device, and it enables you to create a

11   second phone number that you can then use on that same

12   device.

13           MS. HUGHES:  If we could please bring up what's

14   already been admitted into evidence Government's Exhibit 2426.

15   If we could zoom at the top here.  Thank you, Ms. Badalament.

16   **Q.**  (BY MS. HUGHES)  What is this document?

17   **A.**  This is a return from the Text Me company, attributed to

18   the account associated with Mr. Hackett.

19   **Q.**  And what is the username on this account?

20   **A.**  John Willow 232581.

21   **Q.**  And this e-mail, johnwillow23@protonmail.com have you seen

22   this e-mail elsewhere?

23   **A.**  I have.

24   **Q.**  Where did you see this e-mail?

25   **A.**  Proton Mail was an application on that same iPhone, and

Direct Examination - Cain (By Ms. Hughes)

1    this was the account associated with it.

2    **Q.**   And for the user information for the Text Me, what is the

3    model associated with this account?

4    **A.**   IPhone 6S Plus.

5    **Q.**   And what is the date of activation?

6    **A.**   November 17th, 2020.

7    **Q.**   What was the withdrawal date?

8    **A.**   February 6, 2021.

9            MS. HUGHES:   And we can zoom out, thank you,

10   Ms. Badalament.   If we can go back now to 9705, which is

11   already in evidence, and if we can now focus on the Text Me

12   portion of these iCloud search warrant returns.

13   **Q.**   (BY MS. HUGHES)   So again, do these entries relate to the

14   same global identifying number that we referenced previously

15   that's associated with the device, Government's Exhibit 66?

16   **A.**   It does, yes.

17   **Q.**   And are these entries for the update and download entries

18   associated with Text Me?

19   **A.**   Yes, they are.

20   **Q.**   What's the first entry associated -- the update associated

21   with Text Me?

22   **A.**   November 17th, 2020.

23   **Q.**   And what was the date of the activation that was found in

24   that user information from Text Me?

25   **A.**   Also November 17th, 2020.

Direct Examination - Cain (By Ms. Hughes)

1    **Q.**  In the course of your -- of this investigation, did you

2    review whether or not Mr. Hackett, in fact, used Signal?

3    **A.**  I did, yes.

4    **Q.**  How were you able to determine that Mr. Hackett, in fact,

5    had used Signal?

6    **A.**  We had identified other devices in which Signal was

7    present, and his name and username was a participant in those

8    chats.

9    **Q.**  And from your examination of these devices, were you able

10   to summarize the groups and the messages that he sent to these

11   various groups?

12   **A.**  I was, yes.

13        MS. HUGHES:  If we could please bring up just for

14   the witness, Government's Exhibit 9700.  And if we could go to

15   page 2.  Thank you, Ms. Badalament.

16   **Q.**  (BY MS. HUGHES)  Are these the summaries of his -- of

17   Mr. Hackett's group membership that you were just

18   discussing?

19   **A.**  They are, yes.

20        MS. HUGHES:  Government seeks to admit and publish

21   Government's Exhibit 9700.

22        MS. HALIM:  No objection.

23        THE COURT:  9700 will be admitted.

24   **Q.**  (BY MS. HUGHES)  Starting with the first page, how did you

25   compile this chart?

Direct Examination - Cain (By Ms. Hughes)

1    **A.**  I -- we looked at Signal across other phone applications

2    that still had the Signal chat app installed, and then looked

3    for Mr. Hackett's phone number and the accounts, which then

4    led us to the messages in these particular Signal groups.

5    **Q.**  And what is meant -- there's a notation on this chart that

6    says "source."  What does source refer to?

7    **A.**  That is the device containing the Signal chat application

8    in which that message was present.

9    **Q.**  So when you say, "First known message to this DC Operation

10   Intel Team," the source from this is from Stuart Rhodes's

11   phone; is that right, for that first row?

12   **A.**  Yes, that is correct.

13   **Q.**  And does this number here -- is this his Apple iPhone

14   number, or is this his Text Me number?

15   **A.**  That is his iPhone number.

16   **Q.**  What was the first date of the message sent to Signal --

17   to a Signal group associated with his iPhone number?

18   **A.**  July 25th, 2020.

19   **Q.**  And this was to the OK FL Hangout?

20   **A.**  Yes, ma'am.

21   **Q.**  And what is the last date that a message was sent that you

22   were able to find associated with this number?

23   **A.**  January 20th, 2021.

24   **Q.**  Is that for the DC Operation Intel Team?

25   **A.**  Yes, ma'am.

Direct Examination - Cain (By Ms. Hughes)

1   **Q.**  And was there anything -- did you have a chance to look

2   actually at this message that was sent on January 20th?

3   **A.**  I did.  It was not actually a message sent by the user, it

4   was an update to the account, and possibly just notated in

5   that group.

6   **Q.**  So what was the last message you saw that he sent that

7   actually was -- included content?

8   **A.**  November 17th, 2020.

9   **Q.**  And this was to both the Grey Team OK FL and the OK FL

10  Hangout?

11  **A.**  Yes, ma'am.

12          MS. HUGHES:  If we could please go to page 2 of

13  Government's Exhibit 9700.

14  **Q.**  (BY MS. HUGHES)  What is this number associated with?

15  **A.**  That's the Text Me number.

16  **Q.**  And what is the first date of a number -- of a message

17  sent using this number?

18  **A.**  November 17th, 2020.

19  **Q.**  And could you remind me, what was the date that the Text

20  Me account was activated?

21  **A.**  Also November 17th, 2020.

22  **Q.**  What was the last date that a message was sent on using

23  this Text Me number?

24  **A.**  January 9th, 2021.

25  **Q.**  And could you please read the groups that were associated

Direct Examination - Cain (By Ms. Hughes)

1    with this Text Me number?

2    **A.**   Sure.  The Miami Rolling Stone OP, OK Florida, OK Florida

3    Vetted Leadership, OK Florida DC OP Jan 6, OK SE Region Open

4    Forum, OK FL Hangout, Vetted OK FL Hangout, Temp OK FL

5    Leadership.

6    **Q.**   Thank you.

7              MS. HUGHES:  If we could please go now to

8    Government's Exhibit 2413, already in evidence.  If we could

9    go to page 29, thank you, Ms. Badalament.  And if we could

10   just focus on this number here for a moment, the IMEI.  Sorry,

11   I can't see it.  The IMEI, the number on the left.

12   **Q.**   (BY MS. HUGHES)  Did you have a chance to compare this

13   IMEI number to the IMEI that is associated with the physical

14   phone, Government's Exhibit 66?

15   **A.**   I did.

16   **Q.**   And are they the same?

17   **A.**   They are the same.

18   **Q.**   How did you compare these numbers?

19   **A.**   The first 14 ident- -- numbers in this string, that

20   comprises the mobile identity equipment number, and they

21   match, they are a match.

22             MS. HUGHES:  If you could zoom out, please,

23   Ms. Badalament.

24   **Q.**   (BY MS. HUGHES)  And on Government's Exhibit 2413,

25   page 29, does it appear that there are numerous entries in

Direct Examination - Cain (By Ms. Hughes)

1    January 2021 for calls using that physical phone?

2    **A.**  Yes, there are.

3          MS. HUGHES:  Okay.  We can bring that down, thank

4    you, Ms. Badalament.

5    **Q.**  (BY MS. HUGHES)  We're going to now talk about David

6    Moerschel.  Was Signal found on Mr. Moerschel's phone, the

7    phone that you examined?

8    **A.**  No, it was not.

9    **Q.**  And that, again, is, for identification purposes,

10   Government's Exhibit 130.

11         MS. HUGHES:  If we could please just bring up for

12   the witness, Government's Exhibit 9701.  And there are three

13   pages, Ms. Badalament, if you could just scroll through them.

14   **Q.**  (BY MS. HUGHES)  Is this, what you're seeing on your

15   screen now, an excerpt of the Cellebrite report from

16   Mr. Moerschel's phone?

17   **A.**  It is, yes.

18   **Q.**  And is this a fair and accurate excerpt of some of those

19   entries?

20   **A.**  Yes.

21         MS. HUGHES:  Government seeks to admit and publish

22   Government's Exhibit 9701.

23         MR. WEINBERG:  No objection.

24         THE COURT:  Government's 9701 is admitted.

25   **Q.**  (BY MS. HUGHES)  Okay.  So there was no Signal found on

Direct Examination - Cain (By Ms. Hughes)

1    this phone; correct?

2    **A.**  Correct.

3    **Q.**  But were there Text Messages found on the phone?

4    **A.**  There were.

5    **Q.**  Starting on page 1, please, what is the earliest text

6    messages you found on the phone?

7    **A.**  August and October of 2019.

8    **Q.**  And again, is this just a summary?  Are there actually

9    many, many, many more text messages?

10   **A.**  There are.  These are just the first.

11   **Q.**  Okay.  So August and October 2019 are the earliest ones?

12   **A.**  Yes, ma'am.

13        MS. HUGHES:  If we could please go to page 2.

14   **Q.**  (BY MS. HUGHES)  Are these the last messages you found on

15   his phone?

16   **A.**  They are.

17   **Q.**  And what are the date of the last messages found on his

18   device?

19   **A.**  May 26, 2021.

20        MS. HUGHES:  If we could please go to page 3.

21   **Q.**  (BY MS. HUGHES)  Does this focus on the time period of

22   November to January, 2020 to 2021?

23   **A.**  It does.

24   **Q.**  What is the next message sent after November 13th, 2020?

25   **A.**  January 16th, 2021.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Direct Examination - Cain (By Ms. Hughes)

1    Q.  So where -- where were the messages between November 13th,

2    2020 and January 16th, 2021, were they on the phone?

3    A.  There were no messages in that time frame.

4    Q.  As with Mr. Hackett, for Mr. Moerschel, were you able to

5    conclude that he was, in fact, a Signal user, that he had a

6    Signal profile?

7    A.  Yes.

8    Q.  How were you able to determine that for Mr. Moerschel?

9    A.  The other devices that we examined that contained the

10   Signal application contained Mr. Moerschel's Signal

11   identifiers, including his phone number.

12   Q.  And did you again create a summary of the groups

13   Mr. Moerschel was a member of?

14   A.  I did.

15           MS. HUGHES:  Could we please bring up just for the

16   witness, Government's Exhibit 9701, page 4.

17   Q.  (BY MS. HUGHES)  And is this the summary you created in

18   connection with Mr. Moerschel?

19   A.  It is.

20           MS. HUGHES:  Government seeks to admit and publish

21   Government's Exhibit 9701, page 4.

22           MR. WEINBERG:  No objection.

23           THE COURT:  9701 is admitted.

24   Q.  (BY MS. HUGHES)  How many groups was Mr. Moerschel a

25   member of?

Direct Examination - Cain (By Ms. Hughes)

1    **A.**   Four.

2    **Q.**   And what was the earliest message he sent -- pardon me,

3    the earliest date he sent a message?

4    **A.**   December 13th, 2020.

5    **Q.**   And what was the last date we know he sent a message?

6    **A.**   January 7th, 2021.

7    **Q.**   And just to be clear, could there be messages we don't

8    know exist?

9    **A.**   Yes.

10   **Q.**   So these are just the messages we know from the devices we

11   have collected over the course of the investigation; is that

12   right?

13   **A.**   That's correct.  That is correct.

14   **Q.**   Now, how many groups was Mr. Moerschel a member of?

15   **A.**   Four.

16   **Q.**   And finally --

17            MS. HUGHES:  You can bring that down, thank you,

18   Ms. Badalament.

19   **Q.**   (BY MS. HUGHES)  Mr. Vallejo, was Signal found on

20   Mr. Vallejo's Motorola Moto phone?  That's Government's

21   Exhibit 210.

22   **A.**   It was not.

23   **Q.**   What -- or how many groups was Mr. Vallejo a member of?

24   **A.**   Just one that we found.

25            MS. HUGHES:  If we could please bring up just for

Direct Examination - Cain (By Ms. Hughes)

1   the witness, Government's Exhibit 9702, and for page 1,

2   seeking to admit just page 1 at this time.

3   **Q.**   (BY MS. HUGHES)   Is this one of the messages you reviewed

4   that Mr. Vallejo sent?

5   **A.**   Yes, it is.

6          MS. HUGHES:   Government seeks to admit and publish

7   Government's Exhibit 9701 [sic], page 1.

8          THE COURT:   It will be admitted.

9   **Q.**   (BY MS. HUGHES)   Okay.   So who -- first of all, you said

10  that Mr. Vallejo was part of one group.   What was that

11  group?

12  **A.**   DC OP Jan 6/21.

13  **Q.**   And how did Mr. Vallejo -- what was his username?   How

14  would he appear if you were chatting with him on Signal?

15  **A.**   Just as you see here, as Ed Vallejo.

16  **Q.**   Is that a name that he would have given himself?

17  **A.**   For this instance, yes, it is.

18          MS. HUGHES:   If we could please bring up page 2 just

19  for the witness.   Apologies, page 3, Ms. Badalament, thank

20  you.

21  **Q.**   (BY MS. HUGHES)   Is this how his username is associated

22  with this phone in a cell phone extraction?

23  **A.**   It is.

24  **Q.**   Is this a fair and accurate excerpt from that

25  extraction?

Direct Examination - Cain (By Ms. Hughes)

1    **A.**  Yes, it is.

2            MS. HUGHES:  My apologies, I believe I misspoke.  I

3    said 9701.  This is 9702.  My apologies.

4        The government seeks to admit and publish Government's

5    Exhibit 9702, page 3.

6            THE COURT:  Admitted.

7    **Q.**  (BY MS. HUGHES)  Okay.  So you were just -- you were just

8    describing how his username is associated with a phone number.

9    Can you explain what we're looking at right now on 9702,

10   page 3?

11   **A.**  Sure.  This is from a Signal database, and that database,

12   inside it has a table that tracks all the identifiers

13   associated with its users, and the full name, Ed Vallejo, is

14   associated here with phone number 602-434-6843.

15   **Q.**  Whose device was this from?

16   **A.**  Mr. Rhodes.

17   **Q.**  Stuart Rhodes?

18   **A.**  Yes, ma'am.

19           MS. HUGHES:  If we could please go just for the

20   witness to Government's Exhibit 9702, page 2.

21   **Q.**  (BY MS. HUGHES)  In addition to Signal messages, did you

22   also review Text Messages that were sent on that number,

23   602-434-6843?

24   **A.**  I did.

25   **Q.**  Did you notice -- or did you note the number of messages

Direct Examination - Cain (By Ms. Hughes)

1    that Mr. Vallejo sent in any given month on that number?

2    **A.**  I did, yes.

3    **Q.**  And is this exhibit in front of you an accurate summary of

4    those messages sent in 2019, 2020, and 2021?

5    **A.**  Yes.

6             MS. HUGHES:  Government seeks to admit and publish

7    Government's Exhibit 9702, page 2.

8             THE COURT:  All right.  9702, page 2 is

9    admitted.

10   **Q.**  (BY MS. HUGHES)  Focusing your attention on this time

11   period, November/December/January 2020 to January 2021,

12   approximately how many Text Messages were sent from

13   November 2020 through January 2021?

14   **A.**  Approximately 1,400.

15   **Q.**  And why have we not reviewed -- we started by talking

16   about Mr. Hackett's iCloud search warrant.  Why have we not

17   reviewed an iCloud search warrant in connection with

18   Mr. Moerschel and Mr. Vallejo when analyzing their Signal

19   usage?

20   **A.**  Those two particular devices are Android devices, they are

21   not iPhones, so they back up to their Google accounts.  And

22   Google just does not store the same types of data that Apple

23   does.  So whereas you can get Apple store data on any given

24   device, that's just not available on the Google platform.

25             MS. HUGHES:  And if we could back up just for a

Direct Examination - Cain (By Ms. Hughes)

1    moment to Government's Exhibit 2414.1, page 11.

2    **Q.**  (BY MS. HUGHES)  Did you have an opportunity to compare

3    this?

4           MS. HUGHES:  And we're missing the top column, so if

5    you could actually go to page 1 first, Ms. Badalament, my

6    apologies, and just identify which row is the IMEI row.  The

7    IMEI row would be the row that is three from the right.

8        And we can now go back to page 11.

9    **Q.**  (BY MS. HUGHES)  Did you have an opportunity to compare

10   whether this IMEI -- this IMEI corresponded with any of the

11   physical phones that you examined?

12   **A.**  It did.

13   **Q.**  And which phone did this correspond with?

14          MS. HUGHES:  My apologies, Ms. Badalament, you might

15   have to zoom out.  If you could just zoom in on just a small

16   portion of it.

17   **A.**  I'm sorry, I don't have them committed to memory as to

18   which of the four devices.

19          MS. HUGHES:  If we could go to the top of this

20   exhibit.

21   **Q.**  (BY MS. HUGHES)  So this device -- we've gone through

22   Mr. Hackett's.  That was Government's Exhibit -- my apologies,

23   2413 was Mr. Hackett's.  Were you asked to evaluate whether an

24   IMEI corresponded with another physical device?

25   **A.**  Yes, I was.

Direct Examination - Cain (By Ms. Hughes)

1   Q.  Which device were you asked to correspond an IMEI with the
2   physical device for?
3   A.  With his iPhone.
4   Q.  With whose iPhone?
5   A.  Oh, Mr. Hackett.
6   Q.  And this is a different exhibit.  This is Government's
7   Exhibit 2414.  My apologies, they all look very similar.
8   A.  Okay.
9   Q.  There are two CDR records you were asked to look at and
10  correlate with physical phones.
11  A.  Yes.
12  Q.  We've gone over Mr. Hackett's phone.  Did you look at a
13  different phone and compare it with the IMEI?
14  A.  Yes, I did.
15  Q.  Who?
16  A.  Mr. Moerschel.
17  Q.  Mr. Moerschel.
18  A.  Yes.
19  Q.  Now, going back to page 11, for this exhibit, this is
20  Government Exhibit 2414 --
21          MS. HUGHES:  If we could please go to page 11.
22  Q.  (BY MS. HUGHES)  Did there appear to be entries in the
23  January time period that showed that this phone was indeed
24  active, was making calls in the January time frame?
25  A.  Yes, there are.

Direct Examination - Cain (By Ms. Hughes)

1    **Q.**  And is this the same phone that you examined -- you

2    examined the physical phone for?

3    **A.**  Yes.  The IMEIs are a match.

4    **Q.**  In addition to looking at various text messages, did you

5    also summarize how many -- just in terms of raw numbers, how

6    many Signal messages Mr. Vallejo, Mr. Hackett, and

7    Mr. Moerschel sent in these groups that you're able to

8    identify?

9    **A.**  I did.

10   **Q.**  And did you create a summary chart summarizing those

11   number of chats that were sent?

12   **A.**  I did.

13          MS. HUGHES:  If we could please bring up just for

14   the exhibit [sic], Government's Exhibit 9704.

15   **Q.**  (BY MS. HUGHES)  And is this a fair and accurate

16   representation of the summary you created?

17   **A.**  It is, yes.

18          MS. HUGHES:  Government seeks to admit and publish

19   Government's Exhibit 9704.

20          THE COURT:  All right.  9704 is admitted.

21          MS. HUGHES:  Okay.  If you could just zoom in on the

22   chart itself, Ms. Badalament, thank you.

23   **Q.**  (BY MS. HUGHES)  Okay.  So first of all, there are two

24   entries for Mr. Hackett, one with the number ending in 9396

25   and one for an entry ending 2509.  Does this refer to his

Cross-examination - Cain (By Mr. Weinberg)

1    iPhone number and then is Text Me number?

2    **A.**  It does.

3    **Q.**  How many messages approximately in total did Mr. Hackett

4    send from July 25th, 2020 through January 20th, 2021?

5    **A.**  Just under 400.

6    **Q.**  And for Mr. Moerschel, for the time period of December

7    13th, 2020 through January 7th, 2021, approximately how many

8    messages did Mr. Moerschel send?

9    **A.**  150.

10   **Q.**  And for Mr. Vallejo, from January 5th, 2021 through March

11   7th, 2021, approximately how many messages did Mr. Vallejo

12   send?

13   **A.**  140.

14   **Q.**  And did you find any of these messages on any of the three

15   devices you examined?

16   **A.**  No, I did not.

17           MS. HUGHES:  No further questions.

18           THE COURT:  Okay.  Any cross-examination?

19                    CROSS-EXAMINATION

20   BY MR. WEINBERG:

21   **Q.**  Good afternoon, how are you?

22   **A.**  Great.  Thank you.

23   **Q.**  That was a lot of data?

24   **A.**  Yes.

25   **Q.**  All right.  So you'll have to excuse me, I'm not very good

Cross-examination - Cain (By Mr. Weinberg)

1    with data, but I just have a couple questions.  Okay?

2        Mr. Moerschel's phone is what kind?

3    **A.**  It's a Motorola.

4    **Q.**  Okay.  Is it fair to say that that type of phone doesn't

5    have a lot of memory compared to like, let's say, the

6    iPhone 14?

7    **A.**  They're all older devices, yes, so they're not as robust

8    as today's devices.

9    **Q.**  Okay.  And you looked through the Cellebrite; correct?

10   **A.**  I did.

11   **Q.**  Okay.  And in the Cellebrite, it has a list of all of the

12   text messages and everything like that, correct?

13   **A.**  It does.

14   **Q.**  Okay.  We can agree that in Mr. Moerschel's phone, he had

15   numerous other gaps where text messages were not on his phone.

16   Would you agree with that?

17   **A.**  There were some other gaps where there were no messages.

18   **Q.**  So we can agree that from 8/24/2019 to 9/28/2019, that's

19   about a five-week period there were no messages besides two

20   spam messages?

21   **A.**  I don't recall that exactly, but that sounds logical.

22   **Q.**  Okay.  And then between 10/10/2019 and 5/22/2019, there

23   are no messages besides four spam messages, correct?

24   **A.**  I -- I don't remember the exact dates that there were no

25   messages, but there were indeed time gaps like that, yes.

Cross-examination - Cain (By Mr. Weinberg)

1   **Q.**  Okay.  So -- and there was also one more gap from

2   8/11/2020 to 9/23/22020, about a six-week gap where there are

3   no messages on his phone?

4   **A.**  Okay.

5   **Q.**  Okay.  So it's your understanding that he deleted those

6   messages on those three other four- to five-week to six-week

7   spans, is that --

8   **A.**  They are not on the device.

9   **Q.**  Okay.  Then I do have a question about one of your

10  exhibits.  I think it was 9701.

11          MR. WEINBERG:  Could we pull that up?  I think it

12  was page 4, maybe.  Okay.

13  **Q.**  (BY MR. WEINBERG)  Just a quick question.  This data, what

14  time zone is that?

15  **A.**  I believe this is in UTC.

16  **Q.**  Okay.  So for UTC, that would mean five hours back; is

17  that right?

18  **A.**  If we're comparing it to Eastern Standard Time, yes, sir.

19  **Q.**  Okay.  From like to --

20  **A.**  From here, in D.C.

21  **Q.**  Okay.  All right.  So that would mean -- I'm not very good

22  at math, but at 14:35, that would mean five hours prior is

23  when he left the group?

24  **A.**  Is the last -- not necessarily when he left the group, but

25  when the last --

Cross-examination - Cain (By Ms. Halim)

1   **Q.**  Message?

2   **A.**  -- message that he posted to that group, yes.

3   **Q.**  Okay.  Great.

4           MR. WEINBERG:  I don't have any other questions.

5   Thank you.

6                         CROSS-EXAMINATION

7   BY MS. HALIM:

8   **Q.**  Agent, good afternoon.  You have some familiarity with the

9   Signal app; is that correct?

10  **A.**  Yes, ma'am.

11  **Q.**  All right.  So if a person is on Signal and sends a

12  message, and later decides that he or she wants to get rid of

13  that message, there is a function where you can just delete an

14  individual message; correct?

15  **A.**  There is, as long as you're the creator of that message.

16  **Q.**  If you're the creator, correct.  So an author of a message

17  could say go back a day, a week, or a month and say, I don't

18  like that message, I'm going to delete that specific

19  message?

20  **A.**  Yes.

21  **Q.**  And when that happens, you know from your review that what

22  you then see on Signal, is you still see the person's name and

23  it just says messages deleted; correct?

24  **A.**  Yes.

25  **Q.**  All right.  Now, when you reviewed Mr. Hackett's messages

Cross-examination - Cain (By Ms. Halim)

1    from other people's -- from the Signal on other people's

2    phones, never once did you see that in connection with a

3    message that he authored; correct?

4    **A.** I didn't specifically look for that, so I can't answer to

5    it.

6    **Q.** Okay.  But you didn't -- you -- in preparation for your

7    testimony, as the FBI agent who did the digital forensic

8    analysis, you don't recall ever seeing that, do you?

9    **A.** I didn't specifically look for it.

10   **Q.** But what you did see, regardless of what you were looking

11   for, what you saw, what you absorbed and observed, you did not

12   see messages that were individually deleted by Mr. Hackett,

13   what you saw?

14   **A.** No, I did not see on Signal the words, "This message has

15   been deleted by the user."

16   **Q.** But you did see that in connection with other people,

17   correct?

18   **A.** Occasionally, yes.

19   **Q.** Yeah, so you have seen it, as your job as the digital

20   forensic examiner in this case, in this investigation, were

21   individual authors did, in fact, delete specific messages?

22   **A.** Yes, ma'am.

23   **Q.** All right.  Now, Mr. Hackett's phone was seized by the FBI

24   on May 28th, 2021.  Does that sound right?

25   **A.** That sounds accurate, yes.

Cross-examination - Cain (By Ms. Halim)

1   **Q.**  And so your examination couldn't have begun prior to May

2   of 2021, right?

3   **A.**  That is correct.

4   **Q.**  And by the time --

5       MS. HALIM:  Oh, thank you.  Did you do this, Scott?

6   Thank you so much.

7   **Q.**  (BY MS. HALIM)  By the time that you -- when you analyzed

8   Mr. Hackett's phone, Signal, the application, was not on the

9   phone at all, correct?

10  **A.**  That is correct.

11  **Q.**  Now, Signal is an application like many other applications

12  that a person can have a smartphone, right?

13  **A.**  Yes.

14  **Q.**  And Signal's an application that only works on a

15  smartphone, correct?

16  **A.**  You can also download it for a desktop computer as well.

17  **Q.**  A desktop computer, but not like an old decrepit phone?

18  **A.**  Right.  You have to have data and Wi-Fi capabilities, yes.

19  **Q.**  Thank you.

20      Now, I'm going to be specific to iPhones, because that's

21  what I know, okay.  So if I were to go to my iPhone and if I

22  had Signal on it, and I wanted to delete it, I would press and

23  hold, right, and I'd get the little jiggly box with an X,

24  right?

25  **A.**  Yes, ma'am.

Cross-examination - Cain (By Ms. Halim)

1   **Q.**  I would press the X, correct?

2   **A.**  Yes, ma'am.

3   **Q.**  And then typically, a message is going to pop up, are you

4   sure you want to delete this, yes or no, right?

5   **A.**  Yes, ma'am.

6   **Q.**  And then sometimes you would even get a second message,

7   are you really, really sure, because if you delete this, it's

8   going to wipe out everything, right?

9   **A.**  Yes, ma'am.

10  **Q.**  And then you say yes or no, correct?

11  **A.**  Yes.

12          MS. HALIM:  If we could -- Justin, could you please

13  pull up Government's Exhibit 9704.

14  **Q.**  (BY MS. HUGHES)  This is the summary of the number of

15  messages, correct?

16      And I see for Mr. Hackett, you have tabulated or counted

17  a total of 390 messages sent between July 25th, 2020 and

18  January 20th, 2021, correct?

19  **A.**  January 9th, but yes, 2021.

20  **Q.**  Well, if you look at that first one, the very first box,

21  does it not say 1/20/2021?

22  **A.**  Oh, I'm sorry, yes.

23  **Q.**  So the all-encompassing dates for the two boxes that

24  pertain to Mr. Hackett are from July 25th, 2020 to January

25  20th, 2021, correct?

Cross-examination - Cain (By Ms. Halim)

1    **A.**  Yes.

2    **Q.**  And we don't have any information here as to when those

3    390 messages specifically were sent, correct?

4    **A.**  Not on this slide, no.

5    **Q.**  And to make it even more specific, we don't have the

6    number of messages between November 3rd and January 20th,

7    correct?

8    **A.**  November 3rd, no.

9    **Q.**  Right.

10       Did you look at any of the Signal messages?  Was that

11   something that you did as part of your role for the FBI?

12   **A.**  Yes, it was.

13   **Q.**  Do you recall a number of messages from Mr. Hackett to the

14   effect of, Welcome, from Sarasota?

15   **A.**  I do not.

16   **Q.**  You don't recall that?

17   **A.**  I don't --

18   **Q.**  You don't recall to the tune of 50 or more messages,

19   Welcome, from Sarasota?

20   **A.**  I do not.

21   **Q.**  Okay.  Thank you, Agent.

22           MS. HALIM:  I have no further questions.

23           MR. SHIPLEY:  I have no questions.  Thank you.

24           THE COURT:  Okay.  Mr. Peed.

25           MR. PEED:  Your Honor, I have an objection.  I want

Cross-examination - Cain (By Ms. Halim)

1    to have the witness testify about the total DC OP chat file,

2    and the government's objecting, so I don't know...

3         (Bench conference on the record.)

4         THE COURT:  Mr. Peed.

5         MR. PEED:  I want to have the witness identify the

6    total number of pages and the total DC Signal OP chat from

7    Stuart Rhodes's phone, the page that Vallejo's first message

8    appears on, and then the number of Vallejo messages between

9    January 5th and January 8th, and the number of Vallejo

10   messages between January 5th and January 20th, and the last

11   Vallejo message date.

12        THE COURT:  Okay.  I can't hear you, Ms. Hughes.

13        MS. HUGHES:  He can ask her is it fair to say x

14   amount, date, but what he wants to have her do is a worksheet

15   it looks like, and have her look at some document that's over

16   300 something pages, we cannot -- we don't know what this --

17   if his version compares to our version or what this is and to

18   have to do this on the fly.  So if he wants to ask those

19   dates, I object to the worksheet exercise with this document

20   that she's never seen before.  We object.

21        MR. PEED:  I believe this document is extracted from

22   Stuart Rhodes's phone.

23        THE COURT:  What are you going to ask her to do?

24   Are you going to ask her to look through 300 pages and count

25   up Mr. Vallejo's Signal messages?

Cross-examination - Cain (By Ms. Halim)

1          MR. PEED:  No, Your Honor.  I'm going to ask if

2     she's worked with this document and if she does the search

3     function, then enter Ed Vallejo's handle.  And then it will

4     bring up all 144 messages.  And then identify these dates, it

5     should take about five minutes.

6          MS. HUGHES:  She's not seen this document before.

7     So if he wants to fill in the answers, the government does not

8     have an objection, but doing this kind of worksheet format

9     with something she's never seen before, is --

10          MR. PEED:  I guess it's news to me that she hasn't

11     seen this, because I thought this was from discovery.

12          MS. HUGHES:  You sent me an e-mail with this

13     document.  I'm not sure what this is.  And apologies, I have

14     not had time to look through all 360 pages.

15          MR. PEED:  So what I have is the DC OP chat pulled

16     from what I believe is discovery, if she has not seen this

17     document --

18          THE COURT:  I'm still lost, what are you trying to

19     accomplish with her with this 300-plus page document?

20          MR. PEED:  The relative to the total what page of

21     the document does Mr. Vallejo's first message come in.  And

22     then the number of messages she -- her chart only has from

23     January 5th to the end.  I want to establish how many messages

24     between January 5th and January 8th, and then January 5th to

25     January 20th, you know, key points in the time line --

Cross-examination - Cain (By Mr. Peed)

1           THE COURT:  How is she going to do that while she's

2   standing there, is she just going to count up the number of

3   messages looking page-by-page?

4           MR. PEED:  We're going to do it together and she's

5   going to create an exhibit --

6           THE COURT:  No, we're not going to do that.  You

7   want to do that, you can call your investigator or somebody

8   else on the stand to do that.  We're not going to waste the

9   jury's time while you try to create an exhibit on the fly.  So

10  you can do that in your own case, call your investigator who's

11  going to do the same exercise and do it that way.

12          (The following proceedings were had in open court.)

13          MR. PEED:  Can you pull up 9702, second page?

14                        CROSS-EXAMINATION

15  BY MR. PEED:

16  **Q.**  Okay.  You went over these.  This is the number of

17  messages -- of SMS messages recovered from Mr. Vallejo's

18  phone, correct?

19  **A.**  That is correct.

20  **Q.**  And could you just notate with the screen the messages in

21  January of 2021?

22  **A.**  668.

23  **Q.**  Okay.  That number was greater than December and greater

24  than in February, right?

25  **A.**  That is correct.

Cross-examination - Cain (By Mr. Peed)

1    Q.  And the FBI was able to review or possess all 668 of those
2    messages, right?
3    A.  Yes.
4    Q.  Because they were on Mr. Vallejo's phone when he gave his
5    phone to the FBI, right?
6    A.  Yes.
7    Q.  Now, Mr. Vallejo's phone was searched by the FBI in June
8    of 2021, correct?
9    A.  I believe that is correct, yes.
10   Q.  All right.  And so that would be over five months after
11   the events of January 6th, right?
12   A.  Yes.
13   Q.  Mr. Vallejo had a Moto E5 Cruise, correct?
14   A.  That sounds correct, yes.
15   Q.  And he was using that same Moto E5 Cruise up through the
16   point where the FBI asked for it, correct?
17   A.  That is my understanding.
18   Q.  The same one he came with to D.C.?
19   A.  Yes.
20   Q.  And the same one he was using going back to 2019?
21   A.  Yes.
22   Q.  Right.  That Moto E5 Cruise has a manufacturer or release
23   date of -- has a general release date of July of 2018,
24   correct?
25   A.  That sounds accurate.

Cross-examination - Cain (By Mr. Peed)

1    **Q.**  And it's an Android 8 device, right?

2    **A.**  I'm not sure of what operating system it was running, but

3    it was running an Android operating system.

4    **Q.**  Okay.  It has a hard drive space of 16 gigabytes, right?

5    **A.**  I'm not sure what the specs were on this particular phone,

6    but that does sound accurate.

7    **Q.**  Okay.  It had RAM of -- 2 gigabytes of RAM, right?

8    **A.**  Sure.

9    **Q.**  Fairly cheap little phone, right?

10   **A.**  I -- it's a smartphone.  It is less expensive than some of

11   its other counterparts, but I don't know how you classify

12   cheap.

13   **Q.**  I guess I'll put it this way, 2 gigabytes on an Android

14   device is about the minimum you can have on it to run

15   effectively in 2020, right?

16   **A.**  Sure.  Yes.

17   **Q.**  The Android operating system takes up about 3 to

18   4 gigabytes on most phones, right?

19   **A.**  I don't know.

20   **Q.**  Now, you said that the Signal -- Signal is a phone app,

21   right?

22   **A.**  It is.

23   **Q.**  And messages on Signal app can be stored on the user's

24   device; they're not stored in the cloud, right?

25   **A.**  That is correct, until the time move go through the Signal

Cross-examination - Cain (By Mr. Peed)

1   server until the time they are delivered to the device.

2   **Q.**  Now, you said that -- I think the last question to you was

3   did the FBI find Signal on any of the phones that we've been

4   discussing, right?

5   **A.**  Yes.

6   **Q.**  Okay.  Signal also has a desktop application, correct?

7   **A.**  It does.

8   **Q.**  And when a user downloads a Signal desktop application,

9   they can sync it with their phone, right?

10  **A.**  You can.

11  **Q.**  Okay.  When you sync it with your phone, the messages that

12  are stored on your phone are then synced to your computer,

13  right?

14  **A.**  No, they are not.  It's if you send a message from your

15  phone, that message is on your phone, and if you send a

16  message on your computer, that message is on your computer.

17  **Q.**  But if you link it with a QR code, it will be synced

18  between those devices, won't they?

19  **A.**  To my knowledge, it does not sync the complete history of

20  Signal.  It could sync a particular set of data in the chat

21  that you were discussing between the two devices.

22  **Q.**  Okay.  So if someone with -- syncs their phone to their

23  computer or to the Signal desktop app, and they were in the DC

24  OP chat, that chat group would appear on their Signal desktop

25  app, correct?

Cross-examination - Cain (By Mr. Peed)

1   **A.**   Potentially.  Parts of it could, yes.

2   **Q.**   And the FBI did not search to see if Mr. Vallejo had these

3   messages on a computer, for example, correct?

4   **A.**   I was not involved with looking at his computer or even if

5   he possessed one, no.

6   **Q.**   All right.  And you'd agree with me that if you have a

7   phone with two gigabytes of RAM, and its memory is running

8   out, it will run slower, correct?

9   **A.**   Sure.

10   **Q.**   And that deleting things will make it run more quickly,

11   generally, right?

12   **A.**   Sure.  Yes.

13   **Q.**   And Mr. Vallejo's last message was -- that you brought up,

14   is March 7th, 2021, right?

15   **A.**   For Signal?

16   **Q.**   Yes.

17   **A.**   Yes, if that's what I had on my chart, then yes.

18   **Q.**   That is two months after January 6th, right?

19   **A.**   It is.

20   **Q.**   And there had been arrests in January 6 cases before then,

21   correct?

22   **A.**   Correct.

23   **Q.**   There had been arrests of people we've heard names about

24   like Mr. Caldwell, correct?

25   **A.**   Correct.

Redirect Examination - Cain (By Ms. Hughes)

1    **Q.** All right.  And two months -- Mr. Caldwell was arrested in

2    January of 2021, right?

3    **A.** I don't recall the date of his arrest.

4    **Q.** But before March 7th, right?

5    **A.** I don't recall the date of his arrest.

6    **Q.** Okay.

7              MR. PEED:  No further questions.  Thank you.

8              THE COURT:  Redirect, Ms. Hughes.

9                        REDIRECT EXAMINATION

10   BY MS. HUGHES:

11   **Q.** Ms. Badalament, if we could please begin -- you were asked

12   a series of questions about Mr. Moerschel and how there were

13   chunks of time that were missing in Mr. Moerschel's text

14   messages out of his extraction.  Do you remember those

15   questions?

16   **A.** I do.

17   **Q.** And specifically in your testimony you discuss that there

18   were no messages found between November 13th, 2020 and January

19   16th, 2021, correct?

20   **A.** That is correct.

21   **Q.** Does January 6, 2021 fall within that time span?

22   **A.** It does.

23   **Q.** You were asked by Mr. Peed, Mr. Vallejo's attorney, about

24   there being voluminous text messages found on Mr. Vallejo's

25   phone.  In your experience, what is the difference in terms of

Redirect Examination - Cain (By Ms. Hughes)

1    encryption between a text message and Signal messages?

2    **A.**  Well, text messages go through your phone provider, and

3    that's all controlled by your cellular phone provider, and

4    Signal is an encrypted chat app in which you select these as

5    you're going to exchange text messages with.

6    **Q.**  So text messages compared to Signal messages, which one is

7    more secured?

8    **A.**  Signal messages.

9    **Q.**  Finally, you were asked a series of questions by

10   Ms. Halim, Mr. Hackett's attorney, that many of the messages

11   he sent were sort of welcome -- welcome in nature.  Do you

12   remember those questions?

13   **A.**  I do.

14            MS. HUGHES:  If we could please bring up what's

15   already been admitted into evidence as Government's Exhibit

16   6776, page 13.

17            MS. HALIM:  Objection.

18            THE COURT:  Can I see it?

19            (Bench conference on the record.)

20            MS. HUGHES:  She made it seem like it was all

21   welcome, so this is -- I believe, actually, this is precisely

22   the issue Your Honor flagged.

23            THE COURT:  Well, I don't want to reverse engineer

24   what I was trying to avoid, which is opening the door to every

25   single message that --

1          MS. HUGHES:  This is the only message the government

2     intends, Your Honor.

3          THE COURT:  No, no, I know, but if you introduce

4     this -- look, this is already in evidence, you're going to be

5     able to make whatever argument you want.  I think it's really

6     outside the scope.  And unfortunately -- or not unfortunately,

7     in my view, based on my thinking, opened the door to the

8     admission of all these Signal messages that she's identified

9     and can be presumably collected from other phones.  So I'm

10    going to sustain the objection.

11         MS. HUGHES:  I understand.

12         (The following proceedings were had in open court.)

13         MS. HUGHES:  If we could please go to Government's

14    Exhibit 9704, Ms. Badalament.  And you can zoom in.

15    **Q.**  (BY MS. HUGHES)  You were asked a series of questions that

16    Mr. Hackett said a bunch of times, you're welcome, welcome.

17    In the date range -- first of all, you testified that January

18    20th, that this was, in essence, not a real message.  What was

19    that message again?

20    **A.**  It was a system message indicating that the user's profile

21    had just been updated in some form.

22    **Q.**  And so from July 25th, 2020 to January 9th, 2021, five

23    months and some change, did Mr. Hackett send approximately 400

24    messages?

25    **A.**  Yes.

Redirect Examination - Cain (By Ms. Hughes)

1    **Q.**  And after January 9th, do we have any evidence that he

2    sent a single message?

3    **A.**  No, we do not.

4    **Q.**  And you've reviewed some of his messages, not all of them,

5    correct?

6    **A.**  That is correct.

7    **Q.**  Were all of them, Welcome?

8    **A.**  No, they were not.

9          MS. HUGHES:  No further questions.

10          THE COURT:  Okay.  Ms. Cain, thank you very much for

11    your time and testimony.  You may step down.

12        Okay.  Ladies and gentlemen, we actually are going to

13    have a early dismissal today.  We've come to the end of our

14    day.  So we will adjourn and resume tomorrow at 9:30.  We look

15    forward to seeing you then.  Thank you.

16          (Jury left the courtroom.)

17          THE COURT:  All right.  Please be seated, everyone.

18        All right.  Let's just talk about scheduling.  So it

19    sounds like we should have the better portion of the day

20    tomorrow.  And then that puts us to Wednesday.  So who's

21    prepared to start Wednesday?

22          MS. HALIM:  Our agreement was if there's no

23    agreement, we go in order.

24          MR. SHIPLEY:  Well, I have an opening, Judge,

25    obviously.

1    its next witness.

2              **MR. KENERSON:**  Thank you, Your Honor.

3              The government calls Jennifer Kate Cain.

4              **THE COURT:**  Can I ask -- can the government remove

5    the exhibit?  Presumably, they're not going to use this with

6    this particular exhibit.

7              **MR. KENERSON:**  This map exhibit?

8              **THE COURT:**  Yes, sir.

9              **DEPUTY CLERK:**  Please raise your right hand.  Do

10   you solemnly swear or affirm that any information or

11   testimony you shall present to the Court and to the jury in

12   the case now on trial will be the truth, the whole truth and

13   nothing but the truth?

14             **THE WITNESS:**  I do.

15             **DEPUTY CLERK:**  Thank you.  You may be seated.

16             **COURT REPORTER:**  Can you take your mask off for

17   me, please?

18                **DIRECT EXAMINATION ON QUALIFICATIONS**

19                    **OF JENNIFER KATHERINE CAIN**

20   BY MR. KENERSON:

21        **Q.**   Good afternoon, ma'am.

22        **A.**   Good afternoon.

23        **Q.**   I'm going to try and keep this microphone as close

24   to me as I can.  I'm going to ask you to do the same.  Can

25   you please introduce yourself to the jury by telling us your

1    name and spelling your last name, please?

2         **A.**   Jennifer Katherine Cain, C-a-i-n.

3         **Q.**   Do you go by Jennifer or do you go by a different

4    name?

5         **A.**   I go by my middle name Kate.

6         **Q.**   Thank you.

7              Are you employed currently?

8         **A.**   I am, with the Federal Bureau of Investigation.

9         **Q.**   Also known as the FBI?

10        **A.**   Yes, sir.

11        **Q.**   What's your current job title at the FBI?

12        **A.**   I am a senior digital forensic examiner.

13        **Q.**   Did you have any educational or professional

14   experience prior to joining the FBI?

15        **A.**   Yes.  I have a bachelor's in business

16   administration from the University of North Carolina and a

17   masters in cybersecurity with a concentration in digital

18   forensics from the University of South Florida.

19        **Q.**   Now you said you are a senior digital forensic

20   examiner.  How long have you been with the FBI at this

21   point?

22        **A.**   I have been with the FBI 10 years.

23        **Q.**   Of those 10 years, for how many were you a digital

24   forensic examiner?

25        **A.**   Almost six.

1    Q.   Out of those six, how often or how long have you

2  been a senior digital forensic examiner?

3    A.   One year.

4    Q.   Can you tell us what are the duties within the FBI

5  of a digital forensic examiner?

6    A.   Sure.  We handle all aspects of digital evidence,

7  which is to include computers, laptops, tablets, mobile

8  devices and any kind of electronic storage media that could

9  attach to those devices.

10    Q.   What is the difference in terms of duties between

11  a digital forensic examiner and a senior digital forensic

12  examiner?

13    A.   We undergo an additional certification to be a

14  senior examiner.  You have to have a certain number of years

15  in the position as well as contributions to the community,

16  teaching classes, undergoing an additional examination and

17  providing a research project.

18    Q.   Now did you have to undergo any sort of training

19  back six years or more than six years ago when you first

20  became a digital forensic examiner?

21    A.   Yes.  To become certified, it's about a two-year

22  process and roughly 400 hours classroom in-person and

23  instructor-led training.

24    Q.   Now once you get certified and become a digital

25  forensic examiner, are you required to keep current on

1     updates in technology?

2          A.    Yes.  So each additional year after the initial

3     certification we receive about 100 hours of advanced

4     forensics training.

5          Q.    Now you also mentioned a little bit about your

6     background.  Is there anything about your professional

7     background prior to joining the FBI that's relevant to your

8     work here today?

9          A.    Yes.  Before I joined the FBI, I worked for Johns

10    Hopkins University Medical Center, the All Children's

11    Hospital as a database administrator and a system

12    administrator, which essentially means that I ran all of the

13    database operations for the hospital healthcare system, the

14    electronic system.

15         Q.    What about that master's degree you mentioned?  Is

16    that helpful to you in your role here today?

17         A.    It is.  My concentration was in digital forensics,

18    so my courses were geared towards that.

19         Q.    Do you ever -- you mentioned you did this 400

20    hours before becoming certified and 100 hours a year since

21    becoming certified.  Is that within FBI, outside FBI or a

22    combination?

23         A.    It's a combination.

24         Q.    Have you -- you've mentioned the number of hours

25    of training that you have attended.  Have you ever given

7650

1    training as an instructor?

2         **A.**   I have.

3         **Q.**   Can you tell us about that?

4         **A.**   Yes.  Currently, I serve as one of the instructors

5    for our digital forensics trainees and I teach incident

6    response and acquisition as well as digital forensic

7    fundamentals.

8         **Q.**   Now, you mentioned earlier that some of the duties

9    of digital forensic examiner involve examining electronic

10   evidence.  Did I hear you correctly on that?

11        **A.**   Yes, sir.

12        **Q.**   Approximately how many cell phones have you been

13   involved in processing in your role as a forensic examiner?

14        **A.**   About 1,000.

15        **Q.**   And approximately how many computers?

16        **A.**   Three to 400.

17        **Q.**   And have you also had a chance to review as part

18   of your duties information provided by companies like Apple

19   and Google related to electronic accounts that those

20   companies hold?

21        **A.**   I have.

22        **Q.**   Approximately how many of those?

23        **A.**   About 100.

24        **Q.**   Does the FBI have any sort of an audit process to

25   ensure the quality of the work that you perform?

1    A.   We do.  We have an internal department dedicated

2    towards quality -- our quality standards as well as our

3    education and training.  And this department puts together a

4    standard operating procedure or SOPs for all of us to

5    follow.  And then we are required to complete an exam each

6    year to refresh our certification in those standard

7    operating procedures.

8    Q.   And in terms of the actual casework that you

9    conduct, examinations of phone, computers and the like, is

10   there anyone -- is there any process in place to checkup to

11   ensure that the work that you're doing is also up to

12   standard?

13   A.   Yes, we have -- in -- all of our work is subject

14   to peer review and technical and administrative reviews, and

15   those are templates that follow the standard operating

16   procedures.  And we submit roughly 20 to 50 percent of our

17   work for approval and review.

18   Q.   And could you just tell us a little bit about what

19   that process is like for the work that you do submit to it?

20   A.   Sure.  We turn over all of the -- any notes and

21   final reports that we create during the course of any

22   complete examination, and another examiner goes in, ensures

23   that we have reviewed the correct legal authority, followed

24   the CART request that the agent has put in for that specific

25   case.  They review the way that we perform the extraction on

7652

1    any given piece of evidence, how we processed it and the

2    reports that we created for accuracy.

3         **Q.**   Thank you.  And we'll get to some of the terms

4    that you just mentioned in there in a moment.

5              But in the course of your work, have you become

6    familiar with the workings of encrypted applications, like

7    Telegram, WhatsApp and Signal?

8         **A.**   I have.

9         **Q.**   How did you become familiar with those apps?

10        **A.**   I use them both personally and professionally as

11   well as I see it routinely in my case work and I do my own

12   testing and validation of any new applications that are

13   relevant to my case work.

14        **Q.**   When you say "testing and validation," can you

15   tell us what you mean by that?

16        **A.**   Sure.  I have a variety of test phones, both

17   Androids and iPhones, that any time a new chat application

18   comes up that's of interest to us forensically, I create

19   accounts.  I test sending messages or whatnot back and forth

20   between the accounts.

21             Then I go through what we would consider a full

22   examination of that phone by extracting my test devices,

23   processing them and then comparing the output to what I

24   actually see on the device itself.

25        **Q.**   And why is going through that sort of testing

1    important for the work that you do?

2        A.    Well, we have a variety of in-house and commercial

3    tools that help us during the processing process.  And I

4    like to know that the tools that I am using represent that

5    data accurately.

6        Q.    And again, we'll get to some -- what you mean by

7    some of these terms, like "tools," in just a moment.

8              And have you, in addition to conducting this

9    testing that you've described, reviewed information that's

10   put out by the companies like Signal, WhatsApp and Telegram?

11       A.    I do.

12       Q.    What types of information have you reviewed that's

13   been put out by the companies?

14       A.    I follow them on their websites, and typically

15   they each have some type of platform, such as a blog, where

16   they issue new features and monthly updates, as well as I

17   read the release notes of all of the different applications

18   as they hit the Google Store and the App Store.

19       Q.    And why is it helpful to you to read the release

20   notes and these blogs in your line of work?

21       A.    Because with every new edition of any application,

22   the features are always changing which means that what you

23   can do on the app is changing, which then in turn means what

24   we look at forensically on that device is also changing.

25       Q.    Ms. Cain, have you testified before?

7654

1          **A.**   I have.

2          **Q.**   How many times?

3          **A.**   Twice.

4          **Q.**   And were those both in this courthouse here in

5     D.C.?

6          **A.**   They were.

7          **Q.**   Have you been qualified as an expert previously?

8          **A.**   I have.

9          **Q.**   How many times?

10         **A.**   Once.

11         **Q.**   Was that for the government or for the defense?

12         **A.**   For the defense.

13         **Q.**   Has any court ever declined to recognize you as an

14    expert?

15         **A.**   No.

16              **MR. KENERSON:**   Your Honor, at this point, I would

17    seek to qualify Examiner Cain as an expert in digital

18    forensic analysis.

19              **THE COURT:**   All right.  Let me hear from --

20    actually, we are at a decent time now to stop and I can see

21    that the court reporter would like me to do that.  So let's

22    take -- well, maybe a little bit longer but at least our

23    usual 10-minute break for the court reporter and we'll go

24    from there.

25              Ma'am, you may step down as well.

1          Second, as for this Friday, I was able to bump

2    matters so we have Friday morning until 12:30 this Friday.

3          Next Friday, we will not sit.  Next Friday we will

4    not sit.  Not --

5          (Jury entered the courtroom.)

6          **THE COURT:**  Ladies and gentlemen, you all may be

7    seated.  A couple of scheduling notes, so I don't forget

8    them, this Friday will be a half day, a half day.  We will

9    go until either noon or 12:30, something on that order of

10   magnitude.

11         And then next Friday, the 17th, I think it's the

12   day before the long weekend -- I will just make absolutely

13   sure of that.  Yes, correct.  We will not sit that day.  We

14   will not sit that day.

15         All right.  Very well.  Let me recognize

16   Mr. Jauregui for some initial questions from the defendants.

17         **MR. JAUREGUI:**  Thank you, Your Honor.

18         **CROSS-EXAMINATION ON QUALIFICATIONS**

19         **OF JENNIFER KATHERINE CAIN**

20   **BY MR. JAUREGUI:**

21     **Q.**   Good afternoon, Ms. Cain.

22     **A.**   Good afternoon.

23     **Q.**   My name is Sabino Jauregui and along with my

24   colleague, Nayib Hassan, we represent Enrique Tarrio.

25         I am just going to ask you a few questions, if I

7673

1      may, please.

2          **A.**    Sure.

3          **Q.**    When you testified on direct, you spoke about some

4      of your training and experience.  Let me just ask you if you

5      are a member of some of these certifying organizations.  Are

6      you a member of the International Association of Computer

7      Investigative Specialists?

8          **A.**    No.

9          **Q.**    Okay.  Are you a member of the National Computer

10     Forensic Institute?

11         **A.**    No.

12         **Q.**    Okay.  Are you a member of the American Academy of

13     Forensic Sciences?

14         **A.**    No.

15         **Q.**    Okay.  Are you a member of the Forensic

16     Specialties Accreditation Board?

17         **A.**    No.

18         **Q.**    Okay.  I did see that you had some SANS computer

19     forensic training; is that correct?

20         **A.**    That is correct.

21         **Q.**    And you did have also some NCASE; is that true?

22         **A.**    Access data.

23         **Q.**    And that's vendor-provided training.  Correct?

24         **A.**    Vendor provided, yes, sir.

25         **Q.**    But you weren't a member of any of these

1  international or national organizations in your field.

2  Correct?

3  **A.**   None that you mentioned, no.

4  **Q.**   Now, would it be fair to say that these

5  accreditations and your training, they expire after a

6  certain amount of time?

7  **A.**   Yes, I believe they all have term limits.

8  **Q.**   Okay.  And would it be fair to say that the last

9  independent certification that you had, the last time you

10  updated that was in 2020?

11  **A.**   2020 was the last SANS course that I took that had

12  a certification with it, yes.

13  **Q.**   So you are two years and something overdue on that

14  one?

15  **A.**   No, it remains certified for three years.

16  **Q.**   Okay.

17  **A.**   And I'm scheduled to renew it with a course in

18  April.

19  **Q.**   Okay.  Thank you.

20       Would it be fair to say that most of your training

21  and education is actually through the FBI?

22  **A.**   No, it's about half and half.

23  **Q.**   About half and half?  Okay.

24  **A.**   Uh-huh.

25  **Q.**   And you haven't received any more academic

7675

1    training at a university or anything like that since you

2    graduated from your masters?

3        **A.**   No, not since my masters.

4        **Q.**   You graduated from your masters what year?

5        **A.**   2017.

6        **Q.**   2017.  Thank you.

7              Now, would it be fair to say you are a jack of all

8    trade, everything computer forensic; would that be fair?

9        **A.**   Yeah.

10       **Q.**   You don't specialize in any one area in computer

11   forensics?

12       **A.**   We don't have designations.  However, in the

13   Bureau, I am known for specializing in mobile forensics.

14       **Q.**   Okay.

15             Have you ever taught any courses at any university

16   or any college?

17       **A.**   No.

18       **Q.**   And you don't have any academic appointments, do

19   you?

20       **A.**   No.

21       **Q.**   Have you ever won any awards besides at the FBI,

22   any independent awards by peers in your field?

23       **A.**   No.

24       **Q.**   Have you ever been published in the Digital

25   Investigation journal?

1          **A.**   No.

2          **Q.**   How about in the Forensic Science Communications

3    journal?

4          **A.**   No.

5          **Q.**   And that's actually an FBI journal.  You've never

6    been published there?

7          **A.**   Not that I am aware.

8          **Q.**   Have you been published in the International

9    Journal of Digital Crime and Forensics?

10         **A.**   No.

11         **Q.**   The International Journal of Digital Evidence?

12         **A.**   No.

13         **Q.**   Have you ever been published in the International

14   Journal of Forensic Computer Science?

15         **A.**   No.

16         **Q.**   Have you ever been published in the Journal of

17   Digital Forensic Practice?

18         **A.**   No.

19         **Q.**   Have you ever been published in the Journal of

20   Digital Forensics, Security and Law?

21         **A.**   No.

22         **Q.**   How about the Journal of Forensic Sciences?

23         **A.**   No.

24         **Q.**   Lastly, the Small Scale Digital Device Forensics

25   Journal?

7677

1        **A.**    No.

2        **Q.**    And you've only testified just once in your entire

3    career as an expert.  Correct?

4        **A.**    As an expert, yes.

5        **Q.**    And when you testified as an expert in that case,

6    you were talking about call logs, why their phone calls were

7    made and received; that kind of thing?

8        **A.**    That, as well as signal and encrypted chat

9    application.

10       **Q.**    Thank you.

11             Now, you are not an expert in the Telegram

12    application, are you?

13       **A.**    Not yet.

14       **Q.**    Would it be fair to say that your methodology in

15    examining Telegram has never been subjected to peer review

16    or publication.  Correct?

17       **A.**    That is not correct.

18       **Q.**    Okay.  You mean at the FBI?

19       **A.**    Oh, yes.

20       **Q.**    So you've only been peer reviewed by your

21    colleagues at the FBI?

22       **A.**    That is correct.

23       **Q.**    I'm sorry.  My fault.  My question.  It was

24    inartful.

25             Have you ever been peer reviewed by independent

7678

1    computer experts in the field, not working at the FBI?

2         **A.**   No.

3         **Q.**   Now, you've also taken multiple courses on how to

4    testify in court and you are doing beautifully today.

5    Correct?

6         **A.**   Thank you.  Yes.

7         **Q.**   Okay.

8              **MR. JAUREGUI:**  Judge, that's all I have.

9              **THE COURT:**  All right.  Very well.

10             **MR. JAUREGUI:**  Thank you.

11             **THE COURT:**  Let me just ask Mr. Kenerson, are

12   there any further questions or should I discuss --

13             **MR. KENERSON:**  (Inaudible.)

14             **THE COURT:**  Very well.

15        (Sidebar discussion.)

16             **MR. JAUREGUI:**  Judge, I think it is clear that she

17   is not an expert.  She testified herself she is not an

18   expert in Telegram.

19             Not only that, she has not been published in a

20   single journal or peer-reviewed article.  She has never

21   taught a course substantively in anything, never been

22   published in anything and never been qualified as an expert

23   in any of the fields that Mr. Kenerson wants her to testify

24   to as an expert, to give an opinion testimony or conclusion

25   of any kind.

1          **THE COURT:**  Mr. Kenerson?

2          **MR. KENERSON:**  Just -- at least maybe I

3    misunderstood him, but I understood Mr. Jauregui's question

4    about Telegram to be whether she had been qualified as an

5    expert to testify in Telegram.  I didn't take it as kind of

6    a more general, are you an expert in Telegram?

7          But even that aside, I don't think anything that

8    Mr. Jauregui has done has cut into her qualification to

9    testify as an expert in the area of digital forensic

10   analysis.  She has the requisite experience, the training,

11   the peer review from the FBI, as the Court noted ahead of

12   time.

13         I just don't -- I don't see anything that

14   Mr. Jauregui brought out to undercut the qualifications that

15   she laid out during the government's voir dire to testify as

16   an expert in the area of digital forensic analysis.

17         **THE COURT:**  I agree with you, Mr. Kenerson.

18   The -- you know, she wasn't published in a lot of different

19   journals.  That could have been one question, but instead,

20   it was 20.  But in any event, all the other training and

21   experience she has gives her the -- makes it clear to me

22   that she can be qualified as an expert as requested.

23         And as for her answer on the Signal point or

24   Telegram, I guess it was, I think, really, if I understand

25   her answer, to have been sort of about a narrow topic, not

1  her broader question of whether testifying about that topic

2  within her broader expertise, that whether she can do that.

3  In fact, I've looked through, for example, the information

4  Ms. --

5            **MS. HERNANDEZ:**  Hernandez.

6            **THE COURT:**  -- Hernandez -- I'm sorry, that's

7  right, it can only be -- ^there's only on the defense side.

8            Ms. Hernandez had provided me, and it's very clear

9  to me she knows a lot about Telegram and the back-and-forth

10  of extracting data, in the limits of what she can know about

11  certain things.  So I think I will qualify her once

12  Mr. Kenerson asks me that question.

13            (Sidebar discussion concluded.)

14            **MR. KENERSON:**  Thank you, Your Honor.

15            So as we stated before the break, we would proffer

16  Ms. Cain as an expert in the area of digital forensic

17  analysis.

18            **THE COURT:**  All right.  She will be qualified, as

19  you requested.

20            **DIRECT EXAMINATION OF JENNIFER KATHERINE CAIN**

21  **BY MR. KENERSON:**

22    **Q.**   Examiner Cain, let me ask you just a couple basic

23  background-type questions.

24            One of the things that you mentioned during my

25  initial questioning of you was something called CART.  Are

1    you familiar with that?

2        **A.**    Yes.

3        **Q.**    What's CART?

4        **A.**    It stands for Computer Analysis Response Team.

5        **Q.**    And is that a term used within the FBI?

6        **A.**    It is.

7        **Q.**    Can you just tell us what the Computer Analysis

8    Response Team does?

9        **A.**    That -- all of the forensic -- the digital

10   forensic examiners at the FBI, that is our unit.  So it is

11   the unit responsible for digital forensics.

12       **Q.**    Now, as a general matter, what is your goal when

13   you conduct analysis of electronic evidence?

14       **A.**    Well, um, ultimately, the goal is to work with the

15   case agent to understand the scope of any particular case we

16   are working on and how it relates to the device that we are

17   looking at in question.

18           So ultimately my goal is to extract the artifacts

19   from that device and present it to the case agent in a way

20   that they can take it to their investigative team for

21   review.

22       **Q.**    And when you say "extract," what does the term

23   "extract" mean in this context?

24       **A.**    So the first part of digital forensics is actually

25   making a copy of the device.  We typically do not work with

1      the device itself.  We try to extract the data, the file

2      system, off of that device and then do our analysis on a

3      copy of that.

4          **Q.**   Okay.

5              Now, does the FBI have protocols in place for

6      ensuring the integrity of electronic evidence from when,

7      say, a phone is recovered in the field to when you start

8      your analysis of it?

9          **A.**   Yes.

10         **Q.**   Can you tell us what those protocols are?

11         **A.**   Sure.  We followed the typical evidence chain of

12     custody procedures, so when an electronic device is seized

13     under a search warrant or on consent, the seizing agent will

14     put that device inside one of our evidence bags.  They seal

15     it up and sign it.  And then at some point that will come to

16     our computer lab, at which point we would take custody of

17     it.

18         **Q.**   And are there any procedures that you follow to

19     ensure whether something that comes to you in the lab is --

20     has been not -- excuse me -- has not been tampered with

21     between when it's been recovered and when you start your

22     work on it?

23         **A.**   Sure.  When we get physical devices, they always

24     come to us sealed, and so we will break the seal in order to

25     know that it hasn't been tampered with since it was last

1    sealed.

2        **Q.**    Now, once you now have received a piece of

3    electronic equipment that you are going to analyze, can you

4    just walk us through what processes you go through at that

5    point?

6        **A.**    Sure.  The first step is to take a physical

7    inventory of the device, so actually looking at it to see

8    what type of device it is.  Is it an Android or an iPhone?

9    Is it powered on?  Is it powered off?  Do we have the code

10   for the device?  Is there any physical damage that would

11   potentially limit our access to it, such as a cracked screen

12   or a battery that doesn't charge?

13           So by taking kind of inventory of what the

14   physical device looks like, then that allows me to assess

15   which tool would be best to copy the data, to extract the

16   data off of that device.

17       **Q.**    Now, can you just walk us physically through the

18   process?  How is it that you create an extraction from a

19   phone?

20       **A.**    We have a variety of in-house and commercial tools

21   available to us.  Most of them come with their own hardware

22   and software; that is to say they come to us as a unit,

23   perhaps a computer or a laptop.

24           We actually power on the device and hook the

25   device up to that hardware in which the tool would interact

1    with the mobile device in order to pull the data off of it.

2        **Q.**    Now, you mentioned this term "tool."  What does

3    the word "tool" mean in this context?

4        **A.**    Any commercial or in-house tool, such as a

5    software program such as -- I believe the devices that we

6    looked at for this particular case were used with GrayKey

7    and Cellebrite.

8        **Q.**    Now, what is the difference between a commercial

9    tool and an in-house tool?

10        **A.**    In-house is just something that we have developed.

11    It's not available publicly for people to purchase.

12        **Q.**    When you say "we," the FBI?

13        **A.**    The FBI.

14        **Q.**    Now, you've been talking so far about extractions

15    of a phone.  Is there any difference between the process you

16    would do with a phone versus what you would do with a

17    computer?

18        **A.**    There is a slight difference.  Most computers, we

19    can actually take them apart and remove the hard drive and

20    then we would hook up the hard drive to our tools so we

21    don't actually have to interact with the computer to pull

22    the data off of it.

23            However, as I just stated, that's not the case

24    with mobile devices.  They actually have to be powered on in

25    order for our tools to interact with the device.

7685

1      Q.   And what about search warrant returns that you

2   discussed a little bit earlier that you might get from

3   electronic account providers, like Apple and Google?  How

4   does that process differ from what we have been talking

5   about?

6      A.   The data will come to us in some sort of

7   containerized format.  And then it appears -- from there on,

8   the process is the same as it is with any cell phone or

9   computer as we just need to look at the type of data that is

10  contained in that file and determine the best way to process

11  it and provide it to our agents for review.

12     Q.   Now, once you have created this extraction that

13  you have just described, what is the process at that point

14  to safeguard the integrity of that extraction?

15     A.   Once we get an extraction, we typically will --

16  either the tool will create a hash value or we will create

17  the hash value upon conclusion of that.  And what that is is

18  a digital fingerprint, basically.

19          We have -- any -- there's a variety of tools that

20  we use to do it, but it takes all of the content contained

21  in that file and it performs algorithms on it over and over

22  again to reduce it down to just one identifier, and then

23  that's our hash value.

24          Then if anything were to change inside that file,

25  even adding a period, it would change that entire value.  So

1    we always verify those to make sure that they match and that

2    indicates that the content has not been altered.

3        Q.   Now, is the -- the extraction that you created, is

4    that -- you mentioned the phone is treated as evidence.  Is

5    the extraction also treated as evidence?

6        A.   It is.  We would check a copy of the extraction

7    into evidence additionally.  We call that derivative

8    evidence.

9        Q.   And do you also keep a copy that you can work on?

10       A.   We do.  I don't work on the master copy that we

11   check into evidence.  I have a working copy that I perform

12   on.

13       Q.   Now, once you've created this forensic extraction,

14   the first version that comes straight out of the phone from

15   one of these tools that you've just described, can anyone,

16   any layperson, just open that file and see what is in it?

17       A.   Not necessarily.  You really need a specialized

18   tool in order to convert it to a readable format.

19       Q.   So a second tool?

20       A.   After the extraction, yes, a second tool to do the

21   processing on it.

22       Q.   Can you tell us a little bit about the process of

23   creating that first extraction into something that a

24   layperson can look at and understand what they are seeing?

25       A.   Sure.  When we get the file system in the phone,

1    it is exactly that.  It is a file system in the phone.  It

2    is not necessarily what you would look at when you turn on

3    your device.  You can't open this extraction and see text

4    messages.  All of the applications are stored in their

5    native state, which typically are databases.

6         So we use a variety of tools to turn that file

7    system, to turn all those databases and the datapoints into

8    what we would typically see on a phone into a useable format

9    for analysis.

10   **Q.**   Now, you mentioned that there's a copy that is

11   checked into evidence and a copy that you work on.  For the

12   copy that you work on, is that available to anyone in the

13   FBI or is that more limited in distribution?

14   **A.**   It's very limited.  We each -- when I receive a

15   case on my local network, I put it in a case file and only I

16   have access to that.  And then as additional examiners or

17   agents need access to that, I am able to add them to the

18   access list and give them access.  So it's not something

19   that just anyone could go in and get.

20   **Q.**   So let's say you're working on an extraction.  You

21   decide that you need to give another examiner access to that

22   extraction.  How would that second examiner be able to know

23   that what they are looking at is a true and accurate copy of

24   what was taken out of the phone originally?

25   **A.**   All they would have to do is calculate the hash

1    value for that, and as long as it matched, that means that

2    the contents had not been changed and they would be okay to

3    begin working on it.

4        Q.   I want to ask you a couple of questions about the

5    application Telegram.  Are you familiar with that

6    application?

7        A.   I am.

8        Q.   Can you tell us, what is Telegram?

9        A.   Telegram is an encrypted chat application where a

10   user can create an account, either on a mobile device or a

11   computer, and exchange messages both publicly and privately

12   with other users.  They can also hold video and voice calls

13   and send and receive attachments such as videos, images,

14   documents, audio files.

15       Q.   And you mentioned that Telegram is encrypted.  Can

16   you just tell us what you mean by the term "encrypted"?

17       A.   Sure.  Encrypted data is essentially data that has

18   been concealed.  It appears scrambled, for instance, while

19   it is in transit, moving from one phone to another phone.

20   And the only people that can unlock and unscramble the

21   encrypted message are the ones with the keys.

22       Q.   So if -- with Telegram, if a message is sent from

23   phone A to phone B and it is kind of intercepted midstream,

24   would the person who intercepts it be able to see what the

25   message was?

7689

1      **A.**    No.

2      **Q.**    So let me ask you just a couple questions about

3   Telegram.  So if someone wants to put Telegram on their

4   phone and start using it, what's that process?

5      **A.**    You would go to the Google store or the App store,

6   depending on what type of phone, what type of device you

7   have, download the application.  And then once you open the

8   application, Telegram will prompt the user through the

9   account creation.

10     **Q.**    Now, if you and I have Telegram accounts, can I

11  send you a message and vice versa?

12     **A.**    Yes.

13     **Q.**    And for all intents and purposes, would that look

14  any different to the two of us than a normal text message?

15     **A.**    No, it would have your name and a timestamp in the

16  message.

17     **Q.**    Does Telegram also have the ability to create what

18  is called group chats?

19     **A.**    Yes.

20     **Q.**    Can you tell us what the difference between a

21  group chat and that hypothetical where you and I are just

22  sending messages back and forth would be?

23     **A.**    Sure.  The intention of group chats is to add more

24  that two people, though you could create it beginning with

25  two people.

1                   Once a group chat is created, the owner -- the

2       creator becomes the administrator of the group and can add,

3       in certain settings, additional details to that group, such

4       as a group description, a group name, a group image.

5            Q.    And can groups be made private?

6            A.    They can.  There are two types, both public and

7       private groups.

8            Q.    And what is the difference?

9            A.    With a private group, you can only add a member by

10      one of the current members sending out an invitation to join

11      that group.

12                  With a public group, you can actually search for

13      the name of the group in the Telegram app and request access

14      that way.

15           Q.    Now, if you extract a device that has Telegram on

16      it and there are group chats in that, what type of

17      information are you able to see about the group chats?

18           A.    We can see the name, the administrator of the

19      group, the group description and the members of that group.

20           Q.    And if there were, for example, two chats on a

21      given phone that had the name "trial," would you be able to

22      tell the difference between those two, as a forensic

23      examiner?

24           A.    Yes.  When anybody creates a group, Telegram

25      automatically assigns it a unique identifier, which is just

1    a number 10 or 11 digits in length.  That number is never

2    repeated and it is unique to that group.  So you could

3    change the group name potentially infinite amounts of times,

4    but because that group number stays the same, those groups

5    would stay different.

6        Q.   Now, you mentioned there is both -- depending on

7    whether you have an Android or whether you have an Apple

8    phone, you have to go to the Google store versus the Apple

9    store, is there any difference in your ability as a forensic

10   examiner to review data from Telegram based on whether the

11   device in question was an Apple device or an Android device?

12       A.   There is.  The iPhone Telegram database and the

13   Android Telegram database are completely different.  They

14   look and function nothing alike.  Even though to the end

15   user, Android and iPhone users can exchange messages

16   seamlessly, the databases are actually different and store a

17   little bit different information.  So at this time, we can

18   get just slightly more information out of the Android for

19   the group members.

20       Q.   And what types of information can you get out of

21   Android that you cannot, at this point, get out of Apple

22   devices?

23       A.   For certain groups, the number of administrators

24   and who those administrators are, as well as a membership

25   list of that group, regardless of if that person

1    participated in the group chat.

2        **Q.**   Now, I want to ask you just a couple questions

3    about group chats and how you can analyze those when people

4    are on Telegram.

5            Let's say you and I are in a group chat, same

6    Telegram group chat with a few other people.  If you were to

7    analyze my phone and your phone at the same time, would you

8    expect what you saw in the forensic extraction to be the

9    same between those two?

10       **A.**   Potentially.  Potentially not.

11       **Q.**   And when you say potentially not, what types of

12   things would cause them to not be the same?

13       **A.**   Well, the main thing would be when the devices

14   were extracted.

15       **MS. HERNANDEZ:**  I'm sorry, can she repeat the

16   answer?  I couldn't hear.

17       **THE WITNESS:**  Sorry.  The main thing would be when

18   the devices were extracted.  For instance, if users came and

19   went, were added or removed from that group during those two

20   time periods or if messages were added or deleted during

21   those two time frames, then those chats could potentially

22   appear different, yes.

23       **Q.**   And so, say, a hypothetical, my phone is extracted

24   on Monday.  Yours is extracted on Thursday, three days

25   later.  What would happen if messages were deleted in that

1      time period?

2          A.   Well, they -- we would see them on your device,

3      but we would not see them on my device extracted three days

4      later.

5          Q.   And kind of the reverse, for the device that was

6      extracted first, the group chat continues on, other people

7      say things in the interim, what would you expect the

8      difference between phone A and phone B to be?

9          A.   Well, we wouldn't see the devices on your device,

10     Phone A from Monday, but we would see all that added content

11     that had come in Tuesday and Wednesday until the second

12     device had been extracted.

13         Q.   Now, I want to ask you a couple questions about

14     Telegram groups.  Within private groups, is there more than

15     one type of private group?

16         A.   There are groups and super groups.

17         Q.   Okay.  And we'll ask you some questions about

18     super groups in a second, but I just want to ask about kind

19     of regular groups.

20         A.   Regular private groups.  Okay.

21         Q.   So go back to the hypothetical, you and I have a

22     Telegram chat, we add a third person to that chat.

23         A.   Uh-huh.

24         Q.   Will that new member be able to see messages that

25     were sent prior to when he or she was added?

1    **A.**   No, you can only see messages from the point that

2    you were added, on.

3    **Q.**   And you mentioned earlier an administrator having

4    some powers.  Can you just tell us again, within a group,

5    what powers does an administrator have?

6    **A.**   They can add and remove members.  They can set a

7    group photo or a group description and add additional

8    administrators too.

9    **Q.**   Do they also have any influence over who can and

10   cannot be invited to a group?

11   **A.**   They do.  They can set it so that only they can

12   allow other people to join the group or they can allow all

13   members inside that group to invite members in.

14   **Q.**   And are administrators able to tap other people in

15   the group to be administrators as well?

16   **A.**   They can.

17   **Q.**   Is a group limited to one administrator or can you

18   have more than one?

19   **A.**   You can have more than one.

20   **Q.**   Now, again, talking about these regular groups,

21   what happens if a user who was just a group member leaves a

22   chat?

23   **A.**   If they leave the chat, Telegram will prompt them

24   with just a little bubble that comes up on the screen and it

25   says, Do you want to delete this chat or do you want to

1    delete this chat and leave the group?  So there is a

2    difference between those two.

3        **Q.**   And can you just tell us what the difference is?

4        **A.**   Sure.  If they choose just to delete the chat,

5    then that content and the group would be removed from the

6    device, but they would still be a member of that group.  So

7    at any point in the future, if chats resumed, then that chat

8    could potentially come back onto the device because they are

9    still a member of that group.

10       **Q.**   And what about in the second option that you

11   discussed, where they choose to exit the group and -- I'm

12   sorry.  What was the prompt?

13       **A.**   It was delete the group and remove themselves from

14   the group.  Essentially the same thing.  They would be --

15   the chat would be erased from their device and they would no

16   longer be a member in that group.

17       **Q.**   Now, let's say a group member does not want to

18   leave a group totally, but wants to delete a message they

19   had posted to that group, what would happen then?

20       **A.**   They get a similar pop-up, but the pop-up would

21   say, Do you want to delete this message for just you or

22   would you like to delete this message for the entire chat?

23       **Q.**   So let me ask you about each of those options.  If

24   they choose, Delete this message for just you, what happens?

25       **A.**   Then that message would be gone from their device

7696

1      only.

2          **Q.**    And what if they were to choose, Delete this

3      message for everyone in the chat?

4          **A.**    It would be deleted for everyone in the chat.

5          **Q.**    So again, hypothetical, you and I are in a group.

6      I want to delete a message and I choose, Delete this message

7      for everyone in the chat.  Later your phone is imaged.

8      Would that message be found on your phone?

9          **A.**    Most likely not, no.

10         (Brief pause.)

11         **Q.**    Now, so far we have been talking about messages

12     that a given user posted.

13         **A.**    Uh-huh.

14         **Q.**    Let's say we are in a group and I want to delete a

15     message that you have posted.  Do I have that ability?

16         **A.**    No.  You can only delete messages that you

17     personally authored.

18         **Q.**    What about an administrator?

19         **A.**    In a group, an administrator cannot do that

20     either.  They can only delete the messages that they create.

21         **Q.**    And when you say "in a group," you are talking

22     about a group, as opposed to super group?

23         **A.**    That is correct.

24         **Q.**    Okay.  Now we've been asking about these regular

25     groups so far.  Can you tell us what the difference is

1    between a group and a super group in the Telegram context?

2        **A.**   Well, Telegram created super groups as groups

3    started to get larger, so that is their main focus, is for

4    more administrative control over group settings and group

5    content when you have a large number of users.  So that's

6    the reason that they exist, basically.

7        **Q.**   And so how does a group within Telegram get

8    designated as a super group?

9        **A.**   There are two ways.  The first way is as the

10   users -- or the members of that group, as it starts to reach

11   200, Telegram will automatically flip it over to a super

12   group.

13        And the second way is that at any time, the

14   administrator of a group can go in and actually just edit

15   that group and force it into a super group by just clicking

16   on that option.

17       **Q.**   And are there any differences in functionality

18   between groups and super groups?

19       **A.**   There are for the administrator, yes.

20       **Q.**   What are those differences?

21       **A.**   The administrator can -- first off, they can

22   remove messages from all of the devices, not just the ones

23   that they author.  They can remove any user's message and it

24   would remove it from all devices.

25        They also have the ability to set the group to --

1   if a new member comes on, then they can read all of the

2   content prior to them joining; that's something not

3   available in regular groups.  They also have the ability to

4   set a link or a QR code that users can send out to invite

5   people to join groups.

6       **Q.**   Now, you mentioned that this can happen in one of

7   two ways, either a group size approaches 200 or the

8   administrator goes in and says, I want to change this to a

9   super group.  Do I have that right?

10      **A.**   Yes.

11      **Q.**   Now, if I were just a user in one of those groups

12  where the change happened, would I necessarily notice any

13  difference on my device?

14      **A.**   Most likely not.  It would all appear in the same

15  chat thread for you.

16      **Q.**   Now, that's for the user.  For you as a forensic

17  examiner, looking at that phone later, are you able to tell

18  the difference?

19      **A.**   Yes.  So when a group is created, it is given a

20  unique identifier, a unique number by Telegram.  When it is

21  converted to a super group, it's actually given a different

22  unique identifier.

23           So in the database, that chat can appear as two

24  different groups, just because the group will have one ID

25  and the super group will have a different ID.  However, it

1    will appear as one group on the end user's device.

2        **Q.**   Now, I think you mentioned that an administrator

3    of the super group can delete a message for everyone, not

4    just messages that they themselves post; is that right?

5        **A.**   That's correct.

6        **Q.**   Now, what about users in super groups?  Are they

7    still limited to their own messages?

8        **A.**   They are still limited to their own messages, yes.

9        **Q.**   Now, I want to ask you a little bit about images

10   that you either created or reviewed in connection with this

11   case.  Forensic extractions, excuse me.  Did you create a

12   forensic extraction from a phone recovered from an

13   individual known as -- named Paul Ray?

14       **A.**   Yes.

15       **Q.**   And have you been able to examine, using the hash

16   value protocol we discussed earlier, phones from Enrique

17   Tarrio, Ethan Nordean, Nicholas Ochs, Matthew Greene,

18   Gabriel Garcia, Zachary Rehl, Ronald Loehrke and Jeremy

19   Bertino?

20       **A.**   Yes.

21       **Q.**   And for the ones that you did not yourself conduct

22   the extraction of, were you able to verify the accuracy of

23   the extraction that you looked at?

24       **A.**   Yes.  The extractions were sent to me over our

25   forensic network and upon receipt, I verified the hash

1    values to ensure all of them matched, which they did,

2    indicating that none of the data had been altered inside.

3         Q.   And have you also been able to review the results

4    of information provided by Google in response -- or related

5    to an account registered to Joe Biggs?

6         A.   Yes.

7         Q.   Same question.  Were you able to verify the

8    accuracy when you looked at it?

9         A.   Yes, I verified the hash value.

10        Q.   Now, you mentioned I think early on in your

11   testimony that part of what you do is you take data out of a

12   phone.  It's in some format that is not necessarily readable

13   to a layperson, and then you try to get it into a format

14   that is useable to, say, agents in the field who don't have

15   your training; is that correct?

16        A.   Yes.

17        Q.   Okay.  Do the tools that you use to make that

18   happen allow agents to then create what we might call

19   reports of just individual chat strings?

20        A.   Yes.  They can export out any series of artifacts

21   from that into a report.

22             MR. KENERSON:  Ms. Rhode, if we could have up just

23   for the witness Government Exhibit -- demonstrative Exhibit

24   1131.  And if we could just click through so the witness and

25   defense counsel can see a little bit of this.

1              **MS. RHODE:**  (Complied.)

2     **BY MR. KENERSON:**

3         **Q.**   Do you recognize this demonstrative exhibit?

4         **A.**   I do.

5         **Q.**   Does that aid your testimony to the jury in

6     describing kind of the process of how these reports are

7     created and then assembled?

8         **A.**   Yes.

9              **MR. KENERSON:**  Your Honor, I move for the

10    exhibit -- admission of 1131 as a demonstrative exhibit.

11             **THE COURT:**  It will be admitted and permission to

12    publish it to the jury.

13        (Government's Exhibit 1131 was admitted.)

14    **BY MR. KENERSON:**

15        **Q.**   All right.  So what we have up here on the screen

16    looks like something in a column labeled Phone and something

17    labeled A.  What does that represent?

18        **A.**   That represents any phone, just the phone itself.

19        **Q.**   So the actual physical device recovered from

20    wherever it was recovered?

21        **A.**   Yes, the physical device.

22        **Q.**   All right.

23             **MR. KENERSON:**  If we could click to the next one,

24    Ms. Rhode.

25

1    BY MR. KENERSON:

2        Q.   What does what just came on the screen represent?

3        A.   So that's a disk.  That represents the extraction

4    or a copy of the data that we have pulled off of that

5    device.

6        Q.   And now, in the column labeled Chat ID Number

7    123546789, what would that represent?

8        A.   So then we would take the extraction, the file

9    system, and turn that data into a readable format in order

10   to analyze it.  So that would represent, for instance, chat

11   messages back and forth between users.

12       Q.   And before we get -- one question going back to

13   extraction.  In addition to chats like this, would that also

14   have other information on the phone, like photos, videos,

15   things like that?

16       A.   Yes.

17       Q.   Now, in this representation of Chat ID 123456789,

18   there's two bubbles with nothing in them.  Is that out of

19   the ordinary for you to see?

20       A.   No, it usually represents some type of missing or

21   deleted data.

22       Q.   Okay.  So if phone A is all that you have

23   recovered, would this be -- what we see on the screen be the

24   most complete representation of that chat ID that you could

25   put together?

1      **A.**   Yes.

2             **MR. KENERSON:**  Ms. Rhode, if you could click one

3      more time.

4      **BY MR. KENERSON:**

5      **Q.**   So you see that what is labeled as a combined chat

6      is just exactly what is in phone A.  Correct?

7      **A.**   Uh-huh.  Yes.

8      **Q.**   Okay.  So let's say FBI recovers Phone B.

9             **MR. KENERSON:**  If we could click a couple more

10     times.

11     **BY MR. KENERSON:**

12     **Q.**   And creates an extraction.  Can they also -- once

13     you have processed that data into something that an agent in

14     the field can look at, can that agent look for that same

15     chat string?

16     **A.**   Yes.

17            **MR. KENERSON:**  And if we could click again.

18     **BY MR. KENERSON:**

19     **Q.**   So seeing what just came up on the screen under

20     Chat ID 123456789, if an agent in the field saw that and

21     they knew of the existence of phone A, what types of steps

22     could they take?

23     **A.**   Knowing that the chat IDs matched and that the

24     timestamps and the direction of the messages were consistent

25     between the two chats, they could combine those chats.

1      **Q.**   And we don't have timestamps on here, but can you

2    tell us why it's important for the timestamps to match?

3      **A.**   That would indicate that those are actually the

4    same message.

5      **Q.**   Okay.  Now, assuming the timestamps do match,

6    would an agent or yourself be able to put those two chats

7    together and get a fuller picture of what Chat 123456789

8    would have looked like before any data went missing?

9      **A.**   Yes.

10      **MR. KENERSON:**  If you can click again.

11    **BY MR. KENERSON:**

12      **Q.**   So what we see over in the fourth column right

13    there, that puts together those chats, would that be

14    something that if it is put together in the way that we've

15    described, you would believe would be accurate?

16      **A.**   Yes.

17      **MR. KENERSON:**  Now, Ms. Rhode, if we could click

18    once more.  And different hypothetical now, Phone B comes

19    in.  If we could go through to where the chat comes up.

20    **BY MR. KENERSON:**

21      **Q.**   If phone B comes in and that last blue bubble is

22    blank on Phone B as well, such that when you put them

23    together, there is one blank, would that surprise you?

24      **A.**   No, that looks accurate.

25      **Q.**   So would it be common or uncommon for the best

1    version of a chat that can be put together from the phones

2    recovered to still contain some blanks?

3         **A.**   That is to be expected, yeah.

4         **Q.**   What types of things can cause a message, for

5    example, like the one in the bottom right of combined Chat

6    123456789, to be missing from every phone recovered in the

7    course of an investigation?

8         **A.**   The most likely explanation is that it's been

9    deleted.

10             **MR. KENERSON:**   Thank you.  We can take this

11   exhibit down.

12   **BY MR. KENERSON:**

13        **Q.**   Have you been able to, Ms. Cain, analyze -- review

14   a number of reports of the types that we just discussed?

15        **A.**   Yes.

16        **Q.**   Or chat threads labeled Government's Exhibits 500

17   through 550, 5-5-0, for identification purposes?

18        **A.**   Yes.

19        **Q.**   And those came to you as -- well, how did they

20   come to you?

21        **A.**   As zip files.

22        **Q.**   And what is a zip file?

23        **A.**   It's a container file in which it kind of just

24   packages up everything inside into one file.

25        **Q.**   Okay.  And did each of those exhibits, 500 to 550,

1    refer to one chat thread?

2         **A.**    There were multiple chat threads.

3         **Q.**    Each exhibit, so like 500 was one --

4         **A.**    Oh, each exhibit was one individual chat thread,

5    yes.

6         **Q.**    And within those zip files, did some of them

7    contain versions of the chat thread from multiple devices?

8         **A.**    They did, yes.

9         **Q.**    Did you compare -- did you have a chance to

10   compare each of those files in those zip files to the

11   original extractions we discussed for the phones?

12        **A.**    I did.

13        **Q.**    And that's the phones that you testified that you

14   either extracted yourself or compared the hash values and

15   looked at the extraction?

16        **A.**    That is correct.

17        **Q.**    And in keeping with the example we have been using

18   before, Phone A and Phone B, if that zip file contained

19   something labeled Phone A and something labeled Phone B, did

20   you compare the report from phone A to the phone A

21   extraction?

22        **A.**    Yes, I did.

23        **Q.**    And the report from Phone B to the Phone B

24   extraction?

25        **A.**    Yes, I did.

1      Q.   And all of those files -- the zip files and the

2  files within the zip files, were you able to determine

3  whether they matched the original extraction?

4      A.   They all matched the original extraction.

5      Q.   Can you just tell us a little bit about how you

6  did that comparison?

7      A.   Sure.  Each of the zip files has source extraction

8  information in it, meaning the name of the device that it

9  was taken from, so I opened that extraction that had been

10  processed and compared line by line that to ensure that the

11  messages in those exports matched the actual message in our

12  programs.

13      Q.   So let me ask you a question in another way.  The

14  Government's Exhibits 500 to 550, the zip files you

15  reviewed, do they all represent fair and accurate copies of

16  chat strings on -- in those zip files recovered from the

17  phones they were on?

18      A.   They do.

19      Q.   Of those exhibits, do any of them contain super

20  groups?

21      A.   They did, yes.

22      Q.   For example, was Exhibit 505, Ministry of Self

23  Defense Op, was that a super group?

24      A.   Yes.

25      Q.   Exhibit 503, Ministry of Self Defense Main, was

1    that a super group?

2         **A.**   Yes.

3         **Q.**   Exhibit 507, also Ministry of Self Defense Main,

4    was that a super group?

5         **A.**   Yes.

6         **Q.**   And Exhibit 509, Boots on Ground, was that a super

7    group?

8         **A.**   Yes.

9         **Q.**   Now, we've talked a little bit about tools that

10   might allow a layperson to review an extraction in an

11   intelligible way.  Right?

12        **A.**   Yes.

13        **Q.**   Now, is Cellebrite an example of that?

14        **A.**   It is.

15        **Q.**   What is Cellebrite?

16        **A.**   It's a commercial tool that the government has

17   used and bought licenses for.

18        **Q.**   And what does it do?

19        **A.**   It turns the data in the file system extraction

20   into a meaningful format in order for us to review it.

21        **Q.**   Were most of the phone extractions that you

22   mentioned done in Cellebrite?

23        **A.**   Most of them were, yes.

24        **Q.**   I am going to ask you a couple questions about the

25   Boots on Ground chat.  Have you had a chance to -- have you

1    had a chance to look at that chat?

2        **A.**   Yes, I have.

3        **Q.**   And let me ask you about Cellebrite, at least as

4    it existed at the time these phones were extracted, if

5    someone were in a group and was a member, but did not say

6    anything, would that person show up in the participant list

7    created by Cellebrite?

8        **A.**   No.  When Cellebrite creates their participant

9    list, they generate the names and identifiers from the

10   people that actually contributed messages and content to

11   that group.

12       **Q.**   Now, are you able to tell, by looking at something

13   other than the Cellebrite participant list, whether someone

14   was in a group?

15       **A.**   Potentially, yes.  As I mentioned --

16           **MR. PATTIS:**   Potentially, yes, sounds speculative.

17           **THE COURT:**   We'll let the witness complete her

18   answer.  So overruled.

19           **THE WITNESS:**   If -- as I said before, with the

20   Android devices, we can extract membership lists.  So if

21   that group existed on one of our Android devices, then I

22   could look at the membership list of that group on the

23   Android device and get a list of people who were members,

24   but maybe not necessarily contributed content to that group.

25

1    BY MR. KENERSON:

2        Q.    What about if you had the actual device of a

3    member who may not have said anything?

4        A.    Yes.  If the device owner was a member of the

5    group, by the nature of that chat existing on that device,

6    that person would be a member.

7        Q.    And let me ask you about what happens in Telegram

8    when someone is invited to a group.

9        A.    When a user is -- joins a group after a group

10   creation, there is a system message that says, New person

11   has joined the group, and it till say the user's name.

12       Q.    And are you able to view that message in

13   Cellebrite?

14       A.    Yes.

15       Q.    So if someone is invited to the group, but does

16   not say anything, would that system message still be visible

17   to you?

18       A.    Yes.

19       Q.    Now, have you had a chance to look at the Telegram

20   chat Boots on Ground?

21       A.    I did.

22       Q.    And I think you said you reviewed the forensic

23   extraction of Matthew Greene's phone; is that right?

24       A.    I did, yes.

25       Q.    Did -- when you reviewed that, did you see any

1      evidence one way or the other whether Mr. Greene was in

2      Boots on Ground?

3          **A.**   I did.  Mr. Greene's phone was an Android.  So I

4      was able to see in his membership table that he was listed

5      as a member in Boots on Ground.

6          **Q.**   And what about from reviewing the extraction?  Did

7      you see any evidence one way or the other whether he had

8      been invited to that group?

9          **A.**   When I reviewed Mr. Nordean's device, in Boots on

10     Ground chat on Mr. Nordean's device, there was a system

11     message that said Mr. Greene's user name or user ID had

12     joined the chat on January 15th, I believe, at 6:35 p.m.

13         **Q.**   Now, did you ever see any information as to

14     whether an individual with the Telegram handle NobleLead was

15     in Boots on Ground?

16         **A.**   I did.

17         **Q.**   And can you tell us about that?

18         **A.**   So when a user joins the group after the group

19     creation, a system message comes across and says that, This

20     user has joined the group.  When they are added during the

21     group creation, while the administrator is actually going in

22     and creating the group, you have the option to add members

23     right off the bat as the group is being created.  Those will

24     not leave system messages.

25              However, when a user leaves the chat, a system

1    message is created.  I was able to find a system message for

2    NobleLead leaving that chat.

3              **MR. KENERSON:**  And if we could have the

4    demonstrative back up just for the witness for a moment,

5    please.

6              And, Ms. Rhode, you can go to the last slide of

7    that.

8    **BY MR. KENERSON:**

9        **Q.**   And looking at that, would -- do you recognize

10   what you see on the screen?

11       **A.**   I do.

12       **Q.**   Would using what you see on the screen help you

13   explain your testimony you just gave to the jury?

14       **A.**   It would.

15             **MR. KENERSON:**  Your Honor, I would ask that this

16   portion also be admitted as a demonstrative.

17             Number again?

18             **MR. KENERSON:**  1131.

19             **THE COURT:**  All right.  It will be admitted and

20   permission to publish.

21       (Government's Exhibit 1131 was admitted.)

22             **MS. HERNANDEZ:**  So, your Honor, these are

23   demonstrative evidence?  Is that what I understood the

24   government --

25             **THE COURT:**  They've -- correct.  They have -- it

1    is a demonstrative; is that correct, Mr. Kenerson?

2           **MR. KENERSON:**  Yes.

3           **THE COURT:**  All right.  Very well.

4    **BY MR. KENERSON:**

5      **Q.**   All right.  Can you explain to us what we are

6    looking at at the top of these two blue bubbles?

7      **A.**   This is a screenshot of a Cellebrite report and

8    these are system messages.

9      **Q.**   And system messages are the type that you just

10   discussed that happen when people either enter or leave a

11   group?

12     **A.**   Yes.

13     **Q.**   And the one at the top, can you tell us what we

14   are looking at in the one at the top here?

15     **A.**   That is a system message saying that the Peer ID

16   1480174105 joined the group via a link on January 5th,

17   11:35 p.m., UTC, which would translate to January 5th, 6:35

18   Eastern Standard Time.

19     **Q.**   And you mentioned a bunch of numbers and a peer

20   ID.  What is a peer ID?

21     **A.**   When a person creates account on Telegram, much

22   like a group is given a numerical identifier, each person's

23   user name, each account you create is also given a numerical

24   identifier.  This one that begins with 148 is associated

25   with Mr. Greene.

1      **Q.**   Thank you.

2           And -- now, there's one below that says system

3      message, Enrique Florida Pb left the group and it gives some

4      dates.  Can you tell us what we are looking at there?

5      **A.**   Yes.  It is also a system message on January 14th,

6      2:34 a.m., so January 13th, 9:34 p.m. Eastern Standard Time.

7      It says, Enrique Florida Pb left the group.

8      **Q.**   These are both from the Boots on Ground chat?

9      **A.**   Yes.

10     **Q.**   Now, I asked you, I think, about the Telegram

11     handle NobleLead, and we are looking at something that says

12     Enrique Florida Pb.  Can you tell us why this says Enrique

13     Florida Pb?

14     **A.**   When you create an account on Telegram, you are

15     assigned a unique identifier and you are also able to create

16     a user name and a display name for yourself.

17          However, when your friends find you and you join

18     groups on Telegram, they are -- and if you are stored in

19     their phone contact with a different name and you allow

20     Telegram to sync up with your contact list, Telegram will

21     actually display what your phone displays for that same

22     person.

23          So while NobleLead is the user name that he

24     selected during account creation, this is -- Enrique Florida

25     Pb is what is displayed on Mr. Nordean's device.

1     **Q.**   Thank you.

2           And I think you mentioned that -- were you able to

3     find something like you found for Mr. Greene, an invite

4     system message for Mr. Tarrio?

5     **A.**   No, I was not.

6     **Q.**   And what does that tell you?

7     **A.**   That he was added during the group creation as it

8     was being created, so he did not get a system message for

9     joining the group.

10          **MR. KENERSON:**   Thank you, Ms. Rhode, we can take

11    this exhibit down.

12    **BY MR. KENERSON:**

13    **Q.**   Are you familiar with the term "orphan files" that

14    has been used in this investigation in relation to Telegram?

15    **A.**   Yes.

16    **Q.**   What is that?

17    **A.**   For this investigation, we have considered an

18    orphan file to be any type of attachment, such as a video,

19    image, document or audio file that has been sent as an

20    attachment in any given message, but the original message is

21    no longer present on the device.

22    **Q.**   And how -- can you just tell us how a file can

23    become orphaned, such that the original message is not

24    available by the time that you are looking at the phone?

25    **A.**   If the message has been deleted.

7716

1      Q.   Excuse me.  Let's say you come across an orphaned

2   audio file.  Are you able to tell which of those

3   applications it was originally associated with?

4      A.   No.  Oh, sorry.  Yes.

5      Q.   How are you able to tell that?

6      A.   When all of these applications create media

7   attachments, they are all containerized, meaning if Signal

8   create -- has an attachment in it, it is forced to stay in

9   the Signal path file of the device.

10          If Telegram has an attachment with a media file in

11  it, when it saves to the phone, it's also forced to save in

12  the Telegram portion of the device.

13          Each of the devices are containerized and so all

14  of the media within them stays within those certain paths.

15     Q.   Now, if you do learn that, say, a particular

16  orphaned file is associated with Telegram, but there's no

17  associated chat left on the device, are you able to say

18  definitively what chat that file was originally associated

19  with?

20     A.   No.

21     Q.   Now, have you had a chance to look at a number of

22  orphaned files recovered from some of the devices that we

23  have discussed?

24     A.   I have.

25     Q.   And did you have a chance to look at what is

1    called metadata associated with those files?

2        **A.**    I did, yes.

3        **Q.**    What is metadata?

4        **A.**    For these particular files in this scenario, the

5    metadata is essentially just data about the data.  So these

6    are file system dates as they relate to when that particular

7    attachment was saved to the device.

8        **Q.**    And as you sit here today, do you recall the

9    specific dates and metadata in question for those files?

10       **A.**    Not from memory, no.

11       **Q.**    Were you able to -- well, did you send a couple of

12   emails memorializing that metadata?

13       **A.**    I did.

14       **Q.**    Would it aid your testimony if you were able to

15   refer to those emails in the course of that testimony?

16       **A.**    It would, yes.

17       **MR. KENERSON:**    Your Honor, I provided defense

18   counsel a copy of these, but I would ask that Ms. Cain be

19   permitted to refer to her, essentially, notes while

20   testifying about the metadata.

21       **THE COURT:**    All right.  Counsel would like -- one

22   counsel would like to be heard at sidebar.

23       (Sidebar discussion.)

24       **MS. HERNANDEZ:**    The government earlier mentioned

25   Paul Ray I think and a couple other names that are not the

1    defendants in the case.  I guess the Government alleges that

2    those people are co-conspirators or tools or some other

3    category, so --

4            **THE COURT:**  I think at a minimum, it just means

5    that they found relevant evidence on their phone.

6            **MS. HERNANDEZ:**  Well, I just wanted to make an

7    objection subject to the government at some point linking it

8    up -- as I was going to say, whether they are tools or

9    co-conspirators or however else.

10           **THE COURT:**  I don't believe -- well, I actually

11   don't know.  But has any of the evidence that we have been

12   talking about, Mr. Kenerson, come from any of the phones

13   that Ms. --

14           **MS. HERNANDEZ:**  Hernandez.

15           **THE COURT:**  -- Hernandez has mentioned?

16           **MR. KENERSON:**  I guess it depends on what evidence

17   we have been talking about.  Are we talking about the course

18   of her testimony or the PDFs?

19           **THE COURT:**  I'm talking about the PDFs.

20           **MR. KENERSON:**  I believe so.  I believe at least

21   some level of the evidence that wound up going into those

22   PDFs came from some of those phones, yes.

23           **THE COURT:**  Well, I mean -- I guess --

24   Ms. Hernandez, that sounds like an objection you can make as

25   the -- either could have made or might make as a particular

1    exhibit is coming into evidence.

2              It doesn't -- these are -- we know who sent -- we

3    knew who the sender was for all of these messages.  That it

4    happened to be captured on someone else's phone strikes me

5    as not, you know, a bar to its admission.

6         **MS. HERNANDEZ:**  I wasn't sure exactly -- I know

7    the government mentioned those names.  I was not sure how

8    they would interact or how they affected the evidence that

9    the government was going to introduce.  So I just wanted to

10   lodge the objection and if they -- if it becomes an issue,

11   we'll figure it out.  I just --

12        **THE COURT:**  All right.

13        **MS. HERNANDEZ:**  To the extent that any of the

14   evidence is coming in from those devices, I am just lodging

15   the objection.

16        **THE COURT:**  All right.  Mr. Pattis?

17        **MR. PATTIS:**  Briefly, Judge.  Mr. Kenerson read

18   those names pretty quickly.  I didn't want to interrupt the

19   flow because I didn't think it was material.  Could he give

20   us those names again, please?

21        **MR. KENERSON:**  I'm happy to do so.  It might be

22   more efficient to do it just off the record where I am not

23   flipping through my notes again, but if we want to do it

24   now, I'm happy to do it now too.

25        **MR. PATTIS:**  It doesn't matter to me.  It's just a

1     gap in my notes and now that the issue has come up.

2            **THE COURT:**  We only have 15 more minutes with the

3     jury, so let's get back to the testimony and we can tie up

4     these loose ends after we are done.

5            **MR. PATTIS:**  Yes, sir.

6            **THE COURT:**  All right.

7        (Sidebar discussion concluded.)

8            **MR. KENERSON:**  I think the request before the

9     break was to allow Examiner Cain to refer to her notes when

10    discussing the metadata.

11           **THE COURT:**  All right.  Without objection, it will

12    be permitted.

13           **MR. KENERSON:**  All right.  If I may approach the

14    witness --

15           **THE COURT:**  You may, sir.

16           **MR. KENERSON:**  -- with what's been marked for

17    identification as Government's Exhibits 1134, 1135 and 1136.

18           Ms. Rhode, if we can bring up Government's Exhibit

19    1104, which I believe is already in evidence.

20           **DEPUTY CLERK:**  1104 was ID'ed, but it wasn't

21    admitted.

22           **MR. KENERSON:**  To the extent it hasn't been

23    admitted, I think I would move for its admission -- we can

24    go on the phones --

25           **THE COURT:**  All right.

1          (Sidebar discussion.)

2               **THE COURT:**  What is 1104, Mr. Kenerson?

3               **MR. KENERSON:**  1104 was one of the four audio

4      files that was played during Mr. Greene's testimony.

5               **THE COURT:**  Oh, all right.  I don't know why --

6      Ms. Harris, you don't see it in evidence?

7               **DEPUTY CLERK:**  1104, 5, 6, nor 7.  I have them all

8      ID'ed, but not received in evidence.

9               **THE COURT:**  They were all Mr. Pezzola's files.

10     Correct?

11              **MR. KENERSON:**  Well, they were -- Mr. Greene

12     identified the voice as Mr. Pezzola's, yes.

13              **THE COURT:**  Right.

14              All right.  Is there any objection to their

15     admission now?

16              **MS. HERNANDEZ:**  On behalf of Mr. Rehl, I think if

17     that's some of the items that were not co-conspirator

18     statements, we would object.

19              **THE COURT:**  Well, it doesn't -- they're coming in

20     one way or the other.  Right?  I mean, again, I think, at

21     the time we discussed them and the jury heard them, we

22     talked about -- I would have mentioned to all of you that,

23     if you think a limiting instruction is appropriate based on

24     the particulars of the statement, you all let me know and

25     I'll consider it and give it.

7722

1          So they're coming in one way or the other.  You

2     know, if you -- the question of whether these were

3     co-conspirator statements or not, I don't think the parties

4     have addressed but --

5          **MS. HERNANDEZ:**  My recollection was the Court said

6     you would give a limiting instruction once the parties got

7     together and offered something.

8          **THE COURT:**  Right.  On any -- so, so is there any

9     objection to their admission with subject to whatever you

10    want to argue in terms of what the limits might be?

11         **MS. HERNANDEZ:**  Not that -- in that manner, Your

12    Honor.

13         **THE COURT:**  All right.

14         **MR. METCALF:**  Your Honor, Steven Metcalf.  I don't

15    remember how I handled this when they were first introduced

16    with Mr. Greene.  So I just want to reserve me basically

17    taking a look into that for -- to address to the Court a

18    little bit later on if I need to.

19         **THE COURT:**  If you mean a limiting instruction, I

20    suppose, although as to your particular client, I think it's

21    going to be hard for there to be a limiting instruction.

22    They're his statement.

23         **MR. METCALF:**  Understood.  I just don't know if I

24    objected at the time.

25         **THE COURT:**  It doesn't -- whether you did or did

1    not, they're moving their admission now and I don't know of

2    a reason why they wouldn't be admissible.

3           **MS. HERNANDEZ:**  It might not be -- I thought one

4    of them was some call with his wife or about his wife

5    having --

6           **THE COURT:**  Well, I had inquired about the content

7    and whether it was potentially objectionable and it was not.

8           So, Mr. Kenerson, those will be admitted subject

9    to whatever the limiting instruction the parties present to

10   me.

11          (Sidebar discussion concluded.)

12          **MR. KENERSON:**  Okay.  So we'd move for the

13   admission of Exhibits 1104 to 1107.

14          **THE COURT:**  All right.  They will be admitted and

15   permission to publish.

16          (Government's Exhibits 1104 to 1107 were admitted.)

17          **MR. KENERSON:**  And starting with 1104, Ms. Rhode.

18          (Audio played.)

19   **BY MR. KENERSON:**

20      **Q.**  Now, do you recognize that as being one of the

21   orphaned files you reviewed?

22      **A.**  I do, yes.

23      **Q.**  Which phone was that from?

24      **A.**  Mr. Greene's device.

25      **Q.**  Now, did you get a chance to look at the metadata

1    associated with that file?

2         **A.**   I did.

3         **Q.**   What was the metadata associated with that file's

4    creation?

5         **A.**   May I refresh my recollection?

6         **Q.**   Sure.

7         **A.**   It was created on Mr. Greene's device on

8    January 3rd at 1:30 p.m. Eastern Standard Time.

9         **Q.**   January 3rd of what year?

10        **A.**   2021.

11        **Q.**   Now, the fact that it was created on Mr. Greene's

12   device at that date and time, what is that -- what would

13   cause that to be created then?

14        **A.**   If -- when Mr. Greene's device received the

15   message containing that attachment and saw it on his phone,

16   that is when the file would be added to the file system and

17   that's when that time stamp would be created.

18        **Q.**   Thank you.

19             **MR. KENERSON:**   Now, 1105, please, Ms. Rhode.

20        (Audio played.)

21   **BY MR. KENERSON:**

22        **Q.**   Examiner Cain, did you recognize that?

23        **A.**   Yes, sir.

24        **Q.**   Is that one of the files that you reviewed?

25        **A.**   Yes, from Mr. Greene's device.

1      Q.   What was the metadata associated with that file's

2   creation?

3      A.   May I refresh my recollection?

4      Q.   Please.

5      A.   It was January 5th, 2021 at 5:34 p.m.

6      Q.   Thank you.

7           **MR. KENERSON:**  1106, please.

8      (Audio played.)

9   **BY MR. KENERSON:**

10     Q.   Do you recognize that?

11     A.   Yes.

12     Q.   What device was that one from?

13     A.   Mr. Greene's device.

14     Q.   And what does the metadata say about the creation

15  time of that file?

16     A.   May I refresh?

17     Q.   Please.

18     A.   It was January 5th, 2021, at 7:56 a.m.

19     Q.   All right.

20          **MR. KENERSON:**  And lastly in this series,

21  Ms. Rhode, 1107, please.

22     (Audio played.)

23  **BY MR. KENERSON:**

24     Q.   Do you recognize that?

25     A.   I do.

1      Q.   Is that one of the files you reviewed?

2      A.   It is, yes.

3      Q.   Which device was that from?

4      A.   Also Mr. Greene's device.

5      Q.   What did the metadata say about the creation date

6  of that file?

7      A.   May I refresh?

8      Q.   Please.

9      A.   It was January 5th, 2021 at 7:58 a.m.

10         **MR. KENERSON:**  Ms. Rhode, can we have Exhibit 551

11  start, play just a couple of seconds and then stop?

12         (Audio played.)

13         You can stop there before we play the whole thing.

14  **BY MR. KENERSON:**

15     Q.   Do you recognize that file, Examiner Cain?

16     A.   I do.

17     Q.   Is that one of the files you reviewed?

18     A.   It is.

19     Q.   Could you tell us which, if any, of the phones you

20  found that one in?

21     A.   It was on Mr. Loehrke and Mr. Ray's device.

22         **MS. HERNANDEZ:**  Objection.

23         **THE COURT:**  Overruled at the moment.  Overruled as

24  to this testimony.

25         **MR. KENERSON:**  I move for the admission of Exhibit

1        551.

2                THE COURT:  I'm sorry.  Maybe we do need to go to

3        the phone so I understand something.

4            (Sidebar discussion.)

5                THE COURT:  Mr. Kenerson, this is a new document

6        or a new exhibit?

7                MR. KENERSON:  That is correct.  This is a new

8        exhibit.  She has testified that she recovered it from

9        Mr. Ray's device.  I expect a later witness will testify

10       that that's Ethan Nordean's voice.  You know, I -- if the

11       Court wants us to wait to admit it until then, that's fine

12       but it's -- I expect a different witness will testify it's

13       Ethan Nordean's voice, and she will testify as to the

14       metadata associated with that file.

15               THE COURT:  Why don't we just then -- just to make

16       this easy, why don't you just lay the foundation but not

17       move its -- of course, she has to hear it and the jury will

18       hear it, but nonetheless, why don't we just wait until

19       admitting it until that later witness connects the dots.

20               MR. KENERSON:  Sure.

21               THE COURT:  All right.

22           (Sidebar discussion concluded.)

23       BY MR. KENERSON:

24           Q.   All right.  Examiner Cain, from what you heard,

25       did you recognize that to be a file that you examined -- or

1    excuse me, that you -- an orphaned file you found on one of

2    the phones?

3         **A.**   I do, yes.

4         **Q.**   Associated with -- you testified to the phones it

5    was in but associated with which application?

6         **A.**   The Telegram application.

7              **THE COURT:**  I'm sorry.  Again, again, I can't have

8    the examination be competing with other people in the

9    courtroom.  Mr. Kenerson?

10             **MR. KENERSON:**  Associated with --

11             **MS. HERNANDEZ:**  Your Honor, could they keep their

12   voice up?  What you're hearing is we're trying to -- we

13   can't hear what's being said.  I apologize.

14             **THE COURT:**  It's ironic because it makes it harder

15   for me to hear as well.

16             All right.  So Mr. Kenerson and if the witness --

17   both witness and attorney, if you'll try to keep your voices

18   up.

19   **BY MR. KENERSON:**

20        **Q.**   Sorry.  It was, I think you were saying, it was

21   recovered from two different phones associated with which

22   application?

23        **A.**   Telegram.

24        **Q.**   And let's ask you, first, about Mr. Ray's device.

25   What did the metadata say in terms of the creation date in

1      Mr. Ray's device?

2          **A.**    May I refer to my notes?

3          **Q.**    Please.

4          **A.**    The date was January 7, 2021 at -- sorry --

5      7:23 p.m.

6          **Q.**    And what about in Mr. Loehrke's device?

7          **A.**    That was -- can I refer to my notes?

8          **Q.**    Please.

9          **A.**    Mr. Loehrke's device was January 6th, 2021 at

10     9:38 a.m.

11         **Q.**    What types of things would cause one -- was it the

12     same file on both phones?

13         **A.**    It was the same file.

14         **Q.**    What types of things would cause there to be that

15     type of discrepancy in the creation date between the two

16     phones?

17         **A.**    If the message wasn't received on one of the

18     devices until later, then that could cause that day to be

19     later.  Also, Mr. Ray's device is the date that it was later

20     on.  If he had interacted with that file, perhaps forwarded

21     it to some other group or to someone else, that could also

22     modify the dates in there.

23         **Q.**    Now, um, I think I forgot to ask you this with

24     respect to 1104 to 1107.  What application were those files

25     associated with in Mr. Greene's phone?

1      **A.**    Telegram.

2      **Q.**    Thank you.

3            Now, with respect to 551, you said it was on two

4      phones.  Was it an orphaned file in both of them?

5      **A.**    It was, yes.

6            **MR. KENERSON:**  Your Honor, just looking at the

7      clock, this would be about where I move into a different

8      topic.

9            **THE COURT:**  All right.  Very well.

10           Ladies and gentlemen, we'll conclude for the day.

11     Thank you very much for your attention as always.  We will

12     see you tomorrow morning.

13           (Jury exited the courtroom.)

14           **THE COURT:**  All right, ma'am.  You may step down.

15           (Witness stepped down.)

16           **THE COURT:**  And everyone may be seated.

17           All right.  So the only item I want to go through

18     right now with the parties is just give you a, kind of -- I

19     will put on the record a more detailed basis for this ruling

20     later on.

21           But in the interest of time, in the interest of

22     letting the government know what's in and what's out on the

23     Telegram stuff, I'm just going to run through a bunch of

24     objections that I have sustained, either in whole or in

25     part, so that you all know and the government can adjust

```
 1                    So those were newly discovered and a discrete

 2        issue.

 3                    THE COURT:  All right.  Very well.

 4                    Let's bring in the jury and the witness.

 5                    Mr. Kenerson, were we at the end of your -- had

 6        you completed your direct?

 7                    MR. KENERSON:  No, I had not.  I had not much

 8        more, but some more.

 9                    (Thereupon, Examiner Jennifer "Kate" Cain entered

10        the courtroom and the following proceedings were had:)

11                    THE COURTROOM DEPUTY:  Jury panel.

12                    (Whereupon, the jury entered the courtroom at 9:42

13        a.m. and the following proceedings were had:)

14                    THE COURT:  You all may be seated.

15                    Ladies and gentlemen, welcome back.  We'll

16        continue with the Government's direct examination.

17                    MR. KENERSON:  Thank you.

18              (JENNIFER "KATE" CAIN, GOVERNMENT WITNESS,

19                        PREVIOUSLY SWORN.)

20                    CONTINUED DIRECT EXAMINATION

21        BY MR. KENERSON:

22        Q.  Good morning, Examiner Cain.  How are you?

23        A.  Great.  Thank you.

24        Q.  I want to switch topics from where we were yesterday.

25        You said one of the phones you examined was one belonging to
```

1    an individual named Jeremy Bertino.  Is that right?

2    A.  That is correct.

3          MR. KENERSON:  And, Ms. Rohde, if we could bring

4    up, just for the witness, Government's Exhibit 1137.

5    BY MR. KENERSON:

6    Q.  And do you recognize what's on your screen?

7    A.  I do.

8    Q.  What do you recognize that as?

9    A.  This is a video found on Mr. Bertino's device that he

10   had screen recorded and then sent to someone else in a text

11   message.

12   Q.  And can you tell what -- well, what is a screen

13   recording of?

14   A.  When the user goes and actually takes a video of

15   everything that is happening on the device.

16   Q.  Okay.  Does this show any particular application?

17   A.  This is the Telegram app.

18   Q.  And is this -- have you had a chance to view this video

19   in its entirety before your testimony here today?

20   A.  I have.

21   Q.  Does this fairly and accurately represent what was

22   recovered from Mr. Bertino's phone?

23   A.  It does.

24          MR. KENERSON:  Your Honor, I'd move for the --

25          MS. HERNANDEZ:  I'm sorry.  Your Honor, one of the

1    screens isn't working, so we --

2           THE COURTROOM DEPUTY:  I'll send an email to John.

3           THE COURT:  Oh, it's on.  All right.  Very well.

4           You may proceed, Mr. Kenerson.

5           MR. KENERSON:  I'd move for the admission of

6    Exhibit 1137.

7           THE COURT:  All right.  It will be admitted.  And

8    permission to publish.

9           (Whereupon, Government's Exhibit No. 1137 was

10   entered into evidence.)

11   BY MR. KENERSON:

12   Q.  And before we start playing, you said this was a screen

13   recording.  Can you tell us how a user would create a screen

14   recording such as this?

15   A.  There is a setting in the iPhone that you -- the user

16   can go to and click "screen record," and then everything

17   after that point will be recorded.

18   Q.  And is that -- and so what we are looking at here is a

19   video file, not a still shot.  Correct?

20   A.  That is correct.

21   Q.  And if someone takes a video record as opposed to a

22   still shot of a screen, what's the difference?

23   A.  Well, a still screen shot is just an image of how it

24   looks at that time.  A video is actually the user

25   interacting with the device.  So if the user opens an

Cain - DIRECT - By Mr. Kenerson

1    application, you'll see it open.  If they scroll down,

2    you'll see the screen scroll down.  You'll see everything

3    the user sees on that device as it's happening.

4    Q.  So is this how a user would see this chat if they

5    scrolled through it on their phone at the time the screen

6    capture was created?

7    A.  Yes.

8    Q.  Now, was this file particularly associated with Telegram

9    or was it found somewhere else on Mr. Bertino's device?

10   A.  It was found in the camera roll of his device.

11   Q.  Okay.  And so you mentioned that this is how Telegram

12   would appear to a user of Telegram.  If you were looking at

13   the Telegram application through your forensic tools, is

14   this how it would appear to you?

15   A.  No, it wouldn't.  We build the data as similar and as

16   close as possible, but it actually doesn't look like the

17   application does.

18   Q.  Okay.  Now, on this, is there any significance to which

19   side the chat bubbles are coming from?

20   A.  The ones on the left-hand side are all of the incoming

21   text messages -- or messages.  And then the ones on the

22   red -- sorry -- on the right side in green, those are all of

23   the outgoing messages, just like they appear in regular text

24   messaging.

25   Q.  Now, let me ask you something about, as an example, the

Cain - DIRECT - By Mr. Kenerson

1    message that I'm circling right now, which has Captain Trump

2    at the top and then Noblebeard, the Immortal, under it at --

3    it looks like 12:34 p.m.  What does that -- the message

4    displaying in that manner signify?

5    A.  So the author of this message is Captain Trump, and the

6    message is an audio file.  And when you see the blue bar

7    like that, he's actually replying specifically to a voice

8    message that Noblebeard, the Immortal, left.

9    Q.  Thank you.

10          Now, up at the top, it says:  Parler comment on

11   post, Carol Jean, and then some words.

12          What is that denoting?

13   A.  Those are the IOS notification banners that are coming

14   across in realtime as the screen is being recorded.

15   Q.  So notifications on the user's iPhone as he's recording?

16   A.  Yes.

17          MR. KENERSON:  Ms. Rohde, can we play until ten

18   seconds.

19          (Whereupon, segments of Government's Exhibit No.

20   1137 were published in open court.)

21   BY MR. KENERSON:

22   Q.  Now, we just saw the video scroll through at a certain

23   pace.  Are you able to control the pace of how this scrolls

24   as we play the video?

25   A.  I am not, as someone watching the video.  That would

Cain - DIRECT - By Mr. Kenerson

1   have been controlled by the person recording the video.

2   Q.  And we just saw a bubble of a man who said something

3   about storming the Capitol Building.  Under that bubble,

4   there is something that says 12:56 p.m.  What does that

5   12:56 p.m. mean?

6   A.  That was the time the message was sent.

7   Q.  And have you had a chance, Examiner Cain, to compare --

8   first of all, did you have a chance to look at these

9   messages and see whether you can link them up to any of the

10  chats that you looked at?

11  A.  I have, yes.

12  Q.  Which chat was this recording from?

13  A.  This chat was called New MOSD.

14  Q.  And did you have a chance to look at the copies of that

15  chat that were -- you were able to review from the forensic

16  extractions and see whether the messages in this chat were

17  present in any of the versions that you looked at?

18  A.  I did.

19  Q.  And did you take some notes from that?

20  A.  I did.

21  Q.  Would it aid your testimony to be able to refer to those

22  notes?

23  A.  That would help.  Thank you.

24          MR. KENERSON:  Your Honor, if I may approach the

25  witness.

Cain - DIRECT - By Mr. Kenerson

```
1              THE COURT:  You may, sir.

2              MS. HERNANDEZ:  Objection.  Is there a question

3    that she can't recall so that she needs to look at the

4    notes?

5              THE COURT:  I think this is the same -- let me

6    hear counsel.

7              (Whereupon, the following proceedings were had at

8    sidebar outside the presence of the jury:)

9              THE COURT:  Mr. Kenerson, is this the same issue

10   we went through yesterday?

11             MR. KENERSON:  Yes.  This is one of the three

12   documents I brought to her yesterday.  We just did not get

13   to this point in the testimony.

14             THE COURT:  All right.  Do you have any objection,

15   Ms. Hernández?  It's just refreshing her -- it's as to

16   particular details.  Mr. Kenerson isn't using the

17   technically formal refresh procedure, but I think -- I

18   thought everyone had agreed that they didn't have an

19   objection to this in this case.

20             MS. HERNANDEZ:  Is he asking her about the

21   metadata?  I didn't hear him say that.  I thought he was

22   just going to ask her questions about everything.  He said,

23   You took notes.

24             If it's about the metadata, I have no objection.

25   But I thought the question was broader than that.
```

Cain - DIRECT - By Mr. Kenerson

1           MR. KENERSON:  It's going to be whether certain

2    messages were recovered from any of the chats she looked at.

3           THE COURT:  Ms. Hernández, this is, broadly

4    speaking, I would say, about metadata, about where things

5    were recovered from, what the metadata shows, where things

6    were recovered from.  Do you have any objection to this,

7    then?

8           MS. HERNANDEZ:  I'll let him proceed.  If there's

9    a problem that I see, I'll object again, your Honor.  Thank

10   you.

11          THE COURT:  Mr. Pattis?

12          MR. PATTIS:  I'm looking at the exhibit.  I don't

13   know how far -- what the Government intends to do.  But

14   there's a notation -- there are notations from someone who

15   calls themselves cracker, nigger, faggot.  Are we getting

16   into that here?

17          THE COURT:  Mr. Kenerson?

18          MR. KENERSON:  It is literally already on the

19   screen right now.  This was the subject of -- I'm not going

20   to ask her any questions about that, but this was the --

21   kind of a subject of a pretrial motion *in limine*, and this

22   was in the Government's opening as well.

23          THE COURT:  Well, what do you mean, Mr. Pattis?

24          MR. PATTIS:  I'll withdraw it.  I forgot -- I had

25   forgotten the pretrial order.  My mistake.

Cain - DIRECT - By Mr. Kenerson

```
1              I apologize to your Honor.

2              THE COURT:  That's all right.  I wasn't sure

3     whether you meant that screen name or another -- the content

4     of what the person says.

5              Mr. Kenerson, you may proceed.

6              (Whereupon, the following proceedings were had in

7     open court:)

8              MR. KENERSON:  Your Honor, if I may approach the

9     witness with what has been marked as Government's

10    Exhibit 1136 for identification.

11             THE COURT:  You may, sir.

12    BY MR. KENERSON:

13    Q.  Examiner Cain, is what I just handed you the notes that

14    you created in connection with this exhibit?

15    A.  They are, yes.

16    Q.  Now, the chat bubble that we've just been discussing at

17    12:56 p.m., was that message recovered on any device that

18    you examined?

19    A.  No, it was not.

20    Q.  And what about the message right above it that says --

21    and I'll just say it directly -- "Fuck then" -- that comes

22    from the right of the screen?

23    A.  May I refer to my notes?

24    Q.  Yes, please.

25    A.  No, it was not.
```

1          MR. KENERSON:  Ms. Rohde, can we play until 30

2    seconds now.

3          (Whereupon, segments of Government's Exhibit No.

4    1137 were published in open court.)

5          MR. KENERSON:  Thank you.

6    BY MR. KENERSON:

7    Q.  Now, that second bubble video that has a timestamp of

8    12:58 p.m., was that recovered from any device you examined?

9    A.  May I refer to my notes?

10   Q.  Please.

11   A.  No, it was not.

12   Q.  Now, under that, there's two messages coming from the

13   right, one that says, "Form a spear," and one that says,

14   "Holy fuck, do it, boys."

15          Were either of those recovered from any --

16          THE COURT:  I'm sorry, Mr. Kenerson.  I just --

17   can you keep your voice up?

18          And can the witness -- can you keep your voice up,

19   please?

20          And can those at counsel table keep their voices

21   down.

22   BY MR. KENERSON:

23   Q.  So the two messages underneath the bubble at 12:58

24   p.m. -- one says, "Form a spear"; one says, "Holy fuck, do

25   it, boys" -- were either of those recovered from any device

```
 1    that you examined?
 2    A.  No, they were not.
 3            MR. KENERSON:  Can we play until one minute and
 4    one second, please -- or play to the end, I suppose.
 5            (Whereupon, segments of Government's Exhibit No.
 6    1137 were published in open court.)
 7    BY MR. KENERSON:
 8    Q.  Examiner Cain, the chat bubble from the right with the
 9    individual with the beard at 1:00 p.m., was that recovered
10    from any device you examined?
11    A.  May I refer to my notes?
12    Q.  Sure.
13    A.  No, it was not.
14    Q.  What about the two underneath?  We'll start with, first,
15    "Fuck, I'm so mad I'm not there."
16            Was that recovered from any device you examined?
17    A.  No, it was not.
18    Q.  What about, "More videos, Bro"?
19    A.  No, it was not.
20    Q.  What about the bubble from the left at 1:02 p.m.?  Was
21    that recovered from any device you examined?
22    A.  No, it was not.
23    Q.  Now, what about the one underneath it, "Push inside.
24    Find some eggs and rotten tomatoes"?
25    A.  Yes, it was.
```

Cain - DIRECT - By Mr. Kenerson

1    Q.  Which devices was that recovered from?

2    A.  They were found on Mr. Rehl and Mr. Nordean's device.

3    Q.  Now, it looks like we are at the end of the video at

4    this point.  Correct?

5    A.  That is correct.

6    Q.  Now, what, if any, conclusions can you draw as an

7    examiner from the fact that the messages that we just

8    discussed that weren't found on any device were not found on

9    any device you examined?

10          MS. HERNANDEZ:  Objection.  Relevance.

11          THE COURT:  Overruled.

12          THE WITNESS:  These messages that were not found

13   on the device had been deleted.

14   BY MR. KENERSON:

15   Q.  Can you draw any conclusions as to who would have

16   deleted them?

17   A.  The user that posted the video.

18   Q.  Why do you come to that conclusion?

19   A.  Because when we found this chat on two different

20   devices, the missing messages were gone from both of those

21   devices.  Therefore, if the user had selected just to remove

22   it from their own device, then they would still be present

23   on the other two devices.  And since they weren't, the

24   conclusion is that they removed them from all the devices

25   for the chat.

```
1    Q.  Now, in addition to --
2              MR. KENERSON:  Ms. Rohde, we can take this exhibit
3    down.
4    BY MR. KENERSON:
5    Q.  You said you also had a chance to review the extraction
6    from Mr. Rehl's phone.  Is that right?
7    A.  That is correct.
8    Q.  And did you have a chance to look at exhibits labeled
9    Government's Exhibit 400A, 400D, as in delta, P, as in Paul,
10   R, X, as in x-ray, G, as in gamma, P, as in Paul, Q, T, JJ,
11   402B, 403G and 403H?
12   A.  I did.  Yes.
13   Q.  Were all of these found on Mr. Rehl's device?
14   A.  They were.
15   Q.  And do they appear to depict events from January 6th,
16   2021?
17   A.  They do.
18             MR. KENERSON:  Your Honor, I'd move to admit those
19   exhibits.
20             THE COURT:  They will be admitted.
21             (Whereupon, Government's Exhibit Nos. 400A, 400D,
22   400P, 400R, 400X, 401G, 401P, 401Q, 401T, 401JJ, 402B, 403G
23   and 403H were entered into evidence.)
24   BY MR. KENERSON:
25   Q.  Now, we talked about metadata yesterday.  Did Mr. Rehl's
```

1    device have metadata associated with those files?

2    A.  It did.

3    Q.  Did you create a chart that includes some of that

4    metadata?

5    A.  I did, yes.

6         MR. KENERSON:  Ms. Rohde, if we could have, just

7    for the witness, Government's Exhibit 1132.

8    BY MR. KENERSON:

9    Q.  Do you recognize what's on your screen?

10   A.  I do.

11   Q.  What is that?

12   A.  This is the metadata that I extracted out of the device

13   that corresponds with the exhibits that you just named and

14   are listed here.

15   Q.  Thank you.

16        And I need to correct how I read those exhibits.

17   I said -- let me just read them over one more time:  400A,

18   400D, 400P, 400R, 400X, 401G, 401P, 401Q, 401T, 401JJ, 402B,

19   403G and 403H.

20        That's what's on the chart.  Correct?

21   A.  That is correct.

22        MR. KENERSON:  And for the record, those are the

23   exhibits I'm moving to admit.

24        THE COURT:  All right.  And so those will be

25   admitted to the extent there was any discrepancy.

1              (Whereupon, Government's Exhibit Nos. 400A, 400D,

2       400P, 400R, 400X, 401G, 401P, 401Q, 401T, 401JJ, 402B, 403G

3       and 403H were entered into evidence.)

4              MR. KENERSON:  And I would also move at this point

5       for the admission of Exhibit 1132.

6              THE COURT:  It will be admitted.

7              (Whereupon, Government's Exhibit No. 1132 was

8       entered into evidence.)

9              MR. McCULLOUGH:  And seek permission to publish.

10             THE COURT:  And permission to publish.

11      BY MR. KENERSON:

12      Q.  Now, looking at the first column of this chart, does

13      that represent the exhibit number in court that we just read

14      out?

15      A.  It does, yes.

16      Q.  The second column that says Photo Title, what does that

17      represent?

18      A.  It's the name of the image or the video.

19      Q.  The image as found where?

20      A.  In the device.

21      Q.  In Mr. Rehl's device?

22      A.  In Mr. Rehl's phone.  Yes.

23      Q.  Okay.  Now, Photo Taken Date/Time, what does that

24      represent?

25      A.  That is the actual creation date of the video or picture

Cain - DIRECT - By Mr. Kenerson

```
1     listed.  It comes from the EXIF data.  So it actually is
2     embedded in the file itself so that if it's moved to a
3     different -- you know, saved somewhere else other than the
4     device, that creation date is embedded inside the file
5     itself so it will always remain the same.
6     Q.  And you used the term EXIF data.  Can you just tell the
7     jury what that means?
8     A.  Sure.  It's actually a standard for photographers.  When
9     digital cameras became popular, it's a way for them to store
10    all of the camera settings such as the aperture and the
11    lens.  And so among those are things that are relevant
12    forensically, like the date the photo was taken and created
13    and the type of camera that took it and the latitude and
14    longitude of the photo as well.
15    Q.  Now, speaking of latitude and longitude, that's what the
16    next two columns represent.  There's only, it appears, that
17    data for one photo.  Does that indicate that was the only
18    photo that has that data?
19    A.  It does.  Saved as EXIF data, yes.
20    Q.  Okay.  And then what does the camera make denote?
21    A.  These photos were taken with an Apple iPhone.  Several
22    of them with an iPhone 11 Pro and one with an iPhone 8.
23    Q.  Now -- and what's the source of that data?
24    A.  That is also in the EXIF data.
25    Q.  And same question about the camera model.
```

Cain - DIRECT - By Mr. Kenerson

1    A.  Same.  It's embedded in the photos itself, in the EXIF

2    data.

3    Q.  Now, the bottom two, 403G and 403H, do not have a camera

4    make or a camera model.  Is that because there was no EXIF

5    data that indicated that?

6    A.  That is correct.  Telegram and most social media strip

7    most of the EXIF data from the photos to make the size

8    smaller.  However, it does retain the creation date of the

9    video or image.

10   Q.  And were you able to tell which, if any, of these

11   exhibits were taken by the camera on Mr. Rehl's phone?

12   A.  Yes.  Mr. Rehl's phone was an Apple iPhone 11 Pro.  So

13   wherever it says iPhone 11 Pro, those were taken with his

14   actual device.

15   Q.  Now, with respect to 402B, that says it was taken from

16   an iPhone 8.  Are you able to tell how that photo got onto

17   Mr. Rehl's phone?

18   A.  Yes.  He received that photo via a text message.

19          MR. KENERSON:  Ms. Rohde, can we put up 402B.

20   BY MR. KENERSON

21   Q.  So that was the photo he received via text message?

22   A.  It is, yes.

23   Q.  Thank you.

24          MR. KENERSON:  If we can go back to the chart.

25          MS. HERNANDEZ:  Your Honor, I didn't hear

1    Mr. Kenerson's question.  Was it received by Mr. Rehl, did

2    he say?  Or sent by Mr. Rehl?

3                    THE COURT:  This was -- the question was about

4    whether he received it.

5                    MS. HERNANDEZ:  Thank you.

6    BY MR. KENERSON:

7    Q.  Now, you mentioned that Telegram and most social media

8    sites don't necessarily include camera make and model.  403G

9    and 403H, what application were those associated with?

10   A.  Those are from Telegram.

11   Q.  And are those orphaned files like we were discussing?

12   A.  They are.

13                   MR. KENERSON:  Ms. Rohde, can we play 403G,

14   please.

15                   (Whereupon, Government's Exhibit No. 403G was

16   published in open court.)

17   BY MR. KENERSON:

18   Q.  So was that video found on Mr. Rehl's device?

19   A.  It was.

20   Q.  Now, did you also have a chance to take a look at

21   information provided by Google in connection to an account

22   subscribed to by Joseph Biggs?

23   A.  I did.

24   Q.  How, for you, as a forensic examiner, does reviewing

25   that type of data differ from reviewing phone data or

                    Cain - DIRECT - By Mr. Kenerson

```
1    computer data?
2    A.  It's very much the same.  It comes to us usually in a
3    container format, like a zip file.  And inside there, just
4    depending on the type of return it is, it has some type of
5    file system structure to it.  It could contain anything from
6    text files to phone backups.  And so we generally treat it
7    with the same process we treat all of our digital
8    extractions.
9    Q.  And did you also -- first, did that information provided
10   by Google include photos and videos?
11   A.  It did.
12   Q.  Did it also include metadata?
13   A.  It did.
14   Q.  Did you have a chance to create a chart that included
15   some of that metadata linked to the photos?
16   A.  I did.
17             MR. KENERSON:  Ms. Rohde, if we could have 1133,
18   please, just for the witness.
19   BY MR. KENERSON:
20   Q.  And do you recognize 1133?
21   A.  I do.
22   Q.  What is that?
23   A.  This -- when the Google return came back, each of these
24   images or movies had a file with it that contained the
25   metadata or EXIF data out of each of those files.  And so
```

1    because they were all individually, I combined them onto one

2    sheet, and that's the sheet that you see here.

3    Q.  And did you have a chance to look at the exhibits in

4    that chart?  And I'll read them out:  404C, as in cat, 404F,

5    as in Frank, 404G, as in gamma, 404K, as in kilo, 404N, as

6    in Nancy, 404Q, 404V, as in Victor, 404W, 404X, 404Z, as in

7    zebra, 404DD, 404EE, 404LL, 404V, as in Victor, V, as in

8    Victor, 405I, 405M, as in Mary, 405N, as in Nancy, 405AA,

9    405BB, 405FF, and 405HH.

10            Did you have a chance to look at those exhibits?

11   A.  I did.

12   Q.  And did you have a chance to compare them to the data

13   provided by Google?

14   A.  Yes.

15   Q.  Do they appear to be fair and accurate representations

16   of the data provided to you by Google in connection with the

17   account subscribed by Mr. Biggs?

18   A.  Yes.

19            MR. KENERSON:  Your Honor, I'd move for the

20   admission of the exhibits I just read out.

21            MR. PATTIS:  No objection on behalf of Mr. Biggs.

22            THE COURT:  They will be admitted.  And permission

23   to publish.

24            (Whereupon, Government's Exhibit Nos. 404C, 404F,

25   404G, 404K, 404N, 404Q, 404V, 404W, 404X, 404Z, 404DD,

1    404EE, 404LL, 404VV, 405I, 405M, 405N, 405AA, 405BB, 405FF,

2    and 405HH were entered into evidence.)

3    BY MR. KENERSON:

4    Q.  And does this chart, 1133, fairly and accurately

5    represent the metadata provided by Google?

6    A.  It does.  Google provided the photo taken time in UTC,

7    and I did convert it to Eastern Standard Time for this

8    chart.

9             MR. KENERSON:  I would move the admission of 1133

10   as well.

11            THE COURT:  It will be admitted.  And permission

12   to publish.

13            (Whereupon, Government's Exhibit No. 1133 was

14   entered into evidence.)

15            MR. KENERSON:  Thank you.

16   BY MR. KENERSON:

17   Q.  Examiner Cain, I'm going to ask you a couple of

18   questions like we asked with the data associated with

19   Mr. Rehl.

20            The first column, that's the court exhibit name

21   that we just read out.  Is that right?

22   A.  Correct.

23   Q.  All right.  The second column, Photo Title, what's the

24   source of that data?

25   A.  That is the actual name of the file on the device -- or

1    in the Google return.

2    Q.  Now, the Photo Taken Date/Time, what does that

3    represent?

4    A.  That's the EXIF data for the time that that file was

5    created.

6    Q.  And what about the EXIF latitude and EXIF longitude?

7    What was the source of that data?

8    A.  This is also in the EXIF data, and it is embedded in the

9    actual photo itself.

10   Q.  And just in a very broad sense, are you familiar with

11   generally what those latitudes and longitudes on there

12   correspond to?

13   A.  Yes.  Washington, D.C.

14          MR. KENERSON:  And I'm going to ask Ms. Rohde to

15   play just a couple of those.  If we could have 404F, please.

16          (Whereupon, Government's Exhibit No. 404F was

17   published in open court.)

18          MR. KENERSON:  And if we could return to the chart

19   really quick, Ms. Rohde.

20   BY MR. KENERSON:

21   Q.  404F, what we just watched, what does the metadata

22   indicate in terms of the date and time of that?

23   A.  January 6th, 2021, 12:55:54 p.m.

24          MR. KENERSON:  Ms. Rohde, if we could have 404Z,

25   as in zebra.

Cain - DIRECT - By Mr. Kenerson

1                 (Whereupon, Government's Exhibit No. 404Z was

2      published in open court.)

3                 MR. KENERSON:  Thank you.

4                 Ms. Rohde, if we could go back to the chart.

5      BY MR. KENERSON:

6      Q.  404Z, as in zebra, what was the date and time of --

7      associated with that exhibit?

8      A.  January 6th, 2021, at 1:16:25 p.m.

9      Q.  Now, these photos and videos that are represented in

10     this chart -- well, first of all, let me ask you, there's --

11     I have not yet asked you about the final column that is

12     labeled "is trashed."  What does that represent?

13     A.  These photos were deleted and in the trash bin.

14     Q.  What's the source of that data?

15     A.  The Google returns.

16     Q.  And if a Google return lists "true" for "is trashed,"

17     what does that mean?

18     A.  It means that the user deleted that file.

19     Q.  Now, were these the only photos and videos in

20     Mr. Biggs's iCloud account from January 6th, 2021?

21     A.  No, they were not.

22     Q.  Approximately how many more were there?

23     A.  Roughly 40 to 50.

24     Q.  And about what percentage of those had "true" labeled

25     for "is trashed" in the Google return?

1    A.   100 percent.

2    Q.   Thank you.

3              MR. KENERSON:  I don't have any further questions,

4    your Honor.

5              THE COURT:  All right.  Cross-examination for

6    Mr. Nordean.

7                         CROSS-EXAMINATION

8    BY MR. SMITH:

9    Q.   Good morning, Ms. Cain.

10   A.   Good morning.

11   Q.   I just have a few questions about some of your testimony

12   on direct.  I'm Nick Smith.  I'm representing Ethan Nordean.

13             So you testified about how groups work in

14   Telegram, the Telegram application.  Right?

15   A.   I did.

16   Q.   Okay.  And you also testified about how users --

17   Telegram users gain access to those groups.  Right?

18   A.   Yes.

19   Q.   Okay.  And you testified about some of the digital

20   forensics tools that your team and you use to analyze

21   messages that were extracted from Telegram.  Correct?

22   A.   Yes.

23   Q.   Okay.  So let's assume that a Telegram user has been

24   admitted to a group and gains access to messages going

25   forward in that --

```
1    A.  Okay.

2    Q.  -- group.

3           The user can then open the window in the Telegram

4    application and look at messages that are being sent within

5    that group window.  Is that sort of how that works?

6    A.  Look at all the messages in that group chat?

7    Q.  Yes.

8    A.  Is that what you mean by window?

9    Q.  Yes.

10   A.  Then yes.  Yes.

11          MR. SMITH:  Ms. Rohde, would you help me bring up

12   Government Exhibit 1137?  I would do that, but that's not

13   one that we have digitally.  And not to play the videos, but

14   just to show the display for the chats.

15          Okay.  Can we publish that to the jury,

16   Ms. Harris?

17          Thank you.

18   BY MR. SMITH:

19   Q.  Ms. Cain, can you see the -- do you remember testifying

20   about this image on Telegram?

21   A.  Yes, I do.

22   Q.  Okay.  So is this sort of -- does this look, appear --

23   if you were a Telegram user and you were admitted to a group

24   chat and you were to open that group chat and look at

25   messages, is this roughly how that would appear to a user in
```

1    the chat window?

2    A.  It is.  There are some settings.  You can change the

3    colors.  But this is how it would look, yes.

4    Q.  Okay.  So is this a group chat that we're looking at

5    right here?

6    A.  It is.

7    Q.  Okay.  So in our hypothetical, let's say that a Telegram

8    user is admitted to this group chat.  Okay?

9    A.  Okay.

10   Q.  And let's say we are the user right now looking at this

11   window.  Okay?

12          The user would be able to scroll through these

13   messages going back and forth and look at all of them.

14   Right?

15   A.  That's correct.

16   Q.  But the tools that you've been discussing that allow you

17   to analyze these messages, those tools can't tell you when a

18   user has looked at any given message within this window.

19   Correct?

20   A.  No.  In the winter of 2021, Telegram did not do read

21   receipts for individual users in a group chat.

22   Q.  And if I'm -- correct me if I'm mistaken, but did you

23   testify about read receipts on direct?

24   A.  No, I did not.

25   Q.  Okay.  What is a read receipt?

Cain - DIRECT - By Mr. Kenerson

1    A.  When the user looks -- actually opens up and the phone

2    is recorded as digitally have -- seeing the message.

3    Q.  And how does a read receipt display on this?  How would

4    you know whether a user -- if you had access to a user's

5    phone and the user was admitted into a Telegram group, how

6    would you tell, from looking at their phone, that they've

7    read a particular message?  What would be the visual item?

8    A.  Well, in group messages in 2021, the read receipts were

9    for -- if any person in that one group had seen that

10   message, then a checkmark would appear.  So if you look in

11   one of these -- any of these green bubbles in here, you can

12   see that there is a check-checkmark in the bottom right-hand

13   corner.  That indicates that at least one group member has

14   received that.  It does not indicate which group member or

15   how many group members.  It just indicates that someone,

16   just one at least in the group, has seen it.

17   Q.  Okay.  Thank you for that.  That was very helpful.

18            So let's -- I'm going to give you another

19   hypothetical here.  I'm going to draw on the screen.  So

20   let's say -- can you see that I've circled the user Captain

21   Trump, and there appears to be a message from them?

22   A.  Well, this is a message from Mr. Bertino's account in

23   direct reply to Captain Trump.

24   Q.  Sorry.  I should have clarified that.

25            So this message I've circled in green, the user

Cain - DIRECT - By Mr. Kenerson

1    here we're looking at from the perspective of is Bertino.

2    Is that correct?

3    A.  That is correct.  Yes.

4    Q.  Okay.  So if we're in the perspective of Bertino here,

5    can we -- you can see that Bertino in this message is

6    responding directly to one from Captain Trump.  Correct?

7    A.  That is correct.

8    Q.  So we can make a fair inference that Bertino has seen

9    that message from Captain Trump, because he's responding to

10   it.  You could make that inference.

11   A.  Sure.  Yes.

12   Q.  It could be a mistake if someone is texting in

13   response -- if Bertino is texting to Captain Trump there, it

14   could be mistaken, but we can also make an inference that

15   Bertino has seen that message from Captain Trump because

16   he's responding directly to it.  Correct?

17   A.  Yes.  He would have had to select that message in order

18   to reply directly to it.

19   Q.  Okay.  Now, let's take a slightly different -- let's ask

20   a slightly different question here.  I'm circling a message

21   from someone else, someone -- it appears to be -- this

22   appears to be from a user called Aaron of the Bloody East.

23   A.  That is correct.

24   Q.  Okay.  So that message I've circled was posted by Aaron

25   of the Bloody East, whoever that may be.

```
 1    A.  Yes.
 2    Q.  On this window, just taking this window as our universe,
 3    we don't see that Bertino, the user, has responded to that
 4    message.  Correct?
 5    A.  No.  That is Aaron of the Bloody East.
 6    Q.  Right.
 7    A.  So that is an incoming message.
 8    Q.  And we don't see that Bertino, the user of this chat, is
 9    responding to that particular Aaron of the Bloody East
10    message.  Correct?
11    A.  That is correct.
12    Q.  Okay.  So with the technology as it stood in these
13    Telegram chats in this case, we don't know whether Bertino,
14    the user, viewed that message.  Correct?
15    A.  No.  All we can show is that his device received it.
16    Q.  Okay.  And so I guess one might make an inference that
17    if Bertino -- let's remove that circle and let's draw
18    Bertino's message that we were -- I've drawn a circle around
19    Bertino's message again.  You can see that Bertino's message
20    is immediately below, in physical space, the Aaron of the
21    Bloody East message.  Correct?
22    A.  Correct.
23    Q.  So one might make an inference that the user there,
24    Bertino, has seen that message because it's directly above.
25    Correct?
```

Cain - DIRECT - By Mr. Kenerson

```
 1    A.  You could.  Yes.

 2    Q.  Yes.

 3             So in your review of Telegram groups in this case,

 4    is it fair to say that some of them have hundreds or

 5    thousands of messages?

 6    A.  Across all their chats?

 7    Q.  Yes.

 8    A.  Yes.

 9    Q.  Okay.  So the inference one might make about Bertino

10    seeing -- Bertino seeing a message that's directly above one

11    of Bertino's messages might not be the same kind of

12    inference you'd make about Bertino, the user here, seeing a

13    message that was, say -- let's say it was hundreds or

14    thousands of messages above that one.  Correct?

15    A.  I don't presume to know what he -- you know, how he

16    viewed his messages.  I just know that the device received

17    them.

18    Q.  Well, so -- you've qualified as an expert in digital

19    forensics and you've -- I think you said you've reviewed

20    thousands of --

21    A.  I have.  Yes.

22    Q.  Okay.  So I guess I'm asking you based on your

23    experience about -- are you familiar with the habits of

24    users in chat apps?

25    A.  I am.  Yes.
```

Cain - DIRECT - By Mr. Kenerson

1    Q.  Okay.  So is it fair to say that the inference one might

2    draw about what Mr. Bertino, the user here, has seen is

3    different for a text that's immediately above -- a chat

4    that's immediately above where the user responds to a

5    message and a chat that's, say, hundreds of messages above

6    that -- a chat that the user has responded to?  Do you

7    understand my question?

8    A.  I believe so.  Yes.  I mean, because he is responding

9    directly to Captain Trump, I think it's safe to say that he

10   has definitely received that message.

11   Q.  Okay.  So let's say -- let's assume this were -- we're

12   in a group chat window here.  Right?  And let's say the

13   group chat had hundreds of messages in it, like some of

14   these.  Okay?

15   A.  Uh-huh.

16   Q.  Then let's say there was a user who didn't send any

17   messages at all in the chat group.  None.  Would you make

18   an -- is there any tool that you have that allows you to say

19   that that person who's been admitted to a chat group but has

20   not sent any messages there -- is there any tool that allows

21   you to show that that user has seen anything in the chat

22   group?

23   A.  No.  I can just tell if the device has received them or

24   not.

25   Q.  Okay.  So you've testified about a few -- the names of a

Cain - DIRECT - By Mr. Kenerson

1    few chat groups in this case that you've -- where you've

2    analyzed the Telegram data.  Right?

3    A.  Correct.

4    Q.  The original MOSD group was one of those?

5    A.  There is -- I don't believe the title was original MOSD.

6    There was one --

7    Q.  Ministry of Self-Defense?

8    A.  Yes.  There was one called Ministry of Self-Defense.

9    Q.  And I think -- have -- have you been characterizing this

10   as maybe the first Ministry of Self-Defense group or the

11   original Ministry of Self-Defense group?

12   A.  Yes.  There are, in fact, two groups with that name.

13   And there was one that was created first.  Yes.

14   Q.  And the second one was what you were characterizing as a

15   super group?

16   A.  That is correct.

17   Q.  Okay.  So those are two groups we have there, the first

18   MOS -- Ministry of Self-Defense, or MOSD, group, and then

19   the super group.  Correct?

20   A.  Yes.

21   Q.  Did you also testify about a chat group called the MOSD

22   op group -- O-P, for operations, I guess?

23   A.  Yes.

24   Q.  So did there come a time when you had conversations with

25   the prosecutors about whether particular Defendants in this

Cain - DIRECT - By Mr. Kenerson

1    case had communicated in those chat groups?

2    A.  Yes.  I looked for membership in those groups.

3    Q.  And you looked for membership by particular Defendants

4    to see whether they were involved in these groups?

5    A.  Yes.

6    Q.  Okay.  So isn't it the case that you advised the

7    Government that Mr. Nordean was not involved in any of --

8    did not send messages in any of those three groups I've just

9    listed?

10              MR. KENERSON:  Objection to what she advised.

11              THE COURT:  Sustained.

12   BY MR. SMITH:

13   Q.  Did there come a time when you learned that Mr. Nordean

14   did not send messages in those three groups I just

15   mentioned -- and to recall your memory, the original MOSD

16   group, the super group and the MOSD op group?

17   A.  I believe he did not contribute actual messages to the

18   MOSD op group.  However, I believe he contributed messages

19   to the others.

20   Q.  Can you recall any of those messages?

21   A.  Not off the top of my head, no.

22   Q.  Okay.  Do you know whether -- has the Government made an

23   inquiry with you about any of those messages that

24   Mr. Nordean apparently sent in the other two groups?

25   A.  Not specifically.  I know that I have --

Cain - DIRECT - By Mr. Kenerson

1    Q.  Do you recall seeing any of them?

2    A.  I do recall seeing some of them.  Yes.

3    Q.  And what were those?

4    A.  I don't remember the content, but I know there were

5    quite a few in the Ministry of Self-Defense larger group.

6    Q.  So if I told you that the Government has conceded in

7    this case Mr. Nordean did not send any messages in that

8    group, you would say they're mistaken about that?

9              MR. KENERSON:  Objection.  Vague.  Which group?

10              THE COURT:  Sustained as to vagueness.

11   BY MR. SMITH:

12   Q.  So if I were to inform you that the Government has taken

13   the position that the original MOSD group -- in the original

14   MOSD group and the super group, Mr. Nordean has not sent any

15   messages, you would say that's inconsistent with your

16   memory?

17              MR. KENERSON:  Again, objection.  Vague.  Which

18   group?

19              THE COURT:  Overruled.

20              THE WITNESS:  I know that -- I know he has sent

21   messages in one of the Ministry of Self-Defense groups.  I

22   am not sure whether it was the smaller one or the larger

23   one.  I know he did not contribute messages to the Ministry

24   of Self-Defense op group.

25

1    BY MR. SMITH:

2    Q.   Okay.  So let's -- let's cover Telegram handles.  I

3    don't know if that was the term you used, handle or nickname

4    or -- so what I'm referring to is people will -- users in

5    Telegram will use pseudonyms to identify themselves

6    sometimes.  Correct?

7    A.   Usernames.  Correct.

8    Q.   Username.  And the username is not -- sometimes is not

9    the same as the legal name of the user.  Right?

10   A.   That is correct.

11   Q.   Okay.  So just for an example, your name is Kate Cain.

12   You could appear in Telegram as something other than Kate

13   Cain?

14   A.   Correct.

15   Q.   Okay.  So there's no -- you testified about an

16   identification number that each user has, like a -- kind of

17   like a snowflake, has a unique fingerprint for each user.

18   Correct?

19   A.   That is correct.  Yes.

20   Q.   Okay.  But there's no way in the application for a user

21   to look behind the Telegram name and the identification

22   number and find the legal name of a user.  Is that right?

23   A.   No, not the legal name.  Not unless they chose to

24   provide it.

25   Q.   Okay.  So it would be possible for individuals to

1    communicate on Telegram without having any way to determine

2    who that person is -- what the legal name of that person is.

3    Correct?

4    A.  Well, you are required to register your Telegram account

5    with a phone number.  And so we can use that as attributable

6    to a certain person because you must verify -- when you

7    create the Telegram app, it sends you a text message

8    verification.  So we do know the phone number associated

9    with most Telegram accounts.  Yes.

10   Q.  Thank you.  So that is very informative.

11            But I was asking about someone who's not law

12   enforcement.  So when you say "we" -- you know, you have

13   access to certain data because you have search warrants and

14   grand jury subpoenas.  I'm asking about somebody who's a

15   civilian user.

16            Say you and I are both civilian users of Telegram.

17   Okay?

18   A.  Yes.

19   Q.  And we're not using our legal names when we communicate

20   with each other.

21   A.  Okay.

22   Q.  Okay?  And there is no way in the Telegram application

23   for me, a civilian user, who does not have search warrants

24   and grand jury subpoenas -- there's no way for me to look

25   behind your Telegram name and find that you are Kate Cain.

Cain - DIRECT - By Mr. Kenerson

```
 1   Correct?
 2   A.  You can choose to expose the phone number or have it
 3   hidden.  So --
 4   Q.  You could choose -- so a user can choose --
 5   A.  The user chooses.
 6   Q.  A user can also choose not to reveal their phone number
 7   and their legal name.  Correct?
 8   A.  Correct.
 9   Q.  And if you and I are communicating on Telegram and we
10   choose not to use our legal names and our phone numbers,
11   there would be no way for me to know who I'm talking to in
12   the real world.  Correct?
13   A.  Correct.
14   Q.  Okay.  So if you and I are communicating in Telegram and
15   we've chosen not to use our real names, if I was using the
16   name Captain Trump and you were using Sergeant Trump, for
17   example, okay, I can't be sure it's you and I who are
18   speaking unless we communicate outside of Telegram using
19   another medium, like the telephone, for example.  Right?
20   A.  Sure.
21   Q.  Okay.  So -- are you familiar with what chatbots are?
22   A.  In what context?
23   Q.  In the context of social media use.
24   A.  Somewhat familiar.
25   Q.  What are they?
```

Cain - DIRECT - By Mr. Kenerson

```
1    A.  You can have, essentially, artificial intelligence
2    create posts and create content.  I mean, I'm just vaguely
3    familiar with them.
4    Q.  Are they algorithms that allow -- are they algorithms
5    that mimic human speech --
6    A.  Yes.  That's fair --
7    Q.  -- that are not controlled by humans?
8    A.  That's fair to say.  Yes.
9    Q.  Okay.  And you testified that you're an expert in social
10   media use.  Correct?
11   A.  In digital forensics behind social media applications.
12   Yes.
13   Q.  And have you -- in the thousands of phones and computers
14   that you've conducted forensics on, have you familiarized
15   yourself with social media use on those devices?
16   A.  Yes.
17   Q.  Okay.  So is it fair to say that chatbots are a
18   relatively prevalent phenomenon on social media?
19   A.  They are used.  Their uses are limited these days, as
20   most social media blocks the ability to use them nowadays.
21   Q.  Does Telegram?
22   A.  It does, as of this fall.  Yes.
23   Q.  This fall?
24   A.  Yeah.
25   Q.  But it wasn't at the time?
```

Cain - DIRECT - By Mr. Kenerson

1    A.  No.  Not at the time.

2    Q.  Okay.  You testified about Telegram encryption.  Right?

3    A.  I did.

4    Q.  Okay.  So other -- that -- explain what -- did you

5    testify that the users in Telegram chat groups are

6    communicating through an end-to-end encryption system?

7    A.  No, I did not.

8    Q.  What did you testify about encryption?

9    A.  Telegram, by default, uses encryption anytime the

10   message is in transit.  And we consider it a client side to

11   a user side encryption, meaning you create a message on your

12   device.  It is sent to the Telegram server.  And while it is

13   being sent to the Telegram server, it is encrypted.  And

14   then once the Telegram server delivers that message, as it's

15   being sent to the recipient, it is also encrypted.  So

16   anytime that message is in transit, it is encrypted and

17   locked with those keys and cannot be accessed with anyone

18   without those keys.

19   Q.  So there were a wide range of commercially available

20   chat applications that feature encryption.  Correct?

21   A.  There are.  Yes.

22   Q.  Like WhatsApp is one?

23   A.  Yes.

24   Q.  Signal?

25   A.  Yes.

1    Q.   Telegram is another?

2    A.   Yes.

3    Q.   So -- you said you're familiar with these applications.

4    Right?

5    A.   I am.

6    Q.   So you're familiar that billions of users around the

7    world use encrypted chat apps to communicate?

8    A.   Yes.

9    Q.   Okay.  So it's not intrinsically a proof of criminal

10   activity if individuals are speaking through a chat app

11   that's encrypted?

12   A.   No.

13   Q.   I think you testified that you yourself use Telegram,

14   perhaps?

15   A.   Yes.

16   Q.   Okay.  So you testified about -- what are some of the

17   tools from the toolbox you used to analyze the messages

18   from?

19   A.   We have a variety of in-house tools and commercial tools

20   available to us.  I think the ones we spoke about earlier

21   was Cellebrite's Physical Analyzer.

22   Q.   And you used the tool Cellebrite here to manage your

23   extraction of Telegram devices.  Right?

24   A.   Some of them.

25   Q.   But you didn't use -- would you say the vast majority of

```
 1    them?
 2    A.   Yes.  I would say.
 3    Q.   Okay.  But Cellebrite is actually not equipped to handle
 4    extracting Telegram messages, is it?
 5    A.   No, that's not correct.
 6    Q.   That's not correct?
 7    A.   No.
 8    Q.   Have you ever taken the position with the Government
 9    that it was not adequate for extracting Telegram messages in
10    this case?
11    A.   I have taken the position that it was not adequate for a
12    programming project, that -- we had a team developing an
13    in-house commercial tool to parse Telegram messages, and
14    they wanted to build it based off of Cellebrite's platform,
15    and I said that that was not an appropriate use of the tool.
16    Q.   Okay.  And have you taken the position in this case that
17    using Cellebrite to extract Telegram messages gets you wonky
18    message extraction?
19    A.   Up until a certain point -- I believe 7.38 -- was
20    that it gave some wonky messages.  Everything used here in
21    this case today was 7.42 and above.  So those messages are
22    accurate.
23    Q.   Can you explain what you mean by -- what's that
24    distinction about?
25    A.   Sorry.  That's a version distinction.  So we are
```

1    currently on Cellebrite .60.  So that's, you know, a range

2    of about 22 different versions over the last two years.

3            You know, as -- there are 4 billion apps in the --

4    or 4 million apps in the Google store and 3 million apps in

5    the Apple store, and so our tools don't parse all of them.

6    You know, they -- our commercial tools focus on what is

7    relevant to the digital forensics community, what is

8    relevant to the casework of the people buying their product.

9            And so early on, in those earlier versions, you

10   know, as Telegram was just being used and just being parsed

11   by the digital forensic community, there were some limiting

12   capabilities.  Sure.

13   Q.  So --

14   A.  But every release adds new functionality.

15   Q.  So did there come a time when you took that position

16   that Cellebrite would get you wonky Telegram messages with

17   respect to the prosecutors in this case?  Did you inform

18   them of that?

19   A.  With respect to this case?

20   Q.  Yes.

21   A.  No.  To our programming team, who is developing a

22   solution, I told them they should not base their solution on

23   an old version of Cellebrite.

24   Q.  Okay.  And how are you sure that the current version of

25   Cellebrite is any different from -- has resolved the

Cain - DIRECT - By Mr. Kenerson

1   problems that you identified yourself with wonky message

2   extraction on Telegram?

3   A.  I provide -- I do testing and validation on all of my

4   tools, and pretty much every version I use undergoes some

5   type of testing and validation by both my unit and

6   personally by myself.

7   Q.  So it's not the case that you have taken the position

8   that Cellebrite itself, just Cellebrite period, not a

9   specific version, is the very worst tool for extracting

10  Telegram messages?  You've never taken that position?

11  A.  I told that to our programming team when they were

12  writing a solution.  Yes.  I told them they should not use

13  that particular version of Cellebrite to parse those

14  messages in a tool that they were currently building, that

15  there were others ways to build the tool more effectively.

16  Yes.

17  Q.  Okay.  So your position is that you were not -- your

18  position before was not that Cellebrite, period, is

19  ineffective at extracting Telegram messages?

20  A.  No.  Not at all.

21  Q.  Okay.  So --

22          MR. SMITH:  Your Honor, I'm going to bring up an

23  email from Ms. Cain on February 9th, 2022.  This is

24  impeachment material.

25          MR. KENERSON:  Objection.  Can we go to the

Cain - DIRECT - By Mr. Kenerson

1    phones?

2              (Whereupon, the following proceedings were had at

3    sidebar outside the presence of the jury:)

4              THE COURT:  Let's just do this.  It would be

5    helpful for me to see the document while we're having this

6    discussion, but we don't want to bring it up for the

7    witness.

8              MR. SMITH:  I can proffer for your Honor that --

9    she took the position that she formally advised the

10   Government that it was a specific version of Cellebrite that

11   would produce wonky Telegram extraction.  And the email says

12   Cellebrite, period, produces wonky Telegram extractions.

13             THE COURT:  Mr. Kenerson?

14             MR. KENERSON:  I think she's already -- I don't

15   think that there is anything inconsistent with her testimony

16   there.  I mean, the Court can see the email.  But I think

17   her testimony has been, yes, I said those things.  That's

18   what was in the process.  I don't think there's anything

19   inconsistent to impeach her with at this point.

20             MR. SMITH:  Your Honor, the inconsistency is she

21   just -- we went through a colloquy several times where I

22   asked her, Is it Cellebrite itself that produces wonky

23   extractions or is it a particular version?  The witness

24   said, a particular version.

25             The inconsistency is, in this statement she made,

1     it's Cellebrite, period.

2              THE COURT:  I think -- look, again, if you give

3     her a chance -- I think it's at least arguable it's

4     inconsistent.  The witness has to be given the opportunity,

5     though, to explain the statement.  When it comes -- and

6     we've sort of tabled the question of whether these things

7     come into evidence.

8              But I think Mr. -- and to be clear, when you say,

9     "taken the position," the impeachment is about prior

10    statements, not prior positions.  The witness has --

11             MR. SMITH:  This is a prior statement.  Thank you,

12    your Honor.

13             And, your Honor, under the D.C. Circuit precedent,

14    we're entitled to publish it to the jury under 613(b),

15    because this is -- the best evidence, the D.C. Circuit has

16    held, of an inconsistent statement is the statement itself.

17             THE COURT:  I'm not sure there is an

18    inconsistency.  You can show it to her and ask her about it.

19             MR. SMITH:  That's all we're asking for.

20             MR. KENERSON:  On the question of what can be

21    published to the jury, I think to the extent that there is

22    an inconsistent statement, this is just that statement.

23    It's not the entire email and not the entirety of her -- I

24    think it needs to be redacted if it's going to be shown to

25    the jury.

Cain - DIRECT - By Mr. Kenerson

1          THE COURT:  That's fair.  That's a fair point.

2          Isn't it?

3          MR. SMITH:  Your Honor, we will draw a line above

4     the irrelevant and immaterial information that has no

5     bearing on this case earlier in the email.  But, your Honor,

6     the jury has to have some context.  If I redact everything

7     except the word "Cellebrite," then the jury won't see what

8     the statement is.

9          THE COURT:  Obviously.  But I mean, if we're going

10    to put up -- it's a fair request from the Government.  I

11    want you to show it to Mr. Kenerson before we continue so at

12    least we can have -- we don't waste more time with this

13    redaction issue.

14          MR. SMITH:  Okay, your Honor.

15          THE COURT:  Thank you.

16          Mr. Smith, the other thing we could do -- I know

17    you've set up the impeachment.  If you have more to do --

18    we're coming up on a break.  If you want to, we can circle

19    back during the break and do your redaction cleanly when we

20    come back.

21          MR. SMITH:  That works, your Honor.  Thank you.

22          (Whereupon, the following proceedings were had in

23    open court:)

24    BY MR. SMITH:

25    Q.  So apologies for that.

```
1              MR. SMITH:  Your Honor, how many minutes before --
2              THE COURT:  I think we're about ten or 15 minutes
3    away from a break for the court reporter.
4    BY MR. SMITH:
5    Q.  Ms. Cain, I'll come back to that question after a break.
6              So you testified about the means by which a user
7    can delete, who within that chat group can delete messages.
8    You testified about the potential ways that could occur.
9    Right?
10   A.  Yes.
11   Q.  Okay.  And you said that one way that can happen is when
12   the user deletes their own message.  Correct?
13   A.  Correct.
14   Q.  Okay.  And you testified that in the case of -- there
15   might be a distinction when it comes to administrators,
16   group chat administrators, deleting messages between super
17   groups and smaller groups.  Correct?
18   A.  That is correct.
19   Q.  And I think you testified that in the case of a super
20   group, which has a certain number of members in it, an
21   administrator of a chat can delete any message they choose
22   to delete within that group.  Correct?
23   A.  They can.  Yes.
24   Q.  But you testified that when it comes to groups that are
25   not super groups, a smaller number -- that the administrator
```

1    of the chat cannot delete messages.  Right?

2    A.  That is correct.

3    Q.  That's not correct.  Right?  So --

4    A.  No, that is correct.  As of the winter of 2021,

5    administrators of a small group cannot delete messages for

6    the entire group that they did not author.

7    Q.  So it -- how do you know that?  Is that -- well, scratch

8    that.  Let me rephrase the question.

9         Have you reviewed Telegram user protocols and

10   instructions from the Telegram company?

11   A.  I have.

12   Q.  And don't they indicate that at any time, both in the

13   winter of 2021 and the present, that a user -- that an

14   administrator of a chat group of any size can always delete

15   messages?

16   A.  They can always delete their own messages and delete for

17   everyone.

18   Q.  Don't those -- don't those Telegram instructions

19   indicate that they can always delete anyone's message?

20   A.  No, they do not.

21   Q.  Okay.

22        MR. SMITH:  Your Honor, I think we would want to

23   use that impeachment material now.

24        THE COURT:  All right.  Let's just take our break

25   just a few minutes early.

```
 1              Ladies and gentlemen, we're going to take a quick
 2      break for the court reporter's sake.  Ten minutes.  We'll
 3      come back and pick up the cross-examination then.
 4              (Whereupon, the jury exited the courtroom at 10:42
 5      a.m. and the following proceedings were had:)
 6              (Thereupon a recess was taken, after which the
 7      following proceedings were had:)
 8              THE COURTROOM DEPUTY:  Jury panel.
 9              (Whereupon, the jury entered the courtroom at
10      10:58 a.m. and the following proceedings were had:)
11              THE COURTROOM DEPUTY:  We're back on the record on
12      Criminal Matter 21-175, the United States of America versus
13      Ethan Nordean, et al.
14              MR. SMITH:  Your Honor, just an update.  We have
15      an agreement with the Government on the proper redactions.
16      It looks like there's a crayon on the page, but...
17              THE COURT:  Very well.
18              (The witness retakes the witness stand.)
19              MR. SMITH:  Permission to publish the redacted
20      email on the jury screen?
21              THE COURTROOM DEPUTY:  Do you have an exhibit
22      number?
23              MR. SMITH:  It's called impeachment material.  The
24      judge has indicated that these are not --
25              THE COURT:  Well, let's identify it by a number.
```

```
 1                 MR. SMITH:  We can identify it as Nordean Exhibit
 2      No. 4.
 3                 THE COURT:  All right.
 4                 THE COURTROOM DEPUTY:  Exhibit 4.
 5                 Permission to publish?
 6                 THE COURT:  Yes.  Permission to publish is
 7      granted.
 8      BY MR. SMITH:
 9      Q.  Ms. Cain, I'm sorry for how this looks, but do -- you
10      see this appears to be an email with some green redactions.
11      Right?
12      A.  It is.  Yes.
13      Q.  And do you see that the "from" line says from Jennifer
14      Katherine Cain?
15      A.  I do.
16      Q.  And it says:  Sent Wednesday, February 9th, 2022?
17      A.  I do.
18      Q.  Okay.  Now, there's a couple of points I would like to
19      direct your attention to here.
20                 In the middle paragraph, the second paragraph --
21      I've drawn a yellow line next to it.  And you appear to be
22      referencing parsing Telegram extractions through Cellebrite.
23      And you indicate here that, "I don't have any other cases on
24      your list, but I can pretty much say with certainty that
25      they will be missing or have wonky Telegram data as well if
```

1    you relied solely on Cellebrite to parse it."

2            Then I would direct your attention to the last

3    sentence in the next paragraph, with the yellow line next to

4    it, where you say, "However, the issue is that Cellebrite

5    simply cannot handle Telegram the way that some of our other

6    tools can.  It's the very worst, actually."

7            So you testified that there was a particular

8    Cellebrite version that had created a wonky or missing

9    Telegram extraction?

10   A.  I did.

11   Q.  Here, it appears you're saying, "The issue is that

12   Cellebrite cannot handle Telegram the way some of our other

13   tools can.  It's the very worst, actually."

14   A.  Yes.

15   Q.  Would you like to explain?

16   A.  Sure.  This is an email I wrote to our programming team,

17   who I had been working with for the better part of a year.

18   They were trying to create a custom solution to parse

19   Telegram.  The version that we were working with, since we

20   had been working on it for over a year, was 7.38.  That did

21   parse Telegram -- what I consider wonky.  And the way I

22   determined that is the effectiveness for my case agent to be

23   able to go in there as a nontechnical person and review that

24   data.

25            So the way -- for instance, the way they parsed it

Cain - DIRECT - By Mr. Kenerson

1    at the time was they did not parse the group name; they only

2    parsed the group identifier.

3           And as this case has heavily relied on the names

4    of these Telegram groups, it's not attractive for me to

5    present a solution -- to present a report to my case agents

6    in my investigative review by saying, this is group No.

7    4097987677.  You know, they like to see, this is group

8    Ministry of Defense.

9           And so those earlier versions, while technically

10   not incorrect -- all the messages were there, the dates and

11   times were correct, the sender, whether it was incoming or

12   outgoing, was correct, the content of the message itself was

13   correct, the attachment was correct -- none of that was in

14   question.

15          What was in question was the fact that it wasn't

16   optimally suited for a non-technical person to review that

17   data.  For instance, I'd love to see it separate into a

18   section called private chats and then for the user to be

19   able to go down and see a section called groups, and then

20   maybe super groups, and then channels.  I like to see a

21   division.  I like to lay it out very easy for the

22   investigative team.  That is my job, is to take

23   hard-to-understand technical data and present it in a way

24   that is very easy for a non-technical person to understand.

25          The way that Cellebrite parsed it back in 7.38 is

```
1     not the easiest way for a non-technical person to read that
2     data.  So I did not think that we should develop a tool that
3     was not only going to be used on this case, but future
4     cases, based on an output that I just couldn't hand to my
5     case agents and let them run with it.
6              So this was to that programming team.  We actually
7     came up with other solutions --
8              MR. JAUREGUI:  Your Honor, objection.  Narrative.
9              THE COURT:  Overruled.  The witness can complete
10    her answer.
11             THE WITNESS:  So when I came to this case and this
12    came up as a question, I took all of the Cellebrite reports
13    that correspond to the devices that were used in this case
14    and I simply validated them all.  I opened them all up.  I
15    reran them in a multitude of different programs, including
16    parsing the database myself in some instances.  I compared
17    the data that Cellebrite was parsing back to the actual
18    device and the way it was displaying in the Telegram app
19    itself on that actual device.
20             And I came up with the -- just that all of the
21    data was technically correct, and that the only thing that,
22    you know, from a forensic standpoint that I wanted to do was
23    add those group names in.
24             So what I ended up doing is, because they parse it
25    in Cellebrite and it only showed the group number, I created
```

1    a master list of all of the group IDs and their

2    corresponding group names, and I turned that over to the

3    case agents so they were able to review all of their data in

4    the best way and easiest way possible.

5    BY MR. SMITH:

6    Q.   Thank you.

7             So I have one final question for you.  You

8    indicated that the version of Cellebrite that you're

9    testifying today that was problematic with respect to

10   Telegram extraction, that was 7.38, you said.  Right?

11   A.   Yes, it was.

12   Q.   Okay.  Do you see the first line in your email right

13   there?  It says, "I can rerun it through Cellebrite.  I've

14   been working with Cellebrite's programming team to fix the

15   portions of Telegram, so some fixes have gone through as the

16   7.52 version."

17            You appear to be referring to the later version

18   right there.  Right?  7.52?

19   A.   In this email for the changes that we had talked about.

20   Q.   Yes.  And then, several sentences below, after having

21   obtained 7.52, that version, nevertheless, you say, "The

22   issue is that Cellebrite simply cannot handle Telegram the

23   way that some of our other tools can.  It's the very worst,

24   actually."

25            So you made that statement after receiving 7.52.

Cain - DIRECT - By Mr. Kenerson

1    Right?

2    A.  Well, after I said, "So some fixes have gone through as

3    of 7.52," the next sentence says, "I can run it in 7.52,"

4    which has been redacted.  So I had not actually run it in

5    7.52.

6    Q.  Just so you understand, the Government asked me to

7    redact that.

8    A.  I understand.

9    Q.  Okay.

10            MR. SMITH:  Thank you for your testimony.  Thanks.

11            THE COURT:  Counsel for Mr. Biggs.

12                        CROSS-EXAMINATION

13   BY MR. PATTIS:

14   Q.  I'll be very brief, ma'am.

15            My name is Norman Pattis.  Dan Hull and I

16   represent Joe Biggs.  How are you?

17   A.  Well.  Thank you.

18   Q.  You graduated University of South Florida in 2017.

19   Correct?

20   A.  Yes, sir.  For my master's.

21   Q.  University of North Carolina, 2003.  Correct?

22   A.  Yes, sir.

23   Q.  Tell us about your first job, your internship with the

24   Disney World Company.

25   A.  Out of college, I took an internship in the hospitality

7857

1   industry with Walt Disney World.  I worked in a variety of

2   hotels down there in recreation.

3   Q.  Were you giving people tours, like where they could meet

4   Mickey, Goofy, Mary Poppins?

5   A.  I did not, no.

6   Q.  Okay.  Because, as you testified -- the way you look at

7   the jury and testify, I sort of feel like I'm on one of

8   those intern tours when you go to Disney World.

9   A.  I wish.  But no.

10  Q.  Me, too.  Bye.

11          MR. PATTIS:  Nothing further.

12          THE COURT:  Counsel for Mr. Rehl.

13                      CROSS-EXAMINATION

14  BY MS. HERNANDEZ:

15  Q.  Good morning.

16  A.  Good morning.

17  Q.  My name is Carmen Hernandez and I represent Zachary

18  Rehl.  You know his name --

19          THE COURT:  Use the microphone, please.

20          MS. HERNANDEZ:  I need a lavalier.

21  BY MS. HERNANDEZ:

22  Q.  I'm going to ask you a number of questions.  I'll

23  stipulate that you know more about technology than I do.

24  Let's start there.

25  A.  Okay.

Cain - CROSS - By Ms. Hernandez

```
 1    Q.  Let me show you --
 2            MS. HERNANDEZ:  Ms. Rohde, could you pull up
 3    Government's Demonstrative Exhibit -- I think it's 1131.
 4    BY MS. HERNANDEZ:
 5    Q.  I'm going to show you the Government's demonstrative
 6    exhibits.  I believe they're 1131 or 32.  Ms. Rohde is
 7    pulling it up for us.
 8            MS. HERNANDEZ:  You can just do one of the later
 9    ones -- the one that has all the info on it.
10    BY MS. HERNANDEZ:
11    Q.  So I want to start there.  And this is supposed to
12    demonstrate what happens when you -- you got a phone.  You
13    extracted -- or someone extracted the information from the
14    phone.  That's the second column.  Is that correct?
15    A.  Yes, ma'am.
16    Q.  And when we say extracted the information from the
17    phone, it's literally this little device takes the
18    information that is on the phone and -- does it download it
19    into, like, this hard drive or something?
20    A.  It creates a containerized file, either an extraction or
21    a binary file.  And we just save it to another location.  So
22    that just represents just a location that we have saved that
23    copy to.
24    Q.  Okay.  And in theory, it's supposed to have all the
25    information that was on the phone that you extracted?
```

Cain - CROSS - By Ms. Hernandez

1    A.  Depending on the type of extraction that we get, it

2    could differ from device to device.  Yes.

3    Q.  Okay.  And does that mean you can extract only certain

4    information, if that's the only information you're looking

5    for?

6    A.  When we do an extraction, whatever is available for that

7    type of extraction, we would get it all.

8    Q.  All of it?

9    A.  Yes.

10   Q.  Okay.  And then there's this next column, which is

11   supposed to represent, I guess, some messaging on -- is this

12   the way it would look on Telegram?

13   A.  Well, we've used the common iPhone green bubble/blue

14   bubbles here.  It doesn't necessarily look exactly like

15   that.  We've obviously left out date stamps and message ID

16   numbers.  But -- it's just a visual, yes.

17   Q.  But it's a visual -- so this visual, this type of

18   visual -- I understand it's missing dates and names and

19   whatever -- is this what you would find on the phone itself

20   or is this what you would find once you extracted it?

21   A.  When we extract the phone, we get the data from each

22   application.  Most commonly, these are stored in databases.

23   Q.  So that means you would get, like -- words like "hello"

24   and "hi," but the extraction doesn't show these little

25   bubbles.  Is that correct?

Cain - CROSS - By Ms. Hernandez

1    A.  The extraction would not show the bubbles.  No.

2    Q.  Okay.  But if, instead of the extraction, if you were --

3    let me back up one other question.

4         Although -- you've extracted phone information.

5    Correct?

6    A.  Yes.

7    Q.  And one of the phones you extracted was Mr. Rehl's

8    phone.  Correct?

9    A.  Yes, ma'am.

10   Q.  You still have the phone?

11   A.  I don't personally have the phone.

12   Q.  Okay.  The Government -- someone still has the phone.

13   Someone --

14   A.  I assume so, yes.

15   Q.  -- over here still has the phone?

16   A.  I assume so, yes.

17   Q.  If I or if you were provided that phone and you

18   opened -- would you be able to open a Telegram chat?

19   A.  Possibly, yes.  It depends on a couple of factors.

20   Q.  Okay.  And if you open that Telegram chat on the phone,

21   would it appear as -- in this third column?

22   A.  Well, this is a representation.  But a chat would appear

23   with -- you know, visually similar to this.

24   Q.  Okay.  So visually similar to this.  And we've all

25   agreed that it would have words in these bubbles and maybe a

1    date and the name of the person?

2    A.  Yes.

3    Q.  But the information that you've extracted -- so the

4    phone would give you a representation that is much more

5    similar to this chat ID, third column.  Is that correct?

6    A.  That is correct.

7    Q.  Whereas the information you extract -- and I'm not

8    suggesting you're doing anything wrong -- it's just that's

9    the way technology works.  When you extract, you're just

10   extracting the words.

11   A.  We get all of the raw data.  So we get much more than

12   you see on the device itself or represented in these chat

13   bubbles.

14   Q.  And this particular demonstrative appeared to be a

15   conversation maybe between two people?

16   A.  Yes.

17   Q.  And this would -- if this were all you were dealing

18   with, this would allow you to say -- let's say this were

19   Mr. Rehl's phone.  Would Mr. Rehl be in green?

20   A.  No.  He probably would be in blue, because the outgoing

21   messages are usually on the right-hand side.

22   Q.  Okay.  So if this were, for example, a chat between

23   Mr. Rehl and his wife, for example, then you would be able

24   to see Mrs. Rehl and Mr. Rehl and you would be able to

25   clearly say they were having a conversation between the two?

```
 1      A.  Uh-huh.
 2                 THE COURT REPORTER:  Is that yes?
 3                 THE WITNESS:  Yes, ma'am.  Sorry.
 4      BY MS. HERNANDEZ:
 5      Q.  Now, obviously, you've talked about these chat groups
 6      that you have in this.  And these chat groups can contain --
 7      what's the outer number that some of these chat groups
 8      you've looked at in this case?  How many people?
 9      A.  I think just above 100.
10      Q.  Okay.  So in a chat that contained 100 people, the raw
11      data that you got obviously would not be -- but you would
12      have a large amount of raw data?
13      A.  We do.  Yes.
14      Q.  And you wouldn't be able to identify in the same way as
15      you can with two people who they're talking -- that they're
16      talking to each other.  Correct?
17      A.  We would see the chat.  It would be that this message
18      belongs in this particular chat group.
19      Q.  But you would not be able -- let me break that up into
20      two boxes.
21                 In your raw data extraction, you would know that
22      there's 100 people in this chat.  Correct?
23      A.  Yes, ma'am.
24      Q.  This is an example.  At any one time, all or some of
25      those 100 people would be posting?
```

1    A.  Yes, ma'am.

2    Q.  But you would not necessarily know whether they were

3    responding to each other.  Is that correct?

4    A.  If a message was in direct reply to another message?  Is

5    that what you're asking?

6    Q.  Yes.

7    A.  We can get that information out of the database.

8    Q.  Sometimes?

9    A.  Yes.

10   Q.  So in other words, if I -- if the message was, "What

11   time is it," and the very next message said, "It's 3:43" --

12   A.  Yes, ma'am.

13   Q.  -- you could infer that the 3:43 is a response to "What

14   time is it?"

15   A.  That would be logical.  Yes.

16   Q.  Okay.  But some of these messaging threads -- is that

17   the right terminology?

18   A.  Sure.  Yeah.  That works.

19   Q.  Some of these messaging threads aren't so clear that

20   it's a direct response.  Would you agree?

21   A.  In the chat database?

22   Q.  Yes.

23   A.  There is a column that tracks if a message is in direct

24   reply to another message.

25   Q.  Okay.  Let's talk about that.

Cain - CROSS - By Ms. Hernandez

1          When you say there is -- I'm sorry.  There is a

2    what that tracks it?

3    A.  The database tracks it.

4    Q.  You said there is something that tracks whether it's a

5    direct response.

6    A.  Yes.  Potentially there's a table with a record.

7    Q.  And would that be -- would I need the phone to see if

8    it's a direct response?

9    A.  We could see that in the database.

10   Q.  You could see that in the database?

11   A.  Yes, ma'am.

12   Q.  You could see that in Cellebrite?

13   A.  Not earlier versions.  That is a functionality that they

14   added this past year in one of their releases.  Yes.

15   Q.  So do you know whether you've reextracted Mr. Rehl's

16   phone using this new database?

17   A.  We did not -- well, we don't -- it's not reextracting.

18   It would be reprocessing that extraction.  We would still

19   work off of that original copy of the device.

20   Q.  So as to Mr. Rehl's phone, do you know whether you

21   reprocessed it with this new upgraded format?

22   A.  No, we did not.  I believe it came out in November or

23   December past, when we had made all of our final exhibits

24   for this.

25   Q.  So today, you could go back and reprocess -- tell me if

Cain - CROSS - By Ms. Hernandez

1    this is true.  Today, if you wanted to go back and

2    reprocess, you could reprocess the information from

3    Mr. Rehl's data and actually see which messages he responded

4    to or which he didn't respond to?

5    A.  Well, it wouldn't be -- it would be if the user directly

6    replied, took the action of selecting a message and then

7    replying directly to that message.

8    Q.  Okay.

9    A.  Yes.

10   Q.  So maybe you can -- before I go on, so let me -- so the

11   program that you used, or the model number or however you

12   want to define it, you used when you extracted Mr. Rehl's

13   phone on Cellebrite did not have this function that you're

14   describing for the jury today?

15   A.  At the time, no.  None of our forensic tools did.

16   Q.  So the information that we -- and the Cellebrite

17   extraction that you did, I believe you know was provided to

18   the defense.  Correct?

19   A.  Yes, ma'am.

20   Q.  Okay.  So the Cellebrite extraction that we have -- we,

21   the defense counsel and Mr. Rehl -- does not contain this

22   new function that you're describing today.  Correct?

23   A.  I do not believe it does.  No.

24   Q.  So what we have doesn't -- what we have -- and I believe

25   it's what the Government has, what the prosecutors have

Cain - CROSS - By Ms. Hernandez

1    also -- does not let us determine whether any particular

2    person was responding to another person.  Correct?

3    A.  In direct response, no.

4    Q.  It doesn't.  But today, you have the -- is it the

5    technology to actually determine that?

6    A.  I believe so.  I believe one of the Cellebrite releases

7    that came out at the very end of last year, either November

8    or December, I believe they added that capability in.

9    Q.  Okay.  So using the old system, which is the one we're

10   all working on, if you have a large chat with a lot of

11   people, the only way you could tell, from the Cellebrite

12   extraction, whether the responses were directly to another

13   person or not is, would you say, by inference?

14   A.  Yes.  That's accurate.

15   Q.  And again, by inference, the example, "What time is it,"

16   says one person, and the next person, seconds later says,

17   "It's 4:36 p.m."?

18   A.  Yes, ma'am.

19   Q.  And so that would be inference that he's responding to

20   that?

21   A.  Yes, ma'am.

22   Q.  But under the old system, which is what we have, unless

23   you can draw that inference, the answer could be to what

24   someone posted two weeks ago.  Correct?

25   A.  Yes, ma'am.

Cain - CROSS - By Ms. Hernandez

```
1    Q.  Or could be just an idle comment that isn't even related
2    to anything previously posted?
3    A.  We just wouldn't be able to tell.
4    Q.  You couldn't tell.  Okay.
5         So if I get a string of messages one right after
6    the other that were posted all on the same day, that still
7    wouldn't be able to tell you whether they were responses to
8    each other under the system that -- under the extraction
9    that you've provided to us?
10   A.  Correct.
11   Q.  Okay.  Thank you.
12        So let me -- before I go on, Telegram is -- there
13   are millions of users in the United States and in the world
14   who use Telegram.  Is that correct?
15   A.  I believe so.  Yes.
16   Q.  It's not -- did I hear you say that you have Telegram
17   also?
18   A.  Yes, ma'am.  I test all of our applications.
19   Q.  Okay.  So you just have it on your phone just to test
20   it, not because you use it?
21   A.  I -- yes.  I test it.  That's why I have it.
22   Q.  Do you also use it?
23   A.  I use it extensively for testing.
24   Q.  Okay.  You also mentioned other -- like WhatsApp?
25   A.  Yes, ma'am.
```

Cain - CROSS - By Ms. Hernandez

7868

1    Q.  And that's another messaging app?

2    A.  Yes, it is.

3    Q.  I'm getting better at this.  That's another messaging

4    app --

5    A.  Yes, ma'am.

6    Q.  -- that people can use to communicate?

7    A.  Yes.

8    Q.  For example, WhatsApp, I -- I use it because you can

9    make international calls without having to pay a toll or

10   something like that.  Is that right?

11   A.  I believe so.  Yes.

12   Q.  Okay.  So that's a useful tool?

13   A.  Yes.

14   Q.  And it doesn't -- and these multiple -- did you say

15   there's like 3,000 apps?

16   A.  There's 4 million apps in the Google store and almost 4

17   million -- or 3 million apps in the iTunes store.

18   Q.  So these apps are just apps that are out there that

19   people can use.  They don't denote any -- in any particular

20   case -- they don't mean that you're a criminal if you use

21   these particular apps.  Correct?

22   A.  I don't know why anyone -- no.

23   Q.  So it's just an app that you can -- one of many apps

24   that people -- that the young ones use to communicate with

25   each other these days.  Is that correct?

Cain - CROSS - By Ms. Hernandez

1    A.  It is an app.  Yes.

2    Q.  Okay.  So one of the things you spoke about was orphaned

3    files?

4    A.  Yes, ma'am.

5    Q.  Okay.  And tell me a little bit about an orphaned file.

6    I tried to follow, but I'm not sure.  How does an orphaned

7    file -- how is an orphaned file created or why does it

8    exist?

9    A.  For this particular case, the term "orphaned file" means

10   any kind of attachment.  It's a known attachment from the

11   Telegram database, so it's an image, video, audio file or

12   document that we know has been transmitted as an attachment,

13   but we don't actually have the message that corresponds with

14   that attachment being sent.

15   Q.  And I do understand correctly that if you have an

16   orphaned file -- let me back up.

17        So an orphaned file is someone at some point,

18   using Telegram, say, for example, sent another person or

19   sent a chat, an email -- I'm sorry -- say a video or a

20   photograph?

21   A.  Yes, ma'am.

22   Q.  And would that file that was sent -- could it have been

23   sent to an individual or to a whole chat group?

24   A.  Either one.  We would not know.

25   Q.  Okay.  So if it's orphaned, the reason it's orphaned is

Cain - CROSS - By Ms. Hernandez

1    because the original message is no longer found on Telegram?

2    A.  That's correct.  We consider the message the parent.  So

3    it's a child without a parent.

4    Q.  So you have this video, for example, out there.  And did

5    I also understand, from some of the information that we've

6    been provided, that these orphaned files, you cannot tell

7    when it was created?

8    A.  We can tell based on the type of file it was.  There are

9    certain things, such as when I talked about EXIF data

10   earlier, on videos and images -- the creation date is

11   embedded in that EXIF data, so we can tell the creation

12   date.

13   Q.  So, for example, if I took a picture right now, there

14   would be some information on that photograph that showed

15   that the picture was taken today?

16   A.  Yes, ma'am.

17   Q.  Okay.  So even on those orphaned files, you would know

18   when the picture was taken; is that correct?

19   A.  For a picture or a video.  Yes.

20   Q.  Okay.  But for those orphaned files, you would not know

21   when it was transmitted; is that correct?

22   A.  That is correct.

23   Q.  So if I took a photograph -- let's say I took a

24   photograph today and, for whatever reason, it became

25   orphaned.  You would not be able to know -- you would not be

Cain - CROSS - By Ms. Hernandez

1    able to tell us whether it was sent today or it was sent

2    seven weeks from today?

3    A.  Well, forensically, we could narrow down that window

4    based on the EXIF data and the other metadata of that file.

5    Q.  So how far can you narrow it?

6    A.  It just depends on the file.  For instance, we take a

7    picture today.  The EXIF data would have a creation date

8    embedded in that file.  And then I send that message through

9    Telegram to my friend.

10            When my friend's phone gets that message, the

11   attachment is added to that device's file system, and that

12   file system will have a date on it.  So if I sent it

13   today -- if I took it today, I sent it today, I would have

14   that embedded in the actual image itself.  And then, on my

15   friend's device, if he looked at it this afternoon, that

16   same image would have a file system date on his device of,

17   say, 3:00 p.m. this afternoon, so I would know that that

18   image had been transmitted sometime between my creation date

19   at 11:00 a.m. and his file system date of 3:00 p.m.  So I

20   could narrow that window down based on those two types of

21   dates.

22   Q.  So if your friend didn't open the video until two weeks

23   from the day you sent it --

24   A.  Yes, ma'am.

25   Q.  -- then the window would be two weeks?

```
 1    A.  Yes, ma'am.

 2    Q.  So you couldn't narrow it any further?

 3    A.  No, ma'am.

 4    Q.  Okay.  And is that because you're using Cellebrite or is

 5    that just because it's an orphaned file?

 6    A.  That's just the forensic science between how the date

 7    stamps work in image files and how file system date stamps

 8    work.

 9    Q.  So even if you went back to the original phone, the

10    receiving phone and the -- or the receiving device and the

11    sending device, you still wouldn't be able to narrow it more

12    than as you've described?

13    A.  Correct, because the message is gone.

14    Q.  Okay.  So one of the videos that was shown to you by the

15    Government -- and I'm going to need Ms. Rohde's help again.

16    So the Government played a video, 403G, for you.

17            MS. HERNANDEZ:  Ms. Rohde, could you take this

18    down?

19            So 403G -- could you please pull it up.  I'm

20    sorry, Ms. Harris.

21            MR. KENERSON:  This screen is still showing the

22    PowerPoint.

23            THE COURTROOM DEPUTY:  That's what I have, too.

24    But it's set on "Plaintiff."

25            MS. HERNANDEZ:  Do I have to delete this maybe?
```

```
 1            THE COURTROOM DEPUTY:  I'll reset it.  It's still
 2    coming up.
 3            THE COURT:  Also, for the record, could the
 4    Government identify the exhibit that -- I think, when we
 5    first brought up the prior exhibit that Ms. Hernández was
 6    asking questions about, I'm not sure it was identified for
 7    the record.
 8            MR. KENERSON:  The demonstrative is 1131.
 9            THE COURT:  1131.  Very well.
10            MS. HERNANDEZ:  Thank you, your Honor.
11    BY MS. HERNANDEZ:
12    Q.  So the Government played this video for you.  It's 403G.
13            MS. HERNANDEZ:  Could you play it.
14            (Whereupon, Government's Exhibit No. 403G was
15    published in open court.)
16    BY MS. HERNANDEZ:
17    Q.  So your testimony on direct --
18            MS. HERNANDEZ:  Thank you.
19    BY MS. HERNANDEZ:
20    Q.  Your testimony on direct was that was -- that you found
21    that video on Mr. Rehl's phone?
22    A.  I believe so.  Yes.  I don't recall the exact device.
23    But if that is what I said prior, then yes.  Yes, it is.
24    Q.  Let me show you -- and I believe this is Government's
25    Exhibit 32 and it's already -- it's Government's
```

1    Exhibit 1132.  And I have a paper copy.

2             So this is the exhibit that the Government showed

3    you.  And I believe that video is 403G, this one.  Correct?

4    A.  Yes, ma'am.

5    Q.  And your testimony was that this was taken from

6    Mr. Rehl's phone?

7    A.  Yes, ma'am.

8    Q.  And you're showing the photo was taken January 6 at 2:34

9    p.m.?

10   A.  Yes, ma'am.  Video.

11   Q.  But you're not showing any other information with

12   respect to that video?

13   A.  Correct.  When --

14   Q.  So --

15   A.  Telegram will strip most of that EXIF data out due to

16   size restrictions.

17   Q.  So you cannot tell us when that video was received by

18   Mr. Rehl?

19   A.  No, I cannot.

20   Q.  And do you know how he received it?

21   A.  Through the Telegram app.

22   Q.  Through the Telegram.  But you don't know whether it was

23   posted on a chat?

24   A.  I don't know where the original message is.  No.

25   Q.  Or whether it was sent to him as an attachment?

```
 1   A.  No.  The original message has been deleted.

 2   Q.  Or whether he saw it on the 'net, for example?

 3   A.  Well, no.  It would have been sent to him as an

 4   attachment.

 5   Q.  As an attachment through Telegram?

 6   A.  Through Telegram.

 7   Q.  But according to this, you were unable to determine when

 8   it was sent to him?

 9   A.  Correct.  I just have the date the video was created.

10   Q.  Or when he actually received it?

11   A.  I do not know.

12   Q.  Or when he opened it.  Or how about if he opened it?

13   Can you tell if he opened it?

14   A.  No.  But the file exists on his device, so I know that

15   he did receive that message.

16   Q.  You know that he received it.  You don't know when he

17   received it and you don't know whether he actually viewed

18   it?

19   A.  No, because the original message has been deleted.

20   Q.  Okay.  And is there anything -- can you rule out some

21   things?  So let me ask you this:  Can you rule out whether

22   that was sent to him contemporaneously?  And by that, I mean

23   at -- January 6th at 2:34 p.m.

24   A.  No.  That is a possibility.

25   Q.  But it's also -- it's just a possibility?
```

Cain - CROSS - By Ms. Hernandez

```
 1    A.  Yes.

 2    Q.  It could have been sent to him three days later?

 3    A.  Yes.  The message has been deleted.

 4    Q.  And you can't determine how the message was deleted?

 5    A.  I do not know how the message was deleted.

 6    Q.  And when you say the message was deleted, that doesn't

 7    mean he deleted the message.  Correct?

 8    A.  No.  It's most likely whoever authored that message.

 9    Q.  Whoever authored that message --

10    A.  -- is most likely --

11    Q.  -- the person who would have deleted the -- the post or

12    the chat?  I don't know how -- what's the term?

13    A.  That is the most likely scenario.

14    Q.  Okay.  Thank you.

15            You were also shown a number of -- I believe you

16    were shown Government's Exhibit 1136.  I believe you have a

17    copy of 1136 in front of you.

18    A.  I do.

19    Q.  And I have a copy here.

20            And I believe you were asked a number of questions

21    about how this was deleted from all the -- several devices.

22    Is that correct?  Do --

23    A.  Yes, ma'am.

24    Q.  -- you recall?

25    A.  Yes, ma'am.
```

Cain - CROSS - By Ms. Hernandez

1   Q.  And I believe you were asked questions -- it was deleted

2   from all the devices, I believe was what you answered?

3   A.  For the messages that do not appear in this chat thread,

4   yes.

5   Q.  So -- and you -- let me -- I believe what you said, with

6   respect to 1136, was that it was not -- the 12:56 p.m.

7   message, it was not recovered from any device.  Is that

8   correct?

9   A.  May I refer to the notes?

10  Q.  Yes.  And if you need anything else to refer to.

11  A.  Yes, ma'am.  The video at 12:56.

12  Q.  Okay.  And the video at 12:56 was this thing here.  And

13  you believe that that was a video sent by Mr. Bertino.  Is

14  that correct?  Or recorded by Mr. Bertino?

15          MR. KENERSON:  Objection.  Both misstates and kind

16  of vague as just referring to "here" without noting for the

17  record --

18          MS. HERNANDEZ:  I'm sorry.

19  BY MS. HERNANDEZ:

20  Q.  That's the 12:56 message that we're talking about that

21  you just said was not recovered on any device.

22  A.  Oh, the 12:35?

23  Q.  No.  I thought it was at 12:56.  I'm sorry.  I'm

24  pointing to the wrong thing.  The 12:56 was the one that I

25  understood you to say was not recovered from any device.

Cain - CROSS - By Ms. Hernandez

1    A.  Oh, okay.  The video.  12:56 video message.  Yes.

2    Q.  That was sent by Mr. Bertino?  Do you know?

3    A.  It appears that the video message was from Mr. Donohoe.

4    Q.  Okay.  It was Mr. Donohoe.

5         And do you know -- it appears that someone on the

6    ground in D.C. on January 6th was videotaping some of what

7    was going on.  Do you recall these videos that you played?

8    A.  I recall the videos that we entered.  Yes.

9    Q.  And is that accurate the way I'm describing?  Somebody

10   on the ground on January 6th of 2020 was recording some of

11   what was -- 2021 -- was recording -- somebody on the ground

12   on January 6th, 2021, was recording some of what was going

13   on outside the Capitol?

14   A.  Yes.  We had a number of videos.

15   Q.  I mean, we know a lot of people were recording.  But I'm

16   talking with respect to this particular exhibit, 1136, that

17   you were shown, someone on the ground was recording some of

18   this information and posting it on this chat?

19   A.  Yes.

20   Q.  And do you know -- the person who was doing this

21   recording, was that -- if you know, was that Mr. Donohoe?

22   A.  I believe for this message it was.

23   Q.  Okay.  And you indicated that the messages -- that the

24   reason they weren't recovered from any device is that you

25   believe the message had been deleted?

```
 1    A.  That is correct.
 2    Q.  And I believe you were asked your opinion, since it was
 3    deleted from all the devices, does that mean that the
 4    administrator for this group was the one who deleted it?
 5    A.  I don't remember if this was a group or a super group.
 6    Q.  Okay.
 7    A.  I just know that the message went -- whoever selected to
 8    delete it, instead of deleting it for just the device,
 9    selected to delete it and remove it from all of the users.
10    Q.  And what does that tell you about who could have deleted
11    it?
12    A.  The user could have deleted it.
13    Q.  The user could have deleted it?
14    A.  And -- sorry.  I don't recall if this was a super group.
15    But then in that case, the administrator could have also
16    deleted it.
17    Q.  Okay.  And can you tell from here who -- which group it
18    was?
19    A.  I believe it was the New MOSD chat.
20    Q.  Okay.  And is there any document that would tell you who
21    was the administrator for New MOSD that you could look at?
22    A.  I do not recall if I recorded that in writing.
23    Q.  Okay.  But essentially -- so the fact that it was
24    deleted from all the devices would indicate to you that one
25    person with some administrative capacity deleted it?
```

Cain - CROSS - By Ms. Hernandez

1    A.  Or the person that authored that message.

2    Q.  Or the person that authored it.  Because otherwise, you

3    would find it in one of the other devices.  Is that correct?

4    A.  That's true.  I mean, there is the possibility that the

5    two devices we have that contain this chat, that both of

6    those users selected to remove that message from their

7    device.  I cannot rule that out as a possibility.

8    Q.  Okay.  And at one point, I believe you indicated that

9    some of these messages were found on Mr. Rehl's phone but

10   not on other devices.  Correct?

11   A.  That is correct.

12   Q.  And that means he didn't delete them.  If they were

13   found on his device but not on others, that means he -- he

14   had not deleted them from his device?

15   A.  Correct.

16   Q.  Okay.  You talked a little bit about encryption.

17          MS. HERNANDEZ:  I can take this down.

18   BY MS. HERNANDEZ:

19   Q.  Encryption is something that is fairly common with the

20   internet; is that correct?

21   A.  Depending on certain chat applications.  It is widely

22   used today.

23   Q.  And the reason for encryption, the primary reason, is to

24   secure data.  Correct?

25   A.  Correct.

1    Q.  I mean, the average person who sends an email through

2    any number of -- Hotmail, AOL, whatever -- ordinarily, those

3    applications have encryption in them.  Correct?

4    A.  Those do not --

5    Q.  So if I send you --

6    A.  -- use encryption.

7    Q.  Those do not?

8    A.  Not by default.  No.

9    Q.  But you can choose it?

10   A.  Certain providers allow you to.

11   Q.  Retail stores use -- like, if I go online and purchase

12   something from a retail store, it's likely that the

13   information I'm sending is encrypted?

14   A.  I can't speak to that.

15   Q.  Banks?

16   A.  I don't know how their systems are run.  I really can't

17   speak to the encryption services that they use.

18   Q.  Do you know of any encryption -- Department of Justice,

19   when they send an email to you, that's encrypted?

20   A.  I believe it is.

21   Q.  Any other entities that you're familiar with that

22   encrypt their -- their information so -- at least in

23   transmitting the information.  Correct?

24   A.  Yes, ma'am.

25   Q.  That's much more common, in transmitting the

1    information, it's encrypted?

2    A.  Correct.

3    Q.  And that's done so that the entire world, except maybe

4    the hackers and the 13-year-old boys in this country, can't

5    read what you're writing.  Correct?

6    A.  It's to secure the data in transit.  Yes.

7    Q.  Okay.  And in fact, there's a lot of websites where you

8    go on and the prefix is HTTPS.

9    A.  Yes.

10   Q.  When the S is added to the end of that HTTPS, that's

11   because -- that means it's secure?

12   A.  It does.  The protocol used to transmit.

13   Q.  And that's likely to -- let me write this so that you

14   can see that.  And you can see that -- HTTPS, that's what

15   we're talking about?

16   A.  Yes, ma'am.

17   Q.  And you can go on any number of websites and, if you see

18   that S, it denotes that there's some security in the --

19   A.  That's what the S stands for.  Yes.

20   Q.  Okay.  And again, that's pretty common and ordinary in

21   today's world?

22   A.  Yes.

23   Q.  And would you say that's much different or the same as

24   what the Telegram encryption is?

25   A.  Well, this is a totally different type of --

Cain - CROSS - By Ms. Hernandez

1    Q.  Encryption?

2    A.  -- securing data.  This is not technically encryption.

3    It's the protocol used to transmit the website contents,

4    so...

5    Q.  But do you agree with me that the encryption used by

6    Telegram is fairly common and ordinary for a number of these

7    apps?

8    A.  They do use a combination of established encryption

9    protocols.  Yes.

10   Q.  Okay.  And the theory is that encryption keeps the

11   internet somewhat safe or secures Internet privacy?

12   A.  For your data, yes.

13   Q.  And in fact, there's a number of federal regulations

14   that demand that kind of encryption.  Correct?

15   A.  I would assume so.

16   Q.  Like if you are communicating with an M.D. or a hospital

17   or something with health insurance -- with the HIPAA

18   regulations, usually those people have to -- hospitals and

19   doctors, doctors' offices, have to have encryption to secure

20   the information being transmitted.  Correct?

21   A.  I would assume so.

22          MS. HERNANDEZ:  Just a moment, your Honor.

23   BY MS. HERNANDEZ:

24   Q.  I know there was some questions about your view of

25   Cellebrite and how useful it was in extracting Telegram

Cain - CROSS - By Ms. Hernandez

```
 1    information.
 2            Am I correct that there are other programs that
 3    extract information that may be more suited -- may have been
 4    more suited to extracting Telegram when the extraction in
 5    this case took place?
 6    A.  Every -- we use a variety of commercial tools, and they
 7    all have their strengths and weaknesses.  So it's a personal
 8    preference.
 9    Q.  But you identified, I think, an entity named Oxygen --
10    or a program named Oxygen?
11    A.  That is the tool I used for one of the devices.  Yes.
12    Q.  And you believe that was, at least in some instances, a
13    better fit to extract Telegram data?
14    A.  For that particular device, it was.
15    Q.  And that particular device, is it because it's Android
16    versus Apple?
17    A.  That's a large part of it.  Yes.
18    Q.  And just -- Apple is the iPhone?
19    A.  It is, yes.
20    Q.  And Android is?
21    A.  Any non-iPhone, aside from the Windows phone, most of
22    them run on a version of the Android platform.
23    Q.  And again, that's -- and I may be misstating, but that's
24    basically a -- it's like the brand -- maybe "brand" is not
25    the accurate description, but the difference between Apple
```

1    and whatever else -- the other one is essentially the

2    manufacturer?

3    A.  It's the operating system.

4    Q.  The operating system.  But certain manufacturers --

5    Apple uses Apple whatever, technology, whereas the other

6    phone companies might use a different -- anyone other than

7    Apple uses a different system.  Correct?

8    A.  Relatively speaking, yes.

9    Q.  And I think I'm at the end of my questions.  I just want

10   to make sure.

11          So one of the concerns with Cellebrite is that

12   while it extracts information, when it displays it, it loses

13   some of the information that is found in Telegram itself?

14   A.  It displays the messages.  However, you know, databases

15   store many types of different information.  And as we see

16   the need to include more, we request enhancements from those

17   programs to include additional functionality.

18   Q.  But you lose the ability to see -- what's a pinned

19   message on Telegram?

20   A.  A pinned message?

21   Q.  Pinned, P-I-N-N-E-D.

22   A.  In a super group, in a larger group like that, the

23   administrator can -- it looks like a little pin tack that

24   you'd use on a bulletin board.  And that essentially puts

25   that message at the top of the chat so that, when new users

Cain - CROSS - By Ms. Hernandez

1   come on, they see that this somehow has been flagged for an

2   important message and that they should read it.  And so no

3   matter when they come in the chat, no matter how the history

4   is set, even if that message was made and pinned two years

5   ago, anybody new coming in can see that because it's been

6   designated as important.

7   Q.  And -- I mean, if you use Facebook or Twitter or

8   something, you can pin certain messages.  That's a similar

9   concept?

10  A.  They each have their own version, I believe.  Yes.

11  Q.  Which means, I want you all to know that I have -- that

12  I gave birth last week or that I got married a year ago or

13  whatever?

14  A.  Sure.

15  Q.  And you lose that ability to see whether a message was

16  pinned when you just extract?

17  A.  No.  Cellebrite parses the pinned messages.

18  Q.  It does?

19  A.  It does.

20  Q.  How about -- I should probably leave some of this for

21  some of my more technically adept people, but let me --

22  co-counsel.  But just one last question on Cellebrite.  The

23  Cellebrite program that you used when you extracted the

24  information in this case was not as -- would you say it was

25  not as good as the current version?

1   A.  It's always adding functionality.

2   Q.  So the current version is -- has more functions than the

3   one that you used at the time that you downloaded this --

4   that you extracted this info?

5   A.  It does potentially display more data.  Yes.

6   Q.  And again, if I -- is there some -- there is some

7   information on the device itself, on the phone, that, if I

8   had the phone here, I could ask you to go to a particular

9   message and you could provide me more information about

10  whether that message was responding to a particular message

11  or that type of thing than you can from the Cellebrite

12  extraction.  Am I correct on that?

13  A.  That's something we could determine from the device

14  itself or from the database, the Telegram database.

15  Q.  I know.  But what I'm asking you, is that accurate, that

16  if you had the device itself and you could -- if you had the

17  device itself right now, if you had Mr. Rehl's phone right

18  now, you could go to -- the phone should still have the

19  Telegram app on it?

20  A.  It should.  It just depends on a variety of

21  circumstances.

22  Q.  Okay.

23  A.  The type of extraction we got and how it interacted with

24  that device, if we were provided the PIN or passcode to that

25  device.  If it had been removed or placed into airplane mode

1    since the extraction, that could have an effect.  But in a

2    perfect scenario, we could look at the device and see that.

3            However, we are able to get a lot more data from

4    the database itself than we can by looking at the device

5    itself.

6            For instance, all of these orphaned files, they

7    would not be present -- if you were to just open up the

8    Telegram application on the device, you couldn't see those.

9    Those were items that we pulled out of the Telegram

10   application itself.  So you wouldn't -- the end user

11   wouldn't be able to see them.  So in that case, reviewing

12   the physical device would not --

13   Q.  Let me go back to the orphaned video files that we

14   discussed earlier.  I understood that Cellebrite timestamps

15   may or may not have any correlation whatsoever to when the

16   actual message containing the video was sent.  Is that

17   accurate?

18   A.  So the -- when you say the Cellebrite timestamp, that's

19   most likely referring to the file system timestamp.  As we

20   discussed in our earlier scenario, if I were to send a video

21   and it had a creation date embedded in it and then, when it

22   hit that other user's device, that file system timestamp --

23   in my scenario, I had -- I sent a message -- I composed it

24   at 11:00 a.m.  The device received it at 3:00 p.m.  I could

25   not say from the file system timestamp that the message was

1    received at 3:00 p.m.

2    Q.  But you -- and that's different, I guess -- and I think

3    you said this already, but I just want to make sure.  The

4    embedded timestamp does tell you when it was created.

5    That's -- on an orphaned file, that's pretty much -- and

6    particularly, the one I showed -- the one that we played,

7    the only thing you have on that is the time it was created?

8    A.  For videos and images, we would have the creation date

9    embedded in the file and then, on any other devices that it

10   was present on, we would have the file system timestamp.

11   Q.  But the one we played -- and there was an exhibit that

12   went along with that -- only had the time it was created.

13   Do you remember that?

14   A.  Yes, ma'am.  I don't believe we pulled any other dates

15   surrounding that.

16   Q.  Okay.  One last thing.  You looked at a number of chats.

17   Is that correct?  A number of Telegram chats?

18   A.  I did.

19   Q.  And there were a number -- and you know the Defendants

20   in this case.  Correct?  You know the names of the

21   Defendants in this case?

22   A.  Yes, ma'am.

23   Q.  And some of the chats -- some of the Defendants in this

24   case were not in all the chats.  Would you agree with me

25   with that?

Cain - CROSS - By Ms. Hernandez

```
1    A.  I believe that's accurate.

2    Q.  Like, for example, there's a chat that's identified as

3    the Elders chat.  Are you familiar with that chat?

4    A.  Yes, ma'am.

5    Q.  Mr. Rehl was not in that chat?

6    A.  I don't -- sorry.  I don't recall from memory who was

7    present -- a member of which chat.

8    Q.  Okay.  If I showed you something --

9              MS. HERNANDEZ:  I will mark this as Mr. Rehl

10   Exhibit 40, which is a list of chats that the Government

11   produced.

12             And if I may approach.

13             THE COURT:  It will be marked for identification

14   purposes?

15             MS. HERNANDEZ:  Yes, your Honor.

16             THE COURT:  Very well.

17   BY MS. HERNANDEZ:

18   Q.  Mr. Kenerson gave me that, just so you can be confident.

19   A.  Thank you.

20   Q.  And are there a number of chats that Mr. Rehl did not

21   belong to?

22   A.  May I?

23   Q.  Yes, please.

24   A.  Yes.  There are a number of chats.

25   Q.  Can you identify what those are?
```

Cain - CROSS - By Ms. Hernandez

```
1    A.  May I read from this?

2    Q.  Yes, please.

3    A.  Mr. Rehl was not a member of Skull and Bones, 2020-2021,

4    the MOSD Vetting chat, which was renamed to Noble-MOSD

5    Vetting chat.

6    Q.  And Vetting, that's V-E-T-T-I-N-G?

7    A.  V-E-T-T-I-N-G, yes.

8         The chat called Elders; the chat -- MOSD Prospect

9    chat, which we referred to in our exhibits as East Coast

10   Prospect; OG Pickle Back Crew; Space Force chat; WB Stream

11   chat.

12   Q.  Thank you.

13        One last question.  I understood you didn't do all

14   the extractions yourself.  It was a team effort?

15   A.  It was a team effort.  Yes, ma'am.

16        MS. HERNANDEZ:  Thank you very much for your time.

17        May I get the exhibit back?

18        THE COURT:  You may, ma'am.

19        Counsel for Mr. Tarrio.

20        MR. JAUREGUI:  Thank you.

21                     CROSS-EXAMINATION

22   BY MR. JAUREGUI:

23   Q.  Good morning again, Ms. Cain.

24   A.  Good morning.

25   Q.  Almost good afternoon.
```

```
 1    A.   Good afternoon.

 2    Q.   Ms. Cain, who's the lead FBI agent on this case?

 3    A.   The lead agent that I worked with is Special Agent Nick

 4    Hanak, H-A-N-A-K.

 5    Q.   Is he here today?

 6    A.   Yes, he is.

 7    Q.   Now, Cellebrite was developed in Israel.  Correct?

 8    A.   I believe so.

 9    Q.   And they sell this product, the Cellebrite product, to

10    Russia, China, Myanmar, Iran, some pretty oppressive

11    governments.  Correct?

12    A.   I don't know who they sell it to.

13    Q.   Now, Cellebrite has two parts; is that correct?

14    A.   Could you elaborate more?

15    Q.   Sure.  The first part is the UFED, which stands for the

16    universal forensic extraction device.  Correct?

17    A.   That is one of their products.

18    Q.   Okay.  And that extracts data from a mobile device and

19    backs it up to a Windows PC.  Correct?

20    A.   I actually don't use that product, so I'm not familiar

21    with how it works.

22    Q.   Which product is the one that you use?

23    A.   I used -- with this case, we used Cellebrite Premium.

24    Q.   Got it.

25              And the latest version of that is 7.60.  Correct?
```

Cain - CROSS - By Mr. Jauregui

```
1    A.  Cellebrite Premium, I'm not sure what the latest version
2    is.  It's probably somewhere between 7.58 and 7.60.
3    Q.  Okay.  And you're an expert in computer forensics.
4    Correct?
5    A.  Yes.
6    Q.  You didn't bother to look up what the latest version of
7    the most important tool in this case is?
8    A.  I believe a version came out last week, and I'm just not
9    sure which version that is.
10   Q.  Understood.
11          And Cellebrite itself has various trainings and
12   classes.  Correct?
13   A.  They do.
14   Q.  Okay.  And you've taken, I assume, the Cellebrite mobile
15   forensics fundamentals course.
16   A.  I have not.
17   Q.  Okay.  I assume you took the Cellebrite certified
18   operator course.
19   A.  I did not.
20   Q.  Well, then, you must have taken the Cellebrite certified
21   physical analyst course.
22   A.  I did not.
23   Q.  How about the Cellebrite -- since we're talking about
24   Premium -- the Cellebrite certified Premium operator course?
25   A.  I did take that.
```

Cain - CROSS - By Mr. Jauregui

```
1    Q.  Great.
2              Did you take the Cellebrite in-system programming
3    course?
4    A.  No.
5    Q.  How about the Cellebrite advanced smartphone analysis
6    course?
7    A.  No.
8    Q.  Did you take the Cellebrite Apple fundamentals course?
9    A.  No.
10   Q.  How about the Cellebrite Android fundamentals course?
11   A.  No.
12   Q.  Then you definitely didn't take the Cellebrite advanced
13   forensics course?
14   A.  No.
15   Q.  Now, in this case, I think it's very important -- you're
16   saying you did not do the extractions in this case or you
17   only did some extractions?
18   A.  Only some of them.
19   Q.  Out of the gentlemen here in court, which extractions
20   did you do?
21   A.  None of their devices.
22   Q.  You didn't do a single extraction of a single Defendant
23   in this case?
24   A.  No.  I believe they were all done by different
25   divisions.
```

Cain - CROSS - By Mr. Jauregui

1   Q.  Is that because you're in Knoxville, Tennessee?

2   A.  I am now.  When I began work on this case, I was in the

3   Tampa division.

4   Q.  Now, you've testified before, and you compared an

5   extraction to a blood draw at a doctor's office.  Correct?

6   A.  I believe I did.  Yes.

7   Q.  You get a phone, just like a nurse or a doctor at a

8   hospital or at a medical setting, and under controlled

9   conditions, they draw somebody's blood.  Correct?

10  A.  Yes.

11  Q.  And the reason you draw the blood in these controlled

12  conditions is because you don't want any contamination in

13  that blood.  Correct?

14  A.  Well, I believe you draw it so that you can test it.

15  Q.  Of course.

16          But if you draw it incorrectly, if you contaminate

17  the blood, once you take it to the lab, the results aren't

18  going to be correct.  Wouldn't you agree?

19  A.  That's correct.  You would not want to contaminate it.

20  Q.  And in one of the most important cases in the United

21  States of America, you decided it was not important to do

22  the extractions yourself?

23  A.  Oh, no.  It is a generally accepted practice, especially

24  when we have cases that span the entire country -- we have

25  56 field offices -- it's neither practical nor probable for

1    me to visit every single one of those divisions when we have

2    CART-trained examiners in every single field office that can

3    do it locally.

4    Q.  So I can order something from Amazon and have it the

5    same day, but the FBI cannot send you a phone next-day air

6    for you to do the extraction yourself.  Is that what you're

7    telling the ladies and gentlemen of the jury?

8    A.  No.  It's more preferable to have the local division do

9    it.  We wouldn't want any outside factors to come in.  It's

10   important that, if it comes in powered on or if we have the

11   code, that we take the best steps to preserve that evidence.

12   And so I wouldn't risk sending a phone across the country

13   just so I could extract it when my team in, say, Seattle has

14   the exact same capabilities and tools to extract that

15   locally and just get it done on the same day.

16   Q.  I'm glad you said that.

17             And the reason is, because when you do the

18   extraction, you have to make sure that the phone is not

19   connected to the outside world.  Correct?

20   A.  We try to.

21   Q.  Right.

22   A.  We always try.

23   Q.  Right.  Well, I mean, it's easy.  You turn it on, you

24   immediately put it into airplane mode, you turn the Wi-Fi

25   off, those kind of steps.  Correct?

1    A.  Well, you do have to have the passcode, nowadays, to

2    turn airplane mode off [sic].  So we try to preserve it in

3    any way we can.

4    Q.  Understood.

5            And as you sit here today, you cannot testify to

6    the ladies and gentlemen of the jury that you have any

7    personal knowledge whatsoever of the extraction process.

8    Correct?  You're just relying on somebody else's work, are

9    you not?

10   A.  We all follow the standard operating procedures to

11   extract the device.  And so when they created that

12   extraction, they -- the examiners provided a hash value.

13   And then when I received that extraction, when they copied

14   it over to my network, I verified it, confirming that what

15   they had done matched.

16   Q.  Where are the handwritten lab notes that accompany the

17   summary report of the extraction?

18   A.  Where are the what?

19   Q.  The handwritten notes that, under procedure, are

20   supposed to accompany the extraction.

21   A.  We don't -- we're not required to take handwritten

22   notes.

23   Q.  Okay.  Aren't you supposed to create a summary report

24   that describes the date and times that the action was taken

25   in the extraction?

Cain - CROSS - By Mr. Jauregui

1    A.  Our tools generate reports that say that for us.  Yes.

2    Q.  And where is that report?  Did you provide that to the

3    Government?

4    A.  Those reports should come with the extractions

5    themselves.  The tools generate them.  I know that, in this

6    case, we used a variety of tools, both Cellebrite Premium

7    and Grayshift GrayKey.  And in those extractions, there are

8    attached files that document that process.

9    Q.  I'm talking about your forensic report or the forensic

10   report of the person that actually did the extraction.  Have

11   you seen the forensic report of the actual person that did

12   the extraction?

13   A.  I looked at what they wrote up into our case file.  Yes.

14   Q.  Okay.  And did you provide that to the Government?

15   A.  I do not have a copy of that today.

16   Q.  Do you know if it was provided to the Government, is my

17   question.

18   A.  I do not know.

19   Q.  Did you create a forensic mobile phone submission form,

20   as is required?

21   A.  That is not a form that I am familiar with.

22   Q.  Do you know if the person that actually did the

23   extraction created that form?

24   A.  That's not a term I've ever heard before.

25   Q.  Now, Cellebrite can extract live data and hidden data.

1    Correct?

2    A.  By live data, you mean what you would see displayed on

3    the device?

4    Q.  Yes.

5    A.  Then yes.

6    Q.  Now, live data is typical user info, like SMS, MMS,

7    video, email, et cetera.  Correct?

8    A.  Sure.

9    Q.  There's also hidden data.  Correct?

10   A.  There can be.  Yes.

11   Q.  And that typical hidden data is web history, email

12   headers, picture data.  Correct?

13   A.  Well -- I'm sorry.  I now don't follow what you mean by

14   hidden data.

15   Q.  Okay.  Let me move on.

16           There's two types of extractions.  Correct?

17   A.  There are many types of extractions.

18   Q.  Right.  There's a logical extraction, which is what

19   we're dealing with here.  Correct?

20   A.  No.  That is not correct.

21   Q.  Okay.  What are we dealing with here?

22   A.  Well, depending on the different devices, most -- for

23   most of the devices in this case, we got full file system

24   extractions.

25   Q.  Would that be a physical extraction?

Cain - CROSS - By Mr. Jauregui

1    A.  We use the term interchangeably.  Some of our tools call

2    it a physical extraction; some of them call it a full file

3    system.  They're kind of used interchangeably.  Neither

4    are -- you could say that.  Yes.

5    Q.  Right.  But you would agree with me a logical and a

6    physical extraction are two different things.  Right?

7    A.  They are two different things.

8    Q.  Okay.  And since you didn't do the extraction, you don't

9    know what kind of extraction was done in this case.

10   Correct?

11   A.  Oh, no.  I know what type of extraction was done.

12   Q.  Because of the hash value that you testified earlier?

13   A.  Well, no.  That doesn't tell me the type of extraction.

14   The accompanying report that comes with the extraction

15   itself tells me what type of extraction it is.

16   Q.  And that --

17   A.  I believe it's also in the name of the extraction

18   [indiscernible].

19   Q.  -- will then --

20          THE COURT REPORTER:  I'm sorry?  Say that again.

21          THE WITNESS:  The accompanying printout that our

22   tools generate tell the type of extraction that it is.  And

23   also, most of our tools report the type of extraction in the

24   actual extraction name itself.

25


Cain - CROSS - By Mr. Jauregui

```
 1    BY MR. JAUREGUI:

 2    Q.  And the extraction is through Cellebrite?

 3    A.  The extraction is what?

 4    Q.  This extraction report you're speaking about, that's

 5    through Cellebrite?

 6    A.  It's the tool that generates it.  So it would have been

 7    Cellebrite Premium generates a log file, and our Grayshift

 8    GrayKey generates a summary report in a PDF format.

 9    Q.  That's what I'm trying to figure out.  When you say the

10    report that's generated, are you talking about the report

11    generated through Cellebrite or through GrayKey?

12    A.  Yes.

13    Q.  Which one is it?

14    A.  Both.

15    Q.  Both.

16         And in this case, you have both reports?

17    A.  I reviewed all -- yes.  I reviewed -- that came along

18    with each extraction.  Yes.

19    Q.  Thank you.

20         Now, these extractions and these reports, they're

21    not 100 percent reliable, are they?

22    A.  Well, they're log files of how the system interacted

23    with the device.

24    Q.  How the tool interacted with the device.  Right?

25    A.  Yes.
```

Cain - CROSS - By Mr. Jauregui

1    Q.  Now, you know -- you said you followed the releases, the

2    updates on social media and the tools' websites, so on and

3    so forth.  Correct?

4    A.  Yes, sir.

5    Q.  And you know, of course, that Moxie Marlinspike, who's

6    the creator of Signal, he had Cellebrite.  You know that.

7    Right?

8    A.  I know that Signal and Cellebrite have interacted with

9    each other.  Yes.

10   Q.  Okay.  But you know that the tool was hacked by the

11   founder of Signal?

12   A.  It wasn't --

13   Q.  It's a famous hack case.  You've heard about it.  Right?

14   A.  It wasn't hacked.  But I know to what you are referring,

15   yes.

16   Q.  You know what I'm talking about?

17   A.  I do.

18   Q.  Thank you.

19          Now, you're saying you did not personally extract

20   Mr. Tarrio's phone.  Correct?

21   A.  That's correct.

22   Q.  Okay.  Now, isn't it true that Grayshift GrayKey is

23   actually better at processing Telegram than Cellebrite?

24   A.  Well, Grayshift GrayKey doesn't process anything.  It's

25   only a tool used to extract the data from the device.

1    Q.  Right.  But the question was, it works better than

2    Cellebrite.  Correct?

3    A.  No.  The extraction that you would get from Cellebrite

4    Premium, if it was a full file system extraction, and the

5    full file system extraction you would get from GrayKey would

6    be nearly identical.

7    Q.  Okay.  And the reason you use Cellebrite is what?  It's

8    easier to use for the agents -- for the Government?

9    A.  It's just depending on availability.  Right now, we only

10   have GrayKey for iPhones and we have Cellebrite Premium that

11   works on Androids and iPhones.  And as of today, all of our

12   divisions are equipped with both of those.  Back in 2021,

13   each division typically only had one or the other just based

14   on availability at the time.

15   Q.  Okay.  And you would agree with me there's a big

16   difference between the Apple IOS and the Android systems.

17   Correct?

18   A.  Yes.  There's a big difference in their operating

19   systems.

20   Q.  And, actually, the Android even varies by phone.  I have

21   a Samsung, and on the Samsung, there's all this bloatware,

22   and actually, there's an extra kernel on top of the Android

23   operating system.  Correct?

24   A.  I can't speak to the bloatware, but yes, Samsung would

25   be different than, say, LG.  They all use the Android

1   platform, but they are slightly different operating systems.

2   Q.  Okay.  Now, my colleagues asked you about the different

3   messaging apps, Signal, WhatsApp.  Those are all encrypted.

4   Correct?

5   A.  They are.

6   Q.  And even the simple Apple iMessage, that is also

7   encrypted.  Correct?

8   A.  The iMessage is, yes.

9   Q.  Now, on Telegram, it's also encrypted, but it's not

10  end-to-end encryption.  Correct?

11  A.  Not by default.

12  Q.  Okay.  And not only that, but in these group chats, it's

13  not even encrypted at all.  Correct?

14  A.  No.  They are encrypted.

15  Q.  Okay.  Just not end-to-end encrypted?

16  A.  Not end-to-end encrypted.

17  Q.  Now, when a person does the extraction, they control all

18  the factors, correct, as to the variables that they want to

19  extract from the phone.  Right?

20  A.  No.  When we do a full file system extraction, because

21  of the way that our tool interacts with the device, we have

22  to pull all of the data off.  We do not get to select which

23  portions.  We copy the entire file system.

24  Q.  And you know that because somebody wrote it on a report.

25  Correct?

Cain - CROSS - By Mr. Jauregui

1    A.   Because I know that's how the tools work.  Yes.

2    Q.   Okay.  But when they use the tool, you would agree with

3    me that the tool has endless variations and variables in it.

4    Correct?

5    A.   Not the extraction tools, no.  When we hook it up to our

6    extraction tool, it identifies the chipset in the certain

7    device, the type of device it is, the chipset.  And then the

8    tool makes the determination on how to best extract that.

9    It's not interactive with the user.  The tool does it.

10   Q.   So you can't pick a timeframe on the tool; is that what

11   you're telling me?

12   A.   For extraction, no.  We would extract the entire device.

13   Q.   Okay.  Now, you did look at Mr. Tarrio's extraction.

14   Correct?

15   A.   I did.

16   Q.   Okay.  And you saw that he communicated through multiple

17   mediums, text messages, Telegram and other applications.

18   Correct?

19   A.   I saw that there were many applications on there.

20   Q.   And in the Telegram application, you saw he had

21   countless threads and group chats and private and individual

22   chats.  Correct?

23   A.   There were a number of messages and chats.  Yes.

24   Q.   And actually, he had about 32 and a half million unread

25   messages.  Do you remember that?

1    A.  I do not remember that.

2    Q.  You don't remember that.

3         Do you know how many unread messages he had?

4    A.  No, I do not.  But I know it was not 32 million.

5    Q.  Okay.  How many do you think it was?

6    A.  I don't know, but I know that the total number of

7    artifacts that we reviewed for that case did not reach

8    anywhere near 32 million, so I know there weren't 32 million

9    unread chats.

10   Q.  And is there an easy way to look that up after -- you

11   know, between -- you know, during lunchtime?  Can you look

12   that up through a Cellebrite report, perhaps?

13   A.  No, not here, because the data set that we have provided

14   has been scoped to the parameters of the search warrant.  So

15   it would not include --

16   Q.  Okay.

17   A.  -- the entirety of his --

18   Q.  When you say that the data was scoped to the search

19   warrant, what does that mean?

20   A.  When we provided the final reports, we selected data

21   that was relevant to the case here today.

22   Q.  So you used a timeframe.  Correct?

23   A.  That was part of the consideration, but not the entire

24   consideration.

25   Q.  Got it.

```
 1          So you were able to limit that to variables that
 2   you picked out in the tool.  Correct?
 3   A.  For the final reports, yes.
 4   Q.  Got it.
 5          Now, isn't it true that when data is not collected
 6   in a forensically sound manner, you inherently change the
 7   metadata?
 8   A.  I'm sorry.  I'm just not sure what you mean by that
 9   question.
10   Q.  Sure.  If the extraction was not done correctly, the
11   metadata could be contaminated.  Isn't that true?
12   A.  I'd have to see an example.
13   Q.  Well, you'd have to see the phone and extract it, I
14   guess.  Right?
15   A.  I would, yes.
16   Q.  And just by seeing the extraction, you can't check the
17   integrity of the data on the actual phone.  Correct?
18   A.  Well, as our tools are extracting the data, they take a
19   hash value of the data that it expects to extract, and then,
20   once it's done, it takes the hash -- that same hash value of
21   the data that's come out, and that's how we receive that.
22   Q.  But wouldn't it be best practice to have that report and
23   then you have the phone with you to compare them both to
24   make sure they're the same?
25   A.  I did as part of my process, Yes.
```

Cain - CROSS - By Mr. Jauregui

```
1   Q.  Yeah.  But you didn't have the phone, did you?

2   A.  I did not have the physical device.  I did have the

3   extraction with that.  Yes.

4   Q.  Understood.

5          So if the extraction was done incorrectly, the

6   data is dead on arrival.  Isn't that true?

7   A.  I would assume -- I have -- I'd have no way to know

8   that.  I know that the data I looked at in this case, all

9   the hash values matched; all the extractions were valid.

10  Q.  I understand.

11         Now, you had already testified that you're not an

12  expert in Telegram.  So let me ask you just as to your

13  personal knowledge.  When using Telegram, when you use a

14  reply or a swipe reply function, a review byline is created

15  that allows two users to directly communicate without

16  disrupting the flow of the overall chat with unnecessary

17  confusion.  Correct?

18  A.  I'm not -- I'm not sure what --

19  Q.  I'll break it up into pieces.  I'm sorry.  It's a long

20  question.

21         You know what using a reply or a swipe reply is in

22  Telegram.  Correct?

23  A.  Yes.  When you reply directly to another message.

24  Q.  Okay.  When that happens, there's like a little review

25  box that opens up.  Correct?
```

Cain - CROSS - By Mr. Jauregui

1    A.   There is.

2    Q.   Okay.  And that's done so that, as you're speaking back

3    and forth, it doesn't create any kind of disruption in the

4    conversation.  Right?

5    A.   I don't know the intent of it.  I know that it does then

6    display that message as your reply is in direct response to

7    this other reply.

8    Q.   Okay.  When you extract that in Cellebrite, it doesn't

9    show that.  Correct?

10   A.   In the earlier versions it didn't.  As we discussed with

11   Ms. Hernández, I believe the version that came out in

12   November or December now does display that data.

13   Q.   Okay.  And again, you don't know if, in this new latest

14   version, if it does that, because you haven't really looked

15   at it.  Correct?

16   A.   No.  I know that as of the version that came out in

17   November or December, it does.

18   Q.   It does.  What version is that, to be clear?

19   A.   I believe it was as of 7.58 or 7.59.  I'm not sure of

20   the exact version number.  Just in the last few months.

21   Q.   Understood.

22        But the version that we're working with, that

23   Mr. Kenerson and I are working with, is that old one.

24   Right?

25   A.   Not the very first one that I had referenced, but

Cain - CROSS - By Mr. Jauregui

1    somewhere in the 40s, the 7.40s.

2    Q.  7.40s or something?

3    A.  Yes.

4    Q.  And -- I mean, that's important.  I mean, I get an

5    update on my phone every few weeks.  I can't even drive my

6    car if I don't get it updated.  Isn't that important for us

7    to be working on the most updated Cellebrite version tool?

8    A.  We try to use the latest tools.  Yes.

9    Q.  Okay.  Now, extraction creates a complication in terms

10   of the contextual conversation.  Correct?

11   A.  I'm sorry.  Can you repeat that?

12   Q.  Sure.  You already said that in the extraction in

13   Cellebrite, we can't see swipe replies or replies.  So if we

14   can't see that, it creates a big contextual complication.

15   We don't really know who's responding to what or to whom.

16   Correct?

17   A.  Sure.

18   Q.  Now, it's really problematic when you're using Telegram

19   to explain a person's state of mind.  Correct?

20   A.  I don't have any knowledge of using Telegram to explain

21   a state of mind.

22   Q.  Well, the user interface factors in most of how the user

23   conducts themselves.  Isn't that true?

24   A.  I'm sure that's personal to each person.

25   Q.  Okay.  And actually, some data gets missed if it's in a

1    different format, like in a voice chat.  Correct?

2    A.  I don't -- I don't understand what you mean by "data

3    missed."

4    Q.  Well, isn't it true that in a lot of these Telegram

5    messages the voice chats are missing?

6    A.  We do have a lot of voice chats that have been deleted,

7    yes.

8    Q.  Yeah.  And there's a lot of missing GIFs or photos,

9    things that add context.  Correct?

10   A.  Yes.  A lot of messages have been deleted.

11   Q.  Okay.  And, actually, there's missing messages that

12   haven't been deleted.  Isn't that true?

13   A.  I --

14   Q.  Not every single missing message was deleted.  Isn't

15   that true, Ms. Cain?  Some of it are just artifacts that

16   Cellebrite can't recognize correctly.  Isn't that true?

17   A.  No.  The reply -- the message would still be there.  It

18   just wouldn't show that it was in direct reply to another

19   message.

20   Q.  I'm not talking about the replies; I'm talking about

21   missing messages.  Missing messages in a thread.

22   A.  Uh-huh.

23   Q.  Okay?  You've seen those in these Telegram chats,

24   correct, where there's just empty spaces?

25   A.  Yes.

Cain - CROSS - By Mr. Jauregui

1    Q.  Okay.  Not every single empty space was a deleted
2    message.  Isn't that true?
3    A.  No.  That's -- if the message is missing and all that
4    remains is the timestamp, then that is a deleted message.
5    Q.  Isn't it true it could be a pinned message of some kind
6    that Cellebrite can't recognize correctly?
7    A.  No.  Cellebrite parses pinned messages.
8    Q.  It shows up as a big red X?
9    A.  I think it has, like, a little icon and it says Pinned
10   Message.
11   Q.  Okay.  But you can't actually see the pinned message.
12   Isn't that true?
13   A.  Well, it would be the message inside that container.
14   Q.  Okay.  Now, when looking backwards at these messages,
15   without the user interface, we're pretty much guessing what
16   the intent was.  Correct?
17   A.  I don't speak to the intent of these messages.  My job
18   is to provide the technical data in a useable format.
19   Q.  And are you the person with the most technical knowledge
20   in this prosecution team?
21   A.  I did parse these Telegram chats and provide technical
22   advice based on them, yes.
23   Q.  Did anybody above you provide technical advice to the
24   Government in this case?
25   A.  Not to my knowledge.

1    Q.  Okay.  So you're the Government's tech person in this

2    case.  Would that be fair?

3    A.  For this case, yes.

4    Q.  Thank you.

5            Now, isn't it true that Telegram allows for

6    editing and deleting of comments after being sent?

7    A.  Individual messages?

8    Q.  Yes.

9    A.  I'm not sure if you can edit them back in the winter of

10   2021.

11   Q.  Okay.  Are you aware you can do that now?

12   A.  I did not know that.  No.

13   Q.  Okay.  So you didn't know that I can send a message,

14   somebody can reply to my message, and then I can go back and

15   change the initial message?  You didn't know you could do

16   that in Telegram?

17   A.  I don't know if you could do that in the winter of 2021.

18   No.

19   Q.  Now, when checking to see if a comment has been read by

20   other users, a double-checkmark will appear next to the

21   comment.  Correct?

22   A.  That's correct.

23   Q.  One checkmark means that the comment was sent and is

24   ready for others to view and respond in the actual

25   application.  Correct?

Cain - CROSS - By Mr. Jauregui

1    A.  That sounds correct.  Yes.

2    Q.  Now, we can't see any of these checkmarks in Cellebrite.

3    Correct?

4    A.  I don't recall if they included them or not, no.

5    Q.  Okay.  Would something refresh your recollection?

6    Perhaps a Cellebrite report?

7    A.  If we have those available.

8    Q.  I do.

9    A.  Sure.

10              MR. JAUREGUI:  Ms. Harris, this is going to be

11   Tarrio Exhibit 6.  If we could just publish it just to the

12   witness, please.

13   BY MR. JAUREGUI:

14   Q.  Now, Ms. Cain, I'm showing you some Telegram messages

15   between my client, Tarrio, and Lieutenant Shane Lamond, the

16   head of the intelligence of the Metropolitan --

17              MR. KENERSON:  Objection.

18   BY MR. JAUREGUI:

19   Q.  -- Police Department.

20              THE COURT:  Hold on.  Is the witness being asked

21   to refresh her memory about something?

22              MR. JAUREGUI:  That's it, Judge.

23              THE COURT:  All right.  So why don't you just ask

24   her the question about the topic at hand.

25              MR. JAUREGUI:  Thank you.

Cain - CROSS - By Mr. Jauregui

```
 1        BY MR. JAUREGUI:

 2        Q.  I'm going to show you this Telegram.  I'm just going to

 3        scroll there.

 4                Do you see these Telegram messages --

 5        A.  I do.

 6        Q.  -- between my client and Lamond?  Are there any --

 7                MR. KENERSON:  Objection.

 8                THE COURT:  Sustained.

 9        BY MR. JAUREGUI:

10        Q.  Are there any checkmarks there?

11        A.  There are no checkmarks.

12        Q.  Okay.  So in the Cellebrite version that we have, it

13        doesn't display checkmarks, one or two, to determine whether

14        something has been read?

15        A.  Well, this is also not a group chat.  This is an

16        individual chat between two users.

17        Q.  Okay.  Does it show the checkmarks, yes or no?

18        A.  It does not.

19        Q.  Okay.  Would it be fair to say, if it doesn't show it in

20        an individual chat, it won't show it in a group chat?  I

21        could find you a group chat if you'd like.

22        A.  I would prefer that you found a group chat.  Yes.

23        Q.  Sure.

24                MR. JAUREGUI:  If we could publish this to the

25        witness, please.
```

Cain - CROSS - By Mr. Jauregui

```
 1    BY MR. JAUREGUI:
 2    Q.  Now, this is a group chat between Lamond --
 3              MR. KENERSON:  Objection.
 4              THE COURT:  I'm sorry, sir.  Just ask your
 5    question about whether this refreshes the witness's
 6    recollection about the topic you've asked.
 7              MR. JAUREGUI:  Understood.
 8    BY MR. JAUREGUI:
 9    Q.  I'm showing you some Telegram messages between different
10    people -- we won't name who they are -- in a group chat.
11    Any checkmarks on any of these?
12    A.  No.  But that's also not a group chat.
13    Q.  It's not a group chat?
14    A.  No.
15    Q.  What is this?  It's a group text?
16    A.  It's two individuals.
17    Q.  Oh, sorry.  I have it as multiple people.  I have it
18    as -- I'll move along.
19              I have that one as three people.  You didn't see
20    three people there?
21    A.  Well, it doesn't necessarily make it a group chat.  It
22    could still be a private message and not an official group
23    with a name.
24    Q.  Got it.  Got it.
25              I'm showing you another Cellebrite report.  Is
```

Cain - CROSS - By Mr. Jauregui

```
 1    this a group chat?

 2    A.  It is.

 3              THE COURTROOM DEPUTY:  What number is this?

 4              MR. JAUREGUI:  This is Tarrio Exhibit 50.

 5              THE COURTROOM DEPUTY:  50.

 6    BY MR. JAUREGUI:

 7    Q.  Did I finally score on this one?  Is this one a group --

 8    group chat?

 9    A.  Group chat.  Yes.

10    Q.  There's a lot of people on this one.  Right?  How many

11    people do you think are in this one?

12    A.  I have no idea.

13    Q.  Hundreds, maybe?

14              MR. KENERSON:  Objection.  Are we refreshing at

15    this point?

16              THE COURT:  Does this refresh your recollection?

17    BY MR. JAUREGUI:

18    Q.  Does this refresh your recollection, Ms. Cain?

19              THE COURT:  About?

20    BY MR. JAUREGUI:

21    Q.  About whether --

22    A.  It does.  There are no checkmarks.

23    Q.  There's no checkmarks?

24    A.  There are no checkmarks.

25    Q.  Thank you.
```

Cain - CROSS - By Mr. Jauregui

1          Now, what this proves is that simply extracting
2     the phone doesn't give you an accurate picture of what's
3     happening on Telegram.  Correct?
4     A.  No.  Extracting the phone will get all of the data off
5     of the phone.  The next portion is to then process that data
6     into a readable format.  So, yes, extracting the data still
7     does get a complete picture of the data off of the phone.
8     Q.  You mean you're getting a copy of the data of the phone.
9     Correct?
10    A.  That is correct, in the extraction.
11    Q.  Right.  But what I'm trying to say is the Cellebrite
12    that we're all using does not give a real picture of the
13    communications on Telegram.  Isn't that fair?
14    A.  I would say that's not accurate.  I would say it does
15    give a good picture of the communications, as it has every
16    group in it, every private message; it has the users that
17    contributed a message, the message itself, a timestamp, the
18    name of the attachment, the attachment itself.  So it has
19    all of the key features included in order to read any given
20    chat thread.
21    Q.  So a good 50, 60 percent, let's say 70 percent -- that's
22    good enough for court.  Right?
23    A.  No.  I would say more like 95.
24    Q.  95 percent.  Okay.  Not 100 percent.  I guess I got you
25    there.  Not 100 percent, right, of the communication?

1   A.  I mean, maybe later versions -- I could put in some

2   enhancement requests.

3   Q.  It's a shame we didn't use that later version, huh,

4   Ms. Cain?

5          Isn't it true that when somebody joins a group

6   chat, they miss entire sections of the conversations that

7   came before then?

8   A.  There is a setting in the super groups where the

9   administrator can choose to show the history from all time

10  or choose to just show the history from when that person

11  joins the chat.  The default is to just show when that

12  person joins onward.

13  Q.  Got it.

14          And in the extraction, you can't tell that using

15  Cellebrite.  Correct?

16  A.  You can't tell what?

17  Q.  What you just said.  That -- the administrator can

18  activate a setting as to what a user can see.  You can't

19  tell whether the administrator activated that setting on

20  Cellebrite.  Correct?

21  A.  Oh, no.  I do not know that.

22  Q.  Again, we're just guessing, right, on Telegram, whether

23  the administrator did or did not do such a thing?

24  A.  I could look in the database for an individual chat and

25  find that information.

Cain - CROSS - By Mr. Jauregui

1    Q.  But you didn't do that in this case.  Correct?

2    A.  Not for this one.  No.

3    Q.  I understand.

4            Now, this leaves us to try and piece together the

5    original context based on our speculation.  Isn't that

6    right?

7    A.  I'm not sure what your question is.

8    Q.  Well, I just asked you, When somebody joins a group

9    chat, do they know what was said before they got there?  And

10   you basically said no.  Correct?

11   A.  That is correct.  They would just see messages going

12   forward in the default setting.

13   Q.  Got it.

14           So if they start writing, we don't even know what

15   they're responding to.  Correct?  Because we don't know

16   whether they did a swipe reply.  Correct?

17   A.  Well, if they just joined the chat, I would assume

18   they're not responding to anything, because they haven't

19   seen anything.

20   Q.  Right.

21   A.  So they would be replying to nothing.

22   Q.  Right.  But they can't do it the minute they get there.

23   They can do a swipe reply.  You just can't show it on the

24   Cellebrite.  Correct?

25   A.  Well, if you join the chat and you can't see the

1    history, then you can't reply to a previous message because

2    there are no previous messages.

3    Q.  Got it.

4         Isn't it true that Cellebrite processes the

5    database inaccurately sometimes?

6    A.  In my testing, in validation of the earlier versions of

7    Cellebrite, I did find that Cellebrite was duplicating some

8    of the records.  And the way that databases work is they

9    have a write-ahead log, which is called the WAL file, and

10   when a user sends a new message, it writes that to the WAL

11   file first, and then that's moved over to the database at a

12   later time.

13        And so we noticed that, in the earlier versions of

14   Cellebrite, they were processing and displaying some

15   messages twice.  So they were just duplicating messages.  So

16   the content was accurate; the timestamp was accurate; who

17   the message was from was accurate.  We were just seeing it

18   in the database two times.  And obviously, that person

19   didn't send the exact same message at the exact same time

20   twice because we were seeing it for several messages.

21   Q.  And you actually told that to Agent Hanak in an email.

22   Correct?

23   A.  I did.  I wanted him to be able to correctly interpret

24   the data.

25   Q.  Right.  And you even told him, Cellebrite doesn't report

1    with enough accuracy.  Correct?  That's why I hadn't sent

2    you Paul Ray's phone before, even though you guys were

3    clamoring for it.  Correct?

4    A.  For his device, I processed it with a different tool

5    because, at that date and time, and the number of groups

6    that he was a member in, I felt that the interface was more

7    appropriate as a review tool.  Yes.

8    Q.  And you even said Cellebrite has weird ways of

9    displaying the pinned messages.  Correct?

10   A.  Oh, we did have a question about one of the ways that

11   the pinned messages were displayed.  It put an icon -- it

12   created an icon.  Essentially, instead of just saying at the

13   bottom of the bubble, "This message was pinned," it created

14   a little pin icon as -- to draw attention to the fact that

15   that message had been pinned.  It's just a programming

16   preference.  They wanted to be able to draw attention, so

17   they assigned an icon to it.

18   Q.  Okay.  And you also told Agent Hanak that whenever

19   there's extensive group threads, they may not be parsed

20   correctly, nor coherently, in Cellebrite.  Correct?

21   A.  When -- we have a lot of groups and super groups for

22   these particular devices, and because each one of those has

23   a unique identifier, and because Cellebrite doesn't display

24   the chat by the group name, but it displays the chat by the

25   group identifier, one chat thread could appear as two.  So I

1    wanted to just make sure that I drew the case agent's

2    attention to that so that, if they were to look at any

3    particular group, they knew that, for some groups, they

4    needed to look at two chat threads in order to see the whole

5    picture of that.

6              THE COURT:  All right.  Ladies and gentlemen,

7    we're going to break for lunch.  We will see you on the

8    other side of our break.  Thank you again for your attention

9    and patience.

10             (Whereupon, the jury exited the courtroom at 12:35

11   p.m. and the following proceedings were had:)

12             THE COURT:  You may step down from the witness

13   stand.

14             Madam Court Reporter, do you have another ten

15   minutes in you?

16             THE COURT REPORTER:  Yes, Judge.

17             THE COURT:  So we'll wait for Ms. Harris to

18   return, and then I'll hear from you on the overnight issue,

19   if you will.

20             Just in case the issue ripens today, why don't I

21   hear from the parties on the issue that you all -- that was

22   raised overnight, I guess, first by the Government and then

23   Ms. Hernández responding in kind about what the Government

24   wants to do with these additional exhibits.  Whoever from

25   the Government, I will hear from you.  Then I will hear from

```
 1    it's appropriate to ask the question for that reason.  So, I
 2    would move -- move beyond all this.  I would sustain an
 3    objection as to foundation and scope.
 4             But, again, this witness isn't going anywhere.  If I
 5    rule all that admissible, of course, you'll be able to put it
 6    in in your case one way or another.
 7             MR. JAUREGUI:  Thank you.
 8             Judge, please note any objection.
 9             THE COURT:  It is noted for the record.  Very well.
10             (Open court:)
11                         JENNIFER "KATE" CAIN,
12                       CROSS-EXAMINATION (Cont.)
13    BY MR. JAUREGUI:
14    Q.  Good afternoon, Ms. Cain.
15    A.  Good afternoon.
16    Q.  I think we were talking about Telegram, right, before?
17    A.  Yes.
18    Q.  Okay.  Now I would like to show you a short little
19    demonstration that I did on my phone with my -- the very
20    talented Ms. Katinsky over there.  I have Telegram on my phone.
21    I'm going to just show you a video, and I would like you to
22    just take a look at it.  Okay?
23             MR. JAUREGUI:  This is titled Demonstrative Aid 1A;
24    is that all right?
25             THE COURTROOM DEPUTY:  1A?
```

```
 1                    MR. JAUREGUI:  Sure.

 2     BY MR. JAUREGUI:

 3     Q.  You know what kind of phone this is?

 4            Is that a hint?

 5     A.  Oh, it's an Android.

 6     Q.  Yeah.

 7                    THE COURT:  Counsel, has this demonstrative been

 8     shown to the government?

 9                    MR. JAUREGUI:  It has, Judge.  During lunch, I showed

10     them.

11                    THE COURT:  Very well.

12                    MR. JAUREGUI:  Let me just get to the Telegram app

13     here.

14            If we could publish, please, Ms. Harris.

15                    THE COURTROOM DEPUTY:  Permission to publish?

16                    THE COURT:  Permission to publish is granted.

17     BY MR. JAUREGUI:

18     Q.  Does that look like the Telegram app to you?

19     A.  It does.

20     Q.  Great.  I'm going to show you a short little video.

21            If the jury could please pay attention and look at it.

22            (Video played.)

23            Did you see that video?

24     A.  I did.

25     Q.  You said earlier that you didn't know whether messages
```

1    could be edited after the fact.  Now you know they can,

2    correct?

3    A.  In this current version, yes.  I do not know if that was

4    available in January 2021.

5    Q.  Okay.  Wouldn't it have been your specific job, as a

6    computer forensic expert of the FBI, to find out if, back then,

7    when the crime was allegedly committed, whether that option was

8    available?

9    A.  Well, as you can see from the video you just showed me,

10   when a video -- when a message is edited, it actually changes

11   the message itself and says "edited" at a specific time --

12   Q.  Right.

13   A.  -- instead of "sent" on a specific time.  So, there would

14   be indicators in the database if something had been edited

15   after the fact.  There would be a timestamp associated with

16   that.

17   Q.  On the phone, not on Cellebrite, correct?

18   A.  Not on Cellebrite.  In the database, in the extraction

19   itself.  That's something that we look at in the extraction

20   itself.

21   Q.  Thank you for your honesty.

22        Isn't it true that on Cellebrite, there's no pulls data,

23   correct?

24   A.  There's no what?  I'm sorry.

25   Q.  Pulls data.  The pulls.

```
 1    A.   There's no pulls data?

 2    Q.   Right.  When you pull a message.  You don't know what

 3    pulling a message is?

 4    A.   I don't know what the context of that means, no.

 5    Q.   Okay.  And there's no edit history on Cellebrite, correct?

 6    A.   I did not see -- in the January 2021 versions of Telegram,

 7    I did not see an edited column in the database, no.

 8    Q.   Okay.  And, actually, there's no muting history, either, on

 9    Cellebrite, correct?

10    A.   There is.  You can mute history.

11    Q.   On Cellebrite?

12    A.   I'm sorry.  Notifications, you can mute them, yes.

13    Q.   Okay.  But can you please listen to my question carefully.

14         Is there mute history on Cellebrite?  Yes or no?

15    A.   No, it doesn't show if the chat has been muted.

16    Q.   Thank you.

17         And even more importantly, there's no admin logs on

18    Cellebrite; isn't it?

19    A.   Admin what?

20    Q.   Admin logs?

21    A.   Admin locks?

22    Q.   Logs.  Logs.  L-o-g-s.  Administrative logs.

23    A.   Logs?

24    Q.   Yes, on Cellebrite.

25    A.   I don't believe Telegram has administrative logs.
```

1    Q.  You don't believe or you don't know?

2    A.  I've never seen an administrative log for Telegram.

3    Q.  Isn't it true that sometimes the times in Cellebrite are

4    inaccurate?

5    A.  For Telegram specifically?

6    Q.  Yes.

7    A.  No, I have never seen an inaccurate time tamp.

8    Q.  Isn't it true that you can get added to chats without your

9    consent?

10   A.  You can be added to a chat, yes.

11   Q.  And that explains all the spam that I get on Telegram,

12   right?  People just add me though their groups; is that the

13   cause?

14   A.  The public groups, if you've interacted in some way, then

15   you can be automatically added to some.

16   Q.  Thank you.

17       Can you tell on Cellebrite whether or not a message has

18   been forwarded?

19   A.  I don't believe on the earlier versions you could.

20   Q.  Okay.  And, actually, you can't even tell whether a user is

21   a chatbot or not on Cellebrite, correct?

22   A.  Whether a user is a chatbot?

23   Q.  Yes.

24   A.  No.

25   Q.  And, actually, some of the messages that the government has

1    in their exhibits were actually chatbots.  Did you know that?

2    A.  Not that I recall.

3    Q.  Do you know what Group Guardian is?

4    A.  Group Guardian?

5    Q.  Yeah.

6    A.  Is that a -- is that a specific Telegram group?

7          THE COURT:  Counsel, please, just for the court

8    reporter's sake, again, counsel and the witness, each wait

9    until the other is done speaking.

10         MR. JAUREGUI:  My apologies, Judge.

11   BY MR. JAUREGUI:

12   Q.  Have you heard of a chatbot whose name is Group Guardian?

13   A.  No, I have not.

14   Q.  Now, Tarrio created the Ministry of Self-Defense on

15   December 31st, 2020, correct?

16   A.  I don't recall the exact date of the group creation.

17   Q.  So then you don't know when it became a super group,

18   either, correct?

19   A.  I believe I took notes regarding that, or conversed with my

20   case agent regarding those things, but I don't have them

21   committed to memory, no.

22   Q.  Does the government have the notes?  Do you know?

23   A.  Potentially.

24         MR. JAUREGUI:  Eric, do you have the notes?

25         (Off-the-record discussion between counsel.)

1          MR. JAUREGUI:  May I have a minute, Judge, please,

2     for a paper?

3               THE COURT:  Yes, sir.  Yes.

4               MR. JAUREGUI:  May I approach, Your Honor?

5               THE COURT:  You may, sir -- well, you may.

6               MR. JAUREGUI:  Thanks.

7     BY MR. JAUREGUI:

8     Q.  I'm showing you what's been shown to you before.  Hopefully

9     this will refresh your recollection as to when Tarrio created

10    the MOSD.

11         Did he create it on December 31st, 2020?

12    A.  I'm sorry.  This one doesn't have the date the chat was

13    created.

14    Q.  Okay.  And do you know when it became a super group?  I

15    guess not, right?

16    A.  I don't recall from memory, no.

17    Q.  Okay.  And do you know when the group IDs were changed?

18    A.  When the super group conversion happened is when --

19    Q.  And when that conversion happens, there's two different

20    IDs, right?

21    A.  Yes.

22    Q.  Now, let's talk about the Boots on the Ground chat.  You

23    did review that with the government, correct?

24    A.  I did.

25    Q.  And that was important because the government wasn't sure

1    whether or not Enrique was actually in that group, correct?

2            MR. KENERSON:  Objection to characterization of why

3    it's important.

4            MR. JAUREGUI:  Well, I'll take the blame.

5    BY MR. JAUREGUI:

6    Q.  It's important for me to find out when Enrique was in that

7    Boots on the Ground.  And you looked into that, correct?

8    A.  I did research it.

9    Q.  Okay.  And the reason that was important is because there's

10   actually no messages or any interaction by Enrique in that

11   group Boots on the Ground, correct?

12   A.  He does not contribute any messages, no.

13   Q.  And, actually, there's not even a system message that he

14   joined the group, correct?

15   A.  No.  Because he would have been added at the group

16   creation, which does not create a system message.

17   Q.  Thank you.

18           And we don't even know if he had even seen that group,

19   correct?

20   A.  I do not know if he saw it.

21   Q.  Thank you for your honesty, Agent.

22           Now, Ms. Cain, did you create any exhibits whatsoever in

23   this case?

24   A.  No.  I reviewed the exhibits.

25   Q.  Okay.  And the exhibits were manufactured by who?

```
1    A.  Our investigative team put them together.

2    Q.  And the government people at this table here?

3    A.  They are -- the case agent and his team.  You would have to

4    ask him for the participants.

5    Q.  Got it.  So Agent Hanec is the one that created the

6    exhibits in this case.

7    A.  He was my contact that I spoke to about this.  Again, I

8    don't know who created each individual exhibit, no.

9    Q.  Got it.  And whatever exhibit Agent Hanec created was based

10   on your data?

11              MR. KENERSON:  Objection.  Characterizes.

12              THE COURT:  Sustained.

13   BY MR. JAUREGUI:

14   Q.  Okay.  The exhibits created by the prosecution team was

15   based on your data?

16   A.  It was based on the Cellebrite reports for those devices.

17   Q.  Okay.  I saw you make a big differentiation there.  I asked

18   you about the data, and you said:  No, it was based on

19   Cellebrite reports.

20         So what you're telling the jury is, just to be clear,

21   the exhibits were manufactured, created, based on Cellebrite

22   reports; is that correct?

23   A.  That is correct.

24   Q.  Did you preview these exhibits with that elaborate

25   peer-review process you have at the FBI?
```

```
 1    A.  I did not.

 2    Q.  Any future mistakes on these exhibits, who's fault are

 3    they?

 4              MR. KENERSON:  Objection.

 5              THE COURT:  Sustained.

 6    BY MR. JAUREGUI:

 7    Q.  If there's mistakes on the exhibit, they're not your fault,

 8    are they?

 9              MR. KENERSON:  Objection.

10              THE COURT:  Sustained.

11              MR. JAUREGUI:  And I have no more questions.  Thank

12    you, Ms. Cain.

13              THE COURT:  All right.  Counsel for Mr. Pezzola.

14              MR. ROOTS:  Thank you.

15                         CROSS-EXAMINATION

16    BY MR. ROOTS:

17    Q.  Special Agent Cain, my name is Roger Roots.  I represent

18    Mr. Dominic Pezzola, along with my co-counsel, Mr. Steven

19    Metcalf.  My colleagues have mostly asked most of the questions

20    that I wanted to ask, so I will just briefly touch on some of

21    these.

22         Ms. Hernandez, representing Mr. Rehl, asked you:  Isn't

23    it true that millions of people use Telegram?

24         It's actual 500 million users worldwide, correct?

25    A.  I don't know the exact number.
```

1    Q.  That would be more than the total number of people in the

2    United States.

3    A.  I'm not sure.

4    Q.  And hundreds of millions more use other encrypted apps,

5    such as Signal, correct?

6    A.  Signal is a widely used application, yes.

7    Q.  And Signal would be described as a competitor of Telegram?

8    A.  Potentially.  They perform, generally, the same chat

9    functions.

10   Q.  WhatsApp is another encrypted app used by millions?

11   A.  Yes.

12   Q.  So, I believe Mr. Smith asked you a question:  There's

13   nothing criminal about using an encrypted communication,

14   correct?

15   A.  No.

16   Q.  I'll go even further.  If so many hundreds of millions of

17   people use those, there's nothing shady about it, is there?

18   A.  I don't presume to know why people use them.  I just know

19   that they are widely used, yes.

20   Q.  And you use them yourself?

21   A.  I do.

22   Q.  So if witnesses were to come into this room and sit on the

23   witness stand and say, These defendants have used encrypted

24   communications, that wouldn't mean anything remotely unusual

25   about them, would it?

```
 1              MR. KENERSON:  Objection.  Argumentative.
 2              THE COURT:  Overruled.
 3    BY MR. ROOTS:
 4    Q.  Along the same lines, how private do you think these apps
 5    are?  If someone is in a club or a group that is controversial,
 6    or a club that has enemies, if he's aware that in that chat
 7    group there are dozens of strangers that he's never met, he
 8    wouldn't necessarily think he's protected with a lot of secrecy
 9    and privacy, would he?
10    A.  I don't presume to know how people use their devices or
11    what they would think about the privacy.
12    Q.  Now, you testified that you are a FBI digital forensics
13    expert?
14    A.  My title is senior digital forensic examiner.
15    Q.  How many of those are in the FBI?
16    A.  I think there's roughly 400.
17    Q.  400 senior digital forensic examiners?
18    A.  I believe about 100 of us are senior level.
19    Q.  And I'm trying to understand.  Do you all work in about the
20    same place?
21    A.  Well, we have 56 field division offices, so we are
22    dispersed throughout those offices.
23    Q.  So, I heard you mention maybe Tampa and maybe Knoxville or
24    somewhere, Nashville.  Do you work in those buildings -- the
25    FBI buildings in those communities?
```

1    A.  I did.  I worked in the Tampa division until last January,

2    and the last year I've worked in the Knoxville division.

3    Q.  And how many other digital forensics FBI examiners are

4    there in your office?

5    A.  I have three in my current Knoxville office, and we had six

6    in Tampa.

7    Q.  Do you know anything about the D.C. FBI office division?

8    A.  I work with their examiners.  I've never visited their

9    location.

10   Q.  Do you know how many there are?

11   A.  I do not.

12   Q.  So, I believe you just said there are 400 FBI digital

13   forensic, would you say, not senior, but agents?

14   A.  No.  It's a combination of agents and professional staff.

15   Q.  And are they all doing what you were doing, or are they

16   doing different things?

17   A.  We all follow the same standard operating procedure.

18   Q.  Did you -- did you go through the FBI training, Quantico,

19   all the basic training, and that kind of thing?

20   A.  We have our own digital forensic training, and so that is

21   the training that I attended.

22   Q.  You mentioned a programming team.  Does the FBI program

23   software?

24   A.  Sure.  Yes.

25   Q.  The FBI creates actual software?

```
 1    A.  Yes.
 2    Q.  You mentioned developing a tool.  The FBI developed actual
 3    tools for examining things?
 4    A.  Yes.
 5    Q.  How many people in the FBI are designing software?
 6    A.  I couldn't say.  I'm not sure what the number is.
 7    Q.  Now, would you call what you do surveillance?
 8              MR. KENERSON:  Objection.
 9              THE COURT:  Overruled.
10    A.  I would not.
11    BY MR. ROOTS:
12    Q.  What's the distinction between what you do and
13    surveillance?  What's the distinction?
14    A.  I look at devices in the past tense, essentially.
15    Q.  Okay.
16    A.  They must be seized upon consent or search warrant and have
17    some type of legal authority, and the moment that that -- they
18    come into our possession, the device activity ceases.  So, I am
19    not looking at any kind of live, interactive data.  All the
20    data I look at is historical.
21    Q.  Okay.  So you do your digital forensics of devices in the
22    past tense, after -- after occurrences have already happened?
23    A.  I do.
24    Q.  And the FBI obviously has surveillance people that examine
25    communications in realtime, correct?
```

1    A.  I cannot speak to that.

2    Q.  Couple of my colleagues asked you some questions about the

3    fact that you can be put into a chat group uninvited, correct?

4    A.  Someone can add you to a chat group without your

5    permission.

6    Q.  Without your permission.  Without your even -- against your

7    will?

8    A.  No.  You would accept the invitation to join the chat

9    group.

10   Q.  Okay.  At least two of my colleagues asked about chatbots.

11   I believe you said those are artificial intelligence entities

12   on these chats that post comments?

13   A.  To the best of my knowledge.

14   Q.  So, if you were in a club that has enemies, you were

15   involuntarily put in a chat with strangers, how comfortable

16   would you be thinking that you're going to plot to overthrow

17   the government in such a group?

18          MR. KENERSON:  Objection.  Speculation.  Foundation.

19   403.

20          THE COURT:  Sustained.

21   BY MR. ROOTS:

22   Q.  Let's ask a different question, maybe from a different

23   angle.  Suppose an organization that wanted to harm the Proud

24   Boys, such as the federal government, wanted to harm the Proud

25   Boys, could they create a chat group, put chatbots in the chat

1    group, put, perhaps, plants, individuals that are put there

2    with the sole purpose of harming others in the chat group, and

3    then try to concoct a case based on such things?

4            MR. KENERSON:  Objection.  Speculation.  Relevance.

5    Foundation.  403.  Argumentative.

6            THE COURT:  Sustained.

7            MR. ROOTS:  Thank you so much.  No further questions.

8            THE COURT:  All right.  Any redirect from the

9    government?

10           MR. KENERSON:  Thank you, Your Honor.

11                    REDIRECT EXAMINATION

12   BY MR. KENERSON:

13   Q.  Examiner Cain, Mr. Jauregui asked you some questions about

14   an edit function, correct?

15   A.  Yes.

16   Q.  Have you ever seen any evidence that -- of editing going on

17   back in 2021?

18   A.  I did not.  The database did not contain any indicators

19   that editing was possible back then.

20   Q.  You were asked a number of questions, as well, about

21   whether these -- the phones at issue that you've testified

22   about were extracted using the latest version of Cellebrite.

23   Do you remember those questions?

24   A.  I do.

25   Q.  Could you tell us about how many releases of Cellebrite

1    have happened between January 2021 and today?

2    A.  Do you refer to Cellebrite extracting or Cellebrite

3    processing?  Because they have different tools.

4    Q.  Processing.

5    A.  At least 20 different versions have come out in the last

6    two years.

7    Q.  And is it -- would it be standard operating procedure for

8    the FBI to reimage -- or reprocess, excuse me, a phone every

9    single time there's a new update to Cellebrite?

10   A.  No, it wouldn't.

11   Q.  Mr. Jauregui also asked you a question about what might

12   happen if someone improperly extracted a phone and then you

13   were looking at it.  Do you remember those questions?

14   A.  I do.

15   Q.  Did you see any evidence of improper extraction in any of

16   the phones in this case?

17   A.  I did not.

18   Q.  You were also asked a question about end-to-end encryption,

19   and I think you said that Telegram was not end-to-end

20   encrypted.  Did I understand that correct?

21   A.  It is not end-to-end encrypted by default.  Groups can

22   never be end to end --

23            MR. PATTIS:  Objection, Your Honor.  This is a

24   narrative, no question.

25            THE COURT:  Overruled.

1   A.  Groups can never be end-to-end encrypted; however, direct

2   messages between two users, private conversations, they have

3   the ability to turn into secret chats, and those chats can be

4   end-to-end encrypted.

5   Q.  And can you just explain what the difference is between

6   end-to-end encryption and the type of default encryption that

7   Telegram uses?

8   A.  End-to-end encryption --

9            MS. HERNANDEZ:  Objection, Your Honor.

10           (Bench discussion:)

11           MS. HERNANDEZ:  Your Honor, my concern is we're going

12   into an area that wasn't explored in direct, and I don't want

13   to end up with situation where -- asking to recross the

14   end-to-end encryption we're talking about.  I know there were

15   questions about encryption, but end to end is a different

16   animal.

17           THE COURT:  I recall questions about end to end, but

18   I could be wrong.

19           Mr. Kenerson, what is your --

20           MR. KENERSON:  There were questions about end to end

21   on cross, and I would think she's entitled to explore that

22   difference because Mr. Jauregui, I think, left the impression

23   that there might be some difference between them that's

24   meaningful, and I would like to explain that.

25           MR. JAUREGUI:  Judge, I did ask a question about end

1    to end.

2              MS. HERNANDEZ:  I hadn't, so I my missed that.

3              THE COURT:  Very well.

4              (Open court:)

5              THE COURT:  Objection is overruled.

6    BY MR. KENERSON:

7    Q.  Can you explain the difference between end-to-end

8    encryption and the type of encryption that Telegram generally

9    uses?

10   A.  Sure.  End-to-end encryption is from the first device, it

11   is encrypted immediately after it is written.  It passes

12   through the Telegram servers, also encrypted, and then is

13   delivered to the recipient, also in an encrypted state.  It is

14   encrypted the entire time and can only be decrypted by the two

15   end users on the either side of that using the encryption key.

16             The type of default encryption that Cellebrite uses

17   is a client-to-end-user encryption, which means that from

18   the -- when the message is created, it is encrypted until it is

19   received on the Telegram servers.  And it is -- when it is at

20   rest on the Telegram servers, it is in a decrypted state.

21             Their servers are distributed across hundreds of

22   countries all over the world so that a piece of your data lives

23   on each one of those 200 servers, so it's not all together.  So

24   for all intents and purposes, it might as well be encrypted

25   because it's been split up.

```
 1              And then it leaves Telegram servers in an encrypted
 2       state to its final destination, where it will be decrypted on
 3       the end user's device.
 4       Q.  Thank you, Examiner Cain.
 5              I think you were also asked whether you had taken some
 6       courses put out by Cellebrite itself.  Do you remember those
 7       questions?
 8       A.  I do.
 9       Q.  Can you remind us how many hours per year of training you
10       must complete to keep your certification?
11       A.  We do about 100 hours of advanced forensic training.
12       Q.  And that's per year?
13       A.  Per year, yes.
14       Q.  I believe Ms. Hernandez asked you some questions about
15       orphan files and what data is available and what you can tell
16       based on certain properties associated with those files.  Do
17       you remember that?
18       A.  Yes.
19       Q.  And I think that you had said to her that there is EXIF
20       data associated with images and videos and that can help you
21       learn things about those files, correct?
22       A.  That is correct.
23       Q.  What is the difference between images and video and audio
24       files in terms of what data is available to you?
25       A.  Well, as I kind of mentioned before, the EXIF data was
```

1    established for photographers, originally, to use so that they

2    could memorialize their camera settings in digital photos.

3    Audio files are not inherently a photographer's use, so EXIF

4    data is not attached to an audio file.  So, that's why it's

5    only available in video and images.

6    Q.  And I think you also, with Ms. Hernandez, looked at a

7    spreadsheet that you had created with some information about

8    who was in what groups to refresh your memory.  Do you remember

9    that?

10   A.  I do.

11   Q.  It's sitting in front of you right now.  I think it's Rehl

12   Exhibit 40?

13   A.  It is.

14          MR. ROOTS:  Your Honor, at this point, I move this

15   into evidence under Rule 612(b).

16          MS. HERNANDEZ:  I don't -- we only used it to refresh

17   her recollection, Your Honor.  I'm not sure why it comes in and

18   how it's relevant.

19          THE COURT:  Well --

20          MS. HERNANDEZ:  That document was marked up by me,

21   too.

22          THE COURT:  Let's -- let's just take this up -- let's

23   take this up between witnesses, whether that will be admitted.

24   BY MR. KENERSON:

25   Q.  Let me ask you, if private groups -- private Telegram

1    groups, I think you had some conversations with Mr. Jauregui

2    about maybe being automatically added to a public channel; is

3    that right?

4    A.  I believe so, yes.

5    Q.  What's the difference in terms of automatic addition to a

6    public channel versus automatic addition to a private group?

7              MR. JAUREGUI:  Objection.  Vague.  We don't know what

8    version of Telegram we're talking about.

9              THE COURT:  All right.  Counsel can account for that

10   in a rephrased question.

11   BY MR. KENERSON:

12   Q.  In January -- or, not January, but in and around the time

13   period we're talking about here, 2021 or so, was there a

14   difference between the ability to be added to a private group

15   versus automatically added to a channel?

16   A.  Yes.  Channels are public facing.  A channel has a creator

17   and -- or, an administrator, and when they post, it's not an

18   interactive conversation.  It's a one-way communication where

19   the person that hosts the channel just posts video -- just

20   posts comments or media, and people essentially just follow it.

21   They don't interact in a group setting with it.

22              So if you're automatically added to a channel, it's

23   just like following a channel.  Just like following someone on

24   Twitter, per se.

25   Q.  And when you had that example with Mr. Jauregui about being

1    added to a channel as a result of maybe somehow interacting

2    with it, were you talking about public channels or private

3    groups?

4    A.  With those, that would be a public channel -- and all

5    channels are public by default -- or a public group.

6    Q.  Okay.  And can you remind us the process of how someone can

7    get invited to a private group?

8    A.  You must be invited to a private group.  So, someone sends

9    you an invitation to join.  You accept that invitation to join

10   the group.

11   Q.  And within a group, who can send those invitations to join?

12   A.  The administrator can always send those invitation, and

13   then they can set a setting either allowing or disallowing the

14   other users of that group to also be able to send invitations

15   out.

16   Q.  So people who are in a private group, if I understood you

17   correctly, must be either invited by an administrator or

18   someone the administrator has designated?

19   A.  Yes.

20   Q.  Now, you had a lot of conversations with Mr. Smith and a

21   couple of the other defense counsel about whether Cellebrite

22   parses all data associated with Telegram messages.  Do you

23   remember those conversations?

24   A.  Yes.

25   Q.  Now, you've had a chance to review, I think, those zip

1    files that we discussed labeled Government 500 through

2    Government's Exhibit 550?

3    A.  I did.

4    Q.  And based on your understanding of Cellebrite as it existed

5    at the time of these extractions, do you have any concern about

6    the accuracy of those reports, in terms of accurately reporting

7    the messages and the timestamps and the senders and things like

8    that?

9         MR. PATTIS:  I think that's compound, the items

10   versus reports.  So, objection.

11        THE COURT:  I'll sustained as to compound.

12   BY MR. KENERSON:

13   Q.  So for the exhibits that you reviewed labeled 500 through

14   550, based on your knowledge of Cellebrite as it existed at the

15   time of the extractions, do you have any concern about the

16   accuracy of that data?

17   A.  No.  The data was accurate.

18   Q.  And any concern that Cellebrite would not capture messages,

19   for example?

20   A.  No.

21   Q.  Any concern that Cellebrite would not capture the sender?

22   A.  No.

23   Q.  Any concern that Cellebrite would not capture timestamp?

24   A.  No.

25   Q.  Let me ask you, for more clarification, question on the

1    issue of who can join private groups.

2         In a super group, does the administrator have the

3    ability to create a link?

4    A.   They do.

5    Q.   And what would be the functionality of that link?

6    A.   When the administrator creates a link, then, I believe,

7    anyone in that group can send the link out to add people.  So,

8    once that link is created, that functionality becomes

9    available.

10   Q.   Okay.  So, in a super group, if the administrator creates a

11   link, other group members can invite people by that link?

12   A.   They can.

13   Q.   Okay.  Thank you.

14         MR. KENERSON:  I do not have any other questions.

15   Thank you, Your Honor.

16         THE COURT:  All right.  Can I have just counsel pick

17   up the telephone for a moment.

18         (Bench discussion:)

19         THE COURT:  All right.  Just before we have the

20   witness leave the stand, Mr. Kenerson, let me just ask

21   Ms. Hernandez, do you -- the document that has been used to

22   refresh her recollection, I guess I want to know whether -- I

23   think technically, under the rule, I had always been of the

24   view that the -- generally, the writing used to refresh

25   recollection did not come in.

1          However, as I think has come up in other context in

2     this case, the adverse party -- if an adverse party uses it,

3     the adverse party, under 612, can -- can introduce into

4     evidence a portion that relates to the witness's testimony.

5     I'm not sure if the sponsoring -- the sponsoring party, the

6     non-adverse party can do that.

7          On the other hand, if it's -- if you all have seen

8     this, you all have had her use it to refresh her recollection,

9     you all may not object, if you don't want to.

10          So let me just ask, Ms. Hernandez, do you object to

11     the document coming into evidence?

12          MS. HERNANDEZ:  Your Honor, this is a document

13     generated by the government, and I used it similarly to the way

14     the government used the metadata documents.  I mean, it just

15     lists the different groups, it lists everybody else.  I don't

16     know how the other defendants feel about introducing it, one;

17     and, two, I only asked about Mr. Rehl's participation.

18          And that particular document, I believe, has my notes

19     on it, or at least my highlights on it, because I think I had

20     highlighted Mr. Rehl.  I don't know what other information is

21     on there.  It is the government's -- the government generated

22     the document, so to the extent Your Honor is talking about

23     adverse party, I don't know whether that even fits this

24     definition.

25          THE COURT:  The witness is the government's witness,

1   so, I think technically, under the rules, I don't know that

2   they have the right to admit the document.  However, if all the

3   defendants think that what's on there is accurate and no one

4   objects, I will admit it.

5          But, I want to know whether you maintain your

6   objection or whether the government might have to either

7   address this as a legal matter or ask certain questions that

8   could, for example, have the document admitted in some other --

9   for some other reason.  For example, if she were to just

10  testify that everything in there is accurate and she helped put

11  it together as a demonstrative, or something like that.

12         I haven't seen the document, so I don't know.  But,

13  while the witness is on the stand, I think we could clean this

14  up.  The question is just whether you do object to the

15  government's request to admit it.  Whether any defendant does.

16         MS. HERNANDEZ:  Your Honor, maybe, could we -- I

17  think we would stipulate that if everybody is okay with it, it

18  could come in, but let the other defendants see it later on, so

19  they -- whether they have any objections or not.

20         THE COURT:  All right.  I mean, how about this:

21  Mr. -- so, we'll -- just, again, if the government wants to ask

22  any questions of the witness while she's here that might lay

23  the foundation for it to come in some other way.  I want to

24  give them the opportunity to do that, rather than have to have

25  the witness come back.

1          MS. HERNANDEZ:  What I'm suggesting is if nobody

2     objects, I don't think anybody would say you have to bring the

3     witness back just to admit it.  I mean, I think we would all

4     agree, if nobody objects, it would just come in.

5          MR. JAUREGUI:  For Tarrio, we object, Judge.  I don't

6     even know what that document is, to be honest with you.  I

7     haven't had a look at it.

8          THE COURT:  I thought you used it to fresh her

9     recollection, if I recall.

10          MR. JAUREGUI:  I did.  But I don't -- I didn't look

11     at it.

12          MS. HERNANDEZ:  It doesn't have the information you

13     needed, so you couldn't use it.

14          THE COURT:  Mr. Kenerson, how do you want to proceed?

15          MR. KENERSON:  Your Honor, I think we got to have an

16     adequate basis to admit it, but I would take the Court's

17     invitation to ask a couple of foundational questions so we can

18     have a legal argument later, depending on what her answers are.

19          THE COURT:  Let's do that.  All right.

20          (Open court:)

21     BY MR. KENERSON:

22     Q.  Examiner Cain, just a couple more questions.

23          That document that you have in front of you, I think

24     that Ms. Hernandez showed you --

25     A.  Yes.

```
 1    Q.  -- can you tell us what this is?
 2    A.  This is a chart I created of the Government Exhibits 500
 3    through 544, it appears.  It's a variety of Telegram group
 4    chats.  In it I've put the name of the exhibit, the kind of
 5    colloquial name that we were calling it internally, because
 6    there's a couple with very similar names.  The actual Telegram
 7    chat name as given -- as assigned to the group.  And then the
 8    Android and IOS group number and super group number, if
 9    applicable, and then a list of the five subjects and whether or
10    not they were members or administrators in each of these
11    groups.
12    Q.  Now, with the exception, I think, of, you said, some of it
13    was, what?  We have colloquially referred to the chats as --
14    what's the source of the data for that spreadsheet?
15    A.  The Telegram databases.
16    Q.  The -- the extractions?
17    A.  From these extractions, yes.
18    Q.  Thank you.
19          MR. KENERSON:  I don't think I have anything further.
20          THE COURT:  All right.
21          Sorry one more.
22    BY MR. KENERSON:
23    Q.  For the data that came from those databases, does the data
24    in your chart fairly and accurately describe what was in the
25    databases?
```

```
1     A.  It does.

2               MR. KENERSON:  Thank you.

3               THE COURT:  All right.  Very well.

4               (Bench discussion:)

5               MR. PATTIS:  Can it be circulated briefly between

6     counsel?  I didn't look at it when it was shown to her.  I want

7     to look at it.

8               THE COURT:  I'm not admitting it now.

9               MR. PATTIS:  Okay.  You did say that.  I apologize.

10              THE COURT:  Very well.

11              (Open court:)

12              THE COURT:  Ma'am, you can step down.  Thank you very

13    much for your testimony.

14              Government may call its next witness.

15              MR. MULROE:  Your Honor, the United States calls

16    Peter Dubrowski.

17              THE COURTROOM DEPUTY:  Will you please raise your

18    right hand.

19                          PETER DUBROWSKI,

20    was called as a witness and, having been first duly sworn, was

21    examined and testified as follows:

22              THE COURT:  Counsel, to begin, you may want to

23    retrieve -- there's an item at the -- with the witness right

24    now.

25              MR. McCULLOUGH:  Permission to approach, Your Honor?
```

1          Let's talk a little bit about what your expectation

2     is after that.  Who you are calling next?

3          MR. DREHER:  Sure.  Yeah.  I think that we are going

4     to call next -- so we have three witnesses.  It's only the

5     third of whom that really needs to testify today.  She has

6     chemotherapy tomorrow.  So we have three witnesses that we

7     think we can do this afternoon.

8          THE COURT:  Okay.  For this afternoon?

9          MR. DREHER:  Yeah.

10         THE COURT:  Okay.

11         MR. DREHER:  Captain Shawn Patton with the Capitol

12    Police and then an FBI CART examiner and an FBI special agent.

13         THE COURT:  Okay.  All right.  Anything else you all

14    want to raise now?

15         MR. SHIPLEY:  Nothing, Your Honor.

16         THE COURT:  Okay.  I'll see y'all around 2:20.  I'll

17    do my best to get it finished by then.

18

19         MR. DREHER:  Your Honor, before we begin with our

20    next witness, the parties did reach four stipulations --

21         THE COURT:  Okay.

22         MR. DREHER:  -- which I have marked as Government's

23    Exhibits 400 through 403.  So 400, 401, 402 and 403.  And my

24    thought at this time since it's a bench trial is that I

25    wouldn't read these into the record, but I would admit them --

1          THE COURT:  Okay.

2          MR. DREHER:  -- provide them to the Court so that

3     the Court can file them.

4          THE COURT:  Good.

5          MR. DREHER:  And then that the parties -- I mean we

6     have our own version.  So even before they hit the docket, if

7     we need to read some portion of it or refer to it, I think we

8     have our own copies.

9          THE COURT:  That's fine.

10         MR. DREHER:  Permission to approach?

11         THE COURT:  Yes.  All right.  Thank you very much.

12         MR. DREHER:  And then the other sort of just

13    housekeeping matter is we provided the wrong version -- we've

14    provided the correct version of Exhibit 175 to defense

15    counsel.  We provided the wrong version in the Court's two

16    exhibit binders.  So at the break I just printed two copies of

17    that particular exhibit.

18         THE COURT:  Okay.

19         MR. DREHER:  All right.  And I think with that, the

20    government is prepared to call FBI Senior Digital Forensic

21    Examiner Jennifer Kate Cain.

22         THE COURTROOM DEPUTY:  Raise your right hand.

23    Thereupon,

24                    JENNIFER CAIN,

25    Having been called as a witness on behalf of the

1    government and having been first duly sworn by the Deputy

2    Clerk, was examined and testified as follows:

3                     DIRECT EXAMINATION

4         BY MR. DREHER:

5    Q    Can you please introduce yourself to the Court?

6    A    My name is Jennifer Katherine Cain.  I'm a senior

7    digital forensic examiner for the Federal Bureau of

8    Investigation.

9    Q    And what are your duties in that role?

10   A    I work with CART, the Computer Analysis Response

11   Team and we are responsible for handling all aspects of

12   digital evidence to include computers, laptops, phones and any

13   kind of external media that would attach to those devices.

14   Q    And have you undergone any training or

15   certifications to become a senior digital forensic examiner?

16   A    I have.

17   Q    Can you just provide a very brief overview of the

18   type of classroom training or, sorry, how many hours of

19   classroom training you have to undergo?

20   A    Sure.  To become certified originally, we do around

21   400 classroom hours of training and then each additional year,

22   we are required to undergo a hundred hours of advanced

23   forensics training.

24   Q    Thank you.  During the course of your time as a

25   senior digital forensic examiner, how many cell phones roughly

1    do you think you've processed?

2        A    Approximately a thousand.

3        Q    And how many computers do you think you processed?

4        A    Between three and four hundred.

5        Q    Okay.  All right.  What does F.B.I. CART generally

6    do?

7        A    We are responsible for all aspects of digital

8    evidence.  So we take in any kind of digital device.  It

9    follows the standard chain of custody evidentiary rules.  We

10   take in those devices.  We physically inventory them.  We

11   extract them.  We turn those extractions into meaningful

12   readable usable formats for our case agents and our

13   investigative team to review and then we write reports on the

14   analysis and the findings.

15       Q    Okay.  And when you obtain a digital device in the

16   field, what processes does the FBI use to ensure the integrity

17   of the data inside that device?  So, for example, a cell phone

18   from when it's taken in the field to when someone like you

19   reviews it.

20       A    When we extract the device, we get a file -- a

21   containerized file usually in the form of a zip file and we

22   get -- we calculate a hash value for that file, which is

23   essentially a digital fingerprint, meaning that at any point

24   in time, no matter how you calculate that hash value, it will

25   always come to the same value.  And so we use that hash value

1    to verify that the contents of that particular extraction have
2    not changed from the start of the exam to the conclusion of
3    the exam.
4         Q    All right.  Are you familiar with the telephone
5    application called Telegram?
6         A    I am.
7         Q    What is that?
8         A    It is an encrypted chat application.
9         Q    All right.  What does it mean for it to be
10   encrypted?
11        A    Essentially that means that the data is scrambled
12   while it's in transit.  So only the parties that are
13   communicating that message can see the contents.
14        Q    Have you reviewed extractions of cell phones that
15   had the application, Telegram, on it?
16        A    I have.
17        Q    Have you done any testing yourself of the
18   application even outside of your review of those kinds of
19   devices?
20        A    I do.
21        Q    Can you just talk a little bit about how you do that
22   testing?
23        A    Sure.  I have a variety of test phones, both Android
24   and IPhones.  Whenever I get a new application such as
25   Telegram, I create user accounts on both those devices and

1  then use the application to the full extent possible meaning

2  sending messages, sending attachments like media and

3  documents.  Then I take those phones through our full

4  examination process where I actually extract them, run them

5  through all the tools that we could use that are available to

6  us and then make sure that the data that our tools is

7  producing matches what I actually put into the application

8  into the device itself.

9       Q    All right.  Based on your experience in working with

10  the application, are users of the Telegram application able to

11  send both direct messages to a single other user, but then and

12  also be part of a group that can send messages to one another?

13       A    They are.  Yes.

14       Q    Do those appear differently in the phone?  Can you

15  tell the difference between the two?

16       A    The only way you would really tell the difference is

17  when you are talking to one other individual, the name of that

18  chat is the other individual that you are communicating with.

19  When you're communicating in a group, the name of that chat is

20  the group name.

21       Q    All right.  When somebody signs up with a Telegram

22  account, how does Telegram identify that user in the

23  application?

24       A    Telegram assigns a unique identifier.  It's

25  typically nine or ten digits long.  The user themselves would

1   assign themself a username.  But the Telegram assigned

2   identifier is the unique identifier.

3        Q    Okay.  So there's a nine or ten-digit I.D. number

4   and then there's also a username that the user can create?

5        A    That is correct.

6        Q    Is there also a display name?

7        A    There is a display name.

8        Q    All right.  And what's the difference between a

9   display name in Telegram and the first two things you

10  mentioned?

11       A    So when someone communicates with another party, if

12  that party has them stored as a contact in their phone, then

13  the display name would then be the contact name.  So, for

14  instance, my name is Jennifer Cain, but I go by my middle

15  name, Kate.  I would originally appear in Telegram as Jennifer

16  Cain.  But in your device, if you have me saved, I could

17  appear as Kate Cain.

18       Q    Okay.  Can users change their unique identifier?

19       A    No, they cannot.

20       Q    Can they change their display name?

21       A    Yes.  They can.

22       Q    Okay.  What about group chats?  Are there

23  identifying features for group chats as well?

24       A    When a chat, a group chat is created, Telegram

25  assigns it a unique numerical identifier and it is

1   approximately ten or eleven digits long.

2       Q    So if you see a group chat on multiple different

3   devices, are you able to verify that it's the same chat across

4   those devices?

5       A    We can.

6       Q    All right.  And even apart from the unique

7   identification number for that group chat, how else might you

8   look at different chats and verify that it's the same chat on

9   those devices?

10      A    The content of the messages inside that chat.  For

11  instance, the number of messages the users that are a member

12  of that group and then the messages themselves based on if it

13  is identical from the person that wrote the message and the

14  time stamp and the content is identical across multiple

15  devices, that's an indication that it's the same group in all

16  of those devices.

17      Q    All right.  Can Telegram chats or like can a

18  Telegram message be deleted?

19      A    It can.

20      Q    All right.  And how does that process work?  Like

21  what happens when you delete a message -- if you're a user and

22  you delete one of the messages that you've sent, what happens?

23      A     When the user goes to delete a message, they receive

24  a pop-up that says do you want to delete for just you or would

25  you like to delete this for every member in the group.  If the

1    user selects just them, it will be removed from their device

2    only.  If the user selects remove from all -- remove for all

3    users, then it will delete across the board for all of the

4    users.

5        Q    And if a user -- let's say the two of us are in a

6    group chat.  And you delete a message that you sent, how would

7    that appear on my phone then when I look at that group chat?

8        A    It will have been removed from the chat.

9        Q    Are there ever chats that are just empty?

10       A    There are.  Yes.

11       Q    Okay.  And can you just explain what that indicates?

12       A    Sure.  So the Telegram data is stored in the

13   database and when a message is sent, it essentially removes

14   that entry from the database.  However, if a message is sent

15   with an attachment, it actually is stored in two different

16   locations in that database.  And so it would remove it from

17   the attachments location, but might not necessarily clean it

18   up in the main table.  So messages that have attachments sent

19   to them could appear as blank messages.  It would have the

20   user that sent the message and the time stamp.  But then --

21   and it could indicate whether it was a video or a document or

22   an audio file, but the file would actually be gone.

23       Q    Okay.  And I just want to clarify for the record.  I

24   think you said if a user sends a message, it could remove it

25   from the underlying tables.  Did you mean if a user deletes?

1     A     Deletes.  Sorry.  Yes.

2     Q     Thank you.  And so when you as part of the

3  extraction process end up reviewing messages from a digital

4  device, how would it appear to you when you're reviewing if

5  someone had deleted a message in a group chat?

6     A     The user and the time stamp would be there.  But the

7  content -- there would just be no content to that message.

8     Q     All right.  What about editing messages?  Are you

9  aware of the ability of whether there was an ability in

10  Telegram to edit a message as of let's say December and

11  January of 2021?

12     A     At that time there was not the ability to edit

13  messages.

14     Q     And I meant of course December 2020 --

15     A     2020.

16     Q     -- to January 2021.  Yes.  Okay.  Let me ask you

17  whether you extracted data from the digital devices of four

18  individuals as part of the investigation in this and other

19  cases.  Enrique Tarrio, Ethan Nordean, Zachary Rehl and

20  Nicholas Ochs.

21     A     Yes.

22     Q     Okay.  Did each of those extractions contain

23  Telegram data from the application, Telegram?

24     A     It did.

25     Q     All right.  Did you create reports relevant to this

1   case -- for this case of the Telegram messages from those

2   extractions?

3        A    I did.

4        Q    And is the Telegram user -- and this will be a nine

5   digital number so I apologize for that.  Is the Telegram user

6   1387834575 in each of those extractions of Telegram data?

7        A    It is.

8        Q    For that Telegram user I.D., what username did the

9   user assign to that Telegram user?

10       A    Loach_Gan_Eagla.

11       Q    And then do you recall what the or do you know what

12  the display name that that user used across those four

13  devices?

14       A    Yes.  Sergeant Peppers and also Loach Gan Eagla

15  depending on the extraction.

16       Q    Okay.  So the display name might be one of those two

17  things, something like or sorry, either Loach Gan Eagla --

18       A    Eagla.  Sorry.  Yes.

19       Q    Or username something like Sergeant Pepper?

20       A    Yes.

21       Q    All right.  And did those Telegram reports that you

22  reviewed, did they contain chat groups with multiple people?

23       A    They did.

24       Q    Did you verify that the Telegram user that we've

25  been talking about was in each of those chat groups as well?

1       A    I did.

2       Q    All right.  I'm going to show you now Government

3   Exhibit 175.  All right.  Do you recognize -- just looking at

4   the first page of this, do you recognize what this is?

5       A    This is the device belonging to Mr. Nordean and it

6   has Telegram chats from that device.

7       Q    Okay.  Is this the device or a Cellebrite report?

8       A    Sorry.  This is the report that I created from the

9   device.

10           MR. DREHER:  All right.  The government moves to

11  admit Government's Exhibit 175.

12           MR. SHIPLEY:  No objection.

13           THE COURT:  Received.

14           BY MR. DREHER:

15      Q    All right.  Let's take a look at Government's

16  Exhibit 180.  Looking again at the first page, do you

17  recognize what this is?

18      A    I do.

19      Q    All right.  What is it?

20      A    This is the report that I created from Mr. Tarrio's

21  device.

22           MR. DREHER:  At this time, Your Honor, the

23  government moves Exhibit 180 into evidence.

24           MR. SHIPLEY:  No objection.

25           THE COURT:  Received.

1          BY MR. DREHER:

2     Q    Okay.  I'm pulling up Government's Exhibit 185.

3  Looking at the first page, do you know what this is?

4     A    This is the report that I created of Mr. Ochs'

5  phone.

6          MR. DREHER:  The government moves Exhibit 185 into

7  evidence.

8          MR. SHIPLEY:  No objection.

9          THE COURT:  Received.

10         BY MR. DREHER:

11    Q    And then lastly in terms of these reports, let me

12  show you Government's Exhibit 190.  Looking at this, do you

13  know what this is?

14    A    This is the report I created from Mr. Rehl's device.

15         MR. DREHER:  Okay.  The government moves

16  Government's Exhibit 190 into evidence.

17         THE COURT:  Any objection to 190?

18         MR. SHIPLEY:  No objection.

19         THE COURT:  Received.

20         BY MR. DREHER:

21    Q    All right.  And let's go back now to Government's

22  Exhibit 180 and I'm going to look at page 40 here.  All right.

23  So on page 40 of Government's Exhibit 180, if I were to zoom

24  in on the first message visible, is there -- in this -- first

25  of all, is this a message sent in the Telegram application?

1    A    It is.

2    Q    All right.  And based on what is seen in this

3 report, does that indicate that there's an attachment to that

4 message?

5    A    Yes, it does.

6    Q    And would that attachment have been visible to the

7 users in that chat group?

8    A    Yes, it would.

9    Q    All right.  And if I open Exhibit 181 -- well, first

10 let me just ask you if you know.  Is Exhibit 181 the video

11 file that was -- that is attached to that message?

12    A    Yes, it is.

13         MR. DREHER:  The government moves for the admission

14 of Exhibit 181, Your Honor.

15         MR. SHIPLEY:  No objection.

16         THE COURT:  Received.

17         BY MR. DREHER:

18    Q    And then if we go to page 50 -- I apologize.  So

19 page 51.  Again if I pull up the first message on that screen,

20 is there also an attachment to that message?

21    A    Yes, there is.

22    Q    All right.  And is Government's Exhibit 182 a copy

23 of the attachment that was attached to that message?

24    A    Yes, it is.

25         MR. DREHER:  All right.  The government moves

1    Exhibit 182 into evidence.

2              MR. SHIPLEY:  No objection.

3              BY MR. DREHER:

4         Q    If we go back to --

5              THE COURT:  182 you said?

6              MR. DREHER:  Yes.  182.

7              THE COURT:  Received without objection.

8              BY MR. DREHER:

9         Q    If I go back to page 7 on Exhibit 180, the third

10   message on that page -- I apologize -- the first message on

11   page 8 of Exhibit 180, is there an attachment to that message?

12        A    Yes, there is.

13        Q    And is Exhibit 183 the native file attachment that

14   was attached to that message?

15        A    Yes, it is.

16             MR. DREHER:  And the government moves Exhibit 183.

17             MR. SHIPLEY:  No objection, Your Honor.

18             THE COURT:  I'm not getting these numbers straight.

19   Is that 180-3?

20             MR. DREHER:  No.  It's 183.

21             THE COURT:  Government's 183 then is received

22   without objection.

23             MR. DREHER:  The dash is the pagination of Exhibit

24   180.  So it is actually confusing even to myself as I'm

25   flipping through it.

```
 1              BY MR. DREHER:
 2         Q    Okay.  So now if I'm looking at page 35 of Exhibit
 3    180, again the first message, does that message have an
 4    attachment to it?
 5         A    Yes.
 6         Q    All right.  And is Exhibit 184 the attachment, the
 7    native file attachment that was sent by that user --
 8         A    Yes.
 9         Q    -- in that message?
10         A    Yes, it is.
11              MR. DREHER:  All right.  The government moves to
12    admit Exhibit 184.
13              MR. SHIPLEY:  No objection.
14              THE COURT:  Received.
15              BY MR. DREHER:
16         Q    All right.  Just a few more.  We're going to look
17    now at Exhibit 185.  And I'm going to go to page 4.  If we
18    take a look at the second message on -- sent on page 4 of
19    Exhibit 185, is there an attachment to that message?
20         A    Yes, there is.
21         Q    And is Exhibit 186 a copy of that video file that
22    was attached to that message?
23         A    Yes, it is.
24              MR. DREHER:  All right.  The government moves
25    Exhibit 186 into evidence, Your Honor.
```

1          MR. SHIPLEY:  No objection.

2          THE COURT:  Received.

3          BY MR. DREHER:

4     Q    Do you recognize the individual in that video file?

5  Well, let me ask first.  Have you reviewed that video file

6  message prior to your testimony?

7     A    I have.  Yes.

8     Q    Do you recognize the individual in that video file?

9     A    I do.

10    Q    Who is it?

11    A    It is Mr. Worrell.

12    Q    What if anything can you as a CART examiner discern

13 about what that means about who the user, Loach Gan Eagla,

14 that sent this message is based on the fact that it has this

15 video attached to it?

16    A    When you take a video in Telegram inside the

17 Telegram application and hold your phone up -- you hold your

18 camera up to your face, Telegram circles the video.  It's kind

19 of a trademark of Telegram that the video will be contained in

20 a circle.  So it is most likely that this video is taken

21 inside the Telegram app and then posted by this user.

22    Q    And so if, for example, if Mr. Worrell is this user

23 and took a video of himself, that's how it would appear in

24 Telegram.  Is that right?

25    A    That is correct.

1    Q    And if Mr. Worrell were not this user, is there any

2    way that his -- that a video of him could be sent by that user

3    in that fashion?

4    A    If he were with that person and took the video while

5    they were logged in.  I mean you'd have to be present and have

6    access to this account.

7    Q    Okay.  So somebody else would have to allow him to

8    use their Telegram account.  Is that right?

9    A    Correct.

10    Q    Okay.  Are there other videos featuring Mr. Worrell

11    that were sent by this same user in Exhibits 185 and 190?

12    A    There are.  Yes.

13    Q    Do you know just roughly how many?  And it's okay,

14    if not.

15    A    I believe maybe eight to ten.

16    Q    Okay.  And so am I understanding correctly that in

17    order for Mr. Worrell not to be the user, this particular

18    user, he would have had to have been with that user on each of

19    those occasions --

20    A    That is correct.

21    Q    -- to have them record him?

22    A    Yes.  That is correct.

23    Q    All right.  Let's now look at Exhibit 175, we'll go

24    back to that one, just to get a sense of how Telegram chats

25    generally work.  So if I start with just this page here, page

1    2 and I zoom in, what is in the sort of the middle of the

2    page?  What does that indicate?

3         A    This indicates that this is the start of this

4    particular chat.  The chat's name is Boots On Ground.

5         Q    And then what are the list of names and numbers

6    below that?

7         A    These are the participants in that chat.  This is

8    anyone who has contributed a message inside this chat.

9         Q    Okay.  And so again for every chat that's in

10   Exhibits 175, 180, 185 and 190, did you verify that the same

11   username, Loach Gan Eagla, with that same unique user I.D. was

12   present and listed as a member in each of those chats?

13        A    Yes.

14        Q    Okay.  All right.  And if we take a look now at page

15   4?  It's only one message on page 4.  So I'll zoom in on that.

16   Can you just explain what that message shows or indicates?

17        A    When a user joins a Telegram chat, a system message

18   gets posted to that chat saying what user has joined the group

19   and then the time stamp that they joined it.

20        Q    Okay.  So would this indicate that they weren't in

21   the group prior to that date and time.  But then thereafter

22   they're in the group?

23        A    That is correct.

24        Q    And if they were in the group from the beginning, if

25   they were part of the group that was -- when it was first

1    created, would there be a message like this showing that they

2    had joined the group?

3         A    There would not.  No.

4         Q    Okay.  What about when somebody leaves the chat, is

5    there also a notification in there when they leave the chat?

6         A    Yes.  There is a system message that says the

7    username has left the chat.

8         Q    All right.  And in your review of Exhibits 175, 180,

9    185 and 190, did you confirm that all the messages in those

10   exhibits were sent prior to any notification that this same

11   user had left the chat?

12        A    Correct.

13        Q    And by this same user, I again mean the user with

14   the username, Loach Gan Eagla?

15        A    Yes.

16        Q    And then lastly, just to give an example for the

17   Court, if we were to go down to page 26 -- I must have the

18   wrong page number here.  All right.  So if I go to page 15 and

19   I look at the second to last message, is that an example of

20   how a message would appear if it was deleted and had no

21   attachment, for example?

22        A    That is correct.  Yes.

23        Q    Okay.  Thank you.  My able colleague pointed out

24   just one thing that might have been confusing.  So I want to

25   clarify that.

1              If I go back to Exhibit 175, page 4 and I look again

2       at the one message on that page, so as you testified this

3       mentions a username or a user with the username SGT, Sergeant

4       Pepper.  Is that right?

5          A    Yes.  That is correct.

6          Q    And it indicates the date and time or why don't you

7       tell me what date and time is indicated in terms of when he

8       joined the group?

9          A    January 5, 2021 at 2:08:56 p.m.

10         Q    Okay.  Does that necessarily mean that this user's

11      display name was Sergeant Pepper at that time?

12         A    No, it does not.  The data can be for this

13      particular system message and any system message is actually

14      tracked by the nine or ten digit number of that user and then

15      our tools assign the display name from the corresponding

16      message -- the corresponding username table.  So I verified

17      that this is actually the same user identifier number.

18      However, the display name just depending on the time was

19      Sergeant Pepper or Loach Gan Eagla.

20         Q    Okay.  And so if the phone, for example, was seized

21      and extracted after January 5th and in between January 5th and

22      that seizure date the display name had been changed --

23         A    Yes.

24         Q    -- is that when you could have the display name

25      appear, for example, as Sergeant Pepper in this extraction

1    even though on January 5th, it would have appeared to this
2    user as something different?
3         A    Yes.
4              MR. DREHER:  Okay.  I don't have any further
5    questions, Your Honor.
6                        CROSS-EXAMINATION
7              BY MR. SHIPLEY:
8         Q    Good afternoon.
9         A    Good afternoon.
10        Q    It's Ms. Horvath.  Right?
11        A    Cain.
12        Q    Yeah.  Okay.  When there are multiple people in a
13   chat and you found in Telegram that there were multiple people
14   in these chats including Boots On The Ground.  Right?
15        A    Yes, sir.
16        Q    When there's multiple people in the chat and they're
17   all firing off messages, you can look at your own phone and
18   see that you have 20 unread messages.  Right?
19        A    I'm not sure if it displays the number, but it does
20   display the chat in bold saying that there are unread
21   messages.  Yes.
22        Q    And then when the user opens it, all of the unread
23   messages suddenly become read?
24        A    The ones that are displayed in the preview pane.
25   Yes.

1     Q    Okay.  But that doesn't mean that the user actually

2  read them.  Right?

3     A    It means that they have been seen on the device.

4     Q    That the application has been opened and that

5  particular chat has been opened and then every unread message

6  is converted to a read message?

7     A    The ones that are viewable in that pane at that

8  time.

9     Q    Okay.  But the only way to know that somebody

10  actually either sent or read a message is if they sent it and

11  you have Loach or Sergeant Pepper as the sender, then

12  presumably you know that Mr. Worrell had either had sent that

13  message using one of those two usernames.  Right?

14     A    Yes, sir.

15     Q    Or if he's replying to a particular message, then

16  the reply will reflect the message it's being replied to.

17  Right?

18     A    It would.  Yes.

19     Q    Okay.  So in that case, you would know that he read

20  that particular message?

21     A    Yes, you would.

22     Q    But beyond that, you can't really say whether an

23  open message was actually read by the person who has the

24  application on their phone?

25     A    Not necessarily.  When the user opens the Telegram

1    application, it will -- it marks all of the messages that are

2    viewable in that pane as read.  For instance, if you opened

3    Telegram in February and then you don't open Telegram again

4    until November and there are a million messages, when you open

5    the application in November, it will not mark one million

6    messages read.  It will just mark the ones viewable, the

7    latest viewable ones from November as read and so it would

8    just mark that subset.

9         Q    So, for example, if there were ten messages on the

10   screen when you opened it up, those ten would be marked as

11   read?

12        A    That is correct.

13        Q    And then if you scrolled up, every one you brought

14   onto the screen would be marked as read?

15        A    Yes, sir.

16        Q    That doesn't necessarily mean they read every one of

17   them though, does it?

18        A    It means that the device has registered that

19   message.

20        Q    Okay.

21             THE COURT:  And you had the opportunity then to read

22   it?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  But it doesn't mean you actually had

25   read it?

```
1              THE WITNESS:  Yes.  It just means that the message
2    has been seen on the device.
3              BY MR. SHIPLEY:
4        Q    Now the deletion function, that can be set
5    automatically.  Right?
6        A    At the time, you could you not set an automatic
7    deletion like a self-destruct timer.
8        Q    So Telegram did not have the application that
9    allowed you to set it to delete after seven days automatically
10   unless you saved it?
11       A    I believe in the private chats, there was some
12   functionality behind that.  However, with what I saw, the
13   timer is actually recorded in the database and none of these
14   group chats had timers set.  The fields and the columns in the
15   database that tracked those were empty.
16       Q    So in your CART extraction, you would see if
17   somebody had set an automatic deletion timer.  But your
18   analysis showed that no such timers were set.
19       A    That is correct.  Yes.
20       Q    Okay.  Now I want to -- I just want to make sure I
21   understood the questions.  What was marked as Government's
22   Exhibit 180 which I believe was the report of Mr. Tarrio's
23   phone.  Correct?
24       A    I'm sorry.  I don't remember which individual was
25   which exact number.
```

1    Q    Okay.

2    A    Okay.

3    Q    They are saying yes.

4    A    Then yes, sir.

5    Q    And then he showed you the example of a video of Mr.

6  Worrell that appears on the Telegram app in Mr. Tarrio's

7  phone.

8    A    Okay.  Yes.

9    Q    Okay.  Does that mean that he had to use

10 Mr. Tarrio's phone to make that video?

11   A    No, sir.  That means that in that specific chat

12 message, the username associated with it, which I believe was

13 Loach Gan Elanga, that is the user that sent and posted that

14 message.

15   Q    Okay.  So it just turns up in Mr. Tarrio's phone as

16 something that was stored in his phone having received it?

17   A    That is correct.

18   Q    Now when Mr. Worrell joined or was -- well, when

19 somebody joins a chat, Boots On the Ground, 1-5-21, or Loach

20 which then later becomes Sergeant Pepper, he has to be invited

21 to that.  Right?

22   A    For most chats, you do have to be provided a link.

23 I believe all of these were private chats in which case you do

24 have to be provided a link in order to join.

25   Q    So it's nothing that he could just go on and become

1    a member of on his own.  Right?

2         A     Not to my knowledge.  I believe all of these were

3    private chats.

4         Q     And so the Cellebrite report showed that he joined

5    or was invited to that chat and joined on January 5, 2021?

6         A     That is correct.

7         Q     Does the Cellebrite report show who sent the

8    invitation?

9         A     It does not.

10        Q     Does the Cellebrite report show when he accepted the

11   invitation?  Is that the 1-5 date and time?

12        A     That would be the same time stamp.  Yes, sir.

13             MR. SHIPLEY:  Thank you.  Nothing more.

14             MR. DREHER:  No redirect for this witness, Your

15   Honor.

16             THE COURT:  All right.  Thank you.  You may step

17   down.  Next witness.

18             MR. DREHER:  The government calls FBI Special Agent

19   Kate Camiliere.

20   Thereupon,

21             SPECIAL AGENT KATHRYN CAMILIERE,

22   having been called as a witness on behalf of the

23   government and having been first duly sworn by the Deputy

24   Clerk, was examined and testified as follows:

25             THE COURTROOM DEPUTY:  You may be seated.