**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 23-cr-177-ABJ** |
| **SHANE LAMOND,** | |
| **Defendant.** | |

## UNITED STATES' SENTENCING MEMORANDUM

NOW COMES the United States Attorney for the District of Columbia, Edward R. Martin, Jr., on behalf of the United States and requests that the Court sentence the Defendant as follows:

Shane Lamond was a 23-year veteran of the Metropolitan Police Department ("MPD") who used his access and power in pursuit of his own personal agenda – and to undermine and counter the work of MPD. Lamond, a Lieutenant, chose to use his position as head of MPD's Intelligence Branch to learn sensitive law enforcement information related to a crime in the District, and then leak the information he learned to the person he knew committed that crime. Because Lamond knew what he did was wrong, he lied to cover it up – not just to the Federal Agents who questioned his actions, but to this Court. This is an egregious obstruction of justice and a betrayal of the work of his colleagues at MPD. For these reasons, discussed in more detail below, this Court should adopt Probation's sentencing recommendation and sentence Lamond to 42-months imprisonment on Count 1, and 6-months imprisonment for each of Counts 2 through 4, to run concurrently to each other and consecutively to Count 1, for a total of 48-months imprisonment. This Court should also impose 60 months of supervised released, a $10,000 fine, and a $400 special assessment.

## I.    PROCEDURAL BACKGROUND

On May 18, 2023, a federal grand jury in the District of Columbia returned a four-count indictment charging Lamond with one count of obstruction of justice in violation of D.C. Code § 22-722, and three counts of making false statements in violation of 18 U.S.C. § 1001(a)(2). *See* ECF No. 1. Lamond was charged with obstruction of justice for impeding an MPD investigation into the theft and burning of a Black Lives Matter ("BLM") banner in Washington D.C. on December 12, 2020. MPD's investigation indicated that Enrique Tarrio ("Tarrio"), the leader of the Proud Boys, was the person responsible for burning the flag.[1] Lamond's obstruction involved, among other things, tipping Tarrio off to the existence of the warrant for Tarrio's arrest.

Lamond was charged with false statements for lies he told federal law enforcement agents during an interview on June 2, 2022, about his relationship and communications with Tarrio. Specifically, in Count 2, Lamond was charged with lying when he told the agents that his relationship with Tarrio "was more, you know, one-sided with just him telling me, you know what their plans were." In Count 3, Lamond was charged with lying when he told the agents that he had tried to find out information from Tarrio about Tarrio's involvement in the December 12, 2020, destruction of the BLM banner "without tipping him off to the MPD investigation." And, in Count 4, Lamond was charged with lying when he said that he "didn't, you know, inform [Tarrio] that he had an arrest warrant" for Tarrio's participation in the December 12, 2020, destruction of the BLM banner.

Following a bench trial, Lamond was convicted on all four charges with which he been charged, one count of obstruction of justice in violation of D.C. Code § 22-722, and three counts

---

[1] Tarrio was arrested and pled guilty to one count of destruction of property in Superior Court in the District of Columbia for his role in that crime.

of making false statements in violation of 18 U.S.C. § 1001(a)(2). Sentencing is set for April 25, 2025.

## II.    FACTS RELEVANT FOR SENTENCING

During trial, the Government presented the testimony of several witnesses and admitted approximately 100 exhibits into evidence. As this Court found, this evidence proved that Lamond obstructed MPD's investigation into the BLM banner burning and lied about the nature and extent of his communications with Tarrio during an interview with federal law enforcement agents. Specifically, the evidence established the following sequence of events:

### a.    Lamond's Initial Involvement in MPD's Investigation of the Banner Burning

Lamond, then a Lieutenant in charge of MPD's Intelligence Branch of the Homeland Security Bureau, inserted himself into MPD's BLM banner burning investigation even though he had no specific mandate or reason to do so. On December 18, 2020, Lamond emailed Commander Leslie Parsons, who supervised MPD's riot task force; Captain David Hong, who served as a liaison to FBI; and another MPD officer, to ask whether FBI was investigating the banner burning as a hate crime. Gov. Ex. 4018 at 20. A few minutes later, Lamond initiated contact with his supervisor, Sergeant Nicole Copeland, and Commander Parsons and stated, "Please let me know if you need anything related to this. I know him [Tarrio] so I can probably fill in any blanks you may have. I have attached his picture for your awareness." *Id.*

On December 19, 2020, the task force sent Lamond photographs of Tarrio at the banner burning to see if Lamond could positively identify him. *Id.* at 30. In reply, Lamond stated:

> [I]t is difficult for me to *conclusively* identify with 100% certainty that the individual depicted in this photograph is Mr. Henry "Enrique" Tarrio since I cannot see his whole face. However, I physically observed Mr. Tarrio on December 12th and have reviewed multiple videos that captured him on December 12th in Washington, D.C. Based on a comparison of those videos with the attached photograph, I believe this is Mr. Henry "Enrique" Tarrio kneeling down next to the

banner based on the clothing he is wearing, the placement of the patches and the drink on his tactive vest, and the limited view of his face.

*Id.* at 34. The task force then sent Lamond additional photographs. Lamond stated that in one, taken during a march on December 12, it was "100%" Tarrio. *Id.* at 35. With respect to the others, he stated that "believed" it was Tarrio. *Id.* Lamond also wrote:

> I forgot to provide the background on my familiarity with Mr. Tarrio in my previous email. I have known him for almost 1.5 years, since meeting him while working the Demand Free Speech First Amendment event in July 6, 2019. I have seen him in person and spoken with him approx. 5-6 times since first meeting him in July 2019.

*Id.* A couple of days later, on December 22, 2020, Lamond also identified Tarrio's voice on a podcast that Sergeant Copeland sent him through Commander Parsons. Gov. Ex. 4019 at 3.

Detective Ashan Mufti, the lead Detective on the banner burning investigation, also testified that he had a phone call with Lamond, Sergeant Copeland, and an Assistant United States Attorney during which they discussed with Lamond how he knew Tarrio. Based on Lamond's responses, Mufti testified that he understood that Lamond was not still in regular contact with Tarrio. Detective Then, another Detective assigned to help the banner burning investigation, agreed.

### b. Lamond's Undisclosed Contacts with Tarrio

The evidence proved that Lamond had an ongoing relationship with Tarrio, since at least October 2019, *see* Gov. Ex. 4006, but that, consistent with Then and Mufti's testimony, Lamond never disclosed to anyone within MPD the extent of his contacts with Tarrio around the time of the banner burning or during MPD's investigation of it, and when asked, Lamond lied to the federal law enforcement agents about it.

As Detective Then corroborated through his testimony, Lamond led others in MPD to believe that his contacts with Tarrio had always been limited to receiving information about

potential protests or other Proud Boys activity in the District.  In fact, a review of Lamond's contacts with Tarrio – obtained from Tarrio's and Lamond's phones – reveals that in the months leading up to January 6, Lamond had ongoing and regular contacts with Tarrio, *see* Gov. Exs., 4005-4018, 4028, 4029; purposefully moved their contacts from regular text messages to Telegram, an encrypted messaging service, Gov. Ex. 4012; set messages in Telegram to "self-destruct" after Tarrio read them so they would not be recoverable, Gov. Ex. 4019 at 2; and frequently gave Tarrio sensitive law enforcement information, *see e.g.* Gov. Exs. 4018 at 23, 4019 at 3, 4024.

Lamond's and Tarrio's contacts were recovered from Tarrio's phone, which was seized upon his arrest on January 4, 2021. The evidence proved that Lamond purposefully deleted the Telegram chat he used with Tarrio to exchange messages prior to that date.

### c. Lamond Shares Information about the Status of MPD's Banner Burning Investigation with Tarrio and Withholds Information from MPD

Lamond leaked information about the banner burning investigation with Tarrio and withheld information from MPD that directly implicated Tarrio. As proven at trial, Tarrio did not become the primary subject of MPD's investigation into the banner burning until he publicly claimed responsibility on Parler. Gov. Ex. 4004. After the burning and before Tarrio claimed responsibility, however, Lamond got drinks with Tarrio at the Dubliner, a bar located in a hotel near the Capitol on December 15, 2020. *See* Gov. Ex. 4018 at 8. Lamond did not take any other MPD personnel with him and did not document the content of the meeting, even though Lamond later admitted that he knew statements made by suspects should be documented. *See* 12/06/24 Trial Tr. at 70:19-25.  According to Lamond's messages with Tarrio on December 13, 2020, the purpose of the meeting was to answer Tarrio's question about "what's the general consensus with DC metro and my guys?" *Id.* at 5. Tarrio asked this question after Lamond told Tarrio one person had been

arrested for stabbing some Proud Boys members in an altercation that occurred earlier in the evening on December 12, before the burning. *Id.* at 4. The evidence proved that when Lamond and Tarrio met for drinks at the Dubliner, Tarrio confessed to him that he had burned the BLM banner. *Id.* at 11. Lamond never told anyone at MPD about this confession.

On December 18, 2020, Lamond learned of an anonymous tip identifying Tarrio as participating in the banner burning at 7:26am. *Id.* at 14.  Less than 10 minutes later, at 7:34am, Lamond messaged Tarrio on Telegram and asked, "Hey brother, did you call in an anonymous tip to MPD claiming responsibility for the banner burning?" *Id.* at 15. At 9:30am, Tarrio responded, and he and Lamond had the following exchange:

> TARRIO:    I did more than that.  It's on my social media.
>
> LAMOND:   I gotcha.  Someone called in an anonymous tip saying that you claimed responsibility for it.
>
> TARRIO:    This wasn't a hate crime.  And I want to see it play out.
>
> LAMOND:   I'm curious to see what happens too.  I will check with our CID people if they have you on video.

*Id.* at 17. Later the same day, Tarrio asked Lamond what he thought about the banner burning and whether "they'll make a stink of it." *Id.* at 22.  Lamond responded by providing information about MPD's sensitive internal discussions:

> No, a bit of the opposite.  I've been talked to CID about it.  They wanted to know what I know about your group and if I think you all are racist.  I told them you are made up of a lot of Latinos and blacks so not a racist thing.  If anything I said it's political but then I drew attention to the Trump and American flags that were taken by Antifa and set on fire.  I said all those would have to be classified as hate crimes too.  It's not being investigated by FBI though.  Just us (MPD).

*Id.* at 23. After Tarrio responded, "Ahhhh ok!" and "Awesome," Lamond further shared, "I don't think they have any pictures of you though." *Id.* at 24.

The next day, December 19, 2020, Lamond messaged Tarrio, "Police want to talk to you about the banner.  You have a certain phone number you want me to give them." *Id.* at 31. As proven at trial, it was unnecessary for Lamond to ask this question, he was never asked to do so, and he never informed anyone that he did. The evidence proved that Tarrio used this information to consult an associate, who instructed Tarrio how to respond once MPD reached out. *Id.* at 36-37. The next day, when Detective Mufti messaged Tarrio, Tarrio informed him that he was taking the Fifth. Gov. Ex. 4019 at 1.

As demonstrated at trial, beginning on December 22, 2020, Lamond and Tarrio used the Telegram self-destruct feature, meaning any messages would automatically delete from the chat after a certain time once the recipient opened it.  After December 22, 2020, there were only two recovered communications between Tarrio and Lamond. *See* Gov. Ex. 1002. First, on December 25, 2020, Lamond sent Tarrio the following message: "Just a heads up, CID had me ID you from a photo you posted on Parler kneeling down next to the BLM banner so they may be submitting an arrest warrant to US Attorney's Office."  Gov. Ex. 4019 at 3. Second, on December 30, 2020, at 6:34pm, shortly after a signed version of the warrant was sent to Det. Mufti, Lamond, and Tarrio had an approximately 14-minute phone call, made through the Telegram app. Gov. Ex. 4021 at 1.

The evidence also proved that on January 4, 2021, Lamond told Tarrio that the warrant for his arrest had been signed. *See* Gov. Exs. 4024, 4034.

During trial MPD witnesses testified that Lamond never disclosed to MPD personnel involved in the banner burning investigation and Tarrio's arrest that he was providing information about the investigation and arrest to Tarrio. They also testified that Lamond never disclosed that Tarrio had provided him relevant and useful information about the banner burning, including that Tarrio had confessed to burning the banner to him directly. They further testified that had Lamond

been honest about the extent of his communications with Tarrio, the investigation would have moved much faster, been more streamlined, and the risk of harm to the integrity of the evidence would have been much less. They also testified how Lamond's actions risked the destruction of evidence, witness flight, and jeopardized officer safety.

MPD obtained the arrest warrant for Tarrio on December 30, 2020, at 5:56pm, for destruction of property. Gov. Ex. 4021 at 1. Tarrio was scheduled to fly into Ronald Reagan National Airport on January 4, 2021. *See* Gov. Exs. 2001, 2005, 2007, 4024. MPD set up its arrest plan to have plain clothes officers follow Tarrio through the airport, to follow him in a car as he drove into D.C., and to arrest him when he crossed the border from Virginia to D.C.  The government proved at trial that while in flight, Lamond told Tarrio about the warrant. Despite this, Tarrio was arrested without incident.

### d. Lamond Shares Information with Tarrio about other Law Enforcement Activity

In addition to sharing information with Tarrio about the banner burning investigation, Lamond also shared information with Tarrio about other law enforcement activity, including First Amendment Activity. *See e.g.* Gov. Exs. 4016 at 1, 4017 at 4.  While testifying at trial, Lamond admitted to providing Tarrio information related to First Amendment Activity – information he admitted he learned because he was a police officer. *See e.g.*, 12/06/2024 Trial Tr. at 97:19-98:13; 101:25-104:12; 108:4-130:7. Specifically, when asked if he provided Mr. Tarrio with police information about First Amendment activities, Lamond stated: "That's fair to say, yes."

### e. Lamond's Interview and False Statements to Law Enforcement

Lamond lied at least three times to Special Agent in Charge Bryan Molnar and Special Agent Sean Ricardi of the Criminal Investigations Unit of the U.S. Attorney's Office when he was interviewed on June 2, 2022.

First, Lamond lied when he told Agent Ricardi that his relationship with Tarrio "was more, you know, one-sided with just him telling me, you know what their plans were." As described in more detail above, the evidence proved at trial that the conversations between Tarrio and Lamond were not one-sided. As Special Agent Elizabeth Hadley testified, Lamond and Tarrio communicated at least 700 times and Lamond routinely provided Tarrio with information.

Second, Lamond lied when he told Agent Ricardi that he had tried to find out information from Tarrio about Tarrio's involvement in the December 12, 2020, destruction of the BLM Banner "without tipping him off to the MPD investigation." Also described in more detail above, the evidence proved at trial that Lamond routinely tipped Tarrio off about the MPD banner burning investigation, including about whether MPD was investigating the banner burning as a hate crime, Gov. Ex. 4018 at 23, that FBI was not investigating, *id.*, that the police wanted to speak to Tarrio about the banner burning, *id.* at 31, that Lamond was being asked to identify Tarrio in photos, Gov. Ex. 4019 at 3, that MPD was preparing an arrest warrant, *id.*, and that the arrest warrant had been signed, Gov. Exs. 4024, 4034.

Third, Lamond lied when Lamond told Agent Ricardi that he "didn't, you know, inform him that he had an arrest warrant" for Tarrio's participation in the December 12, 2020, destruction of the BLM Banner. As the evidence proved at trial, Lamond informed Tarrio about the warrant for his arrest while Tarrio was on a plane traveling from Miami to the District on January 4, 2024. Gov. Ex. 4024, 4034.

### f. Lamond's Admissions at Trial

At trial, Lamond testified on his own behalf. During his testimony, Lamond admitted that he knew leaking sensitive information to Tarrio was wrong, but that he did it anyway. These admissions include that Lamond knew: 1) Tarrio was the suspect of a crime, 12/06/24 Trial Tr. at

123:24-25, 124:1; 2) deleting communications with the suspect of a crime was wrong, *id.* at 71:1-4, 124:7-10; 3) it was wrong to delete communications with a suspect of a crime because it could impede the investigation, *id.* at 71:5-7, 124:11-13; and 4) setting the self-destruct timer in Telegram automatically deleted the messages in that chat, *id.* at 77:13-78:1. Lamond also admitted 5) that he set his Telegram communications with Tarrio to self-destruct, *id.* at 76:23-25; and, as a result, 6) deleted communications with Tarrio, *id.* at 77:13-78:1, 125:11-14; and 7) that could have impeded the banner burning investigation, *id.* at 71:5-7, 124:11-13. Lamond further admitted that he provided Tarrio with police information about First Amendment Activity and the banner burning investigation, and that he was not authorized to do so. *Id.* at 130:5-21.

g. **Lamond's Obstruction at Trial**

Lamond's testimony at trial was not only full of admissions, but also full of lies intended to deceive this Court and avoid having to take responsibility for his criminal conduct. During his testimony, Lamond continued to spew falsehoods about the nature of his communications with Tarrio, even when confronted with evidence that proved he was lying. For example, Lamond testified that he told Tarrio that MPD had received an anonymous tip indicating Tarrio was responsible for the banner burning, but that he did not think the tip was "of value" because it did not contain witness information. *See id.* at 39:3-23. Given his background in law enforcement, it was clear that Lamond must have known that anonymous tips can have tremendous value for investigative purposes, even without witness information. The evidence at trial, including witness testimony and MPD's general orders, *see* Gov Exs. 3002, 3003, 3005, proved that Lamond, who had 23 years of experience, knew it was not acceptable to provide a suspect of a crime with police information, including the fact that MPD had received an anonymous tip.

As another example of Lamond's false testimony, Lamond testified that he set the self-destruct feature to "mirror" Tarrio's use of Telegram, and that Tarrio had discussed that feature with him. *See id.* at 22:23-5, 23:1-4, 77:1-11. As Agent Hadley testified at trial, however, it was Lamond who first set the self-destruct timer, and Tarrio did not use the self-destruct feature with anyone else. Gov. Ex. 4019 at 2.

As this Court recognized: "Given the [Lamond's] years of experience as an MPD officer, I find his supposedly genuine understanding of his rules, his description and treatment of them as a matter of opinion, open to interpretation, and the interpretation he offered up at trial to be strained and incredible." 12/23/24 Tr. at 70:10-15.

## III.    APPLICABLE LAW

### a.  General Sentencing Principles

For the federal counts of conviction, as the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Once the Court calculates the defendant's advisory Guidelines range applicable to the federal counts of conviction, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). To make this determination, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a

preponderance of the evidence, including evidence not presented to the jury, without regard to the rules of admissibility at trial, subject to basic principles of reliability. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); and the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B).

A similar process drives determination of the sentence for Count 1, the D.C. code offense. For such violations, the court must begin by referencing the D.C. Voluntary Sentencing Guidelines. Though voluntary, the D.C. Sentencing Commission anticipates that most defendants will be sentenced to a guideline sentence. This is because, like the federal guidelines, the D.C. guidelines are formed with the "bedrock principle" that "like offenses/defendants should be sentenced alike." *See* District of Columbia Sentencing Guidelines Manual at § 5.2.1 (2023). And though the D.C. guidelines are voluntary, a judge departing from the applicable guideline range must state the reasons for the departure on the record and communicate the reason for any departure to the D.C. Sentencing Commission. *Id.*

Just as federal law (*i.e.*, § 3553) mandates certain factors that the Court must consider when determining the sentence for the federal offense, the D.C. Code includes a set of factors that must be considered when determining the sentence for the D.C. Code offense. *See* D.C. Code § 24-

403.01(a). Those D.C. statutory factors mirror the U.S. Code factors, in-part and include: the seriousness of the offense and the criminal history of the offender; the need to provide just punishment and afford adequate deterrence; and providing the offender with needed educational or vocational training, medical care, and other correctional treatment. *Id.*

### b. Interplay Between the D.C. Code and Federal Offenses

When a defendant is facing sentencing in federal court for both federal and D.C. Code violations – as the defendant is here – the Court should use the D.C. Voluntary Sentencing Guidelines to determine a guidelines range for the D.C. Code offenses and the U.S. Sentencing Guidelines to calculate guidelines for the federal crimes. *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016) (holding that "the federal Sentencing Guidelines do not apply to the sentencing of D.C. offenses. . . . Likewise, the D.C. Voluntary Sentencing Guidelines do not apply to the sentencing of federal offenses"). Once these guidelines are properly calculated, "how a court is to relate a [federal] Guidelines sentence to a non-[federal] Guidelines sentence is a matter of discretion" for the sentencing court. *Id*. This is because "neither set of guidelines addresses whether sentences for federal offenses should run consecutively or concurrently to the D.C. Code offenses when a defendant is convicted of both." *Id*. Accordingly, the Court here has discretion to fashion a sentence that accounts for both sets of guidelines.

### IV.    SENTENCING GUIDELINES

Lamond was found guilty of one count of obstruction of justice in violation of D.C. Code § 22-722, and three counts of making false statements in violation of 18 U.S.C. § 1001(a)(2).  A violation of D.C. Code § 22-722 is punishable by no less than three years and not more than 30 years. A violation of § 1001 constitutes a felony offense punishable by a maximum of five years imprisonment.

The Government agrees with Probation that for Count 1, pursuant to the D.C. Voluntary Sentencing Guidelines, Lamond's guidelines range is 36 to 84 months. And the Government agrees with Probation that the applicable sentencing guidelines for the three violations of 18 U.S.C. § 1001(a)(2) in Counts 2 through 4 are:

| Guideline | Description | Offense Level |
|-----------|-------------|---------------|
| § 2B1.1(a)(2) | Base Offense Level | 4 |
| § 3B1.3 | Abuse of Position of Trust or Use of Special Skill | 2 |
| § 3C1.1 | Obstructing or impeding the administration of justice | 2 |
| **Total** | | **8** |

The two-point enhancement under § 3C1.1 is applicable specifically because of Lamond's false testimony at trial. And Lamond patently abused a position of trust as contemplated by § 3B1.3 by leaking sensitive law enforcement information to a subject of a criminal investigation without any authority or any legal or factual basis to do so beyond his own agenda.

## V.    THE APPROPRIATE SENTENCE

To determine an appropriate sentence, after the Court accurately calculates each Defendant's advisory Guidelines range, it should consider the various factors set forth in 18 U.S.C. § 3553(a) (for the federal offenses) and D.C. Code § 24–403.01 (for any D.C. code offense). As noted above, the § 3553(a) factors include the nature and circumstances of the offense, the history and characteristics of the Defendant; and the need for the sentence to promote respect for the law, just punishment, and adequate deterrence. 18 U.S.C. § 3552(a). Similarly, D.C. Code § 24–403.01 requires this Court to impose a sentence that (1) reflects the seriousness of the offense and the criminal history of the offender; (2) provides for just punishment and affords adequate deterrence

to potential criminal conduct of the offender and others; and (3) provides the offender with needed educational or vocational training, medical care, and other correctional treatment.

The United States submits that considering these factors, a sentence of 48-months imprisonment is appropriate and not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). The United States also submits that the imposition of 60 months of supervised released, a $10,000 fine, and a $400 special is appropriate.

### a.  The § 3553(a) Factors

#### i.  The Nature and Circumstances of the Offense Support a Significant Term of Imprisonment

The nature and circumstances of Lamond's offense support a term of 48-months imprisonment. Lamond's conduct from the inside of MPD is an egregious way to obstruct an investigation and to mislead colleagues.  Lamond was an experienced MPD Lieutenant whose job required him to uphold the law. Instead, he violated the public trust. This conduct must be taken seriously. Lamond leaked sensitive law enforcement about the BLM banner burning investigation to Tarrio, the main suspect of that investigation, withheld evidence from the investigative team and his superiors that would have brought Tarrio to justice sooner, and repeatedly lied about his ongoing relationship with Tarrio.

Lamond's actions jeopardized the integrity of the BLM bannering burning investigation, threatened the safety of the officers involved, and undermined the public's trust in the District's police force. And after, Lamond repeatedly lied – first to Federal Agents and then to this Court – to cover up his own criminal obstruction. The significance of this attempted coverup cannot be understated: despite being a sworn member of law enforcement, Lamond's reaction was to cover up the facts and protect himself at the expense of his fellow officers and the public. This emphasizes Lamond's callous disregard for his responsibilities as a law enforcement officer.

Lamond willfully ignored his duties, choosing to take steps to help Tarrio, rather than take steps to help his colleagues bring Tarrio to justice. Thus, the nature and circumstances of the offense warrant a term of 48-months imprisonment.

### ii. Lamond's History, including Criminal History, and Characteristics Support a Term of Imprisonment

Lamond's background does not support a lesser punishment. Lamond's status as an officer – a 23-year veteran – and his purposeful neglect of the responsibility and honesty that position mandates, requires the opposite. First, it is by the very fact of his position as an MPD officer that he was able to commit these crimes. He used his position as a Lieutenant with MPD's Intelligence Branch to insert himself into the banner burning investigation. However, as the evidence proved at trial, he inserted himself not to be helpful to MPD, but to be helpful to Tarrio, who admitted to Lamond that he committed the offense – a fact the Defendant did not tell anyone at MPD. All the while Lamond was pretending to support the investigation, he was carefully curating what information he provided his chain of command – providing just enough to appear helpful, while withholding information that directly implicated Tarrio. Lamond was able to help Tarrio only because of his job as an MPD Lieutenant. That Lamond worked in a position of public service and public trust does not weigh in favor leniency, but rather was plainly an abuse of a position of trust as contemplated by U.S.S.G. § 3B1.3 and supports a term of 48-months imprisonment.

### iii. The Need for the Defendant's Sentence to Reflect the Seriousness of the Offense and Promote the Rule of Law Supports a Term of Imprisonment

Lamond's sentence must also reflect the seriousness of the offense to promote rule of law, to provide just punishment, and to provide adequate deterrence. Law enforcement officers are a central part of maintaining the rule of law in this country. Lamond's crimes did significant damage to the credibility of law enforcement generally – and MPD specifically – in carrying out this

essential role. As the evidence presented at trial made clear, Lamond used his position as a high-ranking police official, and deliberately disregarded his duties, to help someone who confessed to committing a crime. This abuse of police power threatened the integrity of a criminal investigation, delayed justice, and risked officer safety. Conduct like this erodes the public trust in law enforcement. A sentence of 48-months imprisonment sends the messages that no one, including MPD officers, is above the law.

### iv.  The Need for Just Punishment and Adequate Deterrence Supports a Term of Imprisonment

A sentence of 48-months imprisonment will also provide deterrence. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). The requested sentence will serve both here.

With regard to specific deterrence, although Lamond admitted to his criminal conduct when he was cross-examined, he never expressed any remorse for his crimes. Indeed, the Defendant did quite the opposite at trial when he repeatedly lied to this Court and attempted to justify his actions. Lamond's obvious disregard for honesty and integrity suggest that he would reoffend.

With regard to general deterrence, a term of 48-months imprisonment will deter other law enforcement officers from abusing their position of trust and obstructing justice. Lamond's actions here – obstructing justice and lying to cover up his actions – erodes the faith the public has in the District's police force and demands a level of deterrence that conveys that this type of abuse of police power will have serious consequences.

### b. D.C. Code § 24–403.01 requirements

A sentence of 42-months imprisonment on Count 1 further (1) reflects the seriousness of the offense and the criminal history of the offender; (2) provides for just punishment and affords adequate deterrence to potential criminal conduct of the offender and others; and (3) provides the offender with needed educational or vocational training, medical care, and other correctional treatment, as required by D.C. Code § 24–403.01. Although Lamond does not have any prior criminal history, he abused his position of trust, jeopardized the integrity of an ongoing police investigation, and risked officer safety. Lamond broke the law for his own personal gain, placing his interests ahead of the interests of the public. He was an experienced member of MPD, with a college degree and the support of family and friends. He knew what he was doing broke the law, but he chose to do it anyway. For these reasons, and those discussed in more detail above, the proposed sentence of 42-months imprisonment on Count 1 satisfies the sentencing requirements set forth in D.C. Code § 24–403.01. And, importantly, the sentence recommended by the Government and Probation will also avoid unwarranted sentencing disparities. A review of 39 recent sentences imposed in D.C. Superior Court for offenders convicted of a violation of D.C. Code § 22-722 indicate that 37 received a term of imprisonment, with an average term of imprisonment of just over 49 months.[2] Lamond's violation of § 22-722 did not involve threats or the use of violence to obstruct justice, but Lamond's actions were deliberate and calculating and intended to help the perpetrator of a crime at the expense of justice.

---

[2] The sentencing data reviewed by the Government is published by the D.C. Sentencing Commission and available at https://scdc.dc.gov/page/2023-datasets.

## VI.    FINE

For Count 1, obstruction of justice in violation of D.C. Code § 22-722, the maximum fine is $75,000. *See* 22 DDC § 3571.01(b)(10). For Count 2 through 4, the false statement counts in violation of 18 U.S.C. § 1001, the maximum fine is $250,000. At offense level 8, the fine range for this offense is $2,000 to $20,000. In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In considering these factors, as Probation has detailed, *see* ECF No. 102 at ¶¶ 141-48, Lamond has the resources to pay a fine. As such, the Government is asking this Court to adopt Probation's recommendation and order Lamond to pay a $10,000 fine.

## VII.    FORFEITURE, RESTITUTION AND SPECIAL ASSESSMENT

The Government is not seeking forfeiture and is not seeking restitution. In this case, a special assessment of $100 is mandatory for each count for a total of $400. *See* 18 U.S.C. § 3013(a)(2)(A).

## VIII.    CONCLUSION

Lamond's conduct must not be taken lightly. Our government cannot function properly when the trusted law enforcement officers violate the public trust by disregarding the laws they have sworn to uphold and then lie the evade responsibility. The Government asks the Court to impose a sentence of six-months imprisonment.

//

//

//

//

//

Respectfully submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY
D.C. Bar No. 5590666

Jonathan R. Hornok
Chief, Criminal Division, U.S. Attorney's Office

*/s/ Rebecca G. Ross*
Rebecca G. Ross
N.Y. Bar Number 5590666
Joshua S. Rothstein
N.Y. Bar Number 4453759
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 2053
Office: 202-252-7164 (JSR), 202-252-6937 (RGR)
Rebecca.Ross2@usdoj.gov
Joshua.Rothstein@usdoj.gov

## CERTIFICATE OF SERVICE

Rebecca G. Ross, attorney for the United States, hereby certifies that a true and correct copy of this memorandum has been electronically filed and accordingly served upon attorney for the defendant.

/s/ Rebecca G. Ross
Rebecca G. Ross